## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FINTECH LEADERS FUND, LLC,

Plaintiff,

v.

No. _____

CRAIG MYLES COGUT, DEBORAH
CHARLOTTE COGUT, DAVID HAROLD
COGUT, and PEGASUS CAPITAL
ADVISORS, LP,

**Jury Trial Demanded**

Defendants.

## COMPLAINT

Plaintiff, Fintech Leaders Fund, LLC ("**Plaintiff**" or "**FLF**"), by and through its undersigned counsel, Greenspoon Marder LLP, respectfully submits this Complaint against Defendants Craig Myles Cogut ("**Craig**"),[1] Deborah Charlotte Cogut ("**Deborah**"), David Harold Cogut ("**David**"), and Pegasus Capital Advisors, LP ("**Pegasus**," and with Craig, Deborah, and David collectively, "**Defendants**"). Plaintiff alleges as follows:

## PRELIMINARY STATEMENT

1. By this action, Plaintiff seeks to hold Defendants accountable for damages caused by Defendants' misconduct, including: (1) violations of the Racketeer Influenced and Corrupt Organizations Act ("**RICO**"), 18 U.S.C. §§ 1961 *et seq.*, (2) engaging in a conspiracy to violate RICO, (3) fraud, (4) negligent misrepresentations, (5) aiding and abetting fraud, (6) tortious interference with contract, (7) civil conspiracy, and (8) unjust enrichment.

---

[1] Because multiple Defendants have the same last name, first names are used to distinguish among them.

2.      This case arises from the acts of Craig and David (together, the "**Coguts**"), along with their United States Securities and Exchange Commission ("**SEC**")-registered investment manager, Pegasus (with Craig and David, "**Manager Defendants**"), who implemented a scheme to secure substantial amounts (potentially, hundreds of millions or even billions of dollars) in public and private funding by, upon information and belief, fraud and bribery, among other means (the "**Scheme**").

3.      The Scheme targeted, among others, the Green Climate Fund ("**GCF**"), the Barbados Government, the United States Agency for International Development ("**USAID**"), the International Monetary Fund ("**IMF**"), the Rockefeller Foundation, and the Inter-American Development Bank ("**IDB**," and with GCF, the Barbados Government, USAID, IMF, and the Rockefeller Foundation, the "**Other Victims**").

4.      Manager Defendants' Scheme included a plan to deceptively market and promote a publicly traded company in the UK, then called Tintra Plc ("**Tintra**"), to serve their own business purposes.  The Scheme involved the following:

(a)      From no later than the fall of 2021, Manager Defendants sought to take advantage of two business opportunities.  The first opportunity was to establish, set-up, and manage an innovative Blue Green Bank ("**BGB**") in Barbados (the "**Barbados BGB**"), for the Barbados Government.  The Other Victims, led by GCF, would provide $30.5 million in capital for the Barbados BGB.  The Barbados BGB was to focus on certain environmental, social, and governance ("**ESG**") objectives, particularly climate change mitigation.  The second opportunity was to capitalize on the SPAC (special purpose acquisition company) craze then sweeping the financial markets using a newly minted, NASDAQ-listed SPAC called 7 Acquisition Corporation (the "**SPAC**"), which was controlled and chaired by Craig and sponsored by his company 7 Acquisition Holdings, LLC (the "**Sponsor**").

(b)      Both opportunities had the potential to be very lucrative for Manager Defendants.  But to be selected to establish and manage the Barbados BGB, Manager Defendants needed to demonstrate to GCF and the Barbados Government that Manager Defendants had the capability and the technology to build a novel, ESG-focused bank.  For the NASDAQ-listed SPAC, Craig and

the Sponsor needed to identify an attractive, high-growth company, which also met narrowly defined ESG criteria, as a suitable acquisition target.

(c) To exploit both opportunities using a single entity, Manager Defendants gained control of Tintra. Manager Defendants then proceeded to greenwash and artificial intelligence ("**AI**")-wash Tintra, or caused it to be greenwashed or AI-washed, to deceptively (1) hold it out as a provider of unique AI banking technology that would purportedly enable Manager Defendants to roll out the Barbados BGB and (2) position Tintra as a suitable target for the SPAC to acquire. Manager Defendants knew that Tintra's valuation was too low for Tintra to be acquired by the SPAC, so the Cogut Family invested in Tintra on terms to manipulate Tintra's valuation upwards to a level suitable for an acquisition by the SPAC. They did so despite knowing that Tintra had no substantive business, technology, or product and was not developing (and could not develop) such business, technology, or product.

(d) By their Scheme, Manager Defendants, together with others, did successfully deceive the Other Victims and obtain control and management of the Barbados BGB and funding from the Other Victims, including $5 million committed by USAID in about early 2023 and $15.5 million committed by GCF in July 2023.

(e) During the execution of the Scheme, Defendants, together with Tintra, its Chief Executive Officer Richard Shearer ("**Shearer**"), its director Vanessa Neumann ("**Neumann**"), and LRB35 Limited ("**LRB**") (a company co-controlled by Defendants), also deceived Plaintiff. First, Manager Defendants, Tintra, Shearer, and Neumann duped Plaintiff out of a $3 million loan in December 2022. Then, Manager Defendants induced Tintra to repeatedly breach the terms of its agreement with Plaintiff, causing additional damage to Plaintiff. When Plaintiff attempted to enforce its rights, Defendants, Tintra, Shearer, Neumann, LRB, and others mounted a concerted campaign of concealment and deceit, causing Plaintiff millions of dollars in additional injury.

(f) During the Scheme, Manager Defendants also used Tintra to serve their other business ends, including—upon information and belief—as an illicit cut-out for making payments to members of families of foreign public officials.

5.    The Scheme began in or about the fall of 2021. By then, upon information and belief, following a string of unsuccessful investments and a substantial decline in Pegasus' assets under management, Pegasus' legacy business—private equity—had deteriorated substantially.

6.    The decline in business left Manager Defendants almost entirely dependent on a single investor, GCF, for capital. GCF is a multi-billion dollar, United Nations-affiliated,

intergovernmental body tasked with funding climate action in developing countries.  Between 2014 and 2023, the United States Government committed a total of six billion dollars to GCF.

7.    Manager Defendants cultivated relationships with GCF and its current and former officials.

8.    Manager Defendants' courting of GCF paid off.  GCF showered Manager Defendants with hundreds of millions of dollars in funding for their funds and projects, committing a total of approximately $335 million to four funds or projects managed or sub-managed by Manager Defendants and their entities.  As of December 31, 2024, GCF had handed more than $140 million of those commitments over to Pegasus' and its affiliates' funds and projects, had committed to pay over $10 million in fees to Pegasus and its affiliates, and had paid Pegasus and its affiliates more than $8.3 million in fees.

9.    Certain senior executive officers at GCF ("**GCF's Executive #1**" and "**GCF's Executive #2**") were key capital allocation decision-makers at GCF at the relevant times.  During GCF's Executive #1's tenure at GCF, GCF committed over $200 million to funds or projects managed or sub-managed by Manager Defendants and their entities.

10.    Upon information and belief, the flows of funds and benefits between Manager Defendants and GCF's Executive #1 have not all been one-way.  GCF's Executive #1, upon information and belief, entered into an undisclosed fee arrangement with, and received undisclosed benefits from, Pegasus.  Upon information and belief, those fees were paid or promised to be paid by Manager Defendants directly or by their funds or those funds' portfolio companies.

11.    Upon information and belief, Manager Defendants have put a similar arrangement in place with another individual, a former "founding board member" of GCF ("**GCF's Executive #3**").

12.     In 2021, Manager Defendants became involved in another project expected to be funded by GCF—the Barbados BGB.  The Barbados BGB was to be established with $30.5 million in funds provided by the Other Victims, led by GCF (with a $15.5 million commitment), USAID (with a $5 million commitment), and the Barbados Government.  GCF sought to identify a party to manage and use that funding to set up the Barbados BGB (including its systems and technology) and to control and operate the Barbados BGB.

13.     The Barbados BGB was a further opportunity for Manager Defendants to leverage their relationships with GCF and its current and former officials to have Pegasus appointed to set up, control, and operate the Barbados BGB and its capital.

14.     Through the Barbados BGB, Manager Defendants planned to control over $200 million in assets and become involved in at least $5.8 billion in investments in climate projects over the course of 15 years.

15.     To that end, in or about April 2022, Pegasus formally commenced the application process with GCF for eventual control of the Barbados BGB and the $30.5 million in funding.

16.     Serving as the controller of the Barbados BGB would also give Manager Defendants a pathway to potentially securing control over other contemplated projects modelled on the Barbados BGB, which would place hundreds of millions, and potentially billions, in additional dollars under Manager Defendants' control.

17.     However, upon information and belief, Manager Defendants had no expertise, capability, or technology to build any bank, much less the innovative, digital bank focused on ESG objectives that the Barbados Government and GCF wanted to establish.  Upon information and belief, Manager Defendants also had no relevant experience investing in or managing that type of bank or banks generally.

18.    To deceive the Other Victims into believing that Pegasus could develop the Barbados BGB for them, Manager Defendants turned to Tintra, a micro-cap company publicly traded in the United Kingdom.  Tintra was (and at all relevant times remained) a distressed "shell" listed on the AIM Market of the London Stock Exchange (the "**LSE**").  It had no substantive business, technology, or product.

19.    Between in or about October 2021 and March 2022, Craig, his wife Deborah, and Craig's son and business partner David (Craig, David, and Deborah collectively, the "**Cogut Family**") invested $2.25 million in Tintra, and Manager Defendants obtained effective control of Tintra.

20.    Upon information and belief, Manager Defendants directed and/or caused Tintra, Shearer, and Neumann to—although Tintra had no banking product, technology, or banking expertise and although Manager Defendants knew that Tintra was a mere "shell"—embark on an extensive, deceitful, and public promotional campaign beginning no later than the fall of 2021. The goal of that campaign was to convincingly portray Tintra as a legitimate, cutting-edge company with AI banking technology and an ESG focus (particularly on "financial inclusion" in the "emerging markets").  The public repositioning campaign would enable Tintra to be presented as the (in Pegasus' words to GCF) "suitable provider" of banking technology and systems to the Barbados BGB.

21.    By that promotional campaign, Manager Defendants, Tintra, Shearer, and Neumann successfully and deceitfully repositioned Tintra as a purported rapidly developing, innovative, cutting-edge, and "culturally-relevant" AI banking technology company that was focused on "financial inclusion" for "the unbanked" and "the global South," that was "different" from traditional banks, and that was itself a "bank."  Upon information and belief, not coincidentally,

those descriptions conformed both to the Barbados Government's stated vision for the Barbados BGB and to Pegasus' submissions to GCF for the funding for the Barbados BGB. In reality, the promotional campaign was "AI washing."

22.    In March 2022, once Tintra completed the initial phase of its deceitful repositioning campaign to create a public record of its purported business, the Cogut Family directly or indirectly invested $2.25 million in Tintra.

23.    The Cogut Family, Tintra, and Shearer contrived the terms of that investment, upon information and belief, in contemplation of the potential sale of Tintra to the SPAC, specifically by inflating Tintra's valuation to meet the SPAC's requirements for the minimum size of its acquisition target. The investing Defendants' identities were not disclosed to the public.

24.    Soon after, in or about April 2022, Pegasus submitted its first application to GCF. Manager Defendants, upon information and belief, crafted that application so that Tintra could be brought into the Barbados BGB project as the "suitable provider" that would purportedly build the Barbados BGB's banking systems.

25.    Under Manager Defendants' direction, throughout 2022 and 2023, Tintra worked to help Manager Defendants secure control of the Barbados BGB. Privately, Manager Defendants held out Tintra to the Other Victims as a business that would be the "suitable provider" of the Barbados BGB systems and, upon information and belief, held out Shearer as (in Craig and Pegasus' words) a "leader[] from the banking and insurance industry."

26.    Manager Defendants and Tintra's joint efforts included preparing extensive documentation, which deceitfully described how Pegasus would set up the Barbados BGB using Tintra's non-existent banking technology and systems. Upon information and belief, Manager Defendants provided that documentation to the Other Victims. Manager Defendants also brought

Shearer to meetings with key decision-makers of the Other Victims to support Manager Defendants' sales pitch.

27.    Throughout 2022 and 2023, Tintra continued its campaign of publishing false and/or misleading announcements—even timing its announcements to support Pegasus' submissions to GCF and to parrot public pronouncements by the Barbados Government—to enable Pegasus to present itself as having the capability to roll out the Barbados BGB using Tintra.

28.    Upon information and belief, Manager Defendants knew and were told that Tintra was a fraud and that Tintra did not have and could not produce any banking technology. Tintra had very few employees, only one employee with banking experience, and none with relevant technical experience. That one employee with banking experience—who was not hired until April 2023, over a year *after* Tintra claimed to possess banking technology—was among those who described Tintra as a sham.

29.    Yet, Manager Defendants pushed ahead.

30.    The Scheme was ultimately partially successful. First, upon information and belief, in about early 2023, USAID contracted with Pegasus to set up the Barbados BGB, and to fund $5 million for the bank's set-up. In July 2023, GCF followed suit, approving Pegasus' application for another $15.5 million. In September 2023, Tintra, Pegasus, and Craig publicly announced that Pegasus would use Tintra to set up the Barbados BGB's banking systems even though by then Tintra was insolvent and had discontinued what little operations it had.

31.    Securing control over the Barbados BGB was not enough for Manager Defendants. The Scheme also had another objective.

32.    In November 2021, Craig and the Sponsor controlled by him established the SPAC.

33.    Pursuant to its offering documents, the SPAC had 18 months (i.e., until sometime in April 2023) to consummate an acquisition of a target company that met certain criteria.  If the SPAC consummated an acquisition before that deadline, Craig and the Sponsor stood to gain tens of millions of dollars, including obtaining a 20% ownership stake (worth approximately $40 million in the SPAC at the time of the SPAC's initial public offering).  If the SPAC failed to consummate an acquisition, Craig would not only fail to make those gains but also lose an initial, almost $8 million, investment in the SPAC.  And, if the SPAC acquired Tintra at an attractive valuation, the Cogut Family could exchange their shares in Tintra for cash and/or shares in the SPAC, potentially gaining millions of dollars more.

34.    Tintra's public repositioning campaign described Tintra in terms that conformed to the acquisition criteria set forth in the SPAC's offering documents, upon information and belief, to position Tintra as a suitable acquisition target for the SPAC.

35.    Manager Defendants also made use of Tintra in other important respects.

36.    Manager Defendants used Tintra, upon information and belief, as a "cut-out" to make illicit payments to third parties.  Among other things:

   (a)    From 2021, Manager Defendants were doing or seeking to do business in Rwanda through Global Subnational Climate Fund SCSp ("**SNCF**") and the CRAFT Fund.  After Manager Defendants became involved with Tintra, it announced that it was purportedly working on setting up a financial institution in Rwanda.  In about late 2022 or early 2023, Tintra hired Brian Cyizere Kagame ("**Brian**"), a son of the President of Rwanda and a brother of a board member of the Rwanda Development Board (the "**RDB**"), for a "no-show" job, upon information and belief, to attempt to improperly influence Brian's father and brother to advance business opportunities for Manager Defendants in Rwanda.

   (b)    Upon information and belief, from no later than late 2022 or early 2023, Manager Defendants or their related funds were seeking funding from the British Government.  In about January 2023, Tintra hired a stepson of a Minister in the British Government ("**UK Minister**"), upon information and belief, seeking to improperly influence his stepfather to advance Manager Defendants' interests in the UK.  UK Minister was responsible for "[c]lean growth" in the

UK and the British Government's "Green finance strategy." Three months later, the grant arm of one of Manager Defendants' funds received a commitment of £24 million (approximately $29.5 million) in funding from the British Government's Blue Planet Fund.

(c)    Manager Defendants directed and/or caused, during the 2021 to 2023 period, Tintra to spend a substantial amount of money and other resources on the Cogut Family's business and personal interests.

37.    Plaintiff became another of the Scheme's victims. In late 2022, Tintra needed cash, so Tintra, Shearer, and Neumann deceived, and upon information and belief, were caused and/or directed by Manager Defendants to deceive, Plaintiff into entering into an agreement with Tintra (the "**Agreement**") to loan it $3 million, convertible into Tintra's publicly traded equity, duping Plaintiff out of the $3 million loan. Plaintiff was unaware of Tintra being a sham, the Scheme, or the Barbados BGB. Plaintiff was deceived into believing that it was lending money to a cutting-edge, AI-driven, banking technology business with strong prospects, by extensive false and/or misleading representations.

38.    Upon information and belief, within days of Tintra having extracted $3 million from Plaintiff, Tintra breached the Agreement by using a substantial portion of those funds to repay overdue third party debts, which was specifically prohibited by the Agreement. Upon information and belief, Manager Defendants caused and/or directed Tintra to use those funds to repay those debts.

39.    In early 2023, Plaintiff sought a partial conversion of its loan into Tintra's stock. Issuing shares to Plaintiff at the uninflated price determined under the Agreement would have, upon information and belief, among other things, undermined Manager Defendants' efforts to position Tintra as having the much higher valuation it needed to have to qualify for an acquisition by the SPAC.

40.     Manager Defendants directed and/or caused, in January 2023 and again in March 2023, Tintra to breach the Agreement by refusing to issue Plaintiff the shares.

41.     Instead, in April 2023, upon information and belief, Manager Defendants directed and/or caused Tintra to notify Plaintiff that it wished to repay Plaintiff's loan in cash at a premium, as provided for in the Agreement, in an amount equivalent to approximately $3.5 million. The cash repayment notice was accompanied by a bank statement as proof of funds. That bank statement was falsified. Tintra did not have the cash to repay Plaintiff. Unaware, Plaintiff accepted the cash repayment notice, forgoing its right to convert its loan into Tintra's publicly traded stock.

42.     The right to convert the loan into Tintra's stock was very valuable to Plaintiff. First, it provided Plaintiff with an avenue to realize its loan in the absence of cash repayment. Second, it entitled Plaintiff to be issued shares in Tintra at a substantial discount to market, providing Plaintiff with an opportunity to make substantial, multi-million-dollar gains on the loan.

43.     After having deprived Plaintiff of its right to convert the loan into Tintra's stock, Tintra failed to pay the amount it owed Plaintiff.

44.     In April 2023, Plaintiff actively sought to enforce its contractual rights, which put Tintra at the risk of bankruptcy, Manager Defendants at the risk of losing control of Tintra, and Manager Defendants' misconduct at the risk of being revealed to the public. But Manager Defendants had already, upon information and belief, brought Tintra into the Barbados BGB project, for which their application was still pending.

45.     To stall Plaintiff, throughout 2023, Tintra and Shearer convinced Plaintiff, upon information and belief, as directed and/or caused to do so by Manager Defendants, that Tintra could pay and intended to pay its obligations to Plaintiff, if only Plaintiff would give Tintra more time to do so. In reality, upon information and belief, Manager Defendants were playing for time

to obtain approval from GCF of the Barbados BGB application without the true state of affairs at Tintra becoming known.

46.    As part of those efforts, Craig, Deborah, and David wired funds (a total of $214,000) as part-payment towards Tintra's $3.5 million debt and made further false and/or misleading representations directly to Plaintiff.

47.    Then, in April to June 2023, Defendants agreed with Tintra and Shearer that the Cogut Family would (1) wire $1.2 million to Tintra to deceive Plaintiff into believing that Tintra had the cash to repay Plaintiff but then (2) not release their cash to Plaintiff and, instead, return it to them once Plaintiff had been deceived.  To deceive Plaintiff, Defendants, Tintra, and Shearer caused Tintra's UK counsel to misrepresent to Plaintiff that Tintra had sufficient cash to settle with Plaintiff if Plaintiff were to negotiate a settlement with Tintra.  Those settlement talks bought Defendants time.

48.    Craig and Deborah subsequently admitted and detailed the deceit involved in the $1.2 million wire transfer scheme in a lawsuit they filed in May 2024 against Tintra and Shearer in England (the "**UK Complaint**"), a copy of which is attached as **Exhibit A.**

49.    Plaintiff was deceived, as Defendants—working with Tintra and Shearer—intended.

50.    In early July 2023, lulled into a false sense of security by Defendants' deceit, Plaintiff entered into a Settlement Deed with Tintra (the "**Settlement Deed**").  Under the Settlement Deed, Tintra agreed to pay a small amount on execution, and Plaintiff agreed that Tintra could pay the remaining debt (approximately $3.2 million) about one month later.  By deferring payment and thereby delaying Plaintiff's enforcement of its rights, Manager Defendants gained

more time to obtain GCF's approval of Pegasus' application for the Barbados BGB. In the following month, GCF granted that approval.

51.    By the end of August 2023, unbeknownst to Plaintiff and the public, Tintra had effectively collapsed. It could not and would never again make its full payroll, and its few employees had stopped coming into its office. And according to Craig and Deborah, Tintra by then owed them the $1.2 million that Defendants and Tintra had used to deceive Plaintiff.

52.    But Tintra had to appear to remain viable longer to pass GCF's due diligence for Manager Defendants to obtain the funding GCF had just approved. Manager Defendants thus engaged in another deceitful delay tactic: in early September 2023, Tintra abruptly announced a purported cash takeover of Tintra, at a substantial premium to market, by the newly formed entity, LRB. Tintra and LRB publicly hyped the "takeover" process and Tintra's bona fides.

53.    LRB was, upon information and belief, controlled by Manager Defendants and the Cogut Family's company CFP Fintech, LLC ("**CFP Fintech**"), together with Tariq Al-Abdulla ("**Al-Abdulla**"), a Qatari businessman with whom, upon information and belief, Shearer and David had a relationship.

54.    Upon information and belief, neither LRB nor Defendants ever intended to complete or even formally commence the "takeover." Instead, Defendants were simply buying more time for Tintra and preventing the public, Plaintiff, and the Other Victims from discovering that Tintra was an insolvent sham and preventing the Other Victims from discovering that Tintra was incapable of providing the technology and expertise necessary to establish the Barbados BGB.

55.    While the spoof takeover was purportedly pending, Manager Defendants were able, in New York, on September 20, 2023, to host "an intimate dinner" for executives and representatives of the Other Victims tasked with decision-making in relation to the Barbados BGB

funding and other allocations of funding to Pegasus and its affiliates.  At that dinner, which Shearer attended at Manager Defendants' direction, Manager Defendants continued to deceitfully hold Tintra and Shearer out as leaders in banking.

56.    On September 25, 2023, Tintra *publicly* announced its "partnership" with Pegasus for the Barbados BGB.

57.    By the spoof takeover, the announcement of Tintra's partnership with Pegasus, and multiple other false and/or misleading representations made, or caused to be made, to Plaintiff by various Defendants, Plaintiff was convinced that Tintra would be able to, and would, pay its debts and prosper, so Plaintiff entered into an Amendment Deed with Tintra in November 2023 (the "**Amendment Deed**").

58.    Under the Amendment Deed, Plaintiff agreed to defer Tintra's payment of its debt for another month.

59.    That additional month provided Manager Defendants, Tintra, and Shearer with time to conceal the Scheme by removing Tintra from the public eye.  In December 2023, Tintra was abruptly delisted from the LSE, in breach of the Agreement, and in January 2024, over Plaintiff's objections and in yet another breach of the Agreement, Tintra reregistered as a private company, avoiding the public disclosure requirements Tintra had as a public company.

60.    In June 2024, out of the limelight, the newly private Tintra slipped into liquidation. Yet because Manager Defendants remained tied to Tintra in the eyes of the Other Victims, Manager Defendants continued to publicly maintain their association with "Tintra" and Shearer.  To that end, Manager Defendants continued using the "Tintra" brand.  LRB was renamed "Tintra AI Limited" on January 16, 2024, and on January 18, 2024, Craig formally became a director of Tintra AI.  In short, Manager Defendants "swapped out" Tintra, which was in liquidation, for Tintra AI.

61.     In early 2024, Pegasus listed Shearer as a "Strategic Advisor" to Pegasus on its website, and it continued to do so until about April 2024.  Upon information and belief, from the outset of the Scheme, Shearer operated as Manager Defendants' subordinate, and Manager Defendants effectively controlled Shearer and treated him as their subordinate.

62.     Pegasus continued to maintain a false and/or misleading, glowing description of Tintra's non-existent business on Pegasus' website until sometime in about May 2024, a short time before Tintra entered liquidation, the UK equivalent of bankruptcy.

63.     On July 25, 2024, Pegasus completed one of the key objectives of the Scheme—securing control over the Barbados BGB and the millions of dollars committed by the Other Victims to it.  That day, GCF entered into an investment agreement with Pegasus for GCF's $15.5 million investment in the Barbados BGB.

64.     Plaintiff, on the other hand, never recovered the proceeds of the loan or the amounts owed to it under the Settlement Deed and the Amendment Deed, never received the interest owed to it or the stock it was entitled to receive when it sought to convert the loan, lost its right to convert the loan into Tintra's stock, and spent substantial amounts on investigative and recovery efforts.

65.     In late August 2024, Plaintiff notified Defendants that it had discovered the Scheme and that this litigation was impending.  Plaintiff provided Defendants with extensive materials describing the evidence Plaintiff had discovered.  Within weeks, some of that evidence was scrubbed from electronic records in the public domain.

## PARTIES

66.     FLF is a limited liability company organized and existing under the laws of Delaware with a principal place of business in Florida.

67.     Craig is an individual residing in, upon information and belief, Greenwich, Connecticut.  Craig is the husband of Deborah and the father of David.  At all relevant times, Craig

held a position of authority and control over Pegasus as its Founder, Chairman, and Chief Executive Officer.  Upon information and belief, he:

> (a)    Is the sole controller and owner of the managers of the funds SNCF and GFCR Investment Fund SCSp ("**GFCR**");
>
> (b)    Controls and indirectly owns (together with his wife Deborah and the Cogut Family Trust) the general partners of SNCF and GFCR;
>
> (c)    Controls and indirectly beneficially owns or partially owns the general partner of GCF Craft Holdings, LP ("**Pegasus' CRAFT Vehicle**"), which is the largest investor in Lightsmith Climate Resilience Partners SCSP RAIF (the "**CRAFT Fund**");
>
> (d)    Controls and owns Pegasus Capital, LLC ("**PCLLC**"), together with his wife Deborah and the Cogut Family Trust;
>
> (e)    Controls and directly or indirectly beneficially owns or partially owns Pegasus;
>
> (f)    Controls and indirectly beneficially owns CFP Fintech with Deborah and David;
>
> (g)    Is an affiliate of the Cogut Family Trust;
>
> (h)    Is or was a Partner at Cogut Family Partnership VII ("**CFP VII**") and together with Deborah and David, controls and directly or indirectly beneficially owns CFP VII and Cogut Family Partnership III ("**CFP III**");
>
> (i)    Controls or controlled and, together with Deborah and David, directly or indirectly, beneficially, partially owns or owned co-conspirator LRB and between January 18 and April 3, 2024, was one of LRB's directors;
>
> (j)    Controls and directly or indirectly beneficially owns or partially owns the Sponsor; and
>
> (k)    Was Chairman of the SPAC.

68.    Deborah is an individual residing in, upon information and belief, Greenwich, Connecticut, and a licensed New York attorney.  Deborah is the wife of Craig and the mother of David.  Upon information and belief, she:

> (a)    Controls and indirectly owns (together with Craig and the Cogut Family Trust) the general partners of the funds SNCF and GFCR;
>
> (b)    Controls and owns PCLLC together with Craig and the Cogut Family Trust;

(c)     Controls and directly or indirectly beneficially owns CFP Fintech together with Craig and David;

(d)     Owns or owned beneficially and partially, directly or indirectly, together with Craig and David, co-conspirator LRB;

(e)     Is an affiliate of the Cogut Family Trust; and

(f)     Controls and directly or indirectly beneficially owns, with Craig and David, CFP VII and CFP III.

69.     David is an individual residing in, upon information and belief, New York, New York. David is Craig and Deborah's son. He is a Partner of Pegasus and a member of Pegasus' Management Committee, Investment Committee, and Valuation Committee. Upon information and belief, he:

(a)     Is a manager of the general partners of the funds GFCR and SNCF;

(b)     Controls and directly or indirectly beneficially owns CFP Fintech, together with his parents Craig and Deborah;

(c)     Is, or until recently was, together with Craig and Deborah, a direct or indirect beneficial part-owner of co-conspirator LRB;

(d)     Is an affiliate of the Cogut Family Trust; and

(e)     Together with Craig and Deborah, controls and directly or indirectly beneficially owns CFP III and CFP VII.

70.     Pegasus is a Delaware limited partnership with a principal place of business in Connecticut. Pegasus is a registered investment adviser with the SEC, and the managers and general partners of the funds that Manager Defendants and their affiliates set up and/or manage rely on Pegasus as the filing adviser with the SEC.

## NON-PARTIES

71.     LRB is a company organized in England and Wales on September 1, 2023, upon information and belief, specifically to conduct the fake takeover of Tintra described herein. Al-Abdulla served as a director on LRB's Board while Craig was a director. Upon information and

belief, LRB is or until recently was (1) controlled by Defendants together with Al-Abdulla and (2) directly or indirectly part-owned by Craig, Deborah, and David.  While CFP Fintech was a recorded director of LRB, LRB was renamed "Tintra AI Limited" on January 16, 2024.  On or about January 23, 2025, LRB was renamed "TNTWU25 Limited."

72.    CFP III is a general partnership formed under the laws of the United States of America, with its registered address in Connecticut.  Upon information and belief, it serves as an investment vehicle for the Cogut Family, and Pegasus makes investment decisions for it.

73.    CFP VII is a general partnership formed under the laws of the United States of America, with its registered address in Connecticut.  It serves as an investment vehicle for the Cogut Family.  Upon information and belief, Pegasus makes investment decisions for it.  Craig is a Partner of CFP VII.

74.    CFP Fintech is a Delaware limited liability company, with its principal address at Pegasus' office in Connecticut.  Upon information and belief, it is directly or indirectly owned by Craig, Deborah, and David.  It was formed on March 17, 2022, by Pegasus' General Counsel, upon information and belief, specifically in connection with the pursuit of the Scheme by Defendants.  CFP Fintech was recorded in the UK governmental database of companies maintained by the UK regulator the Companies House as a director of co-conspirator LRB between September 8, 2023, and October 31, 2024.  On or about October 31, 2024, CFP Fintech's record of being a director of Tintra AI Limited was expunged from the publicly-displayed records.

75.    PCLLC is a Delaware limited liability company, upon information and belief, owned by Craig, Deborah, and the Cogut Family Trust.  Upon information and belief, PCLLC is the owner of the general partners of SNCF and GFCR.

76.     The Sponsor is a Delaware limited liability company and the sponsor of the SPAC. The Sponsor is controlled by Craig and, upon information and belief, was founded by him.  All actions that Craig took as described herein were undertaken by him in (1) his personal capacity, (2) his capacity as a controller of Pegasus, and (3) his capacity as a controller of the Sponsor and a director and controller of the SPAC.

77.     SNCF is a Luxembourg entity.  It is a private investment fund that purports to invest in "mid-sized infrastructure projects, including sustainable energy, waste and sanitation, regenerative agriculture, and nature-based climate solutions."  Its investments are managed by Pegasus Capital SNCF Advisors, L.P. ("**PCSNCF**"), a Delaware limited partnership.  PCSNCF is owned by Craig (who also serves as its Chairman and CEO), and PCSNCF's general partner is Pegasus Capital Advisors GP ("**PCA GP**").  Pegasus SNCF GP S.à r.l. (of which David is a director, and which is owned by PCLLC) is the general partner of SNCF.

78.     GFCR is a Luxembourg entity.  It is a private investment fund that purports to invest in "commercial projects and companies with business models that reduce threats to coastal habitats including critical coral reefs, as well as novel replicable and scalable solutions."  Its investments are managed by Pegasus Capital GFCR Advisors, L.P. ("**PCGFCR**"), a Delaware limited partnership.  PCGFCR is owned by Craig (who also serves as its Chairman and CEO), and PCGFCR's general partner is PCA GP.  Pegasus GFCR GP S.à r.l. (of which David is a director, and which is owned by PCLLC) is the general partner of GFCR.

79.     The CRAFT Fund is, upon information and belief, a Luxembourg entity.  It is a private investment fund that purports to invest in "climate resilience and adaptation."  Upon information and belief, GCF's investment in the CRAFT Fund (via Pegasus' CRAFT Vehicle controlled by Pegasus and Craig) represents a majority of the CRAFT Fund's capital.  The CRAFT

Fund is managed by a third party manager. Upon information and belief, however, Pegasus effectively co-controls the CRAFT Fund. Pegasus formed and administers Pegasus' CRAFT Vehicle, the entity through which GCF holds its investment in the CRAFT Fund.

80. Pegasus' CRAFT Vehicle is a Delaware limited partnership whose general partner is wholly owned by Pegasus. Pegasus' CRAFT Vehicle is a special purpose vehicle through which GCF invested in the CRAFT Fund and is, upon information and belief, controlled by Pegasus and Craig.

81. The Cogut Family Trust is, upon information and belief, a family investment vehicle related to Craig, Deborah, and David. It directly or indirectly owns over 25% of PCLLC and indirectly partially owns the general partners of SNCF and GFCR.

## JURISDICTION AND VENUE

82. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c), as this case arises under the laws of the United States. Moreover, this Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

83. This Court may exercise personal jurisdiction over Defendants because each regularly conducts or transacts business in New York State, has continuous and systematic contacts with this District, and Defendants have extensively engaged in unlawful practices that are the subject of this litigation in this District.

84. David is a resident of this District and subject to general personal jurisdiction in this District. Given David's presence in this district or the ability of this Court to exercise personal jurisdiction over at least one Defendant, this Court may exercise personal jurisdiction, pursuant to 18 U.S.C. § 1965, over all Defendants.

## FACTS

I.    **Between About the Fall of 2021 and June 2024, Manager Defendants Engaged in Wide-Ranging Illicit Conduct Targeting Multiple Victims and Obtained Control of the Barbados BGB and Its Funding.**

    A.    **As Manager Defendants' Traditional Private Equity Business Deteriorated, They Rebranded as ESG-Focused Investment Managers, Tied Their Fortunes to GCF, and Entered Into Fee-Paying Arrangements With Current and Former Officials of GCF.**

        *1.    Manager Defendants' Business Deteriorated Before the Fall of 2021.*

85.    Craig and David operate a father-and-son private equity firm, Pegasus, with a small team of employees.

86.    After 2017, Manager Defendants' private equity asset management business experienced a substantial decline in assets under management.

87.    In 2017, Pegasus reported approximately $1.875 billion in assets under management ("**AUM**"). However, by 2024, its reported AUM was down to approximately $400 million. Furthermore, upon information and belief, of those assets, Pegasus was in a position to actively invest only approximately $67 million.

88.    By late 2021, Manager Defendants had, upon information and belief, also experienced setbacks in another business of theirs—that of hospitality. In or about 2013, they had partnered with Prince Dasho Sangay ("**Sangay**") (a member of the Bhutanese royal family) and Bhutan Ventures Hospitality Private Limited on "Six Senses"-branded hotels in Bhutan. Upon information and belief, that business, which comprised five lodging properties in Bhutan (almost 20% of all Six Senses-branded properties globally), came under substantial financial stress in or about 2020. Upon information and belief, a development of a Six Senses resort in the Galapagos, in which Manager Defendants had an interest, was also experiencing difficulties.

      *2.*     *To Reverse Their Fortunes, Manager Defendants Rebranded Themselves as Socially Conscious Investors Focused on ESG Investing.*

89.     Manager Defendants acted to arrest the decline in their business by repositioning Pegasus as a purported ESG specialist and a steward of public funds. To that end, Pegasus launched the private funds SNCF and GFCR—upon information and belief, currently Pegasus' only actively investing funds.

90.     To obtain capital, Manager Defendants cultivated a relationship with GCF, a multi-billion-dollar, United Nations-affiliated, intergovernmental funding body tasked with funding "climate action in developing countries."

      *3.*     *Manager Defendants Became Dependent on GCF for Capital.*

91.     Upon information and belief, by late 2021, Pegasus' business had become (and it continues to be) primarily reliant on capital provided by GCF.

92.     During the Scheme, despite Pegasus' relatively small size, its history of investments incompatible with GCF's climate goals (including those in fossil fuels), and its portfolio company bankruptcies and shutdowns, Pegasus was one of only two (or from sometime in 2024, three) U.S.-based private, for-profit "Accredited Entities" (i.e., entities authorized by GCF to manage its funds, among other things) and "the first and only U.S. private equity fund manager accredited by the Green Climate Fund."

93.     GCF provided substantial initial capital to SNCF and GFCR, effectively reviving Manager Defendants' declining investment management business. Soon after Pegasus launched SNCF and GFCR, Pegasus received commitments for capital from GCF for them. GCF approved $150 million for SNCF on November 13, 2020, and $125 million for GFCR on October 7, 2021.

94.     GCF also approved $100 million for another fund—the CRAFT Fund—on October 8, 2021.  The CRAFT Fund is managed by someone else.  However, GCF made its investment in it through Pegasus' CRAFT Vehicle.

95.     GCF has funded Manager Defendants' funds and projects even though GCF's staff had reservations about Pegasus' capability.  In 2023, GCF's staff stated their concerns about Pegasus' "gaps in personnel, operational tools and underlying legal and institutional frameworks; and . . . the local expertise and ability of [Pegasus] to execute."  Yet, even after the staff memorialized those concerns, GCF awarded more funding to Pegasus in July 2023.

96.     Upon information and belief, other institutions largely shied away from SNCF and GFCR, despite Manager Defendants' active fund-raising efforts, and GCF was the only investor in SNCF as of October 9, 2024, and the largest investor in GFCR as of March 7, 2024.

97.     Manager Defendants were unsuccessful in raising private funds from investors other than GCF even though GCF committed its capital on terms that were unusually favorable to private investors who could have followed it into Manager Defendants' funds.

98.     GCF contributed $50 million out of the $150 million committed to SNCF in closings conducted on or about May 21, 2021.  GCF contributed an aggregate of $50 million out of the $125 million committed to GFCR in closings conducted on or about August 31, 2022, and May 9, 2023.  GCF contributed an aggregate of $44.2 million to Pegasus' CRAFT Vehicle and the CRAFT Fund in closings conducted on or about February 22, 2022, September 15, 2023, January 19, 2024, and December 12, 2024.  The CRAFT Fund has made at least three investments.

99.     Upon information and belief, SNCF and GFCR have paid management fees respectively to PCSNCF and PCGFCR.  Upon information and belief, an affiliate of Manager Defendants' has received management fees in relation to the CRAFT Fund from its assets.  Upon

information and belief, one or more Manager Defendants has caused certain costs to be paid out of SNCF's, GFCR's, and the CRAFT Fund's assets.

100.    Overall, by December 31, 2024, GCF had committed to pay at least $10 million, and had paid approximately $8.3 million, in fees to Pegasus and/or its affiliates.  Upon information and belief, more than half of those were committed and paid by GCF during GCF's Executive #1's tenure.

101.    Manager Defendants had to seek and obtain at least four extensions from GCF of contractual deadlines that required Manager Defendants to raise capital for SNCF and GFCR from investors other than GCF.  GCF granted one of the requested extensions in June 2022, one in September 2022, and two in March 2024.

> 4.    *Under the Guise of Climate Mitigation, Manager Defendants Directed GCF's Capital Into Hotel Developments.*

102.    Manager Defendants, under the guise of climate change mitigation, directed funds contributed by GCF to SNCF and to GFCR into their Six Senses-branded hotel developments.

103.    Craig and Pegasus billed GFCR as investing in "oceans" and "coral reefs" through "innovative" "blended finance," and Craig touted the impact that GFCR would make in "carbon capture" and extracting "protein" from "coral reefs" to feed "the planet."  But, as of December 31, 2022:

    (a)    GFCR's largest and only reported investment was in a Six Senses hotel development in the Bahamas (as of that date, in the amount of approximately $10.1 million).

    (b)    SNCF's largest reported investment (approximately $10.5 million) was that in a Six Senses hotel development in the Galapagos, representing a majority—approximately 72%—of the capital reported to have been invested by SNCF.

104.    Until 2019, the global Six Senses brand itself was a portfolio investment of Pegasus' legacy private equity business.  *Even currently*, David is described by Pegasus as overseeing Six

Senses U.S.  Six Senses' CEO Neil Jacobs is a former Pegasus employee and, as of late 2021, was a director of Craig's SPAC.

          *5.*       *Pegasus Entered Into Undisclosed Fee Arrangements With Current and Former GCF Officials on Whose Goodwill Manager Defendants Depended.*

      105.    While relying on investments from GCF and the goodwill of GCF and other, quasi-intergovernmental, not-for-profit organizations, upon information and belief, Manager Defendants entered into fee-paying arrangements with current and former executives or board members of GCF and those other organizations—directly or via Manager Defendants' funds or those funds' portfolio companies.

      106.    Upon information and belief, GCF's Executive #1 and GCF's Executive #3 are parties to such fee arrangements, among other people.

      107.    GCF's Executive #1 is the Chief Investment Officer of GCF.  Upon information and belief, he was the Director of GCF's Private Sector Facility (the department that, upon information and belief, is and was responsible for funding decisions in relation to Pegasus) between September 2021 and February 2022, and between February 2022 and August 2024, he was the Deputy Executive Director of GCF.

      108.    Upon information and belief, GCF's Executive #3 was previously a "founding board member" of GCF and is currently the Chairman of an investment firm headquartered in Rwanda.

      109.    Manager Defendants have acknowledged their relationships and fee-payment arrangements with GCF's Executive #1 and GCF's Executive #3 (and others) in private investment presentations, describing those fees as payments that "will be paid" to them in their purported capacity as "Operating Partners," "Operating Advisors," "Strategic Advisors," or "Consortium Partners."

110.    Upon information and belief, GCF's Executive #1's employer had not consented to the advisory or partnership appointments or the fees described above.

111.    Manager Defendants have, upon information and belief, both concealed the fee arrangements from public disclosure and, when they did publicly reveal the "advisory" roles of GCF's Executive #1 and GCF's Executive #3, sought to mislead the public into believing that those roles did not involve fees.

112.    Upon information and belief, the Coguts authorized Pegasus, and Manager Defendants authorized their funds and/or portfolio companies, to offer, or to promise, to GCF's Executive #1 to appoint him a "Strategic Advisor" or to a similar position or positions at those funds and/or portfolio companies and/or to offer, pay, or promise to pay fees to GCF's Executive #1.

113.    Throughout 2021 to 2023, Manager Defendants extensively traveled globally for meetings and joint public appearances with GCF's Executive #1 and GCF's Executive #2 and hosted them at events organized by Manager Defendants, including in New York.  Upon information and belief, throughout 2021 and 2023, GCF's Executive #1 repeatedly traveled internationally to appear on panels and in public presentations together with Craig and to attend events organized by Pegasus, at Pegasus' expense.

114.    In public appearances, GCF's Executive #1 and GCF's Executive #2 lauded Pegasus and Craig and their handling of GCF's funds and promoted Pegasus, Craig, SNCF and/or GFCR.  A statement by GCF's Executive #2, lauding Pegasus' fund, upon information and belief, SNCF, is prominently featured on Pegasus' website.

**B.    Manager Defendants Sought Control of, and Funding for, the Barbados BGB, from the Other Victims.**

    *1.    The Barbados Government and GCF Sought to Establish the Barbados BGB.*

115.    In 2021, the Barbados Government, in cooperation with GCF (and eventually, the rest of the Other Victims), commenced steps to establish the first BGB, a public-private bank in Barbados.  The Barbados Government intended for the Barbados BGB to provide financing to projects such as climate resilient housing, renewable energy, clean transportation, and water conservation in Barbados and later in other Caribbean countries.

116.    The Barbados BGB, its equity, GCF's investment in it, and the Barbados BGB's substantial balance sheet would be managed or controlled by an "Accredited Entity" selected by GCF.

117.    The Barbados BGB was a lucrative project.  It would be established as a "digital" bank and initially capitalized with $30.5 million in contributions ($10 million from the Barbados Government, $15.5 million from GCF, and $5 million from USAID).  Using that capital, the Barbados BGB (and thus the Accredited Entity to which the Other Victims would award the control of the bank) was intended to control over $200 million in assets.  Pegasus expected the Barbados BGB "to mobilise at least USD 5.8 billion of investment in climate projects over the next 15 years."

118.    The Barbados BGB was intended to be a model for other potential BGBs in potentially over 100 countries.  The Accredited Entity would thus be well-positioned to seek to establish, manage, and control such other BGBs.

    *2.    Manager Defendants Sought to Be Awarded the Management of the Barbados BGB.*

119.    Manager Defendants sought for Pegasus to be the Accredited Entity managing the Barbados BGB.  Upon information and belief, no later than in fall of 2021, Manager Defendants

had begun their effort to secure control of the Barbados BGB and the Other Victims' funding for it and began their work on an application to GCF in relation to the Barbados BGB (the "**Preliminary Application**"). The Preliminary Application was for the "Project Preparation Facility," whereby GCF could provide the Accredited Entity with up to $1.5 million in initial funding to assist it with preparing the main application to GCF (the "**Main Application**").

3. *Manager Defendants Lacked Qualifications to Be Awarded the Barbados BGB Project.*

120. However, upon information and belief, as of late 2021, Pegasus (1) had never invested in, built, or operated a bank, (2) had never developed or managed the development of a "robust technical platform" of the kind that Pegasus would need for the Barbados BGB, and (3) did not have the requisite financial technology capabilities.

121. Yet GCF required the Accredited Entity to which it would award the Barbados BGB to build the Barbados BGB from scratch.

122. Manager Defendants knew, as they represented to GCF, that doing so was "a complex task" that "require[d] significant legal and technical resources" and that establishing the Barbados BGB would involve "building the technical and operational platforms" which would be "built ahead of the launch of the [Barbados BGB] – including setting up . . . necessary operational departments within the bank."

123. Upon information and belief, Manager Defendants knew that to secure Pegasus' role as the Accredited Entity in charge of the Barbados BGB, they would have to convince GCF that Pegasus could build a bank because other entities existed that could compete for the role.

4. *Pegasus Represented to GCF That Pegasus Could Build the Barbados BGB Using a Third Party Suitable Provider to Develop the Digital Platform for the Operation of the Bank.*

124. To secure the Barbados BGB project, in 2023, Pegasus represented to GCF in its Main Application that "[a]s a digital bank, the [Barbados] BGB will require a robust technical platform for its operation. Professional services will be procured to work alongside the BGB management team to develop the technical platform and train all staff on its operation. Once operational, the [Barbados] BGB will be publicly launched."

125. Pegasus assured GCF in the Main Application that Pegasus would "[p]rocure the services of a suitable provider to develop the digital platform for the operation of the bank."

126. That representation was materially false and/or misleading because Manager Defendants represented that they had the capability to build the Barbados BGB when they did not, failed to disclose that they had a particular purported "suitable provider" in mind—Tintra, failed to disclose that they had an equity interest in and controlled that "suitable provider," and failed to disclose that Tintra was not, in fact, a "suitable provider" because it had no relevant capability and was a sham.

127. That misrepresentation was material because, as Manager Defendants' associate would state (in December 2023), Pegasus' purported "use of technology" was an important consideration for the Other Victims during the application process.

128. Pegasus needed to show GCF both that Pegasus had identified a "suitable provider" with the requisite experience and banking technology and that the provider would in fact be able to put Pegasus in a position to roll out the Barbados BGB by "develop[ing] the digital platform for the operation of the bank."

**C.    Just as Manager Defendants Commenced Their Efforts to Secure Control of the Barbados BGB, Craig and the Sponsor Launched a $230 Million SPAC.**

129.    In November 2021, Craig and the Sponsor also launched and closed a $230 million initial public offering of the SPAC.

130.    Following the IPO, Craig, the Sponsor, and the SPAC needed to consummate an acquisition of a company that fit the criteria set forth in the SPAC's offering documents.

131.    Doing so would have richly rewarded Craig and the Sponsor.

    (a)    First, it would have given the Sponsor control of about $230 million held by the SPAC, which was required to be returned to investors absent an acquisition within 18 months.

    (b)    Second, the Sponsor had purchased 7,945,000 of the SPAC's private placement warrants for $7,945,000, which warrants would expire worthless absent an acquisition.

    (c)    Third, the Sponsor would have held 20% of the SPAC's equity following consummation of an acquisition of a target—*any target*—by the SPAC.

    (d)    Fourth, if the SPAC acquired a company in which the Cogut Family held an equity interest, the Cogut Family would have benefited from the SPAC's payment for that equity.

132.    But, as the SPAC's offering documents acknowledged, there was a shortage of suitable acquisition targets, and identifying a suitable target willing to be acquired, and consummating an acquisition of such target, would be difficult.

133.    The SPAC's offering documents, published on the SEC's website and, upon information and belief, submitted thereto via the EDGAR system by the Sponsor and the SPAC, were prepared with, upon information and belief, Craig's active participation and approval.

134.    The SPAC's offering documents set forth very specific criteria that the acquisition target would have to meet to qualify to be acquired by the SPAC. The target had to be a business focused on "ESG," "sustainability, "inclusion," and "improving . . . communities" and be a benefactor of "trends" and "regulatory tailwinds."

135.    The target had to have a fair market value of at least approximately $190 million.

**D.    Manager Defendants Found Tintra, a Distressed Shell, and Had Multiple Reasons to Direct the Actions of, and Deceptively Promote, Tintra.**

136.    In or about fall of 2021, Manager Defendants effectively obtained control of Tintra, and in or about March 2022, the Cogut Family invested $2.25 million in Tintra.

137.    No later than in the fall of 2021, David held a meeting with Tintra's CEO Shearer. Upon information and belief, David had been introduced to Shearer by Sangay.

138.    At the time of their meeting, Tintra—a publicly-traded micro-cap company listed on the LSE with a market capitalization of approximately £8.91 million (approximately $12.07 million)—was distressed.  It had discontinued its substantive operations (a small remittance business), fired all but about two of its employees, and was unable to pay its debts.  Tintra had little cash and negative net assets.  At that same time, Tintra was being pursued by creditors.

139.    Shearer was seeking to reposition Tintra to attract additional investors.

140.    Another person involved in Tintra was the Qatari businessman Al-Abdulla.

**E.    Manager Defendants Acted on Their Motivations, Masterminding the Scheme.**

141.    Upon information and belief, no later than by sometime in fall 2021, Manager Defendants expected that they would seek to secure control of, and funding for, the Barbados BGB from GCF and intended to formally apply to GCF for the same.

142.    Upon information and belief, no later than by sometime in fall 2021, Manager Defendants agreed with Shearer that they would use Tintra to pursue the Barbados BGB opportunity and other opportunities, by falsely presenting Tintra as a suitable provider of banking technology and by using it as an acquisition target for the SPAC.

143.    Manager Defendants secured Shearer's agreement through financial incentives, promises of employment, and/or other means.  From the fall of 2021, Shearer was effectively a

subordinate of Manager Defendants, a role that would be formalized by Pegasus' hiring of Shearer as a "Strategic Advisor" after Tintra collapsed.

144.    Upon information and belief, no later than in the fall of 2021, Manager Defendants, the Sponsor (through Craig), the SPAC (through Craig), Tintra, Shearer, and Al-Abdulla agreed, in furtherance of the foregoing objectives, that Tintra would be publicly and deceptively repositioned as a rapidly developing provider of cutting-edge and unique banking systems, with AI banking technology, focused on the emerging markets, that the Cogut Family would invest in Tintra, and that Manager Defendants would "use it to secure further funding in the 'developing world' from governments and financial investors."

### F.    In the Fall of 2021, and at All Subsequent Times, Tintra Did Not Have Any Substantive Business or Technology and Was a Sham.

145.    Manager Defendants, Tintra, Shearer, and Al-Abdulla agreed to do so even though, at all relevant times, Tintra had no underlying business and possessed no substantive technologies or products.  Tintra never had, never developed, nor had the ability to develop, any technology or product that it would promote in public statements beginning in the fall of 2021.

146.    Tintra was not a bank and had no resources or licenses to become one.

147.    Tintra had no capability to develop a product because it had no employees with expertise to develop the business in which it would publicly claim to engage from October 2021. Tintra only hired its first (and only) employee with *any* banking experience in April 2023, and that employee had no technical experience.

148.    Tintra had a small number of employees, was repeatedly late making payroll, and in the end, was unable to make payroll at all.  Upon information and belief, at times between late 2021 and the time of its collapse in late 2023, Tintra had as few as only two employees.

149.    That small employee roster included two foreign government officials' family members who were hired, upon information and belief, in an attempt to influence the foreign officials' decision-making for Manager Defendants' benefit.

150.    Tintra did not even provide its employees with such basics as computer equipment, word processing software, or spreadsheet software, and at most times, Tintra required little to no work from most of its employees.

151.    Tintra had no actual customers.

152.    Tintra promoted products that did not exist, including in meetings and on calls with the Other Victims.

153.    Defendants were, upon information and belief, aware at all relevant times that Tintra never had any substantive technologies or products and was a sham.

**G.    From the Fall of 2021, Manager Defendants, Caused and/or Directed Tintra, Shearer, and Neumann, to Conduct an Intense Publicity Campaign to Deceptively Recast Tintra as a Hot New AI-Driven and ESG-Focused Banking Technology Company.**

154.    In October 2021, Tintra and Shearer began a public remarketing campaign in furtherance of their agreement with Manager Defendants and Al-Abdulla.

155.    The statements made by Tintra, Shearer, and Neumann during the campaign contained materially false and/or misleading representations.

156.    In multiple public announcements via the LSE,[2] social media posts, and press interviews and articles, published between October 2021 and March 2022, Tintra, Shearer, and Neumann made dozens of deceitful statements.  Tintra's announcements, unless otherwise stated herein, were made by Tintra and its Board of Directors ("**Board**"), which included Shearer and

---

[2] All references in this Complaint to Tintra's announcements, financial statements, or reports being "published" are to online publications via the LSE, unless stated otherwise.

Neumann.  Upon information and belief, Neumann reviewed and approved most, if not all, of the announcements and financial reports published by Tintra during her tenure as a director.  Upon information and belief, Shearer was in charge of approving the final version of each announcement and financial report.  Those false and/or misleading statements described Tintra as a "culturally-relevant" AI banking technology company and a "bank."  Those false and/or misleading statements claimed that Tintra was focused on "inclusion," "financial inclusion," or "economic inclusion" for "the unbanked," "the global South," and "frontier and emerging markets . . . underserved by today's environment."  Those false and/or misleading statements also claimed that Tintra was focused on "ESG," "culturally-relevant" technology, "inclusive access to international transactions," elimination of "bias," "sustainability," "equality," "gender" equality, "climate," "environment," "solving . . . challenges faced by emerging market individuals and businesses," "revolutionis[ing] how developed market banks interact with their emerging market counterparts," and "a meaningful change in the way banking between developed and emerging markets takes place" and that Tintra had "scalable infrastructure."

157.    The campaign included the following public announcements:

(a)    On October 1, 2021, Tintra published an announcement deceptively touting—in a sharp departure from Tintra's prior presentation of itself—its focus on the "[AI] software within the financial technology sector" and asserting that "the use of AI software is a core element of the [Tintra] Group's strategy for radically improving payments between emerging and developed economies."

(b)    From October 13, 2021, Tintra started deceptively touting its potential "banking . . . licences," and from October 26, 2021, "banking services."

(c)    On October 26, 2021, Tintra published an announcement deceptively stating that Tintra would apply for an "International Financial Entity[] licence" in Puerto Rico to obtain "regional access" to Central America and offer "banking services to international (non-Puerto Rican resident) clients."

(d)    In Tintra's Half-Year Report, published on October 29, 2021, Tintra and Shearer deceptively represented that Tintra was "solv[ing] the biggest need in the

[emerging world banking] space" and that it "ha[d] built a model that [was] somewhat revolutionary."

(e)   On November 24, 2021, Tintra published an announcement deceptively describing its "open, integrated banking capability that will provide software as a service ('SaaS') to its clients sitting on its own global banking platform, using scalable infrastructure and application programming interface ('API') innovation."

(f)   On January 10, 2022, Tintra published an announcement deceptively touting its "banking applications" and "[t]he application of artificial intelligence ('AI') within the banking and infrastructure technology systems that the Company is developing, focused on frontier and emerging markets."

(g)   On or about February 4, 2022, Tintra published an announcement which promoted the deceptive article titled "Artificial Intelligence's Role in Banking 3.0," authored by Shearer.  The article decried "biases against emerging markets, nationalities or cultures that currently colour the A[nti] M[oney] L[aundering] landscape," which Shearer stated were prevalent in banking, and deceptively touted Tintra's purported AI solutions for removing such "prejudices," "addressing the inequities," "eradicate[ing] bias in an AML [anti-money laundering] context," and "neutralising human bias, which has promising implications for organisations and individuals in emerging markets who face these preconceptive biases frequently."

158.   The foregoing announcements and statements were deceptive because, as described above, Tintra was a sham and had no business, technology, or capabilities described therein.

159.   On February 2, 2022, Neumann was appointed to Tintra's Board.  She immediately joined the publicity campaign and put out a flurry of similarly deceptive statements.

160.   Neumann is a prominent figure on various social media platforms and in the media. She has over 24,000 followers on X (formerly known as Twitter), almost 10,000 followers on Instagram, and nearly 4,000 followers on LinkedIn.  She is a frequent contributor to multiple media outlets, including Al-Jazeera, where, upon information and belief, Al-Abdulla had been the General Counsel.

161.    Upon information and belief, Neumann relocated to London, England, from this District when she became involved with Tintra and worked out of its office for at least several months.

### H.    Manager Defendants, Tintra, and Shearer Scripted the Deceitful Repositioning of Tintra to Serve their Business Ends.

*1.    Tintra's Statements Were Intentionally Timed With the Barbados Government's Statements and Scripted to Match What the Barbados Government Was Seeking for the Barbados BGB.*

162.    Upon information and belief, Manager Defendants, Tintra, and Shearer intentionally matched the content and timing of Tintra's deceitful public statements with the content and the timing of pronouncements by the Barbados Government and coordinated Tintra's public statements accordingly.

163.    The Barbados Government had very specific requirements for the Barbados BGB project, which the Barbados Government's representative Avinash Persaud ("**Persaud**") would disclose publicly in December 2023: to "break boundaries," to "do a different kind of bank" using "technology and digital," and to "use technology to make this [Barbados BGB] bank impactful, more efficient, better than maybe traditional banks in the past."

164.    Upon information and belief, those requirements had not been publicly disclosed prior to that time but were known to Pegasus because it was in discussions with the Barbados Government in relation to the Barbados BGB. Upon information and belief, Manager Defendants informed Tintra and Shearer of what the Barbados Government's requirements for the Barbados BGB were.

165.    Through its repositioning campaign, Tintra carefully presented itself as meeting those publicly undisclosed requirements by deceitfully claiming in its announcements published between October 2021 and March 2022 that: (1) Tintra's "Platform" was "being built on a 'clean-

sheet' basis rather than bolting such elements on to legacy platforms," (2) Tintra's "infrastructure" would "enable financial and regulatory communication layers between currently siloed metaverse projects, but also provide a bridge to off-chain, traditional regulatory and financial systems," (3) Tintra's "technologies" were "borderless," (4) Tintra's AI "technologies" would "allow emerging market financial institutions to access global banking systems," (5) Tintra was "building banking infrastructure that will allow us to open borders and business sectors," and (6) "[Tintra] fully expect[ed] [to] lead the world in eroding financial friction as [Tintra] buil[t] a Web3 bank that is truly beyond borders, politics and geography."

166.    Tintra's public announcements hewed even to the most unusual priorities expressed by the Barbados Government and, more specifically, to the unique priorities advanced by Persaud, the Barbados official in charge of the Barbados BGB project.

167.    In pursuit of such unique priorities, in November 2021, Barbados made a push into the "metaverse."[3] The Barbados Ministry of Foreign Affairs and Foreign Trade reportedly signed an agreement with "Decentraland" to launch a "virtual embassy." "Decentraland" describes itself as a "virtual world," "metaverse" platform, whose operations include blockchain and cryptocurrency. Persaud promoted Barbados' push into the "metaverse" in November 2021.

168.    Tintra would later claim to have begun work on banking in the "metaverse" in November 2021, upon information and belief, to match Persaud's focus.

169.    In or about February or March 2022, Persaud claimed that "new structures" like "metaverse" could "ensure that technology benefits all and not a select few."

170.    At about the same time, Tintra also published an announcement about "metaverse" banking, touting Tintra's purported participation in it. In an announcement titled "RegTech firm

---

[3] "Metaverse" loosely refers to virtual worlds in which users form social and economic connections and interact.

Tintra PLC announces world's first Web 3.0 bank to power metaverse," published by Tintra on March 17, 2022, Tintra, Shearer, and Neumann deceptively described that "the next stage of its strategy" involved "the development of . . . the world's first built for purpose Web 3.0 banking platform . . . to expand its already-extensive technological capabilities, through to the launch of of [sic] an equally innovative fully functional metaverse bank" and that "Tintra intend[ed] to create the first bank capable of functioning operationally within the digital realm of the metaverse."  In that announcement, Tintra also acknowledged that it was aware of "lounges and branches in the metaverse [being opened] via platforms like Decentraland."  Upon information and belief, Tintra was referring to Barbados' efforts described above.

171.    Tintra's highly specific "metaverse" banking initiative did not actually exist, and yet it intentionally matched (and matched the timing of) Barbados' unorthodox, public pronouncements in relation to "metaverse," even down to their mention of Decentraland.

> 2.    *Tintra's Statements Positioned Tintra as a Suitable Provider for Pegasus' Application to GCF.*

172.    Upon information and belief, every announcement described above was a building block to position Tintra as a bona fide and cutting-edge provider of banking technology and systems for the emerging markets so Manager Defendants could present Tintra to the Other Victims as a "suitable provider to develop the digital platform for the operation of the bank."

173.    From October 13, 2021, through late March 2022, Tintra's announcements touted its purported banking "platform" and the "digital" nature of that "platform"—terms Pegasus would subsequently use to describe its "suitable provider."

3.    *Tintra's Statements Lay Bare the Plan to Sell Tintra to the SPAC and Matched the SPAC's Acquisition Criteria.*

174.    Upon information and belief, including as described below, Manager Defendants and Shearer caused Tintra's public announcements to describe it in terms that also matched the SPAC's acquisition criteria set forth in its offering documentation.

175.    From in or about the fall of 2021, in discussions with others, Shearer became abruptly, intensely, and openly focused on the idea of relisting Tintra on NASDAQ and in New York, i.e., upon information and belief, on a sale of Tintra to the SPAC.

176.    Tintra's public announcements published between November 4, 2021, and March 10, 2023, lay bare Manager Defendants' plan to sell Tintra to the SPAC.

177.    On November 4, 2021, the SEC declared the SPAC's Registration Statement effective. The same day, Tintra published an announcement that contained an extensive description of Tintra's plans to, upon information and belief, sell itself to the SPAC, containing the following statements.

(a)    The announcement described a plan to conduct two fundraisings—one relatively soon, and the second one in the second half of 2022. Upon information and belief, the reference to the first fundraising was to the Cogut Family's investment that arrived soon after the announcement, and the reference to the second fundraising was to a sale to the SPAC that would then follow.

(b)    The second fundraising was "intended to be at substantially higher valuations to the [first fundraising]." Upon information and belief, that statement referred to the SPAC's minimum valuation criteria for an acquisition mandated pursuant to its offering documents.

(c)    Tintra was in "advanced discussions with a major US Venture Capital firm," was discussing the aforementioned second fundraising with that firm, and "ha[d] visibility on what . . . valuation[]" Tintra would undertake that fundraising. Upon information and belief, that firm was Pegasus.

(d)    Tintra and Shearer "ha[d] an 18-24 month view through to the end of the [second fundraising]" and "shareholders and potential shareholders should view

[Tintra] with a 2-year horizon." That timeframe approximated the SPAC's 18-month timeframe for the acquisition.

178.    Furthermore, November 4, 2021, was, upon information and belief, the first instance when Tintra's announcements discussed the kind of transaction that was covered in that announcement.  Upon information and belief, the SPAC's formal launch on or about that date occasioned that detailed description because, from then on, an acquisition of Tintra by the SPAC became a real possibility.

179.    In its Annual Report for the year ended January 31, 2022 (i.e., from February 1, 2021, to January 31, 2022), which was published on or about August 1, 2022, Tintra and Shearer contended that the AIM Market of the LSE was not the optimal stock exchange for Tintra because Tintra was a "US style V[enture]C[apital] play." They also stated that they were executing on a "plan" "to navigate toward a listing on NASDAQ" and that "NASDAQ will be the right home" for Tintra.  They also claimed that they would raise a substantial amount of capital "in the first three months of 2023." Upon information and belief, Tintra and Shearer were describing Manager Defendants' and their plan to sell Tintra to the SPAC at a substantial valuation before the SPAC's term expired in April 2023.

180.    In the 2022 Annual Report, Tintra, Shearer, and Neumann described their "original intention" that Tintra's initial "funding round" be followed by "a further funding round in the first three months of 2023." Upon information and belief, they were referring to the plan to sell Tintra to the SPAC before the SPAC's term expired in April 2023.

181.    In an announcement published on November 30, 2022, Tintra and Shearer described a pending fundraising transaction valuing Tintra at $250 million.  At the time, Tintra had a market capitalization of only approximately £35.5 million ($42.8 million).  On December 16,

2022, Tintra and Shearer reaffirmed their fund-raising plans.  Upon information and belief, both of the foregoing announcements referred to a sale of Tintra to the SPAC.

182.    Upon information and belief, after March 10, 2023, Tintra never again referred to the fundraising transactions described above in its public statements, i.e., the "funding round" that would purportedly be conducted at a substantial valuation disappeared from Tintra's public announcements just before the SPAC's term drew to an unsuccessful close in April 2023.

### I.    As Part of the Repositioning, Directors and Assets Inconsistent With Tintra's New Image Were Jettisoned.

183.    As part of the repositioning, Tintra's directors whose biographies were inconsistent with Tintra's new image resigned on October 1, 2021, and its (dormant or near-dormant) subsidiaries whose past business would have been inconvenient for its new image were closed or divested for no substantive consideration throughout the fall of 2021 and the spring of 2022.

### J.    Two New Directors Joined Tintra as Manager Defendants' Effective Representatives.

184.    Neumann and another individual ("**Director #1**"), upon information and belief, both American citizens, were added to Tintra's Board in or about spring 2022, as part of the Scheme.  Upon information and belief, Neumann was a longtime resident of New York at the time of her appointment.

185.    Upon information and belief, the new directors joined Tintra's Board as part of Tintra's relaunch with Manager Defendants' knowledge and approval and effectively as their representatives.

186.    Director #1 joined Tintra's Board on March 7, 2022, the very day on which Tintra announced the Cogut Family's investment in Tintra.

187.    Before Director #1 was appointed, Sangay vetted Director #1 at two meetings in the fall of 2021.  Sangay evaluated Director #1's suitability for the directorship based on the

Coguts' preferences and on their behalf.  Director #1 was expected to follow the directions provided to him by the Coguts and was expressly told of those expectations before he was appointed to Tintra's Board.

### K. Once Tintra Had Completed the Initial Stage of Its Repositioning, the Cogut Family Made an Investment in Tintra While Keeping Their Identities Secret, and Tintra Submitted the Preliminary Application to GCF.

188.    With Tintra having publicly repositioned itself, on March 7, 2022, Tintra announced that it had received an investment in the amount of $2.25 million.

189.    That money came from the Cogut Family directly or indirectly through entities they controlled.  Tintra and Shearer publicly announced that the $2.25 million investment was made by "a private equity professional based in New York City" (and on March 21, 2022, "[by] the Family of the private equity professional based in New York City").  Tintra did not disclose the investors' identities to the public.

190.    Upon information and belief, between March 2022 and June 2024 when Tintra entered bankruptcy, the only cash it raised came from either the Cogut Family or Plaintiff's loan.

### L. Throughout the Remainder of 2022, Tintra, Shearer, and Neumann Continued the Campaign of Deceitful Public Statements.

191.    Following the Cogut Family's investment, the deceitful campaign to establish Tintra as a credible AI banking technology company intensified.

#### 1. Even the Public Disclosure of the Cogut Family's Investment in Tintra Was Permeated With Lies.

192.    On March 7, 2022, Tintra published an announcement of the Cogut Family's investment (without disclosing their identities).  In that announcement, Tintra, Shearer, and Neumann stated:

Further Strategic Investment Under Funding Round

The board of directors of Tintra (the "Board") is pleased to announce that further to the announcement of 26 November 2021, that it has finalised a further subscription under the current funding round, raising a further US$250,000 (the "Subscription").

The Subscription is for 37,128 new ordinary shares of 1 pence each in the capital of the Company ("Ordinary Shares"), priced at [£5.04] per Ordinary Share, at an exchange rate of £1.00:$1.336 (the "Subscription Price").

For each new Ordinary Share purchased under the Subscription, the investor will receive two warrants to subscribe for new Ordinary Shares at an exercise price of [£0.50] per Ordinary Share for a period of five years, conditional on either the market capitalisation of the Company exceeding US$250m for a period of three consecutive trading days or a future funding round being concluded with a post-money valuation of US$250m or greater (the "Warrants").

The Subscription is made by a private equity professional based in New York City. This investment is part of a larger investment related to his family's Family Office which is anticipated to subscribe to a further US$2.025m on the same terms, for which the documentation is currently in process (the "Additional Subscriptions").

The funds to be received will be used for the continuing development of the Company's artificial intelligence platform and regulatory licensing build alongside general working capital purposes.

. . .

Richard Shearer, Tintra CEO, said, "I am extremely pleased to have on board this new partner and investor.  One that shares our artificial intelligence driven vision of revolutionising how emerging markets directly benefit from financial inclusion. The family have deep private equity experience and those insights have already started to assist in our thinking.  I know this is something that I will draw on, and will add value for the board and shareholders, over the coming months and years as we build out our game changing model."

193.    Those representations were false and/or misleading because:

   (a)    Tintra was not developing any and had no substantive technology, Tintra had no "artificial intelligence driven vision of revolutionising how emerging markets directly benefit from financial inclusion," and Tintra had no substantive, let alone "game changing," business.

   (b)    The statements implied that the investor was endorsing the merits of Tintra's technology (which Defendants knew or should have known did not exist) and omitted to disclose that Defendants invested to further the Scheme and not because of Tintra's merits.

194.    On March 21, 2022, Tintra published an announcement disclosing the receipt of the remaining $2 million from Defendants (without disclosing their identities).  In the announcement, Tintra, Shearer and Neumann stated:

Further Strategic Investment Under Funding Round

The board of directors of Tintra (the "Board") is pleased to confirm that further to the announcement of 7 March 2022 (the "Announcement"), that it has received the subscription agreements under the current funding round for a further US$2,000,000 (the "Subscriptions").  As set out in the Announcement, these are the Family of the private equity professional based in New York City, who has already agreed to invest $250,000, and consists of two investments of $1,000,000 each by separate limited liability companies.  This brings the total investment by the Family or related entities to US$2,250,000, not the $2,275,000 provided in the Announcement.  The investment has no conditionality.

The Subscriptions are for two equal commitments for 148,511 new ordinary shares of 1 pence each in the capital of the Company ("Ordinary Shares"), priced at [£5.04] per Ordinary Share, at an exchange rate of £1.00:$1.336 (the "Subscription Price").

For each new Ordinary Share purchased under the Subscription, the investor will receive two warrants to subscribe for new Ordinary Shares at an exercise price of [£0.50] per Ordinary Share for a period of five years, conditional on either the market capitalisation of the Company exceeding US$250,000,000 for a period of three consecutive trading days or a future funding round being concluded with a post-money valuation of US$250m or greater (the "Warrants").

. . .

Richard Shearer, Tintra CEO, said, "This investment from the family of a renowned New York based private equity professional is perhaps the strongest validation we have yet received of the substance and future of our model and execution plans.

["]We now have all teams focused on the regulation and tech build across all verticals, with the Artificial Intelligence and newly announced Web 3.0 teams at the core.  Further, we have just entered another 90 day internal period, the end of which will see 5 different teams having delivered innovation and on those execution plans, some of which we quite expect to be groundbreaking."

195.    Those representations were false and/or misleading because Tintra was not building the systems it was promising, its employees did not have the relevant expertise to do so, and the

reference to "5 different teams" and their purported technical work was a work of fiction.  Nor was there an expectation that "5 teams" would deliver innovation after "another 90 day internal period."

196.    To amplify those misrepresentations, on March 23, 2022, Neumann republished and reaffirmed the March 7 and March 21, 2022 announcements on her X account.

197.    Tintra's announcements made on March 7, 2022, and thereafter notably added additional, specific terms to its public announcements.

      (a)    Tintra first publicly mentioned its focus on "financial inclusion" in its announcement published on March 7, 2022.  In announcements published on April 19, 2022 (just days before Pegasus made the first submission of the Preliminary Application to GCF), May 20, 2022, June 8, 2022, and July 11, 2022, Tintra, Shearer, and Neumann repeated the representations containing those (or similar) terms.  From June 8, 2022, Tintra also began describing itself as focused on the "unbanked."

      (b)    Just days after the Cogut Family invested in Tintra, on or about March 17, 2022, Tintra, Shearer and Neumann started publicly—falsely and/or misleadingly— referring to Tintra as a "bank" and describing Tintra as building "the world's first built for purpose Web 3.0 banking platform" and an "innovative fully functional metaverse bank" that would be "functioning operationally within the digital realm."

198.    Those descriptions were designed to bolster Pegasus' chances of securing the Barbados BGB project by even more granularly matching the Barbados Government's requirements and Pegasus' impending application to GCF.  Those descriptions were published, upon information and belief, at Manager Defendants' direction and using Defendants' "insights."

199.    Upon information and belief, each Defendant (directly or through another) reviewed and/or approved the March 7 and March 21, 2022 announcements.

      *2.*    *Even the Terms of the Cogut Family's Investment in Tintra Were Designed to Deceive.*

200.    Upon information and belief, the terms of the Cogut Family's investment described in the announcements of March 7 and March 21, 2022, were contrived to deceptively assert the purported faith of a "renowned New York based private equity professional" in the prospects and

quality of Tintra's business.  In reality, to position Tintra for an acquisition by the SPAC, Defendants and (through Craig) the Sponsor and the SPAC designed those terms to deceptively inflate Tintra's valuation and imply that an investor had evaluated Tintra and found the (inflated) valuation warranted.

(a)     The investor was announced to have paid £5.04 per share, a nearly 200% premium to the then-prevailing market price of Tintra's shares.

(b)     At the announced price of £5.04 per share, Tintra purportedly commanded a valuation of approximately £73 million (approximately an even $100 million) (while its market capitalization at the time based on the prevailing market price of its shares was approximately £28 million (approximately $36 million)).

201.    The published terms of the Cogut Family's investment were a blunt attempt to justify a nearly $100 million valuation in a build up to the potential SPAC transaction.  On November 28, 2023, Tintra and Shearer would publicly acknowledge how they had hoped that this implied valuation would increase Tintra's share price.

202.    The Cogut Family also received warrants to purchase further shares at a deeply discounted price of £0.50 per share.  The warrants were only exercisable if "either the market capitalisation of [Tintra exceeded] US$250m for a period of three consecutive trading days or a future funding round concluded with a post-money valuation of US$250m or greater."

203.    The $250 million valuation would meet the SPAC's requirement that its acquisition target's value exceed approximately $190 million.  Upon information and belief, the warrants were issued to the Cogut Family in anticipation of an acquisition of Tintra by the SPAC to provide the Cogut Family an opportunity to increase their share of the proceeds from the acquisition.

3.      *The Next Step Towards a Sale of Tintra to the SPAC Involved Another Deceitful Announcement of a $10 million Investment at Double the Valuation.*

204.    As the SPAC's acquisition deadline neared, in an announcement published on December 16, 2022, Tintra, Shearer, and Neumann touted a capital raise of $10 million from an

unnamed investor at £11.78 per share, equating to a market capitalization of approximately $230 million—about the very amount raised by the SPAC in its initial public offering. But Tintra's share price at the time was around £2.65 per share (only about $49 million in market capitalization).

205.    Upon information and belief, those representations were false and/or misleading because the purported investor did not exist and because Tintra never expected to, or would, receive those funds.

**M.    The Public Campaign of Deceit Continued Throughout 2022.**

206.    Throughout 2022, the campaign of falsehoods continued, amplifying the deceitful repositioning of Tintra to facilitate the Scheme.

207.    Between March 7 and November 8, 2022, Tintra (and Shearer and Neumann) published announcements in furtherance of the Scheme. Those announcements contained representations, particularized in Schedule 1, which were false and/or misleading on the basis described in Schedule 1. Those misrepresentations are referred to herein as "**Tintra's 2022 Statements**."

208.    Between February 3 and November 18, 2022, Neumann made a number of statements in posts published on social media and in electronically-published press articles in furtherance of the Scheme. Those statements contained representations, particularized in Schedule 2, which were false and/or misleading on the basis described in Schedule 2. Those misrepresentations are referred to herein as "**Neumann's 2022 Statements**."

**N.    Upon Information and Belief, Manager Defendants Directed and/or Caused the Repositioning Campaign and Both the Content and the Timing of Tintra's, Shearer's, and Neumann's Public Statements.**

209.    Upon information and belief, including as described as follows, Manager Defendants intended for the repositioning campaign to be executed.

210.    The repositioning campaign commenced at or about the time when David held a meeting with Shearer concerning the Cogut Family's potential investment in Tintra.

211.    Upon information and belief, as early as fall of 2021, others at Tintra understood that when Shearer spoke at Tintra, he spoke on behalf of Manager Defendants and their business partners.

212.    Upon information and belief, Manager Defendants fed non-public information to Tintra and Shearer to use in the repositioning campaign and continued to do so throughout 2022, including identifying the Other Victims, USAID, IMF, and IDB, as among the victims to target.

213.    Upon information and belief, Manager Defendants supplied Tintra and Shearer with information and instructed them on how to use it in the repositioning campaign.

214.    Upon information and belief, Manager Defendants, Tintra, Shearer, and Neumann also timed Tintra's public announcements to about the same times as when Pegasus made submissions to or received approvals from GCF.  Upon information and belief, they did so to make Pegasus' submissions more credible to the Other Victims, so that Manager Defendants could deceive them.  Examples thereof include the following:

(a)    On August 10, 2022, Pegasus made its final submission of the Preliminary Application to GCF (Pegasus made multiple submissions of interim versions of the Preliminary Application between April 28 and August 10, 2022).  The day before that final submission, Tintra published an article extolling Tintra's purported banking technology for the emerging markets, and Neumann propagated that article on her social media.  Those statements were false and/or misleading for the same reasons as Tintra's prior statements: Tintra had no such technology.

(b)    On November 4, 2022, GCF approved Pegasus' Preliminary Application in relation to the Barbados BGB.  Only two business days after that approval, Tintra published an announcement touting an application it had submitted to a UK regulator.  Upon information and belief, the application contained little substantive information and was likely to be rejected by the UK regulator.  Despite knowing that the license application would likely be rejected, Tintra filed it because Shearer had made a commitment to key investors—upon information and belief, Defendants—to file the application at that time.  Upon

48

information and belief, the inadequate license application was subsequently withdrawn at the UK regulator's urging and never resubmitted.  Tintra, upon information and belief, never submitted any of the other "banking" licensing applications it referred to in its announcements made in 2022 and 2023.

(c)    Just days before Pegasus, on June 14, 2023, made its final submission of its Main Application to GCF (Pegasus made multiple submissions of interim versions of the Main Application between February 2 and June 14, 2023). Tintra published, on June 9, 2023, an announcement, in which Tintra, Shearer, and/or Neumann touted the progress Tintra had purportedly made in setting up its (non-existent) banking operations in the emerging markets and building (non-existent) "Web3 technologies in highly regulated environments."

## O.    After Tintra Was Repositioned, Manager Defendants Extensively Used It to Target the Other Victims.

215.    With Tintra having been repositioned, Manager Defendants commenced using Tintra, Shearer, and Neumann in their efforts to get their hands onto the Other Victims' cash.

### 1.    Manager Defendants Directed and/or Caused Tintra's Preparation of Multiple Deceitful Documents for Submission to the Other Victims and, Upon Information and Belief, Submitted Such Documents to Some of the Other Victims.

216.    Under Manager Defendants' direction, throughout 2023 and, upon information and belief, in 2022, Shearer and others at Tintra created multiple deceitful documents for Manager Defendants to use in support of Pegasus' application to GCF.

217.    Upon information and belief, multiple such documents were transmitted among Shearer, Tintra's employees, David, Craig, and Pegasus' Strategic Advisor and/or employee, Amit Garg ("**Garg**"), via WhatsApp and/or email throughout 2023.

218.    Upon information and belief, Manager Defendants submitted some or all of those documents, or other documents based on such documents, to GCF at various times in 2023.  Upon information and belief, those submissions were made electronically.

219.    In April 2023, Tintra hired a full-time employee to create such documents for Manager Defendants ("**Tintra Pegasus Employee**").  The employee was given the misleading title of "Head of Core Banking Implementation and Strategy."

220.    Once Tintra Pegasus Employee began employment, he joined a call with David and Shearer, at least one of whom, upon information and belief, was in New York.  David directed Tintra Pegasus Employee to prepare BGB-related documentation and to work with Garg.  Shearer required Tintra Pegasus Employee to follow those instructions.

221.    Neither Pegasus nor Tintra had any other employees with experience in creating banking systems, and Tintra Pegasus Employee's experience was not technical, i.e., he was incapable of building a banking system.

222.    Garg was an associate of Manager Defendants.  To mitigate its and Tintra's lack of banking experience, in 2023, Pegasus hired Garg as a "Strategic Advisor" and designated him as the "incoming" Chief Executive Officer of the Barbados BGB.  Garg publicly and, upon information and belief, deceitfully represented that he possessed "[s]trong subject matter expertise as a qualified Chartered Accountant, CFA and MBA from London Business School" and touted that he had "[l]aunched and led a Cat-1 licensed, digital neo-bank" and had "[p]ioneered [a] blockchain trade finance application for a global bank and crypto-token based payment settlement model" at "the Anglo-Gulf Trade Bank."

223.    For months after April 2023, Craig, David, Garg, and Pegasus worked with Tintra, Shearer, and Tintra Pegasus Employee preparing documents for Pegasus' application to GCF.

224.    Manager Defendants and Garg controlled Shearer's and Tintra Pegasus Employee's work.

225.    Shearer required Tintra Pegasus Employee to "focus all [his] energy" on the work he was doing for Pegasus and tailor the documentation to Pegasus' and GCF's requirements. Tintra Pegasus Employee understood that Craig was the ultimate boss, and Garg was the project manager of the BGB project. Tintra Pegasus Employee followed both Craig's instructions, relayed via Shearer, and Garg's instructions.

226.    Shearer also instructed other Tintra employees to undertake work in furtherance of Manager Defendants' instructions.

227.    The documents prepared by Manager Defendants, Garg, Tintra, Shearer, and Tintra Pegasus Employee for GCF contained multiple false and/or misleading representations describing Tintra's purported bank systems and technologies that Pegasus, via Tintra, would purportedly implement at the Barbados BGB. The documents deceitfully described the "core bank" system that Pegasus would purportedly implement and Tintra's purported banking platform that comprised the "core bank" system. Yet, no such systems, technologies, or platform existed, and neither could Tintra develop them, nor could Pegasus provide them.

228.    The documents falsely and/or misleadingly described (1) "Tintra Bank," (2) the creation of an "Offshore development center" or an "India development center," (3) "Tintra Core banking platform" with "hubs" in North America, Europe, and Middle East and Africa, and (4) "Tintra platform work" as "completed." None of those existed or could be achieved by Tintra or by Pegasus using Tintra.

229.    Tintra had no actual customers. Nor could it honestly acquire any, as it had no product.

2. *Manager Defendants Held Tintra Out as Their "[P]artner Tintra Bank" to the Other Victims and Others.*

230. Upon information and belief, in materials disseminated by email and/or WhatsApp no later than July 2023 to its potential funders and/or partners, Pegasus was deceptively describing (1) Tintra as "our partner Tintra Bank" and (2) a partnership for the Barbados BGB for which "[w]e [Pegasus] provide both the structural advice and patented Digital Green Core Banking Technology via our partner Tintra Bank." A transcript with a screenshot of Pegasus' email referencing their "partner Tintra Bank" is attached as **Exhibit B.**

231. Those representations were false and/or misleading. Tintra was not a bank, it was never "Tintra Bank," and it had no "Green," "Banking," "Green Core," "Green Core Banking," "Digital Green Core Banking," or any substantive technology. Nor was Pegasus able to provide the services it was describing "via [its] partner Tintra Bank."

3. *Manager Defendants Used Shearer and Neumann to Pitch the Other Victims, Including at In-Person Meetings.*

232. At various times in 2022 and 2023, Manager Defendants held Shearer out—in Pegasus and Craig's words—as "[a] leader[] from the banking and insurance industry" and extensively used Shearer to pitch senior decision-makers at the Other Victims in person, to promote Tintra, and with the use of Tintra, to establish Pegasus' credibility for the Barbados BGB project.

233. In 2022 and 2023, Neumann specifically targeted IMF and IDB to assist Manager Defendants in securing the Barbados BGB project.

234. Upon information and belief, in 2022, Neumann targeted USAID for Manager Defendants, traveling to Los Angeles, California, and holding a meeting with the then-Administrator of USAID, sometime between June 6 and June 8, 2022. Upon information and belief, that trip was paid for from funds provided by the Cogut Family's investment.

235.    Between March 29 and March 31, 2023, Tintra participated in the United States Department of State's "Call to Advance Democracy" event in Washington, DC.  Shearer and Neumann attended the event, upon information and belief, using funds provided by the Cogut Family.  By then, Tintra was severely financially distressed, had missed at least one payroll, and was late paying its directors' fees (including Neumann's fees).  Upon information and belief, Shearer did not want Tintra to participate in the event, but Manager Defendants insisted on Tintra's participation because, in their view, making a commitment to the United States Department of State at the event would "open the floodgates with regulators and money."  Shearer repeated that sentiment to an employee just weeks later, stating that "'[t]he Coguts' were about to 'open the floodgates of money' for Tintra."  Upon information and belief, he was referring to Tintra's participation in the Barbados BGB project.

236.    Shearer complied with Manager Defendants' instructions, and Tintra attended the event.  At the event, Tintra pledged to the United States Department of State to host a "hackathon/datathon in its offices with USAID's key partners, advancing solutions toward a problem identified by USAID."  That pledge was never met, upon information and belief, because Tintra was incapable of conducting even a simple technical event.  Upon information and belief, that pledge was made pursuant to Manager Defendants' instructions because they believed that the pledge would ingratiate Tintra to USAID.

237.    Upon information and belief, in early April 2023, Manager Defendants and/or Shearer met with GCF in New York to discuss Tintra's participation in the Barbados BGB project.

238.    By May 11, 2023, Shearer was participating in Pegasus' pitches to the Rockefeller Foundation about the Barbados BGB.

239. On May 18, 2023, Neumann attended a Latin Trade event at the Patterson Mansion in Washington D.C., with Persaud. At the event, Neumann presented on a panel with Persaud, upon information and belief, as part of her continued effort to bamboozle decision-makers as to Tintra's (and by extension Pegasus') capability. Upon information and belief, the event was attended by twelve ambassadors, twenty high-level diplomats, and close to thirty experts and private-sector leaders.

240. Upon information and belief, Shearer met with the Prime Minister of Barbados on May 19, 2023. Upon information and belief, that meeting was procured and attended by Manager Defendants.

241. Upon information and belief, on or about June 20, 2023, Shearer met with the Prime Minister of Barbados. At that meeting, organized and attended by Manager Defendants, Tintra and Shearer were held out as the impending providers of the Barbados BGB's banking infrastructure. Upon information and belief, that effort included a document prepared by Shearer and Tintra Pegasus Employee specifically for that meeting.

242. The Barbados Government formally committed to the Barbados BGB project in May 2023. On June 14, 2023, Pegasus made its final submission of its Main Application to GCF. GCF formally approved Pegasus' Main Application on July 13, 2023. Upon information and belief, Craig and/or Garg traveled to Seoul, Korea, to attend that board meeting. Upon information and belief, Shearer's participation in the meetings described above was part of Manager Defendants' plan to obtain control of the Barbados BGB.

243. On about June 20, 2023, Shearer met with Irene Arias Hoffman ("**Hoffman**"), the CEO of IDB Lab, a division of IDB, in Rwanda to pitch Hoffman on the Barbados BGB and BGBs generally.

244.    In an email he sent to IDB officials on July 17, 2023, Shearer described Tintra's participation in Manager Defendants' Barbados BGB efforts and deceitfully described Tintra's technology, stating, "Under Vanessa's [Neumann's] leadership our goals in LAC [Latin America and Caribbean] are pretty developed and maturing all the time. . . .  As discussed we are in close contact in Barbados regarding the Blue Green Bank Initiative being led from there where we will hopefully be providing our technology to build the proposed bank."

245.    By July 28, 2023, Shearer was coordinating a potential public "BGB day" with Manager Defendants and Persaud at the then-upcoming COP28 climate conference, scheduled to take place in December 2023 in Dubai.  Upon information and belief, the purpose of the BGB Day was to promote Pegasus' phony BGB capabilities.

246.    Even the United States National Security Council was not immune from Manager Defendants' deceitful efforts.  Specifically:

(a)    On May 12, 2023, Craig received an email from Randy Caruso ("**Caruso**"), the Director for Climate Diplomacy, Investment and Trade at the United States National Security Council, with Sarah Ladislaw, Special Assistant to the President and Senior Director for Climate and Energy, National Security Council, The White House, on copy.

(b)    By that email, Caruso expressed the National Security Council's interest in understanding the Barbados BGB.  Caruso also explained to Craig that he was interested in assessing how the United States could provide loan guarantees to "Small Island Developing States," like Barbados, with the use of the Barbados BGB—another potentially lucrative opportunity for Manager Defendants.

(c)    Craig shared a screenshot of that email with Shearer via WhatsApp.  A copy of the email, upon information and belief, as received by Shearer, is attached in **Exhibit C.**

(d)    Upon information and belief, Shearer participated in a call involving Craig and Caruso and/or other representatives of the United States Government on May 13, 2023.

(e)    Shearer and Tintra Pegasus Employee then worked on documentation explaining how "the funds and [the Small Island Developing States] offering" could be managed by the Barbados BGB or Pegasus with the use of Tintra.  That

documentation was "tailor[ed] . . . to the content of [Caruso's] email." Upon information and belief, after Tintra Pegasus Employee prepared the documentation, Shearer forwarded it to Craig.

4.    *Manager Defendants Deceived USAID and Used Tintra to Deceive USAID.*

247.    Upon information and belief, in 2022 or early 2023, Pegasus obtained $612,600 in funding from GCF's Project Preparation Facility. Upon information and belief, Pegasus spent some of those funds on costs related to Pegasus' Main Application.

248.    Upon information and belief, on about January 18, 2023, USAID contracted with Pegasus for the Barbados BGB's roll-out and committed $5 million to the roll-out. USAID stated that Pegasus was "to establish the technological and operational infrastructure needed by the [Barbados BGB] bank to accept capital from the Green Climate Fund, the Government of Barbados, and other initial equity investors" and that USAID would "provid[e] $5 million to help establish the bank's management and administrative capacity."

249.    Upon information and belief, prior to and following USAID's award of the $5 million to Pegasus, one or more of Manager Defendants communicated with USAID via email and/or other electronic means.

250.    In the Main Application, Pegasus represented to GCF that $5 million of the $30.5 million in funding that it expected to be provided by the Other Victims would be utilized "for the BGB's infrastructure."

251.    Pegasus then affirmed, in its Main Application first submitted to GCF on February 2, 2023, that the roll-out of the Barbados BGB would be covered by $5 million, the same amount that USAID had "provid[ed] . . . to help establish the bank's management and administrative capacity."

252.    Pegasus was representing to the Other Victims that the cost of the roll-out would be $5 million or less.

253.    One of the documents prepared for GCF by Pegasus and Tintra in 2023 (titled "Tintra Approach and Delivery Plan for BGB") contained a representation that £2.5 million (i.e., approximately $3.2 million) in funding would allow Pegasus—using Tintra—to develop the Barbados BGB with a "minimally viable product." That representation was made even though Tintra was not in the banking technology business or any other business.

254.    Upon information and belief, that document or at least one document based on that document was provided electronically by Manager Defendants to GCF.

255.    Upon information and belief, Craig was involved in preparing that document.

256.    Upon information and belief, Manager Defendants represented the cost of rolling out the Barbados BGB to USAID and GCF without a reasonable basis, and the cost estimates provided by Manager Defendants to USAID and GCF were knowingly or recklessly false and/or misleading.

257.    Upon information and belief, Pegasus made its $5 million estimates no later than February 2, 2023, even though only in July 2023 did Craig request that Tintra and Shearer describe to Manager Defendants the costs of a roll-out.

258.    Upon information and belief, $3.2 million (or even $5 million) was not enough to set up a bank.

259.    On December 6, 2023, Garg publicly made a statement, upon information and belief, confirming that Pegasus could not establish the Barbados BGB for $5 million or less, stating, "we are in discussions with them [USAID] for a second tranche [of funding], which will help us get the operational infrastructure of the [Barbados BGB] bank going."

260.    Upon information and belief, by December 6, 2023, Pegasus had already spent at least some of the funds provided by USAID, purportedly in connection with its impending roll-out of the Barbados BGB.  Upon information and belief, among other things, Pegasus paid costs of or related to Garg's services out of those funds.

261.    The representations as to the cost of the roll-out of the Barbados BGB made by Manager Defendants to the Other Victims were materially false and/or misleading.  Manager Defendants, upon information and belief, executed a classic "bait-and-switch" by (1) first obtaining control of the Barbados BGB project with a low-ball estimate of the cost of building a bank (baiting USAID into committing $5 million for the Barbados BGB) and (2) then, once Manager Defendants obtained the Other Victims' commitment and control over the Barbados BGB, going back to USAID for more capital.

262.    Manager Defendants had, upon information and belief, a relationship of trust with USAID—in or about March 2023, David described Manager Defendants as being "supertight" with USAID.

263.    When Tintra Pegasus Employee began to explain in WhatsApp messages to Shearer that he was unable to determine the actual anticipated costs because of Tintra's lack of any business or product, Shearer wrote back "stop writing now bro" in an effort, upon information and belief, to stop the creation of a written admission of the scam.

264.    Upon information and belief, as early as January 2023, some private parties had been informed that Manager Defendants had brought Tintra into the Barbados BGB project. Tintra's share price appreciated substantially on January 18, 2023, and continued to climb for several days through January 23, 2023.  Tintra neither released any material information nor made any public announcements in the days preceding the price spike.  Upon information and belief, the

share price increase was a result of USAID's public announcement that it would fund the roll-out

the Barbados BGB, made on January 18, 2023, and USAID's determination (upon information and

belief, publicly undisclosed at that time) that it would engage Pegasus to undertake the roll-out of

the bank.

265.    At that time, Tintra had not publicly disclosed that it was involved in the Barbados

BGB project or with Pegasus.  Nor had USAID publicly mentioned Tintra.

**P.    Manager Defendants Extensively and Illicitly Used Tintra in Their Other Business Activities.**

266.    Upon information and belief, including as described below, Manager Defendants'

use of Tintra and its resources was not limited to the Barbados BGB.

*1.    Manager Defendants Used or Caused Tintra to Make Improper Payments to Third Parties.*

267.    After Manager Defendants became involved with Tintra in about late 2021, Tintra

entered into multiple undisclosed improper transactions with third parties benefiting Manager

Defendants.

*a.    Prince Sangay and His Family.*

268.    In 2021, Tintra issued shares to a Shearer-controlled entity, and upon information

and belief, that entity subsequently transferred shares then worth approximately $266,000 to the

interests of Sangay (Manager Defendants' business partner) and Sangay's wife, Princess Ashi

Chimi Yangzom Wangchuck.  Upon information and belief, the transferees did not pay for the

shares.

269.    On multiple occasions in 2023, Tintra paid certain personal expenses of Sangay's

family.

270.    Upon information and belief, that share transfer and those payments were intended

to earn the goodwill of Sangay's family for Manager Defendants' business activities.

b.  *The President of Rwanda's Son.*

271.    Manager Defendants sought business opportunities in Rwanda.  Both SNCF and the CRAFT Fund targeted investments in Rwanda.  Indeed, upon information and belief, by about February 2021, SNCF's focus on Rwanda was specifically identified by GCF.  GCF had identified Rwanda as one of six countries (and one of only two African countries) in which GCF required the CRAFT Fund to invest.  After Manager Defendants acquired control of Tintra, it also purported to commence work on setting up a bank in Rwanda.

272.    Sometime in or about late 2022 and no later than in early 2023, Manager Defendants and/or Shearer caused and/or authorized Tintra to employ Brian as one of its small number of employees.  Upon information and belief, he was employed as an ethnographic or sociological researcher by the "Tintra Culture Lab," a loose and fictitious concept touted by Tintra.

273.    Brian is a son of the President of Rwanda, Paul Kagame, who has ruled Rwanda since 2000.

274.    Upon information and belief, President Kagame controls an instrumentality of the Government of Rwanda, the RDB, where he appoints board members.  Upon information and belief, in 2020, President Kagame appointed to the Board of RDB another of his sons, Ivan Kagame ("**Ivan**"), who is Brian's brother.  Ivan remains on the Board of RDB.

275.    Upon information and belief, at the time of his hiring, Brian was on hiatus from his attendance of a military academy in the UK and needed a visa to be able to lawfully remain in the UK.  Upon information and belief, Tintra assisted Brian with obtaining a UK visa, and Tintra's hiring of Brian enabled him to remain in the UK lawfully.  Upon information and belief, Brian held a "no-show" job, receiving payments for little to no work.

276.    Upon information and belief, within months after Tintra hired Brian, SNCF became involved in at least two investment projects in Rwanda.

277.    Upon information and belief, within weeks of Brian's hiring, Tintra met with Rwandan banking regulators.  Thereafter, on March 8, 2023, Tintra announced that it would be establishing a "banking hub" in Rwanda "following a number of extensive discussions with representatives from a number of government departments, including with the Rwandan Central Bank and Rwanda Development Board."  Tintra also revealed that both of those instrumentalities of the Rwandan government had "expressed enthusiastic support" for Tintra's project.  In the same announcement Shearer stated that Tintra had "a very collaborative relationship with Rwandan authorities."  Tintra also stated that it would commence a "licensing application process with the National Bank of Rwanda" and that it "fully expect[ed]" the licensing application to be successful. Tintra claimed that its pursuit of the banking business opportunity in Rwanda was "a direct result of the ground-breaking work being undertaken by . . . and [the] team of researchers within Tintra's Culture Lab," where Brian was purportedly employed.

278.    Throughout 2023, Tintra continued to tout publicly its banking prospects in Rwanda in public announcements.

279.    Upon information and belief, including based on the foregoing, Tintra hired Brian to secure the help of Rwandan government officials for Tintra's and Manager Defendants and their funds' business efforts in Rwanda.

280.    Upon information and belief, Shearer expected that the hiring of Brian would influence his family's decision-making.

281.    Shearer traveled to Rwanda (upon information and belief, at Tintra's expense using funds provided by the Cogut Family) and met with President Kagame (upon information and belief, in his presidential office in Kigali and with Brian present), upon information and belief, in or about June 2023.  A photograph that recorded that meeting is below.



*From left: Shearer, the President of Rwanda Paul Kagame, and his son Brian.*
*Kigali, Rwanda, June 2023.*

282.    In New York, on September 20, 2023, Manager Defendants hosted an intimate dinner for a small group of dignitaries, including Clare Akamanzi ("**Akamanzi**"), the CEO of the RDB and, upon information and belief, the President of Rwanda's right-hand woman.  Upon information and belief, at the dinner, Manager Defendants and their guest Shearer pitched Akamanzi on setting up a Manager Defendant-controlled BGB in Rwanda.  In December 2023, some or all of Manager Defendants held at least one meeting with high level government representatives from Rwanda.

283.    Upon information and belief, Manager Defendants were also pursuing business opportunities involving the Green Guarantee Company ("**GGC**").  The launch of GGC with funding from USAID, GCF, the British Government, and others, was announced in about early 2023.  GGC's mission was similar to GCF's in that it included "effectively catalyz[ing] scale-level private investments in climate solutions," and Rwanda was one of the limited number of countries in which USAID expected GGC to "help[] to issue green bonds and loans."

c.    <em>The UK Minister's Son.</em>

284.    From in or about January 2023, Tintra employed (upon information and belief, as a "Sociologist" at the "Tintra Culture Lab") and paid the stepson of UK Minister ("**UK Minister's Son**"), a recent college graduate.  UK Minister had at various times held ministerial posts in the British Government and been a senior member of the British Cabinet.  Upon information and belief, at the time of UK Minister's Son's hiring, UK Minister held at least one ministerial post in the British Government.  Upon information and belief, UK Minister's primary governmental responsibilities at various times included "[c]lean growth" in the UK and the British Government's "Green finance strategy."  And, in September 2022, the UK Minister chaired the "[f]irst ever Islands Forum," "which focused on opportunities for islands around net zero," i.e., an area of GFCR's focus.

285.    Upon information and belief, in 2023, Manager Defendants had sought to obtain benefits from or via the British Government related to its "Green finance strategy" and to "[c]lean growth" in the UK.

286.    In March 2023, GFCR's grant arm received a commitment of £24 million (approximately $29.5 million) from the British Government's Blue Planet Fund.

287.    Upon information and belief, including based on the foregoing, UK Minister's Son was hired to try to secure the help of UK Minister for Manager Defendants and their funds'

business efforts in the UK, as well as a regulatory application Tintra made in the UK in November 2022.

288.    Upon information and belief, Brian and UK Minister's Son remained employed at Tintra through in or about late 2023, received benefits unavailable to other employees, and received payments from Tintra even after it could not pay other employees' salaries.

289.    Upon information and belief, Brian (and the costs of his visa) and UK Minister's Son were paid by Tintra, which was enabled, directed, and/or caused to do so by Defendants.

290.    Upon information and belief, Manager Defendants knew that Brian and UK Minister's Son were employed at Tintra and were paid to attempt to influence their relatives.

291.    Upon information and belief, Manager Defendants caused or authorized Brian's and UK Minister's Son's employment and/or their continued employment at Tintra.

    2.    *Manager Defendants Used Shearer and Neumann to Fundraise for GFCR.*

292.    Upon information and belief, in March 2023, Shearer and Neumann assisted GFCR in obtaining a $5 million capital commitment from the private foundation called "Minderoo Foundation." That commitment was important to Manager Defendants because GCF's continued funding of GFCR was contingent on it securing third party private capital, and Minderoo Foundation's commitment, upon information and belief, enabled GFCR to receive a further $25 million of capital from GCF.

    3.    *Manager Defendants Used Tintra to Pitch Other Investors.*

293.    Manager Defendants also used Tintra to pitch other investors. For instance, throughout 2023, Tintra prepared presentations for Craig's use, including for distribution to Pegasus' Senior Operating Advisor Gina McCarthy ("**McCarthy**"), purportedly to pitch a billionaire philanthropist in the United States. In September 2023, Shearer met with McCarthy at an exclusive dinner in New York organized by Manager Defendants.

294.     On June 8, 2023, GFCR co-organized (and Craig traveled to and attended) an event called the "UK Government, UNEP, & GFCR Convene Private Sector Representatives on World Oceans Day" in London.  At the event, Craig and GFCR promoted "impact investing" and GFCR.  Upon information and belief, Shearer attended the event to assist Craig's, GFCR's and (upon information and belief) SNCF's fundraising efforts.

   4.     *Manager Defendants Used Tintra to Advance the Six Senses Hotel Development in the Galapagos.*

295.     Upon information and belief, in mid-2023, among other times, Manager Defendants were experiencing issues at GFCR's Six Senses hotel development on San Cristobal Island in the Galapagos.

296.     In or about June 2023, Tintra hired Sharon Johnson ("**Johnson**") to head the Tintra Foundation's purported charitable activities.   In reality, upon information and belief, Tintra Foundation did not exist.  Johnson was an employee of, and paid by, Tintra.

297.     Johnson had spent years as CEO of the Galapagos Conservation Trust.  Upon information and belief, within days or weeks of Johnson commencing her employment at Tintra, Shearer instructed her to assist Manager Defendants with resolving their issues in the Galapagos.  Upon information and belief, in late June or July 2023, Craig and Pegasus' executive Natalie Gartmann participated in calls with Johnson, instructing her as to the assistance they required.

298.     Johnson obliged.  Upon information and belief, her efforts included having the financially distressed Tintra hire a consultant with extensive Galapagos experience.

299.     On July 4, 2023, upon information and belief, at Johnson's request, her former employer held a working meeting with Galapagos Rescuing Foundation, which was, upon information and belief, associated with Craig, "to explore possibilities of joint collaboration for project development on San Cristobal Island" in the Galapagos.

300.    Within six months, the Ecuador Minister of Production, Foreign Trade, Investment and Fisheries signed an investment contract for the construction of GFCR's Six Senses resort.

301.    Upon information and belief, Johnson was hired, at least in part, to advance Manager Defendants' interests.

        *5.*     *Manager Defendants Used Shearer to Pursue Other Business Opportunities for Themselves.*

302.    Upon information and belief, in December 2023, Shearer assisted Pegasus in securing a partnership with the United Arab Emirates' Ministry of Climate Change and Environment in relation to a food security initiative.

303.    Upon information and belief, in February 2024, Shearer helped Pegasus secure a memorandum of understanding with the Government of Maharashtra for the benefit of SNCF.

**Q.**    **By Early 2023, Manager Defendants, the Sponsor, and Shearer Were Acutely Aware That Time Was Running Out to Sell Tintra to the SPAC.**

304.    By March 2023 at the latest, Tintra was financially distressed.

305.    Shearer was aware that time was running out for the SPAC to acquire Tintra.  In April 2023, Shearer wrote to Tintra Pegasus Employee, "Time is our enemy right now."

306.    Upon information and belief, Manager Defendants and the Sponsor also knew that time was running out for the SPAC to acquire Tintra.

**R.**    **In the Run-Up to GCF Making Its Decision as to Whether to Award More Funding to Pegasus, Manager Defendants Took Steps to Conceal the Nature of Their Relationships with GCF's Executive #1 and GCF's Executive #3.**

307.    In July 2023, GCF's staff publicly memorialized their concerns about Pegasus' capability to roll out the Barbados BGB.

308.    Upon information and belief, GCF's Executive #1 had a substantial amount of influence over whether GCF would award, and/or disburse to, Pegasus millions of dollars.

309.    On June 23, 2023, referring to the Barbados BGB, GCF's Executive #1 publicly stated in a press release that "[GCF's] Board will consider making a substantial investment in the new Bank at its meeting next month."

310.    Sometime between, upon information and belief, January 6 and February 4, 2023, about when Pegasus submitted its Main Application to GCF, Pegasus edited its website to publicly reveal that GCF's Executive #1 and GCF's Executive #3 had a purported advisory relationship involving Pegasus.    Nevertheless, Pegasus' references to GCF's Executive #1 and GCF's Executive #3 on the website did not contain any disclosure that they were being compensated. Upon information and belief, in Pegasus' further efforts to obfuscate, the advisory relationship that was disclosed on Pegasus' website was not the paid advisory relationship described above.

**S.    Once Pegasus' Control of the Barbados BGB Became Assured in Mid-2023, Defendants Promoted Tintra and Their Involvement With It Publicly and at Its Expense.**

311.    With the Barbados BGB funding just days from being approved by GCF, in mid-2023, Defendants publicly promoted their association with Tintra.

312.    On June 27, 2023, Craig, David, Persaud, and Garg visited Tintra's office in London, England.

313.    The visit preceded the event called "The Animal Ball," a lavish costumed black-tie gala held in London, England on June 28, 2023, described by its organizers as "one of the UK's most acclaimed charity fundraising events."

314.    Upon information and belief, at Tintra's offices during their visit, Manager Defendants, Persaud, and Garg met with UK Minister's Son and Brian.

315.    Even though Tintra was unable to pay its debts at that time, it sponsored The Animal Ball purportedly through the so-called Tintra Foundation.  In reality, Tintra used its meager cash reserves for Defendants' benefit.

316.    Upon information and belief, Tintra paid or committed to pay costs that totaled at least hundreds of thousands of dollars for The Animal Ball.  Given the scale and size of the event, the planning for the Animal Ball commenced months before June 2023, and upon information and belief, at least some of those costs were paid with the use of the proceeds of Plaintiff's loan and/or the funds provided by the Cogut Family, as described herein.

317.    Business leaders and socialites from Asia and Britain attended The Animal Ball.

318.    Upon information and belief, UK Minister's Son, UK Minister, his wife, and Brian attended The Animal Ball, and Tintra paid for UK Minister's Son and Brian to attend.  Upon information and belief, the Cogut Family met UK Minister's Son, UK Minister, the UK Minister's wife, and Brian at the Animal Ball.

319.    The Cogut Family traveled to the event (upon information and belief, also attending at Tintra's cost).  The Cogut Family took advantage of the promotional opportunity presented by The Animal Ball, including by being featured in the promotional video produced by its organizers. A photo depicting Craig, Deborah and Shearer at the event is below:



*From left: Craig, Deborah, and Shearer.*
*London, England, June 27, 2023.*

**T.      Tintra Was Collapsing Throughout 2023 and Effectively Collapsed—In Secret—By No Later Than the End of August 2023.**

320.    In the financial statements included in Tintra's 12 Month Unaudited Results to 31 January 2023 (which Tintra published on July 31, 2023), Tintra and Shearer stated that Tintra held cash (or equivalents) worth over £9.9 million (approximately $12.6 million) as of January 31, 2023.  That representation was false and/or misleading because Tintra did not have that cash as of January 31, 2023, and because it had little to no cash by July 31, 2023.

321.    In reality, Tintra was in dire financial straits throughout 2023.  Tintra was late paying its employees' salaries and directors' fees in or about March 2023.  In April 2023,

approximately $3.5 million in Tintra's obligations payable to Plaintiff became overdue.  By no later than the end of August 2023, Tintra was not making (and would never again make) its payroll. Tintra had effectively collapsed.

322.    None of the foregoing (other than Tintra's default in relation to Plaintiff) was known to the public or Plaintiff.

**U.    Manager Defendants and Shearer Continued Pursuing the Scheme at a Meeting with Key Decision-Makers in New York on September 20, 2023.**

323.    GCF's staff described GCF's decision to approve the award of the Barbados BGB funding to Pegasus in July 2023 as "challenging" and "difficult" and stated that their review had raised "some concerns."  The funding was contingent on, among other things, the completion of due diligence by GCF.  Manager Defendants needed more time.

324.    On September 20, 2023, Manager Defendants hosted a dinner for several investors that Manager Defendants were in the process of deceiving.  Pegasus and Craig described the event (in a newsletter they published on Pegasus' website) as follows:

> [W]e were pleased to host an intimate dinner with high level representatives from the Green Climate Fund, Rockefeller Foundation, leaders from the banking and insurance industry, and . . . Persaud.

325.    The newsletter stated the purpose of the dinner was "to discuss opportunities of the Blue Green Bank in Barbados as an example of a joint public-private sector effort to create a regional financing vehicle to overcome the existing financing challenges and constraints of climate change adaptation and mitigation."  In other words, the dinner was a sales pitch to public body decision-makers, in relation to BGBs generally and the Barbados BGB specifically.

326.    At least four Pegasus principals (Craig, David, Garg, and McCarthy) hosted the dinner.  Upon information and belief, approximately a dozen guests attended.

327.    The exclusive group of Manager Defendants' outside guests included: (1) GCF's Executive #1, (2) Persaud, (3) Kavita Sinha, GCF's Private Sector Facility Director, who had presided over the July 2023 GCF board meeting at which Pegasus' application was approved, (4) Mahmoud Mohieldin, Executive Director at IMF, (5) Eric Pelofsky, the Rockefeller Foundation's President's Deputy Chief of Staff and Vice President (the Rockefeller Foundation had contributed at least approximately $300,000 to the Barbados BGB project), (6) Hoffman (of IDB); (7) Akamanzi (of RDB), (8) Christopher Marks, a member of the Board of GGC, (9) Ariana Pevide (Marks' colleague), and (10) Shearer.  Photographs taken at the dinner follow:



*From left: David, Persaud, Garg, Eric Pelofsky and Shearer.*
*New York, September 20, 2023.*



*From left around the table: David (upon information and belief, and partially outside of the frame), GGC's Ariana Pevide, Pegasus' Terry Tamminen (upon information and belief), GCF's Sinha, IDB's Hoffman, GGC's Christopher Marks, GCF's Executive #1, Persaud, Craig, RDB's Akamanzi, IMF's Mohieldin, unidentified, unidentified, Garg, Shearer, unidentified.*
*New York, September 20, 2023.*

328. Upon information and belief, Manager Defendants brought Shearer to the dinner and the meeting to continue deceiving the Other Victims as to the merits of Tintra's purported capabilities and technology, which was a gating issue to Manager Defendants' ability to receive the funds for the Barbados BGB.

329. Upon information and belief, Shearer's participation in the dinner and the meeting was also part of Manager Defendants' strategy to (1) advance Manager Defendants', SNCF's, the CRAFT Fund's, and Tintra's business ventures in Rwanda and (2) pitch Akamanzi and GGC on a BGB in or involving Rwanda and other business opportunities.

**V.      On September 25, 2023, Tintra, Shearer, Pegasus, and Craig Publicly Announced Their Association.**

330.      On September 25, 2023, Tintra published an announcement revealing Pegasus' and

Craig's partnership with Tintra for the Barbados BGB.  The announcement stated:

Technology Partnership Agreement with Pegasus Capital Advisors

The board of directors (the "Board") of Tintra, the rapidly innovating Deep Tech & Banking business, announces that as a result of events held at last week's Climate Week in New York, which is run in partnership with the United Nations General Assembly, that it has entered into an agreement with Pegasus Capital Advisors ("Pegasus"), a leading global private markets impact investment manager, to provide the planning and technology for the core digital banking system of the Barbados Blue Green Bank (the "BGB") (together the "Agreement").

The Barbados BGB, conceived by the government of Barbados, is a collaborative project with the government of Barbados, the Green Climate Fund and Pegasus (https://www.greenclimate.fund/project/fp213).  It is intended to facilitate and accelerate innovative financing to advance mitigation and resilience in multiple sectors of the society and economy of Barbados

As the 2023 United Nations Climate Change Conference ("COP 28") approaches and the world's attention turns to the growing urgency to combat climate change, this joint collaboration under the Agreement is expected to help address the challenges faced by the global south.

Tintra has spent the past 2 years mapping and understanding economies that are underserved by legacy banking systems.  It has now entered a phase of utilizing this research, based upon its patented inventions in artificial intelligence and decentralised systems, to develop a suite of innovative adaptive technologies and tools which addresses those needs.

Tintra's work generally and particularly in relation to this Agreement is focused very much on the philosophies of the Bridgetown Initiative (https://www.weforum.org/agenda/2023/01/barbados-bridgetown-initiative-climate-change/) and which fully aligns with our conviction that true global change has to come from private sector and public sector collaboration.

Tintra's focus on financial inclusion and equality in the global south is very connected with the issues of climate inequality; the BGB and the Bridgetown initiatives are indeed closely aligned with Tintra's mission of driving such change, which we aim to deliver with urgency in this collaboration.

Tintra will design a fully configured core banking system for the BGB, powered by the world leading banking software provider, Temenos.  This underlying core banking system will be augmented by its patented compliance technology internally

developed by Tintra's Innovation Lab, staffed by PhD level researchers and practitioners in artificial intelligence, machine learning, anthropology, political science, and sociology. In combination, Tintra will design the delivery profile for a truly bespoke, innovative, secure, and fully compliant banking technology infrastructure, designed and developed to the specific needs of the BGB.

Tintra are delighted and honoured to be successful in securing this partnership with Pegasus to work on the early-stage planning of this game changing platform. It is a powerful endorsement of the great work the team at Tintra have undertaken as we use Artificial Intelligence to drive Real Change™.

Tintra CEO Richard Shearer says: "I am thrilled that Tintra's unique way of approaching the issues faced in the global south is being recognised by such distinguished players. The opportunity has the potential to create a much larger conduit through which to create the impact that is truly needed at pace.

["]The clock continues to tick for essential action that is needed to address climate related challenges and in turn to drive true financial inclusion and empower those affected through a bottom up rather than just top-down approach."

Craig Cogut, Founder of Pegasus Capital says: "We are incredibly excited about the pioneering efforts of the Barbados Blue Green Bank and its potential to serve as a model for other Blue and Green Banks to drive climate readiness in the global south. The government of Barbados shares the vision of creating an association of similar banks to create synergies, share knowledge and best practices and diversify risk. We have been approached by a number of other countries to pursue forming similar institutions. I am very grateful for the role Richard and his team at Tintra will play in expediting the establishment of these banks with appropriate de facto infrastructure."

331.    Upon information and belief, Craig and Pegasus, directly or through another, participated in drafting and approved the content of the statement attributed to Craig.

332.    Upon information and belief, one or more of Manager Defendants participated in drafting and approved the announcement.

333.    The statement attributed to Craig (made in his capacity as "Founder of Pegasus") contained representations that Tintra had "appropriate de facto infrastructure" or some substantive infrastructure that could "play" a "role" in or "expedit[e]" the establishment of a bank, the Barbados BGB, and other BGBs. By Craig's statement, Tintra was held out as a bona fide, established provider of cutting-edge banking infrastructure capable of establishing those banks. It

was also held out as a financially stable company that would continue as a going concern at least for the period of time that would be needed to establish the banks with which Craig stated Tintra would be assisting Pegasus.  The statement also contained representations that it was likely that Pegasus would be undertaking multiple BGB or similar projects in multiple countries and that Tintra would participate in such projects through its partnership with Pegasus.  By Craig's statement, Pegasus and Craig were lending their imprimatur as purportedly reputable investors to Tintra's and Shearer's deceitful statements.

334.    By the rest of the announcement, Tintra and Shearer continued to insist that Tintra had (1) an "underlying core banking system," an AI technology, a "truly bespoke" or "innovative" technology, and an "internally developed" "compliance technology" and (2) a "focus on financial inclusion and equality in the global south," which was "very connected with the issues of climate inequality."  The announcement also contained representations to the effect that Tintra would be able to deliver on the projects described therein.

335.    The representations described in the two preceding paragraphs were false and/or misleading because Tintra never had the assets and capabilities described therein and because Tintra had collapsed.

336.    Upon information and belief, leading the Other Victims and Plaintiff to believe those misrepresentations was critical to Defendants.

**W.    In September 2023, LRB Spoofed a Takeover of Tintra to Buy Manager Defendants More Time.**

*1.    Tintra Announced a Potential Takeover by LRB.*

337.    Upon information and belief, sometime in mid-2023, and in any event, no later than before September 7, 2023, Manager Defendants, Tintra, Shearer, LRB, CFP Fintech, and Al-

Abdulla reached an agreement to promote a sham takeover of Tintra by LRB (subsequently replaced by a sham tender offer for Tintra's shares).

338.    On September 7, 2023, Tintra published an announcement of a purported proposed takeover offer of Tintra by LRB.

339.    The announcement described (1) Tintra as a "Deep Tech & Banking business," (2) the purported takeover as one that was "following a period of lengthy and extensive negotiations," (3) LRB as a "special purpose vehicle formed for" the "purpose" of undertaking the purported takeover, and (4) LRB as "currently controlled by its directors, Tariq Al Abdulla and Andrew Bascombe, but with backing from other existing non-management shareholders of Tintra."

340.    The announcement included the following description of the purported takeover:

LRB's proposal is in respect of a possible offer at a price of [£1.50] per Tintra ordinary share of 1 pence each ("Ordinary Shares") in cash, with a share exchange alternative (the "Proposal"). The Board of Tintra has indicated to LRB that it would be minded to recommend the Proposal to Tintra's shareholders, should a firm intention to make an offer pursuant to Rule 2.7 of the Takeover Code (the "Code") be announced on such terms.

The Proposal, if it was to proceed to a formal offer, is subject to the satisfaction or waiver of a number of customary pre-conditions, including satisfactory completion of due diligence and the finalisation and documentation of financing for the transaction.

. . .

This announcement has been made with the consent of LRB.

341.    Tintra followed that announcement with another one published on October 5, 2023, which reiterated the description of the purported takeover, described "[d]iscussions between Tintra and LRB" as "continuing" and described that "therefore [Tintra] today announces that the directors of Tintra (the "Board") have requested, and the Panel on Takeovers and Mergers (the "Panel") has consented to, an extension to the deadline by which LRB is required either to announce a firm

intention to make an offer for Tintra in accordance with Rule 2.7 of the Code or to announce that it does not intend to make an offer, until 5.00 p.m. (London time) on 5 November 2023."

342.    Tintra followed that announcement with another one published on November 5, 2023, according to which, with the statutory deadlines for the takeover having run out, LRB itself announced that it was replacing the takeover with a tender offer.  That announcement described the "discussions about a possible full cash offer by LRB to acquire the entire issued, and to be issued, share capital of Tintra at a price of [£1.50] per Tintra ordinary share of 1 pence each" as continuing.  It included the statement, "The board of LRB is supportive of the growth strategy being pursued by Tintra."  It described "the board of LRB" as having "received indications from holders of a majority of the issued share capital of Tintra that they support the development of Tintra, and consequently that they would not wish to accept a cash offer at [£1.50] per Ordinary Share, but would wish to retain their Ordinary Shares in Tintra."  It included the following statement:

> As such the board of LRB, in discussion with the board of Tintra, has therefore concluded that a significantly simpler, and potentially faster strategy, will be for it to instead pursue its interest in Tintra by making a tender offer to bring its total shareholding up to 29.9% of the issued share capital of Tintra at [£1.50] per Ordinary Share ("Tender Offer").

> The Tender Offer would be subject to the consent of the Takeover Panel and would be made in accordance with Appendix 5 of the Takeover Code ("Code"), so that those Tintra Shareholders who did not wish to retain shares will be able to obtain cash for their Tintra Shares, subject to being scaled back in the event that the Tender Offer is oversubscribed.

> Therefore, in accordance with Rule 2.6(a) of the Code, the board of LRB today announces that it does not intend to make a full offer for Tintra, but instead it intends to make the Tender Offer.  Consequently, going forward, LRB is subject to the provisions of Rule 2.8 of the Code.

2. *Defendants Controlled or Co-Controlled LRB.*

343.    Upon information and belief, Defendants controlled or co-controlled LRB, as described below.

(a)    LRB had been formed by Andrew Bascombe ("**Bascombe**").  Upon information and belief, Bascombe was a long-standing associate of John Michael Botros ("**Botros**"), a substantial and longtime shareholder in Tintra, who would soon be publicly held out in regulatory forms filed with the LSE as a party acting "in concert" with David, LRB, Tintra, CFP Fintech, PCLLC, and several others.

(b)    On September 4, 2023, Al-Abdulla was appointed a (second) director of LRB.

(c)    Upon information and belief, the day after the takeover was announced, the Cogut Family's CFP Fintech became one of the (three) directors LRB.  A copy of the filing confirming CFP Fintech's appointment as a director of LRB is attached as **Exhibit D.**

(d)    Eventually, on January 18, 2024, Craig would become one of LRB's directors (two days after LRB was renamed "Tintra AI Limited").  A copy of the filing confirming Craig's appointment as a director of LRB is attached as **Exhibit E.**

(e)    In September 2023 and October 2023, Tintra filed multiple regulatory forms with the LSE electronically, published on LSE's website.  The forms revealed that (1) David, CFP Fintech, PCLLC, and LRB, (2) Tintra itself, "the Tintra Foundation," "the Tintra Trust," and Shearer and his Tintra Holdings Limited, (3) Sangay and his wife and their Sun Trust and company Crescent Moon Ventures Limited, (4) Tintra's Chairman Roger Matthews ("**Matthews**") and his company Oyster SARL, Tintra's director Joe Lyske and his company TMC2 Ltd, Tintra's directors Kathy Cox ("**Cox**") and John Cripps, and Tintra's company secretary Andrew Flitcroft, and (5) Botros and his First Hartford Trust and Tintra's large shareholder Phil Jackson and his Pintail Holdings Ltd, were all acting "in concert," or in combination, in relation to the "takeover."

344.    Upon information and belief, one or more of Manager Defendants participated in preparing and/or approved the regulatory filings identifying David's, PCLLC's, CFP Fintech's, and LRB's participation in the purported takeover or permitted the submission of those filings.

345.    Upon information and belief, Shearer described LRB's "takeover" as an investment by the Coguts.

### 3. The Takeover Turned Tender Offer Was a Sham.

346.    Upon information and belief, the takeover or tender offer was a sham.  Upon information and belief, LRB and/or its controllers (including Manager Defendants) never intended to commence or complete the takeover, nor could they have reasonably expected to do so, because:

    (a)    LRB's purported offer price of £1.50 per Tintra share would have required LRB to spend at least £26.6 million (approximately $33 million).  Upon information and belief, LRB did not have the financial resources needed for the takeover.

    (b)    Upon information and belief, while the purported takeover was ongoing, Al-Abdulla expressed that Tintra was "a waste of time" and that he was not prepared to complete the takeover.

    (c)    David's, CFP Fintech's, PCLLC's, and LRB's public disclosure in relation to the takeover concealed the material information concerning the overdue $1.2 million owed by Tintra to the Cogut Family and CFP VII.

    (d)    When the takeover charade could no longer be maintained because of a statutorily-mandated deadline, Tintra and LRB purported to extend the deadline to announce the takeover formally by a month.  Once the charade of the *extended* takeover could no longer be maintained for a similar reason, the "takeover" was replaced by a "tender offer," which was a continuation of the same sham, extending the timeline by yet another month.

347.    Upon information and belief, Defendants were aware that LRB financially could not complete the takeover or tender offer, that Tintra was not worth the £26.6 million (approximately $33 million) LRB would have to spend to consummate the fake takeover effort, and that LRB had no plans to proceed with the fake takeover or tender offer.

### 4. Tintra's Announcements in Relation to the Purported Takeover and the Purported Tender Offer Were Deceitful.

348.    The announcements on September 7, October 5 and November 5, 2023, promoting the takeover or tender offer were false and/or misleading because the purported transaction was fake.

349.    The November 5, 2023 announcement (made by LRB) contained additional false and/or misleading representations because it touted Tintra's "growth strategy" and "development"

without disclosing that, in reality, Tintra had ceased substantive operations.  The announcement also created the false and/or misleading impression that Tintra was so valuable that a majority of its shareholders would not sell their shares at £1.50 per share (despite that price equating to a 122% premium to the then market price of Tintra), necessitating the "takeover" being replaced by the "tender offer."

> 5.    *The Deceitful Takeover Was Backed Up by Deceitful Financial Statements.*

350.    On October 2, 2023, Tintra published its Annual Report for the year ended January 31, 2023, representing that it held cash and cash equivalents of £8.7 million (approximately $11.1 million) as of January 31, 2023.

351.    On October 31, 2023, Tintra published its Half-Year Report for the period to July 31, 2023, representing that it held cash and cash equivalents of over £7 million (approximately $8.9 million) as of July 31, 2023.

352.    Those reports were false and/or misleading because (1) Tintra did not have those amounts of cash at the dates represented and (2) they did not disclose that Tintra had no cash at the time of publication.

353.    Defendants, upon information and belief, knew that the statements holding out the cash balances described in the foregoing financial statements (and in the financial statements published on July 31, 2023) were inaccurate.

> 6.    *By the Fake Takeover and Tender Offer and Related Announcements,*
> *Manager Defendants Were Biding Time.*

354.    The false and/or misleading representations contained in Tintra's announcement of September 25, 2023, and in Craig's statement in that announcement lent further credibility to the deceit advanced by the fake takeover and tender offer-related announcements and the financial statements.

355.    By the publication of the foregoing, and the continued promotion of the fake takeover and tender offer, upon information and belief, Manager Defendants, Tintra, Shearer, LRB, CFP Fintech, and Al-Abdulla were biding time until Tintra could be removed from the public eye through a delisting and a reregistration as a private company.

**X.    In Late 2023 and Early 2024, Manager Defendants Swept the Misconduct at Tintra Under the Rug.**

        *1.    Following Tintra's De Facto Collapse, Manager Defendants Sought to Preempt Potential Public Scrutiny and Take Tintra Private.*

356.    Upon information and belief, including based on the following, Manager Defendants sought to remove Tintra from the public eye to cover up their wrongdoing and Tintra's true state of affairs.

357.    On November 6, 2023, Tintra announced that it was planning to delist from the AIM Market of the LSE and to become a private company, despite both actions being in violation of the Agreement.

358.    On November 28, 2023, Tintra published an announcement of its intention to delist from the AIM Market of the LSE and become a private company.  Its collapse, however, remained concealed from the public.

359.    On December 6, 2023, Tintra cemented its plan to delist and become a private company by calling a shareholders' meeting for January 4, 2024, to seek approval for those plans.

360.    On or about December 5, 2023, Tintra published an announcement stating that it "ha[d] been working with its investment partners . . . for what is now close to six months to restructure and to become a private company."  Upon information and belief, Manager Defendants were among the "investment partners" (as investors in, and controllers of, Tintra) who had worked to remove Tintra from the public eye about when GCF had approved the Barbados BGB funding.

361.    In a letter from Matthews to shareholders published by Tintra on or about December 6, 2023, Matthews specifically reiterated Tintra's involvement with the Barbados BGB and the purported need for Tintra to be privately owned to be able to participate in that project.

362.    Despite the plan having been in the works for nearly six months, Tintra's reregistration as a private company was not announced until after Manager Defendants secured the approval of the Main Application in July 2023 and made substantial progress toward closing on the Other Victims' funding, upon information and belief, so that "Tintra" could continue to be held out to the Other Victims as a credible company.

363.    On November 28, 2023, Tintra published an announcement disclosing its pending delisting, stating:

> Over the past few years, the Company [Tintra] has modelled its capital raising on a US style private equity strategy, seeking funding in the private markets for the most part. This strategy's origin received substantial support from big name funding partners, including a member of a royal family, a major US PE firm and a number of family offices.
>
> We were able to do this at a premium to the price on AIM based on the valuation of the concept and its future potential. Something that is natural in the US, but uncommon in public markets in the UK as we discovered. The assumption in running this strategy was that, over time as the concept turned into build (current phase) and build later turned into deployment, that the valuation of the Company [Tintra] would track a public valuation in line with those early raises.
>
> . . .
>
> Further, the activities in which the Company is to provide services in relation to Blue Green Banks . . . in the global south are related to large funds and public bodies who are heavily involved themselves in those projects and with which the Company is to collaborate in either a formal or informal capacity. It is more realistic to do that in a privately owned company environment, while still maintaining a broad and diverse investor base.

364.    Upon information and belief, the references to "a major US PE firm," "family offices," and "investment partners" were, or included, references to Defendants, and the reference to "large funds" was to GCF and Pegasus.

365.    Following Tintra's reregistration as a private company, Tintra "went dark," ceasing to make readily publicly available announcements about what was transpiring at Tintra.

    2. *Tintra Formally Collapsed in June 2024.*

366.    On January 5, 2024, Plaintiff filed a winding-up petition against Tintra in England, seeking for Tintra to enter a formal bankruptcy process.

367.    On January 16, 2024, LRB was renamed "Tintra AI Limited."

368.    On February 8, 2024, the petition was published in "The London Gazette."

369.    Upon information and belief, Manager Defendants directed and/or caused Tintra, through its and LRB's attorney Botros, to vigorously resist Plaintiff's court application, even though, unbeknownst to the public, at that point Tintra was no longer a going concern.

370.    On June 5, 2024, the English court granted a winding up order against Tintra, and the UK's official receiver was appointed Tintra's liquidator.

371.    On January 23, 2025, Shearer became the sole director of LRB and renamed it "TNTWU25 Limited."

    3. *Manager Defendants Continued to Benefit From the Scheme in 2024.*

372.    The Scheme was successful for Manager Defendants—on July 25, 2024, Pegasus secured formal control over, and GCF's millions for, the Barbados BGB.  That day, Pegasus entered into a formal investment agreement with GCF in relation to GCF's $15.5 million investment in the Barbados BGB.  Tintra had accomplished its role in the Scheme for Manager Defendants.

373.    The Scheme bore fruit for Manager Defendants elsewhere.  In January 2024, Craig and Pegasus obtained a lucrative role in a $1 billion United Nations Development Programme ("**UNDP**") program.

374.    On January 23, 2024, UNDP (the leading United Nations organization fighting to end the injustice of poverty, inequality, and climate change) and Pegasus jointly announced (from

New York) "a transformative partnership dedicated to mobilizing significant investment for climate, energy, and nature-positive infrastructure across emerging economies, Least Developed Countries, and Small Island Developing States" between UNDP and Pegasus, and that "the partnership aim[ed] to unlock in excess of USD $1 billion in combined grants and investments by 2025."

375.    The United Nations lists Barbados as a "Small Island Developing State."

376.    The United Nations listed Rwanda as a "Least Developed Country" until 2024.

377.    Upon information and belief, Manager Defendants' establishing themselves publicly as investors with a particular expertise in both (1) "Small Island Developing States," using the Barbados BGB as a model, and (2) "Least Developed Countries," using their and Tintra's purported Rwandan activities, helped them secure that partnership.

378.    UNDP—none the wiser about the wrongdoing at Tintra and by Manager Defendants given the efforts to conceal the Scheme—admitted Pegasus into the partnership, which, upon information and belief, it would not have done had it known the truth.

## II.    To Obtain Money for Themselves, Defendants, Together with Tintra, Shearer, Neumann, LRB, CFP Fintech, Cox, and Al-Abdulla, Injured Plaintiff.

379.    Defendants, together with Tintra, Shearer, Neumann, LRB, CFP Fintech, Cox, and Al-Abdulla, have been engaging in a course of wrongful conduct directed at Plaintiff.

### A.    Manager Defendants, Tintra, Shearer, and Neumann Duped Plaintiff Into Entering Into the Agreement and Out of a $3 Million Loan.

380.    In addition to the false and/or misleading public statements made by Tintra, Shearer, and Neumann throughout 2022, in late 2022 Tintra, Shearer, and Neumann made further false and/or misleading statements to Plaintiff to induce it to agree to lend $3 million to Tintra.

       *1.     Tintra and Shearer Made Deceitful Statements to Plaintiff on October 4, 2022.*

381.    By late 2022, Tintra needed cash.  Shearer invited Plaintiff's representative to discuss Plaintiff's potentially providing funding to Tintra.  On October 4, 2022, Plaintiff's representative met with Shearer.  At that meeting, Tintra and Shearer sought a convertible loan from Plaintiff.

382.    At that meeting, Shearer represented to Plaintiff's representative, who then relayed those representations to Plaintiff's Chief Investment Officer ("**CIO**"), that: Tintra (1) was "building an emerging market financial infrastructure company," (2) was "using AI to make KYC [know-your-customer banking processes] easier in emerging markets," (3) intended "to be the bank and the clearing house [and] . . . not just a fintech company," (4) was an ESG business, particularly "as its business gives banking access to the 'unbanked' and other marginalised people in developing countries," and (5) "already ha[d] a licence in Qatar."

383.    Those representations were false and/or misleading because Tintra (1) had no substantive business, (2) was not "using AI" for the purposes indicated or for any purposes (as it had no artificial intelligence technology to use), (3) was not an ESG business or a business that had ESG objectives, as its main objective was to further the Scheme, and (4) did not have a license in Qatar.

       *2.     Shearer Sent Plaintiff a Deceitful Presentation.*

384.    On October 4, 2022, Shearer sent to Plaintiff's representative Tintra's presentation titled, "Artificial Intelligence Real Change – Project Revolution" (the "**Presentation**"), via WhatsApp.  The Presentation contained statements by Tintra, Shearer, Neumann, and other directors and purported employees of Tintra, containing false and/or misleading representations.  Those are particularized in Schedule 3.

385.    The representative forwarded the Presentation to Plaintiff's staff via WhatsApp on about October 4, 2022.

       *3.    Tintra Published Deceitful Half-Yearly Results on October 27, 2022*

386.    On October 27, 2022, while Tintra and Shearer were negotiating a loan with Plaintiff, Tintra published its Half-Yearly Results for the six-months ended 31 July 2022.

387.    The "Key Highlights" section of that document contained representations that Tintra was (1) undertaking "development and build of its technology and infrastructure for its new platform" and (2) continuing to focus on "building this deeply innovative, highly regulated new business, implementing a unique combination of Tintra's proprietary AI-driven technology and deployment of market leading systems technology, supported by a growing number of global banking and payment services licences, supported by patents totalling [sic] 4 . . . with more to come and a very strong ESG framework."

388.    Those statements effectively summarized, in a condensed fashion, the false and/or misleading representations made in Tintra's, Shearer's, and Neumann's public statements throughout 2022, as particularized in Schedule 1 and Schedule 2.  So did the statements made by Shearer to Plaintiff's representative on October 4, 2022.  So did the Presentation.

389.    Those representations were false and/or misleading because Tintra was a sham. Tintra had no product, no substantive technology (and no proprietary or AI-driven or market leading technology), and no platform infrastructure or platform and was not "implementing" or even developing any of those.

390.    The document also contained the following statement by Shearer:

Having the strategy now so clearly articulated means that we are now firmly in the delivery phase which manifests itself as the build out.  This is a mixture of technology and regulation with distinct teams working on both, primarily in London for technology and in a range of geographies on the regulation piece.

391.    That statement echoed, was consistent with, and lent further credibility to, the misrepresentations as to "different teams having delivered innovation and on . . . execution plans," which were made in the announcement announcing the Cogut Family's investment on March 21, 2022.    Those representations were false and/or misleading for the same reasons as the misrepresentations in the March 21, 2022 announcement.

    *4. Tintra Published Another Deceitful Announcement on November 8, 2022.*

392.    On November 8, 2022, while Tintra and Shearer were negotiating a loan with Plaintiff, Tintra published an announcement titled "Business Update."    That announcement concerned Shearer's private company Tintra Acquisitions Limited ("**TAL**").    In the announcement, Tintra, Shearer, and Neumann described how TAL would pay £1.4m to £1.5m in Tintra's existing debt.    That representation was false and/or misleading because, upon information and belief, TAL had only a few thousand pounds in cash and did not have the financial wherewithal to pay Tintra's obligations.    Furthermore, upon information and belief, Shearer did not intend for TAL to pay those debts.    Instead, upon information and belief, Tintra and Shearer intended to utilize the proceeds of the loan sought from Plaintiff to repay those debts.

    *5. On December 15, 2022, Plaintiff Agreed to Lend $3 Million to Tintra.*

393.    Before Plaintiff agreed to lend Tintra money, Plaintiff reviewed Tintra's public announcements containing Tintra's 2022 Statements and Neumann's social media posts and other public statements containing Neumann's 2022 Statements, as well as Tintra's October 4, 2022 statements, October 27, 2022 Half-Yearly Results, November 8, 2022 statements, and the Presentation.    Those documents and the representations made thereby were important to Plaintiff's decision to agree to enter into the Agreement.

394.    Following its diligence, on December 15, 2022, unaware (1) that Tintra was a sham and of the true state of affairs at Tintra, (2) of the Scheme, Manager Defendants' involvement in

Tintra, and Tintra's (and Manager Defendants') involvement in the Barbados BGB and with the Other Victims and (3) of the falsity and misleading nature of the statements described above, Plaintiff entered into the Agreement with, and agreed to lend $3 million by way of a convertible instrument with a face value of $3.15 million to, Tintra.

> 6.    *Tintra, Shearer, and Neumann Made Additional Deceitful Statements to Plaintiff to Induce It to Wire the $3 Million to Tintra.*

395.    After the Agreement was signed, the parties still needed to close on the transaction, and Plaintiff was not obligated to close on its loan if, among other things, an Event of Default under the Agreement had occurred, including if any of Tintra's public announcements were inaccurate, false, or misleading in any material respect.  Before signing the Agreement, Tintra and Shearer had publicly announced that Tintra would close a funding round of "at least US$10m" in December 2022 and indicated that Tintra would release a public update on Tintra's fundraising efforts.  Accordingly, Plaintiff was prepared to close on the loan only if the additional funding became committed and if Plaintiff believed Tintra's public update as to the funding to be accurate.

396.    The day after the Agreement was signed, on December 16, 2022, Tintra released a public announcement, by which Tintra, Shearer, and Neumann stated:

Strategic Investment Under Current Funding Round

The board of directors of Tintra (the "Board") is pleased to confirm that further to the announcement of 30 November 2022 (the "Announcement"), that it has received the subscription agreement under the current funding round for US$10,000,000 (the "Subscription").  The Subscription has been agreed with the Family Office of a Gulf-based investor.  The Subscription will be made through a new special purpose vehicle (the "SPV").  The Subscription has no conditionality, however based on earlier funding rounds taking longer to close than anticipated the funds due under the Subscription are contracted to be received within 45 days to enable the establishment of the SPV, at which point an update announcement will be made.

The Subscription is for 684,594 new ordinary shares of 1 pence each in the capital of the Company ("Ordinary Shares"), priced at [£11.78] per Ordinary Share, at an exchange rate of £1.00:$1.24 (the "Subscription Price").

For each two new Ordinary Shares purchased under the Subscription, the investor will receive one warrant to subscribe for new Ordinary Shares at an exercise price of [£5.04] per Ordinary Share for a period of five years, conditional on either the market capitalisation of the Company exceeding US$500,000,000 for a period of three consecutive trading days or a future funding round being concluded with a post-money valuation of US$500m or greater (the "Warrants").  A total of 342,297 Warrants will be issued under the Subscription, once the funds are received.

397.    The foregoing representations were false and/or misleading, because, upon information and belief, Tintra never received a "subscription agreement," agreed to a "Subscription," or "contracted" to receive the $10 million as represented; there was no "Strategic Investment" as announced and, therefore, no "funds due under the Subscription"; and Tintra would not (and could not reasonably expect to) receive the $10 million in cash from the purported investor.

398.    Upon information and belief, Manager Defendants knew that the purported issue price held out in the announcement was contrived to position Tintra to meet the approximately $190 million threshold to qualify as an acquisition target by the SPAC.

399.    Upon information and belief, the December 16, 2022 announcement was published with the additional purposes of assuaging Plaintiff's concerns about Tintra's capital adequacy and to induce Plaintiff to close on the $3 million loan under the Agreement.

400.    Upon information and belief, Manager Defendants knew that the purported $10 million transaction was a sham because, among other things, they knew that the Cogut Family's own similar March 2022 transaction was similarly structured at a premium for illicit reasons.

401.    Before closing on the loan, Plaintiff reviewed Tintra's announcement of December 16, 2022.  Plaintiff relied on the representations in that announcement and was led to believe that Tintra was financially stable by those representations, which were important to Plaintiff's decision to close on the loan.

402.    On December 23, 2022, unaware of the false and/or misleading nature of all of the misrepresentations made to Plaintiff prior to that date, Plaintiff closed on the loan and wired approximately $3 million to Tintra's UK counsel's bank account for Tintra's benefit.    Upon information and belief, Tintra and Shearer subsequently transferred those funds, or caused them to be transferred, to Tintra's and/or its subsidiaries' other bank accounts.    At subsequent times, Tintra paid its working capital and other costs using the proceeds of Plaintiff's loan.    Tintra became indebted to Plaintiff under an instrument with a face value of $3.15 million.

403.    No Defendant ever corrected any of the false and/or misleading representations described in this Complaint.

       *7.    In Late 2022, Manager Defendants Had Multiple Reasons to Cause Tintra, Shearer, and Neumann to Extract the Loan from Plaintiff and to Cause the Announcement of the Fake $10 Million Fundraising to Be Made.*

404.    The false and/or misleading representations that induced Plaintiff to fund Tintra served Defendants' objectives in the Scheme.

405.    By December 2022, Pegasus had not yet secured the Barbados BGB project, and the SPAC had not yet consummated an acquisition.    Tintra needed additional cash to remain viable while Manager Defendants pursued GCF's approval of the funding for the BGB and as a potential acquisition target for the SPAC.    Manager Defendants needed to continue presenting Tintra as both a purported "suitable provider" of banking infrastructure for the Barbados BGB and a credible acquisition target for the SPAC.    Tintra going bankrupt would have scuttled those plans.    The announcement of the purported $10 million investment enabled Tintra to be held out as meeting the minimum valuation requirements to qualify as an acquisition target for the SPAC.

406.    Upon information and belief, Manager Defendants prohibited Tintra from issuing shares at prices that did not support the artificially inflated valuation for Tintra.

407.    Upon information and belief, there were limited funding options for Tintra.  Upon information and belief, the Cogut Family did not want to provide additional funds to Tintra because, among other reasons, they were "cash poor" at the time.  Upon information and belief, a typical equity raise by Tintra to arm's length investors was also not viable as to do so, Tintra would have had to issue shares at a valuation that was significantly below the minimum valuation at which it qualified as an acquisition target for the SPAC.  Indeed, upon information and belief, in discussions with third party investors, Shearer unreasonably and stubbornly insisted that Tintra would issue equity only at substantial and unrealistic premiums to the market price.

408.    Upon information and belief, at no time after Defendants' investment in Tintra in March 2022 did Tintra raise equity.  Tintra's only known sources of cash after March 2022 were Defendants themselves and Plaintiff's loan.

409.    Indeed, when in April 2023 Tintra was again desperate for cash and Shearer disclosed to Defendants that he wanted to approach hedge funds to raise cash, upon information and belief, Defendants proceeded with a self-interested transaction instead.

410.    A convertible loan from Plaintiff, however, provided Tintra with immediate cash while avoiding a share issuance at that time.

411.    The Agreement set forth a formula at which a share issuance to Plaintiff in a conversion of the loan would be priced.  At all relevant times, the share issuance prices determined under that formula would have implied a valuation of Tintra well below the SPAC's $190 million minimum valuation threshold.  Therefore, upon information and belief, an issuance of shares to Plaintiff in a conversion of the loan would have hindered an acquisition of Tintra by the SPAC.

412.    Moreover, an issuance of shares to Plaintiff would have diluted the equity stake formally held by the Cogut Family in Tintra, reducing the value they would have received in a sale of Tintra to the SPAC for their Tintra shares.

413.    Upon information and belief, Manager Defendants never intended to permit Tintra to issue shares to Plaintiff under the Agreement.

        8.    *Manager Defendants Knew That Tintra, Shearer, and Neumann Were Making Statements to Plaintiff to Induce Plaintiff to Lend to Tintra.*

414.    Upon information and belief, Manager Defendants were aware of the content of Tintra's public announcements.

415.    Upon information and belief, Manager Defendants knew that the public statements predating the start of Tintra's loan negotiations with Plaintiff were directed at, among others, Tintra's prospective funders because they knew that throughout the late 2021 to November 2022 period, (1) Tintra was seeking to raise cash and (2) Tintra was using its public announcements to drum up interest.  In a steady drumbeat of public announcements published between October 29, 2021, and November 30, 2022, Tintra acknowledged that a "funding round [was] currently underway," that it was planning to raise funds or was in the middle of an ongoing "funding round," that a fundraising would be conducted in late 2022 and through to the end of 2022, and that a fundraising was expected to close in December 2022.  An announcement of August 1, 2022, described Tintra's goal to attract investors by its public relations campaign.

416.    The foregoing announcements were particularly targeted at funders like Plaintiff.

417.    Manager Defendants knew that Plaintiff would rely on the statements made in Tintra's announcements of October 27, November 8, and December 16, 2022, because upon information and belief, Manager Defendants knew that Tintra was negotiating a loan with Plaintiff.

418.    Manager Defendants knew, at the very least, that Tintra was negotiating a fundraising with someone, because on October 27, 2022, Tintra publicly announced that Tintra was working on completing a fundraising transaction "before the end of November [2022]" (and that statement was reaffirmed in the announcement published on November 8, 2022).

419.    Upon information and belief, Manager Defendants knew as early as July 7, 2022, that a presentation or document had been prepared for funders like Plaintiff and that the presentation or document was consistent with the (false and/or misleading) representations in the public announcements.  Tintra disclosed in an announcement published on that date that a presentation "based on these new fundamentals" had been prepared.  Upon information and belief, the presentation was the Presentation that was provided to Plaintiff on about October 4, 2022, or a similar document targeting prospective funders like Plaintiff.

       *9.    Manager Defendants Directed and/or Caused Tintra to Enter Into the Agreement.*

420.    Upon information and belief, Manager Defendants knew that Tintra was desperate for cash.

421.    Upon information and belief, Tintra informed Manager Defendants of the terms of the proposed Agreement before it was publicly announced.  Upon information and belief, Manager Defendants reviewed, directly or via counsel, the terms of the Agreement before it was signed.  Upon information and belief, one or more of Manager Defendants, directly or via counsel, provided comments or feedback to Tintra and Shearer on the Agreement, including on its terms.

422.    Moreover, Shearer sought the Coguts' approval of the Agreement before Tintra entered into it.  Upon information and belief, Manager Defendants approved Tintra's entry into the Agreement out of necessity, despite their reservations, to get cash into Tintra's hands.

423.    Upon information and belief, Manager Defendants had authority over Tintra's position in relation to the Agreement (both before it was signed and throughout 2023).

**B.    Soon After Plaintiff Wired the Funds to Tintra, Tintra Committed Multiple Breaches of the Agreement, and Defendants, Tintra, Shearer, and Neumann Engaged in a Concerted Scheme to Deceive and Damage Plaintiff.**

*1.    Upon Information and Belief, in or About January 2023, Tintra Breached the Agreement by Using Plaintiff's Funds to Pay Substantial Prior Debts.*

424.    Tintra committed a number of breaches of the Agreement throughout 2023.  It commenced its campaign of breaches soon after it extracted the loan from Plaintiff.

425.    On December 21, 2022, six days after the Agreement was executed but before the closing, Tintra announced that its debts would be settled imminently.

426.    Upon information and belief, soon after Plaintiff made the $3 million loan to Tintra on December 23, 2022, Tintra used a substantial part of those funds to pay Tintra's overdue debts.

427.    Section 8.4(A) of the Agreement provided that Tintra:

[M]ust use the funds received . . . for general corporate and working capital purposes that are reasonable in light of the nature of [Tinta's] business . . . and not, among other things, for dividend payments, or the repayment or redemption of any indebtedness or obligations or interests held by any security holders.

428.    Tintra's repayment of the third party debts from Plaintiff's loan thus constituted a breach of Section 8.4(A) of the Agreement.

*2.    In January 2023 and March 2023, Tintra Breached the Agreement Twice More by Refusing to Convert Plaintiff's Loan.*

429.    Section 4.1 of the Agreement entitled Plaintiff to convert the outstanding loan into Tintra stock, in whole or in parts, at a discount to the prevailing market prices, at all relevant times after January 14, 2023 (the "**Conversion Right**").

430.    On December 16, 2022, Tintra published an announcement describing the Agreement and the impending loan and identifying Plaintiff as the lender.  The Conversion Right

and the use of the proceeds allowed under the Agreement were described in that announcement, in terms that were nearly identical to the description of the use of proceeds of the Cogut Family's investment published on March 7, 2022. Tintra indicated that the loan was expected to close on December 22, 2022, in that announcement.

431.    In January 2023, Tintra breached the Agreement by refusing to convert part of Plaintiff's loan into stock under Section 4.1 of the Agreement. On January 19, 2023, Plaintiff requested a conversion of $800,000 of the $3,150,000 principal amount into 522,569 shares at the contractually determined price of £1.26 per share. Tintra was required to issue those shares to Plaintiff on January 23, 2023. Tintra did not issue those shares, in breach of Section 4.1 of the Agreement. The market value of the unissued shares on that day was approximately £1.12 million (approximately $1.39 million).

432.    On January 30, 2023, Plaintiff notified Tintra that Tintra had breached the Agreement and that Plaintiff had incurred and continued to incur losses due to the breach.

433.    In March 2023, Tintra breached the Agreement by refusing to convert part of Plaintiff's loan into stock in violation of Section 4.1 of the Agreement. On March 13, 2023, Plaintiff requested a conversion of $500,000 of the $3,150,000 principal amount into 407,363 Tintra's shares at the contractually determined price of £1.04 per share. Tintra was required to issue those shares to Plaintiff on March 15, 2023. Tintra did not issue those shares in breach of Section 4.1 of the Agreement. The market value of the unissued shares on that day was approximately £530,000 (approximately $638,000).

434.    On March 16, 2023, Plaintiff notified Tintra that Tintra had breached the Agreement and that Plaintiff had incurred and continued to incur losses due to the breach.

435.    Upon information and belief, Manager Defendants never intended to permit Tintra to issue shares to Plaintiff under the Agreement.

436.    Upon information and belief, Tintra's Board's decisions in relation to the issuances of shares were subject to Manager Defendants' authorization.

437.    Tintra's directors knew that they could not make their own decisions as to the share issuances.

438.    Some of Tintra's directors knew less than Manager Defendants about Tintra's conduct in relation to Plaintiff.

439.    Upon information and belief, on each of the occasions on which Plaintiff requested that Tintra issue shares to Plaintiff, Shearer sought Manager Defendants' approval to issue the shares.

440.    Upon information and belief, Manager Defendants specifically considered whether to allow Plaintiff to become a shareholder of Tintra.

441.    Upon information and belief, Manager Defendants were in close contact and discussed among themselves and with Shearer Plaintiff's share issuance requests.

442.    Upon information and belief, the Cogut Family made payments to prevent Plaintiff from becoming a shareholder in Tintra.

443.    Upon information and belief, Manager Defendants directed and/or caused Tintra to refuse to issue the shares to Plaintiff.

444.    Upon information and belief, Manager Defendants did so despite Shearer's reservations and objections.

445.    Upon information and belief, on multiple occasions, Manager Defendants required Tintra to seek their authorization before attempting to resolve Plaintiff's claims related to Tintra's breaches.

446.    As the April 2023 deadline for the SPAC to consummate an acquisition grew nearer, Tintra, Shearer, and Cox became increasingly agitated and urgently sought for Tintra to enter into a settlement with Plaintiff.  Upon information and belief, that urgency reflected their need for Plaintiff to defer the pursuit of its rights so that a sale of Tintra to the SPAC could proceed.

447.    Upon information and belief, Manager Defendants controlled Tintra's negotiations with Plaintiff, including the maximum value Shearer and Tintra's Board were permitted to offer to Plaintiff as a purported settlement proposal in lieu of the share issuances.  Upon information and belief, Manager Defendants directed and/or caused Tintra to make settlement proposals on March 17 and March 29, 2022, to Plaintiff involving a payment of $2.2 million.

448.    The Conversion Right was valuable to Plaintiff.  The Conversion Right was worth millions of dollars.  Given the then prevailing market conditions and Tintra's breaches of the Agreement, had Plaintiff received shares on its exercise of its Conversion Right, Plaintiff would have sought to divest itself of those shares through the LSE.

> 3.    *In April 2023, Plaintiff Was Induced to Give Up its Conversion Right and to Refrain From Expeditiously Taking Recovery Measures.*
>
> a.    *On March 31 and April 3, 2023, Tintra Sent Plaintiff Cash Repayment Notices That Included, Upon Information and Belief, Doctored Bank Statements.*

449.    On March 16, 2023, Plaintiff put Tintra on notice that Plaintiff was considering serving statutory demands for payment on Tintra.[4]

---

[4] Service of "statutory demands" is a formal first step in a creditor-initiated administration process in the UK.

450.    On March 29, 2023, Plaintiff requested conversion of $200,000 of the $3,150,000 principal amount into 172,705 shares.  Tintra was required to issue those shares to Plaintiff on March 31, 2023.

451.    On March 31, 2023, Tintra purported to exercise a right of cash repayment in relation to the $200,000 conversion amount, under Section 4.3 of the Agreement, in lieu of issuing 172,705 shares (the "**March 31 Cash Repayment Notice**").

452.    The March 31 Cash Repayment Notice was accompanied by a purported bank statement from the UK bank Revolut as alleged proof that Tintra held the funds to make the payment.  Unbeknownst to Plaintiff at the time, upon information and belief, Tintra did not have a Revolut account, and the purported proof of funds was fake.

453.    Relying on that purported proof of funds, Plaintiff agreed to accept the cash repayment.  Tintra was required to pay Plaintiff that amount on April 4, 2023.

454.    On April 3, 2023, by an unsolicited email sent to Plaintiff's CIO, Shearer, copying Matthews and Cox, attempted to exercise Tintra's right under Section 4.2 of the Agreement to repay in cash the remaining outstanding balance of the $3,150,000 loan.

455.    Shearer wrote:

Please note that the Company does not intend to exercise any further Call Rights under the Deed.

To that end, please see attached Cash Repayment Notice in respect of US$2,800,000 being the aggregate Subscription Amount Outstanding issued in accordance with clause 4.2 of the Share Subscription Deed in place between us and dated 15 December 2022 (the "Deed").

. . .

The Cash Repayment Amount . . . shall be paid on the Cash Repayment Date, being 12th April."

456.    Attached to the email was the document referenced in the email, titled "Cash Repayment Notice."  It was signed by Shearer and included the following statement:

> Attached as Appendix A to this Cash Repayment Notice is proof that the Company [Tintra] is holding (as at the date of this Cash Repayment Notice), in cleared funds, a sufficient amount equal to the Subscription Amount Outstanding as at the date of this Cash Repayment Notice.
>
> . . .
>
> Pursuant to the provisions of Clause 4.2(D) of the Deed, on the Cash Repayment Date of 12th April 2023 (being the fifth Trading Day after the date of this Cash Repayment Notice) the Company [Tintra] shall pay to the Investor [Plaintiff] the Cash Repayment Amount.

457.    The attached Appendix A purported to contain an image of a bank account statement as proof that Tintra held the funds it needed to make the payment.  That purported bank statement showed an alleged balance of "11,414,607.53 QAR" in a purported, unidentified bank account in Qatar and featured the statement, "Equivalent to £2,532,193.71 and US$3,135,878.05."

458.    Shearer's email of April 3, 2023, the letter attached thereto, and Appendix A, are collectively referred to as the "**April 3 Cash Repayment Notice**."

459.    Section 4.2 of the Agreement provided that Tintra's cash repayment right was subject to the condition that no Event of Default under the Agreement had occurred.  At the time Tintra gave the April 3 Cash Repayment Notice to Plaintiff, however, multiple Events of Default had already occurred, including Tintra's breaches of the Agreement in January and March 2023. Accordingly, Tintra was not entitled to exercise its cash repayment right under Section 4.2 of the Agreement.

460.    Section 4.2(A) of the Agreement provided that, to exercise its right of cash repayment, Tintra was required to provide "proof of [Tintra] holding . . . cleared funds in the amount equal to the [cash repayment amount]."

461.    By the April 3 Cash Repayment Notice, Tintra and Shearer represented to Plaintiff that Tintra held sufficient funds to pay the amounts due under the Agreement to Plaintiff on April 12, 2023, that Tintra could transfer such funds on that date, and that Tintra intended to do so.

462.    Upon information and belief, those representations were false and/or misleading because Tintra did not hold the funds that it purported to hold, could not transfer such funds, and in any event, did not intend to make the payment.

463.    Upon information and belief, the purported bank statement contained in the April 3 Cash Repayment Notice was fake or false.

464.    Upon information and belief, the April 3 Cash Repayment Notice was given and/or prepared with the participation, with the knowledge, and/or at the direction of Manager Defendants.

>    b.    *Duped by the Deceitful Cash Repayment Notices, Plaintiff Accepted Them and Gave Up Its Conversion Right.*

465.    Between April 3 and April 5, 2023, Plaintiff considered the two cash repayment notices and purported bank statements in light of the representations Tintra made throughout 2022.

466.    Despite Events of Default having occurred under the Agreement and unaware that the March 31 Cash Repayment Notice and the April 3 Cash Repayment Notice and their purported proofs of funds were fake, false, and/or misleading, on April 5, 2023, Plaintiff waived the "no Event of Default" condition to Tintra's cash repayment and accepted the April 3 Cash Repayment Notice.  Plaintiff believed Tintra had the cash and the intention to meet its obligations.  Tintra thus owed Plaintiff £2,852,795.94 (approximately $3,544,598.96) on April 12, 2023.

467.    Plaintiff was unaware at the time of the false and/or misleading nature of the misrepresentations made to it on and before April 3, 2023.

468.    By accepting Tintra's April 3 Cash Repayment Notice on April 5, 2023, Plaintiff gave up its Conversion Right.

> c.    *Tintra and Cox Lied to Plaintiff, Stating That the Bank Statement Accompanying the April 3 Cash Repayment Notice was Real.*

469.    In an email Plaintiff's CIO received from Cox on April 11, 2023, Cox affirmed the validity of the proof of funds accompanying the April 3 Cash Repayment Notice and represented to Plaintiff that Tintra had the funds to pay its debt to Plaintiff and would pay shortly.

470.    Those representations were false and/or misleading because Tintra did not have the funds and did not plan to pay Plaintiff.

471.    Tintra did not make the required payment of £2,852,795.94 (approximately US$3.5 million) on the due date or at any other time.

> d.    *To String Plaintiff Along, the Cogut Family, CFP III, and CFP VII Paid a Small Part of Tintra's Debt to Plaintiff and Made False and/or Misleading Representations to Plaintiff By Wire.*

472.    On April 11, 2023, Plaintiff received an email from Shearer, in which he stated, referring to the $200,000 due to Plaintiff under the March 31 Cash Repayment Notice:

> To ensure funds are in your account today I am going to send from domestically in the US right now and then we can work out with our bank before the bigger payment comes over to avoid this drama.

473.    On April 12, 2023, Plaintiff received $214,000 into its bank account at First Republic Bank in the United States.  The funds were received by three wire transfers initiated from U.S. bank accounts of "Cogut Family Partnership VII" ($50,000), "Cogut Family Partnership III 750 EA" ($80,000), and "Craig M Cogut Deborah Cogut David C" ($84,000.00).  The information accompanying those wire transfers located the transferors' bank accounts at banks in New York. Copies of the notices of those wire transfers are attached as **Exhibit F.**

474.    Upon information and belief, the first wire transfer was made by CFP VII, the second by CFP III, and the third by the Cogut Family.

475.    Each of those wires included a SWIFT message stating, "REF: TINTRA FUNDING."

476.    Upon information and belief, by making the payments or causing the payments to be made and sending the accompanying SWIFT messages, the Cogut Family represented to Plaintiff, and intended for Plaintiff to believe, that Tintra had access to cash to pay what it owed and intended to do so.

477.    Those representations were false and/or misleading because Tintra could not and did not intend to pay what was owed to Plaintiff.

478.    On April 12, 2023, Cox explained by email to Plaintiff that the three wires were a payment of Tintra's obligation using funds "sent by the Craig Cogut Family Office."

479.    Cox wrote:

I've seen that you are now in receipt of funds for the first Settlement Notice, which is great news.  It was sent by the Craig Cogut Family Office – we had assumed it would come from a single account but confirm that what you have received is correct.

. . .

We now would like to send you the full Cash Repayment amount.

. . .

We are making preparations to send the final payment under the Cash Repayment notice to you, but the funds won't get out today.

e. *Manager Defendants Made Deceitful Statements About Tintra on Pegasus' Website.*

480.    As Defendants, upon information and belief, intended, Plaintiff conducted diligence on the connection between the transferors (theretofore unfamiliar to Plaintiff) and Tintra after receiving the wire transfers.  Plaintiff located and reviewed Pegasus' website.

481.    The "Partner Investments" section of Pegasus' website contained a listing of Tintra and a description touting Tintra.  In that description, Pegasus described Tintra and the purported "Tintra Culture Lab," stating:

> Tintra is a mission driven Deep Tech & Banking business focused on using artificial intelligence to drive financial inclusion throughout the Emerging World.  Using Artificial Intelligence atop its own heavily regulated infrastructure the company runs a Public Private Partnership model from which it builds solutions that a region needs in line with the stated regulatory and governmental initiatives.
>
> It does this through the unique Tintra Culture Lab – a lab staffed by high-profile PhD level scientists, sociologists, ethnographers and geo-politicians – that has for the past 2 years been building Machine Learning and Natural Language Processing tools, some already patented by the United States Patent Office, that sees countries as they are, not how a Euro/American centric legacy banking infrastructure would like them to be.
>
> Pricing risk based on behavioural metrics to build banking that is beyond borders, culture, politics or religion.  Tintra uses Artificial Intelligence to bring Real Change.

482.    The statement on Pegasus' website contained the foregoing representations which were false and/or misleading for the following reasons.  Tintra had no substantive business.  Tintra was not a "Deep Tech & Banking" company.  Tintra was not "focused on using artificial intelligence" or on "driv[ing] financial inclusion throughout the Emerging World."  Tintra was not "[u]sing Artificial Intelligence."  Tintra was not building any "Machine Learning and Natural Language Processing tools."  Tintra did not have "its own heavily regulated infrastructure" or any solutions or "build solutions that a region needs in line with the stated regulatory and governmental initiatives."

483.    On its website, Pegasus also stated that Tintra was operating in the industry of "Inclusive Finance" and that Tintra's "Location" was "Global."  Neither statement was true.  Tintra had no substantive business and thus was not part of *any* industry, and its sole location was a cramped small office in London, England.  Those representations created the false and/or misleading impression that Tintra was a bona fide company with a global footprint and scale.  The truth was that Tintra was a deeply distressed shell with no substantive business.

484.    Pegasus edited its website to publish the foregoing statements (the "**Website Statements**"), upon information and belief, sometime between February 15 and March 30, 2023.  A copy of the Website Statements is attached as **Exhibit G.**  It was not until Plaintiff sought to enforce its rights under the Agreement (from late January 2023) that Pegasus abruptly modified its website to reveal its connection to Tintra.  Furthermore, Pegasus published the Website Statements only weeks or days before Tintra sought to deprive Plaintiff of the Conversion Right by its cash repayment notices of March 31 and April 3, 2023.

485.    The Coguts caused Pegasus to make the Website Statements.  Upon information and belief, Manager Defendants intended (1) to affect Plaintiff's decision-making in relation to Tintra and (2) to lead Plaintiff to believe that Tintra was a legitimate enterprise and that Plaintiff's loan was safe.

486.    While most other portfolio company names were alphabetically listed on Pegasus' website, Tintra was listed first, out of alphabetical order, as upon information and belief, Tintra was important to Defendants, which Manager Defendants wanted Plaintiff and others to know.

487.    The foregoing representations and the endorsement by Manager Defendants— purportedly successful and sophisticated investors—led Plaintiff to believe that Tintra was a legitimate enterprise capable of meeting its obligations to Plaintiff.  Plaintiff was reassured that its

loan was safe by the Website Statements, coupled with the wires and the SWIFT messages sent by the paying Defendants to Plaintiff on April 12, 2023.

> f.    *In April 2023, Plaintiff Determined That the Announcements of March 2022 Referenced the Coguts or Their Affiliates.*

488.    After Plaintiff received Defendants' wire transfers, Plaintiff deduced that the Coguts or their affiliates were the investors to which Tintra referred in its March 7 and March 21, 2022 public announcements of the $2.25 million investment.  Those statements were public representations by the investors described in those announcements that Tintra was a legitimate company.  Those representations were false and/or misleading because Tintra was a sham.  When Plaintiff reviewed those representations in April 2023, they further legitimized other false and/or misleading representations made by Defendants, Tintra, Shearer, and Neumann to Plaintiff.

> g.    *To Buy Tintra and Themselves More Time, Between April and June 2023, Defendants Executed a $1.2 Million Wire Transfer Scheme.*

489.    On April 19 and April 21, 2023, after the $3.5 million payment pursuant to the April 3 Cash Repayment Notice became past due, Plaintiff served statutory demands aggregating £2,936,433.27 (approximately $3.6 million) on Tintra.

490.    On April 24, 2023, the SPAC announced that it had been unable to secure an acquisition target and would redeem its shares from its investors.

491.    But Tintra still had a role to play in Manager Defendants' efforts to secure the Barbados BGB project.  That meant keeping (1) Tintra's distress undisclosed and (2) Plaintiff from becoming a shareholder through its Conversion Right or taking other measures to recover its loan.

492.    To achieve those objectives, Defendants devised and agreed with Tintra and Shearer to carry out a scheme to trick Plaintiff into believing that Tintra had the requisite funds to pay and would pay Plaintiff if Plaintiff executed a settlement agreement.  As part of the scheme, Defendants caused Tintra and Shearer to represent to Plaintiff that Tintra had the funds to repay Plaintiff and

intended to do so but would pay only after executing a settlement agreement that pushed the payment of Tintra's debt to Plaintiff further into the future.

493.    On May 21, 2023, however, Plaintiff's CIO explained to Shearer that Plaintiff was prepared to entertain a settlement only if Tintra confirmed that it had sufficient funds to pay its debt.  On May 23, 2023, Plaintiff reiterated that it would not engage in settlement discussions without Tintra providing proof of funds sufficient for the settlement.

494.    In the UK Complaint, Craig and Deborah have detailed how Defendants ensured that the promises of eventual payment would be believable and how they executed that scheme. The UK Complaint is accompanied by a Statement of Truth signed by Craig, in his individual capacity and in his capacity as Partner of CFP VII, and Deborah, acknowledging that "the facts stated in [the UK Complaint] are true" under penalty of proceedings for contempt of court if a statement is false "without an honest belief in its truth."  The UK Complaint reveals the following:

(a)    The scheme was first discussed among the participants in April 2023, when Shearer told David that Plaintiff "had raised concerns about the recovery of the sums it had invested in Tintra" and "[a]s a result of FLF's concerns, Tintra needed funds to prove its ability to return FLF's investments," and funds were needed.

(b)    Between April 2023 and June 2023, David held multiple detailed telephone calls with Shearer about Plaintiff's pursuit of its rights against Tintra.  In or about May 2023, Craig had at least two telephone calls with Tintra's UK counsel regarding the scheme.

(c)    "[T]he sum of US$2,500,000 was needed as some form of security to show to FLF, Tintra's ability to settle in cash, but that that [sic] sum, would not, in reality, be put towards any payments [to Plaintiff]."

(d)    The sum of $2.5 million was ultimately reduced to $1.2 million at a June 1, 2023 meeting with Shearer to which, upon information and belief, David traveled.

(e)    The Cogut Family and CFP VII agreed with Tintra and Shearer that Craig, Deborah, and CFP VII would advance funds to Tintra and Shearer but "the sum advanced . . . would be returned" "at any time until a settlement agreement [with Plaintiff] is signed" and in any event no later than on July 15, 2023.

(f)    Tintra's lawyers were instructed by Shearer and Tintra to hold the funds received from those Defendants until receiving further instructions from *David*.

(g)    Craig, David, Shearer, and Tintra's lawyers directly exchanged correspondence that recorded and/or reflected, in part, the terms of the scheme. The participants in the scheme agreed, by way of exchange of emails, that once Plaintiff was deceived into believing that Tintra had the funds, the "funds can be recalled [by the Cogut Family and CFP VII] at any time until a settlement agreement [with Plaintiff] is signed."

(h)    As a condition of Craig, Deborah, and CFP VII advancing the funds to Tintra and Shearer, Tintra and Shearer agreed not to enter into a settlement agreement with Plaintiff without David's approval.

(i)    As a condition of Craig, Deborah, and CFP VII advancing the funds to Tintra and Shearer, Tintra and Shearer agreed that they would not make a payment to Plaintiff without David's approval, even after Tintra entered into a settlement agreement.

(j)    Tintra and Shearer agreed that Craig, Deborah, and CFP VII would receive interest at a rate of about 96% per annum for the period during which Tintra held the funds.

495.    Upon information and belief, Defendants' discussions with Shearer described above were not limited to the wire transfers of the $1.2 million and included discussions of the wires sent by Defendants to Plaintiff on April 12, 2023. Upon information and belief, at least some participants in those discussions were in New York.

496.    On May 5, 2023, Tintra published an announcement in which Tintra, Shearer, and Neumann disclosed Plaintiff's pursuit of its rights, disclosed that Tintra had failed to issue shares to Plaintiff, and stated that Plaintiff's statutory demands were "an unnecessarily aggressive tactic as these demands were issued in the midst of good faith negotiations . . . and just five business days after a payment was completed under the [Agreement.]"

497.    Those representations were false and/or misleading because (1) Tintra was not negotiating with Plaintiff in good faith, (2) Tintra was not planning to pay Plaintiff, and (3) the

announcement did not disclose that David had the ultimate authority to direct Tintra not to pay Plaintiff and that Defendants had directed Tintra not to pay Plaintiff.

498.    That announcement came *only after* the deadline for the SPAC to consummate an acquisition.

499.    That announcement contained a statement to the effect that Tintra wished to repay the loan in cash "rather than by issuance of shares or a combination of shares and cash."

500.    With the $1.2 million wire transfer scheme agreed to among Defendants, CFP VII, Tintra, and Shearer, on May 24, 2023, Shearer emailed Plaintiff's CIO to say that Tintra would have the funds stating:

> The full amount to cover the settlement of a little under £3m has already been sent or received [to/in Tintra's UK counsel's trust account].

> It was sent in multiple payments from more than one account outside of the UK.  I was confirming that I'd had confirmation from [Tintra's UK counsel] that one had arrived.  The full amount is either received by them or on its way to them having been sent.

501.    Those representations were false and/or misleading because those funds had not been sent or received, because Tintra had no intention of paying its debt, and because the funds would remain under Defendants' control even if and when they arrived and were not to be used to pay Plaintiff.

502.    On May 25, 2023, Plaintiff spoke with Shearer, who falsely and/or misleadingly represented that funds proving Tintra's ability to pay were in Tintra's UK counsel's account.

503.    On May 30, 2023, Tintra's UK counsel confirmed by email that (1) it held some funds "in respect of settling this matter" and that (2) further funds were forthcoming.

504.    Those representations were false and/or misleading because, whether or not funds were forthcoming, Tintra had no intention to pay Plaintiff, and Tintra and Shearer had agreed with

the Cogut Family that Tintra would not release the funds to Plaintiff. Upon information and belief, Defendants used Tintra's UK counsel to deceive Plaintiff.

505.    Tintra's UK counsel pressured Plaintiff to enter into settlement negotiations. In the May 30, 2023 email, Tintra's UK counsel stated, among other things, the following:

> Further to my email below, please note we are holding funds in our client account in respect of settling this matter.
>
> Our client has confirmed that balancing payments have been made to our client account in respect of the full amount required to settle this matter. Please note these funds are currently in transit and our accounts team is liaising with the respective banks and will confirm receipt as soon as the funds arrive.
>
> In the meantime, we should be grateful if you would share with us the draft settlement agreement in order that we can review this and settle the matter ahead of the scheduled court date.

506.    On June 5, 2023, Plaintiff requested that "[a]s a matter of urgency, Tintra must provide (a) proof of the cash it holds and (b) the amount that it has deposited in [Tintra's UK counsel's] client account for the purposes of a potential settlement." By the same letter, Plaintiff's UK counsel also notified Tintra that Plaintiff had engaged U.S. counsel and would seek recovery from "all connected parties who are involved in Tintra's wrongdoing." "Connected parties" included Defendants, which Shearer knew.

507.    That day, June 5, 2023, Craig, Deborah, and CFP VII wired $600,000 to Tintra as part of the wire transfer scheme, upon information and belief, to deceive Plaintiff into believing that Tintra was financially sound and to stave off Plaintiff's enforcement of its rights, including against Tintra "connected parties." Upon information and belief, on June 9, 2023, Craig, Deborah, and CFP VII wired another $600,000 to Tintra, for the same reasons.

508.    Upon information and belief, including based on the foregoing, as soon as Plaintiff identified to Tintra and Shearer that Plaintiff had potential claims against Defendants, that information was shared with the Coguts.

509.    On June 9, 2023, Tintra published an announcement disclosing that its failure to issue the shares to Plaintiff under the Agreement was "ongoing."

510.    On June 20, 2023, Tintra's UK counsel stated to Plaintiff's UK counsel by letter, "our client is in a position to settle," "we have received funds into our client account," and "[i]f [Plaintiff] was acting reasonably a settlement agreement could have been negotiated and payment made before today."  In that letter, Tintra's UK counsel also described a purported $3 million "facility with one of [Tintra's] shareholders" (which counsel stated Tintra "ha[d] arranged" "in the interests of accelerating any settlement payment required") and stated that "the shareholder in question holds funds equal to [$3 million]."  Tintra's UK counsel described that facility as being "expressly stated for the purpose for [Tintra] to make accelerated payment if settlement is reached between [Tintra and Plaintiff] before such time as [Tintra's UK counsel's] account is fully funded."

511.    On a call held on June 23, 2023, upon information and belief, Tintra's UK counsel affirmed to Plaintiff's UK counsel that Tintra's UK counsel held funds for Tintra to settle with Plaintiff.

512.    By wiring or causing $1.2 million to be wired to Tintra, Defendants caused Tintra's UK counsel to serve as the conduit to represent to Plaintiff that Tintra had sufficient funds and intended to pay Plaintiff if it entered into a settlement agreement.

513.    The representations made in the June 20, 2023 letter and on the June 23, 2023 call were false and/or misleading because (1) Tintra was not in a position to pay, (2) Tintra had no intention of paying Plaintiff, (3) the potential settlement was a ruse to lead Plaintiff into protracted negotiations to buy more time for Defendants, (4) there was no bona fide shareholder facility, and (5) Tintra was required to return to the Cogut Family whatever funds it received from them.

514.    The date by which Defendants required Tintra to return the $1.2 million to them (July 15, 2023) was two days after GCF was scheduled to hold its board meeting to formally approve Pegasus' Main Application.

>        *4.    Defendants Deceived Plaintiff to Enter into the Settlement Deed, to Continue Forgoing its Conversion Right, and to Refrain From Expeditiously Pursuing Recovery Measures.*

515.    On July 4, 2023, Plaintiff and Tintra entered into the Settlement Deed.

516.    Prior to Plaintiff entering into the Settlement Deed, Plaintiff reviewed the statements containing the false and/or misleading representations described in Sections II.B.3.c to II.B.3.g above, particularly in light of Plaintiff's receipt of the wires from the Cogut Family and their affiliates, the representations made to Plaintiff during the March 2022 to April 3, 2023 period, and the representations made to Plaintiff throughout 2022 (which Plaintiff believed provided additional credibility to the statements and the conduct described in Sections II.B.3.c to II.B.3.g above).

517.    Based on the foregoing and unaware of the false and/or misleading nature of the foregoing representations, Plaintiff was led to believe that (1) Tintra had cash and intended to pay its obligations to Plaintiff, (2) Plaintiff could continue forgoing the Conversion Right, (3) Plaintiff did not need to swiftly pursue other recovery measures, (4) Plaintiff needed to give Tintra additional time to pay, and (5) Tintra would pay after entry into the Settlement Deed.

>        *5.    Plaintiff Continued to Be the Target of Deceitful Efforts to Delay.*

518.    The Settlement Deed provided that Tintra would pay the Plaintiff (1) £500,000 (approximately $635,000) on execution and (2) a further £2,530,000 (approximately $3.2 million) no later than on August 4, 2023.

519.    Tintra made the first of the two installment payments on July 6, 2023—a week before GCF formally approved the Main Application.

520.    Upon information and belief, Manager Defendants authorized that payment.

521.    Tintra breached the Settlement Deed by failing to pay the second installment due on August 4, 2023.  That debt has never been paid.

522.    In emails Tintra's UK counsel sent to Plaintiff's UK counsel on August 4 and August 10, 2023, Tintra's UK counsel stated that Tintra had instructed "the bank" to send Tintra's UK counsel "the necessary funds to settle the second payment," that Tintra was expecting the funds shortly thereafter, and that Tintra needed an additional "grace period in which to make this second payment."  Tintra's UK counsel claimed in the emails that "Tintra ha[d] the funds available to it to make payment" and that "Tintra ha[d] called upon the loan made available to it by one of its shareholders" to make the payment, which would thereafter be made.

523.    On August 10, 2023, Tintra published an announcement disclosing that Tintra had not met its settlement obligations but representing that its debt to Plaintiff would be paid.

524.    The representations made in the August 4 and August 10, 2023 emails and the August 10, 2023 announcement were false and/or misleading, as Tintra did not have the funds, the intention to pay Plaintiff, or an expectation that Plaintiff would be paid.

525.    By an exchange of emails on August 18, 2023, Plaintiff and Tintra agreed that Tintra would pay Plaintiff a sum of £2,530,000 in two installments: (1) £235,000 by August 21, 2023, and (2) £2,295,000 (approximately $2.9 million) (plus interest) by September 4, 2023 (the "**Extension Agreement**").  On August 21, 2023, Tintra paid £235,000 to Plaintiff.

526.    Upon information and belief, Manager Defendants authorized that payment.

527.    Tintra has never paid the balance of approximately $2.9 million.

528.    Upon information and belief, Manager Defendants authorized the payments of July 6 and August 21, 2023, because they intended by those payments to stave off Plaintiff's enforcement of the Agreement and other recovery efforts.

529.    The representations made in Tintra's financial statements published between July and October 2023 that Tintra had substantial cash on hand further deceived Plaintiff.  Those misrepresentations also made the representations from September 7, 2023, regarding the purported takeover and tender offer more credible, which also deceived Plaintiff.  Plaintiff was led to believe that Tintra had cash and was a company about to be taken over at a premium, leading Plaintiff to believe that it would get repaid.

530.    The payments of July 6 and August 21, 2023, amounted to representations that Tintra had the cash and intention to pay.  Those representations were false and/or misleading because Tintra had neither.

531.    On August 31, 2023, Tintra and Shearer announced publicly that Tintra had entered into a $3 million working capital facility.  That announcement reaffirmed the false and/or misleading representations made to Plaintiff in the emails of August 4 and August 10, 2023, and Tintra's announcement of August 10, 2023.  The representation made in the August 31, 2023 announcement that $3 million was available to Tintra was false and/or misleading on the same basis as the August 4 and August 10, 2023 representations it reaffirmed.

532.    As described above, on September 7, 2023, Tintra publicized the fake takeover.

533.    As described above, on September 25, 2023, Tintra, Shearer, Pegasus, and Craig publicly touted Tintra's purported "de facto infrastructure," partnership with Pegasus, and participation in the Barbados BGB project.  But at that time, Tintra no longer was a going concern.

534.    On October 4, 2023, Tintra's UK counsel emailed Plaintiff's UK counsel seeking

from Plaintiff a release of Manager Defendants stating:

> As you are aware, our client [Tintra] had previously proposed that a further part payment of those sums [overdue to Plaintiff] would be made, with all outstanding sums to be paid on completion of the proposed takeover [by LRB] of our client [Tintra].
>
> It is clear that our client, having paid a substantial amount of monies, is keen to resolve the matter. Our client is in the process of a transaction which would result in a restructuring of its business, and your client's constant changes of tack frustrate our client's efforts to perform under the Settlement Deed and further deal with the other matters that it is working toward which ultimately benefit your client.
>
> As a result of this, in recent discussions regarding the takeover, the bidder has indicated a preference for the dispute between Tintra and Fintech [Plaintiff] to be resolved during the completion of that transaction.
>
> Our client [Tintra] has therefore explored options with the bidder [LRB] and others to enable payment to be made to your client of all outstanding sums under the Settlement Deed by way of a single payment on an accelerated basis. Our client [Tintra] is confident that funding will be available. As such our client [Tintra] seeks confirmation that once it demonstrates that payment of those sums can be made it will result in the waiver and release of all claims or potential claims by your client [Plaintiff] against our client [Tintra] and its related parties.
>
> As you will appreciate, investors are much more likely to provide agreement to our client where there is certainty that the provision of such funding will enable our client to resolve outstanding disputes and concentrate on the development and delivery of its core business.
>
> Accordingly, we request that you take instructions on whether your client [Plaintiff] is willing to provide confirmation that it would accept payment in full of all sums due under the Settlement Deed from our client [Tintra] on the basis that payment will be in satisfaction of all claims or potential claims by your client [Plaintiff] against our client [Tintra] and its related parties (which we anticipate can be documented by way of an amendment to the existing Settlement Deed).
>
> Upon confirmation that your client [Plaintiff] will accept payment on this basis our client will arrange funds from parties (who have given assurances that funding will be available in those circumstances) and then seek to finalise the settlement including payment in full to your client on an accelerated basis.

535.    Those representations were false and/or misleading on the bases described above.

In short, Tintra had nothing and no intention to follow through on any settlement.

536.    On October 4, 2023, Plaintiff confirmed that, in principle, Plaintiff could enter into an amendment to the Settlement Deed.

537.    On October 5, 2023, Tintra and LRB extended the deadline for LRB to make a firm takeover offer for Tintra to November 5, 2023.  Upon information and belief, they did so in a continued attempt to, among other things, bog Plaintiff down in settlement negotiations to prevent Plaintiff from impeding the Scheme.

538.    Through October 2023, Plaintiff and Tintra negotiated an amendment to the Settlement Deed, which would provide for an amended timetable for Tintra to pay Plaintiff.

539.    By October 25, 2023, with no agreement in place, Plaintiff wrote to Shearer to notify him that Plaintiff was prepared to proceed with a lawsuit against Tintra's directors and likely would "add the Coguts and their entities to the lawsuit."  Plaintiff also indicated that (1) it had learned of Tintra's involvement in the Barbados BGB deal and (2) as part of Plaintiff's enforcement efforts, Plaintiff intended to investigate that deal (as well as other business dealings), including the flow of funds to Tintra and the Coguts.

540.    Upon information and belief, Plaintiff's email of October 25, 2023, was shared with Manager Defendants, as on October 26, 2023, Tintra's UK counsel wrote to Plaintiff's UK counsel with a new demand.  That letter conditioned Tintra's entry into an amendment to the Settlement Deed on Plaintiff's confirmation that it would continue to forgo the Conversion Right.

541.    On October 27, 2023, Tintra's UK counsel telephoned Plaintiff's UK counsel and sought an amendment to the Settlement Deed.  Tintra's UK counsel stated that Tintra was seeking the amendment because "the Coguts" were concerned that Plaintiff would pursue an action against them.

542.    On November 5, 2023, LRB announced that the takeover was being replaced with a tender offer.  By making that announcement regarding a phony takeover-turned-tender offer, LRB (which was upon information and belief controlled or co-controlled by Defendants), CFP Fintech, and Al-Abdulla, bought Tintra and Shearer another month.

543.    In the meantime, Defendants were unsuccessfully attempting to recover funds they had provided to Tintra.

544.    On November 10, 2023, Plaintiff agreed to enter into the Amendment Deed.

545.    Before entering into the Amendment Deed, Plaintiff considered the statements made directly to Plaintiff and the statements made in Tintra's and LRB's public announcements during the July to November 2023 period, the implications of the July 6 and August 21, 2023 payments to Plaintiff, the purported takeover and tender offer, and the "acting in concert" forms filed in September and October 2023.

546.    Plaintiff considered those in light of the representations made to Plaintiff at various times prior to July 2023 (which Plaintiff believed provided credibility to the statements and the conduct referenced in the preceding paragraph).

547.    The false and/or misleading representations made by statements or conduct between July 6 and November 5, 2023 (backed by the prior misrepresentations) convinced Plaintiff that if it continued forgoing its Conversion Right, refrained from pursuing expeditious recovery measures, entered into the Amendment Deed, and gave Tintra more time, Tintra would repay its debts to Plaintiff.

548.    The Amendment Deed delayed Tintra's payment obligations further, as it provided for an equivalent of approximately $3.3 million to be paid by Tintra to Plaintiff in two installments,

one on November 13, 2023, and another on December 11, 2023. Tintra never made those payments.

549.    From April 12, 2023, to November 2023, Plaintiff periodically assessed the status of Plaintiff's loan to Tintra and the statements made and conduct engaged in by Tintra, Shearer, Neumann, Cox, LRB, Defendants, and their associates. On each such date, Plaintiff was induced to continue to forgo the Conversion Right and refrain from expeditiously pursuing recovery measures, believing that doing so would lead to Tintra paying its obligations to Plaintiff.

> 6.    *In Furtherance of Manager Defendants' Concealment Efforts, Tintra Breached the Agreement by Delisting and Reregistering as a Private Company.*

550.    On November 28, 2023, Tintra announced that it intended to delist from LSE's AIM Market.

551.    Section 12.1(G) of the Agreement provided that "[a] suspension of trading or cancellation of admission to trading on AIM" constituted an "Event of Default" thereunder.

552.    Section 5.5 of the Agreement provided that "[w]ithout prejudice to the rights and remedies under Clause 12 . . . if the Shares are suspended from trading or no longer admitted to trading on AIM . . . [Tintra] shall use its best endeavours to lift such suspension or re-obtain Admissions of such Shares on AIM."

553.    Section 10.1 of the Agreement provided that "no Party may take . . . any action . . . that would conflict or interfere in any material respect with its obligations to the other Party under this Deed."

554.    Section 8.1 of the Agreement required Tintra to "conduct its business in the ordinary course, and ensure that for so long as there is an Amount Outstanding, the voting and other rights attached to the Shares . . . are not altered in a manner which is materially prejudicial to [Plaintiff]."

555.    Section 8.3(D) of the Agreement required Tintra not to "change the nature of its business" without Plaintiff's written approval.

556.    Section 10.3(A) of the Agreement required Tintra to "take . . . all such further actions . . . as may reasonably be required in order to . . . preserve and protect the rights of [Plaintiff] against impairment."

557.    Section 10.11(J) of the Agreement required Tintra to "continue to make all applicable regulatory filings in respect of the admission to trading of the Shares on AIM and in accordance with the AIM Rules."

558.    Tintra's status as a publicly traded company was critical to Plaintiff.  The publicly traded nature of Tintra's shares was fundamental to the convertible loan made by Plaintiff to Tintra. A delisting (1) was an "Event of Default" under the Agreement, (2) materially interfered with Tintra's obligations to Plaintiff, (3) amounted to Tintra not conducting its business in the ordinary course and a change in the nature of Tintra's business, (4) altered the rights attached to Tintra's shares in a manner materially prejudicial to Plaintiff (as would Tintra "going private"), and (5) constituted a failure by Tintra to preserve and protect the rights of Plaintiff under the Agreement against impairment.  Following the delisting, Tintra failed to make regulatory filings relating to the admission to trading of the Shares on AIM.

559.    By the delisting, Tintra violated sections 12.1(G), 10.1, 8.1, 8.3(D), and 10.3(A) of the Agreement.

560.    Tintra never used its best efforts to reobtain the listed status for its shares, violating section 5.5 of the Agreement.

561.    By failing to make regulatory filings relating to the admission to trading of the Shares on AIM following the delisting, Tintra violated section 10.11(J) of the Agreement.

562.    On November 30, 2023, Plaintiff sent a letter to Tintra insisting that it comply with its obligations under the Agreement in relation to the foregoing.  Plaintiff received no response.

563.    Instead, (1) on December 6, 2023, Tintra called a shareholders' meeting to seek approval to reregister as a private company, (2) on the same date, Tintra's shares were suspended from public trading, and (3) on January 18, 2024, Tintra reregistered as a private company.

564.    Reregistering as a private company transformed Tintra into a privately held company, which in turn materially interfered with Tintra's obligations to Plaintiff, amounted to a change in the nature of Tintra's business, and altered the rights attached to Tintra's shares in a manner materially prejudicial to Plaintiff.

565.    Tintra thus breached sections 8.1, 8.3(D) and 10.1 of the Agreement.

### III.    Tintra, Shearer, Neumann, Cox, and LRB Knew or Recklessly Disregarded That the Representations Made Were False and/or Misleading.

#### A.    Tintra and Shearer Knew or Recklessly Disregarded That the Representations They and Others Made by Their Statements and Conduct Were False and/or Misleading.

566.    This Complaint extensively describes Shearer's and Tintra's awareness of the false and/or misleading nature of the representations detailed in this Complaint, whether made by statements or conduct.  Additional allegations in relation to Tintra's and Shearer's knowledge are set forth below.

567.    From the fall of 2021, Shearer described Tintra as a "shell," reflecting his knowledge that it had no substantive operations.

568.    Shearer ran Tintra, a small company with few employees, out of a cramped small office and had first-hand knowledge of the true state of affairs at Tintra.

569.    Throughout 2023, Shearer was repeatedly told by Tintra Pegasus Employee that Tintra could not develop the products it was purporting to develop.

570.    Tintra and Shearer knew or recklessly disregarded that the November 8, 2022 announcement contained false and/or misleading representations because Shearer controlled the closely held TAL and knew that TAL was unable and did not intend to pay Tintra's debts.

571.    Tintra and Shearer knew or recklessly disregarded that the December 16, 2022 announcement contained false and/or misleading representations because Shearer, as a key day-to-day operator of Tintra, upon information and belief, would have been involved in negotiating the critically important $10 million investment if one was or had been negotiated.

572.    Tintra and Shearer knew or recklessly disregarded that the doctored bank statements contained false and/or misleading representations because, as Tintra's CEO, Shearer was aware of the true state of Tintra's affairs, including its financial position, its bank accounts, and its cash balances.

573.    In a WhatsApp exchange of August 17, 2024, with Neumann, Director #1 described the wrongdoing, and Shearer's and others' knowledge thereof, at Tintra:

> [I]n my view, there's enough to show the directors should be liable for making false statements to the market and blocking the settlement agreement when Tintra didn't pay in August [2023] . . . . [M]ore broadly, one has to wonder about a lot of other stuff the company has done . . . and who benefited from the hustle . . . . [M]y guess is at the minimum [$]3 m is probs going to fall onto the directors for just that . . . I worry optically like you come across as collateral damage . . . . I think [Plaintiff] are on solid ground . . . for the allegation they filed [against Tintra's Directors].

574.    Upon information and belief, "the hustle" referred to by Director #1 was the Scheme, his reference to those "who benefited from the hustle" included Defendants, and his reference to $3 million was to Plaintiff's loan.

**B.      Neumann Knew or Recklessly Disregarded That the Representations Made by Tintra's, Shearer's, and Neumann's Statements and Conduct Were False and/or Misleading.**

575.    Upon information and belief, at about the time of her appointment as Tintra's director in February 2022, Neumann relocated from New York to London.  Neumann worked from Tintra's office and had first-hand knowledge of the true state of affairs at Tintra.

576.    Neumann knew that Tintra could not pay her director fees on time by March 2023.

577.    On July 3, 2023, Director #1 by email to several Tintra directors expressed concerns about the directors' (i.e., Shearer, Neumann, Cox, and others) "own personal legal liability" for, among other things, false and/or misleading representations made to the public.

578.    Neumann was aware of Director #1's concerns throughout her tenure at Tintra.

579.    Neumann claims she had "long standing written concerns over corporate governance" at Tintra and that there was a "lack of governance" at Tintra.  She has also described that she was not provided with "documentation to substantiate the claims made in [public announcements]."

580.    When Director #1 resigned in August 2023, he did so over his extensive concerns over the legality and the propriety of Tintra's, Shearer's, and the other Tintra directors' conduct (of which concerns Shearer and Neumann had long been aware).

581.    Upon information and belief, Neumann returned to this District from London in 2023, at about the time when she was formally notified of Plaintiff's impending litigation against Tintra's directors in England.  Upon information and belief, although she maintains an apartment in this District, which had been her primary residence for many years, she fled this District for Spain (renting an apartment there) in 2024, once this litigation became likely.

**C.   Cox Knew or Recklessly Disregarded That the Representations Made by Her Statements and Conduct Were False and/or Misleading.**

582.    Upon information and belief, Cox worked from Tintra's office and had first-hand knowledge of the true state of affairs at Tintra during her tenure as Tintra's director between February 2, 2022, and June 29, 2023.

583.    Upon information and belief, Cox knew that Tintra could not pay director fees by about March 2023.

584.    As another key day-to-day operator and self-described "senior" director of Tintra, Cox, upon information and belief, was aware of the true state of Tintra's affairs, including its financial position, bank accounts, and cash balances.

**D.   LRB Knew or Recklessly Disregarded That the Representations Made by Statements and Conduct in Relation to the Purported Takeover and the Purported Tender Offer Were False and/or Misleading.**

585.    Each of Craig's, Al-Abdulla's, and CFP Fintech's knowledge (or disregard) is attributable to LRB, as they served as its principals.

586.    Craig, Al-Abdulla, and/or CFP Fintech controlled LRB and knew that it (given, upon information and belief, its limited resources) could not and did not intend to complete the purported takeover or tender offer.

587.    Upon information and belief, Manager Defendants coordinated with Al-Abdulla through, among other things, meetings with him when he visited New York on his frequent business trips.

**IV.   Manager Defendants Directed and/or Caused Tintra's, Shearer's, and Neumann's Conduct.**

588.    At all relevant times, upon information and belief, including as described below, Manager Defendants directed and/or caused Tintra, and each of Tintra's, Shearer's, and Neumann's conduct, to advance Defendants' (and their affiliates') personal and business interests.  Numerous

allegations describing Manager Defendants' control are set forth above. Additional relevant allegations are set forth below.

### A. Shearer, Neumann, and the Rest of Tintra's Board Were Beholden to Manager Defendants.

589.    Shearer was beholden to and sought directions from the Coguts regarding Tintra because he viewed Manager Defendants as Tintra's main backers and the key to Tintra's success.

590.    Upon information and belief, at all relevant times, Shearer was effectively controlled by and a subordinate of Pegasus and/or the other Manager Defendants, a role that was formalized when Shearer was hired as a "Strategic Advisor" of Pegasus after Tintra's collapse.

591.    Upon information and belief, Shearer was incentivized to follow Manager Defendants' directions and/or instructions through promises of formal employment or another role at Pegasus (such as the role of a "Strategic Advisor").

592.    For Shearer and other Tintra board members, the Coguts' opinion was controlling, including when the Coguts and Shearer disagreed.

593.    At all relevant times, Tintra had no actual customers or sources of revenue.

594.    At all relevant times, Pegasus was the only "customer" Tintra purported to have.

595.    Tintra was beholden to Defendants for funding and its continued survival.

596.    Shearer and Neumann were financially incentivized to follow Manager Defendants' instructions.

597.    Craig, David, and Garg treated Shearer as their subordinate and behaved as his "superiors."

598.    Upon information and belief, Shearer deferred to Manager Defendants as their subordinate and followed their instructions.

599.   Tintra had other shareholders with larger equity ownership in Tintra than the Cogut Family.   Yet on multiple occasions when Tintra and its directors were in trouble, Tintra, its directors, and even those shareholders sought Defendants' direction and money.

**B.   Manager Defendants Were Repeatedly Apprised of Tintra's Non-Public Information.**

600.   Upon information and belief, including as described below, Tintra freely shared sensitive information with Manager Defendants, including Plaintiff's allegations of wrongdoing by Tintra.

601.   To maintain the informational flow, Manager Defendants and/or others at Pegasus participated in at least one dedicated WhatsApp group with Shearer and/or Tintra's employees. Manager Defendants and others at Pegasus extensively communicated not only with Shearer but also with others at Tintra via (company or private) email, WhatsApp messages, and on telephone calls.

602.   Upon information and belief, in about mid-2023, Tintra and Shearer apprised Defendants of a financing transaction purportedly contemplated by Tintra in which an entity, "Lootah," would purportedly provide funding to Tintra.   Craig and Deborah have alleged that they expected Tintra to repay them from the proceeds of that transaction the $1.2 million they provided to Tintra so that it could deceive Plaintiff.   That transaction, upon information and belief, had not been disclosed publicly.

603.   When Plaintiff indicated to Tintra in June 2023 and again in October 2023 that it was considering Defendants' role in Tintra's wrongdoing, upon information and belief, Tintra sought to protect Defendants by warning them almost immediately.

C.    **Manager Defendants Directed and/or Caused Tintra's and Shearer's Conduct with Respect to Plaintiff Specifically.**

604.    Manager Defendants were informed by Tintra of Plaintiff's attempts to enforce its rights well before Tintra publicly revealed them.  For example, in their UK Complaint, Craig and Deborah state that in April 2023, David held a call with Shearer regarding Tintra's "need[] to prove its ability to return" to Plaintiff the funds it had advanced.  But the first public release by Tintra disclosing Plaintiff's pursuit of its rights against Tintra was not published until, upon information and belief, May 2023.

605.    Upon information and belief, Manager Defendants directed and/or caused Tintra to make settlement proposals to Plaintiff in March 2023.

606.    Upon information and belief, on multiple occasions, Manager Defendants prohibited Tintra and/or caused Tintra to refrain from taking action to resolve Plaintiff's pursuit of Tintra's breaches of the Agreement without Manager Defendants' authorization.

607.    In relation to the $1.2 million wire transfer targeting Plaintiff, Shearer described himself to Manager Defendants as "your proxy."

608.    Shearer confirmed to the Coguts (1) that he would "not give any instructions to [Tintra's counsel] without your written consent," (2) that he would "execute on your instructions to me in a timely manner," and (3) that "if funds come in from other shareholders I will inform you and we will arrange for funds to be partially returned."

609.    Craig, Deborah, and CFP VII agreed with Tintra and Shearer that David would retain authority over the funds given by them and caused Tintra to deceive Plaintiff and then not to pay the funds over to Plaintiff.

610.    Upon information and belief, at various times in 2023, Manager Defendants were involved—through Tintra and its lawyers—in negotiations of the Settlement Deed and the

Amendment Deed.  On multiple occasions during negotiations, Tintra's counsel expressly stated that "relevant stakeholders" (upon information and belief, Manager Defendants) were providing or had provided comments to the settlement agreements.  Tintra conditioned its agreement to the timing of the settlement payments to Plaintiff on "obtaining final confirmation in that regard from its relevant stakeholders (who may also wish to review the final version of the Deed of Amendment before execution)."  Upon information and belief, those "relevant stakeholders" were Manager Defendants, who directed Tintra's conduct of those negotiations with Plaintiff, down to the specific language of those contracts.  On multiple occasions during the negotiations, Tintra's counsel sought releases for Tintra's affiliates (including Defendants).  While negotiating the Amendment Deed, Tintra's UK counsel sought a release for Tintra's "customers," which Pegasus claimed to be (and upon information and belief Tintra had no other customers).

611.    Pursuant to written arrangements made over email with Tintra's counsel on May 30, 2023, Tintra agreed with Craig and David that David would retain the ultimate authority over Tintra's entry into a settlement agreement with Plaintiff.

612.    Pursuant to the same arrangements, David retained the ultimate authority over whether Tintra would *comply* with any eventual settlement agreement between Tintra and Plaintiff and whether Tintra would pay its debt to Plaintiff.

613.    At least once, *Tintra's* UK counsel expressly stated that the Coguts were concerned about a potential action against them by Plaintiff and threatened that, absent an agreement, Manager Defendants would continue to compel Tintra to continue breaching the Settlement Deed. Upon information and belief, Tintra's UK counsel was directly or indirectly taking instructions from Manager Defendants.  Upon information and belief, Tintra's UK counsel was being paid out of funds provided by the Cogut Family.

614.    On November 2, 2023, Tintra's UK counsel wrote to Plaintiff's UK counsel that Tintra was prepared to "pay[] a premium for a full release" that included shareholders (i.e., the Cogut Family and its controlled entities) and Tintra's key customers (of which there was only one—Pegasus).

615.    Upon information and belief, multiple communications from Tintra to Plaintiff were prepared with the participation of Pegasus.

616.    Shearer took Manager Defendants' directions on Tintra's conduct towards Plaintiff (and to conceal the Scheme).  In a UK court filing, under penalty of proceedings for contempt of court if a statement is false "without an honest belief in its truth," Shearer stated that Manager Defendants discussed Plaintiff and the Agreement "not in one telephone call in April 2023 but in many hundreds of communications throughout 2023 and 2024."  A copy of Shearer's Defense is attached as **Exhibit H.**

D.    **Manager Defendants Maintained Constant Communications with Tintra and Shearer and Directed and/or Caused Tintra's Decision-Making in Relation to Multiple Other Issues, Both Important and Minute.**

617.    On multiple occasions, Manager Defendants communicated specific goals and specific day-to-day operational tasks to Shearer and Tintra's employees.  For instance, Craig oversaw the preparation of the documents for submission to GCF by the combined Tintra and Pegasus team and gave feedback on those documents.  He wrote to Shearer with specific instructions as to discrete work items, such as cost estimates and presentations.  On multiple occasions, Shearer requested that Tintra's employees assist swiftly with such requests and reported back to Craig.  Craig's control was so extensive that Shearer and Tintra Pegasus Employee reveled in his approval and exchanged congratulatory messages when, following Craig's review of a specific document they prepared for him for use in the Barbados BGB project, Craig complimented them on the content of that document.  Upon information and belief, when Manager Defendants

needed to comport the public presentation of Tintra to Manager Defendants' requirements, such as requirements that met Barbados' unique metaverse and other priorities, Tintra did what Manager Defendants needed it to do.

### E.    Defendants Engaged in Transactions for Tintra's Benefit.

618.    When Tintra needed to prevent Plaintiff from pursuing its rights against Tintra, each member of the Cogut Family chipped in to pay a total of $214,000 to Plaintiff on Tintra's behalf.

619.    When Tintra needed to deceive Plaintiff into believing that it could repay Plaintiff, Craig, Deborah, and CFP VII sent Tintra $1.2 million.

### F.    Defendants Engaged in Non-Arm's Length Transactions with Tintra and Shearer.

620.    Craig, Deborah, and CFP VII made what they say in the UK Complaint was a $1.2 million loan to not only Tintra but also Shearer in his personal capacity.

621.    They made that loan without a formal written agreement.

622.    The "loan" attracted an almost 100% annual interest rate, which is an usurious rate that would not normally be associated with an arm's length transaction.

623.    The foregoing non-arm's length transactions were never publicly disclosed despite being material to the micro-cap company Tintra.

### G.    Tintra Spent and Engaged in Activities for Defendants' Benefit.

624.    As described throughout, Tintra engaged in a wide range of activities benefiting Defendants and their affiliates at no cost to Defendants and spent substantial resources to benefit Defendants and their affiliates.

### H.    Both Tintra's Directors and Its Employees Were Aware of the Coguts' Role.

625.    Shearer, Neumann, Tintra's other nominal directors, and its employees were well aware of Manager Defendants' importance to Tintra and deferred to them.

626.    When the Coguts spoke, the directors and the employees at Tintra listened.  Upon information and belief, even after Tintra collapsed in 2024, Tintra's directors and—though unpaid and unhappy—certain employees continued to communicate with the Coguts and follow their instructions.

627.    Even at about the time and/or after Craig and Deborah sued Tintra and Shearer, Defendants continued cooperative interactions with Neumann and Director #1.

## V.    Defendants Knew or Recklessly Disregarded That the Representations They and Others Made, by Statements and Conduct, Were False and/or Misleading.

628.    At various relevant times, each Defendant knew or recklessly disregarded (1) that the representations made by that Defendant, other Defendants, and/or others, were false and/or misleading, (2) that Defendant, other Defendants, and/or others sought to deceive, were deceiving, and had deceived, Plaintiff, and (3) the terms of Tintra's Agreement with Plaintiff, which were breached.

629.    Numerous allegations describing Defendants' knowledge are set forth above. Additional allegations in relation to Defendants' knowledge are set forth below.

630.    Craig's and David's knowledge and/or reckless disregard are attributable to Pegasus because Craig and David are its principals.

631.    Craig and David engaged in the conduct described in this Complaint by utilizing Pegasus' resources, including its name, standing, email system, website, and other assets.

632.    Given Manager Defendants' control over Tintra, Shearer, and Neumann, Manager Defendants, upon information and belief, knew about, approved of, caused and/or directed, the wrongdoing at Tintra (including the publication of Tintra's public announcements).

633.    Upon information and belief, the volume and frequency of the wrongful activity described throughout could not have occurred without the consent and knowing collusion of

Defendants. Upon information and belief, nor could such conduct have continued for at least over two years without Defendants' knowledge.

634. Manager Defendants held multiple meetings with Tintra, Shearer, and Neumann (including at Tintra's small office, which afforded them the opportunity to see the true state of affairs at Tintra firsthand) at various times during the course of the Scheme.

635. In the UK Complaint, Craig and Deborah detailed how they intentionally and knowingly took extensive and complicated steps and risked $1.2 million to deceive Plaintiff.

636. During the course of their relationship with Tintra, as experienced investors closely involved in Tintra's business and privy to Tintra's non-public information, the Cogut Family knew that Tintra was distressed and could not (1) undertake the business it was representing it was pursuing or (2) engage in bona fide transactions of the kind and valuation it was promoting.

637. Upon information and belief, at all relevant times, LRB was co-controlled by the Cogut Family through, among other things, CFP Fintech, a company the Cogut Family controlled.

638. By August 2023, Manager Defendants were aware that others knew that Tintra was a fraud. Upon information and belief:

(a) In August 2023, Craig, David, and Garg visited Tintra's office. During that visit, Tintra Pegasus Employee stated to Craig, in front of others (including David and Garg), that there was no "product" at Tintra, that Tintra had no technical expertise and no banking expertise, and that banking infrastructure would take a long time to build.

(b) Following the meeting, Tintra Pegasus Employee stated to Garg that Shearer was "cooking it all up. We have nothing." Leaving no doubt, Tintra Pegasus Employee also stated to Garg: "This is bullsh[*]t." Tintra Pegasus Employee requested that Garg inform the Coguts "that there was and there would be no product, Tintra had no one who could build the banking platform, Tintra had no useful IP of any kind, Tintra had no cash, and Tintra was not what Shearer, Garg and the Coguts were pretending it to be."

(c) Garg confirmed that he would speak with the Coguts about Tintra Pegasus Employee's concerns but then continued the conversation as though he had not been told anything.

(d)    Craig, David, and Garg returned to Tintra's small office the following day for meetings but did not meet with Tintra Pegasus Employee, the key individual assisting Manager Defendants with the Barbados BGB documentation and the only one with banking experience.  The Coguts did so, upon information and belief, to avoid the creation of a further record of being put on notice that Tintra was a sham.

(e)    On several calls following that meeting, Tintra Pegasus Employee again told Garg that Tintra had no product.

(f)    Subsequently, Garg acknowledged that he had discussed Tintra Pegasus Employee's concerns with Craig and David.  Yet Garg continued to instruct Tintra Pegasus Employee on documentation for Pegasus's application to GCF.

639.    Upon information and belief, in November 2023, Garg admitted that he had known and acknowledged that the Coguts had known that Tintra and Shearer were frauds for at least several months.

640.    Upon information and belief, Defendants were aware that Tintra did not repay the $1.2 million that was due on July 15, 2023, and unsuccessfully sought repayment.

641.    Even after Manager Defendants had been expressly told by others that Tintra was a scam, they continued to promote Tintra and associate with it.

642.    Even after Manager Defendants, Tintra, Shearer, and LRB had abandoned the fake takeover offer and the fake tender offer in late 2023 and Tintra had collapsed, Manager Defendants continued to publicly associate themselves with the company Tintra, the "Tintra" brand, and Shearer, in furtherance of the Scheme.

(a)    On December 6, 2023, Craig, Garg, Persaud, GCF's Executive #2, and a Barbados official hosted a panel at the Barbados country pavilion at "COP28," the world's biggest climate change conference, in Dubai.  In leading the panel, Craig was hard at work "selling" to the world the need for the Barbados BGB— funded by GCF, USAID and the Other Victims' money, which would be under Pegasus' and Craig's control.

(b)    Shearer attended that panel, sitting in the front row.

(c)    The panelists, particularly Craig and/or Garg, described how Pegasus purportedly intended to use technology in BGB projects.  They also described

131

that USAID and GCF had funded the project, promoted the purported technology Pegasus was using at the Barbados BGB, and promoted both (1) Pegasus' purported need to secure more cash from USAID and (2) how Pegasus would purportedly spend USAID's and GCF's funding on the Barbados BGB, particularly on the purported technology.

(d)    At the event, Garg was asked, in effect, to describe Pegasus' ostensible technology that was the purported backbone of the Barbados BGB and differentiated it from other banks. Upon information and belief, Garg could not provide a straight answer to that question because he knew that there *was* no unique (or any other) banking technology at the Barbados BGB provided by Pegasus and Tintra.

(e)    Indeed, in describing Barbados BGB's technology purportedly provided or to be provided by Pegasus, Garg responded with the following "word salad" of buzzwords:

> There are a number of um roles technology can play in this in this space, Avi. I think the first and the most obvious one is the efficiency of operations as an institution. With with the technology and architecture, we can be very nimble, we can be very cost-efficient and cost-effective in the way we deliver these solutions uh on the ground. Um, the second advantage is as Craig mentioned is the capability and capacity to replicate this model in a number of other countries and locations [sic] is can be facilitated at a much lower cost and a much faster speed if we have a digital architecture underpinning the the the institution. Um our plan is to have the bank in a in a cloud-hosted environment with a very high use of modern technology um uh components and that will make it easier for us to replicate this um uh into other markets and into other applications. The third um benefit of the technology is the ability to innovate with time so as we have new projects coming on stream we can leverage the same technology architecture to create new structures, new solutions, uh and the speed to market the the cost to to come bring out new solutions is going to be significantly better uh then what we might have seen with with traditional institutions. And I think the fourth and and equally important point is risk mitigation through data analytics, uh and I think you know a lot of the the financial viability of these projects is gonna be uh struck based on how efficiently the bank can monitor and mitigate risk and how we leverage some of the new means and tools available to us through technology which is around not just the micro data for the project but the macro data around similar projects in other countries and how do we bring it all together to make more uh efficient and effective credit decisions, lending decisions going forward.

(f)     At the conclusion of the panel, Shearer was heartily embraced by the smiling Garg, upon information and belief, reflecting the continued cooperation and understanding between Manager Defendants and Shearer.

(g)     Pegasus subsequently promoted that video, with Shearer featured prominently, on its website, under the heading "Roofs to Reefs Program and Blue Green Bank Barbados."

(h)     A still frame from the video recording of the panel is below.



*Left: Shearer (smiling), Persaud (in the background, obscured by Shearer in the foreground), GCF's Executive #2 (laughing), a Barbados official (smiling), Garg (smiling) and Craig (with the microphone, smiling).*
*Dubai, December 6, 2023.*

643.    Upon information and belief, Manager Defendants' relationship with Shearer continued to be so important to them that in December 2023, Craig had Shearer accompany Craig to a business meeting with one of the most prominent investors in the United States.

644.    Following that meeting, Pegasus proudly published on its website two photographs that showed Craig, that investor, Shearer and others together.  Those photographs remain on

Pegasus' website.  In a photograph depicting 19 attendees, Shearer and Craig were in the very center of the row of posing attendees.

645.    Notably, another photograph of that meeting Pegasus proudly published depicted just four individuals posing for the picture: Shearer, Craig, Natalie Gartmann, and another Pegasus/SNCF executive.  Craig stood smiling next to Shearer.  Shearer had his arm wrapped around Craig's shoulder.  Upon information and belief, the photographs confirm Shearer's status as a key (and continued) associate of Defendants, how close of a team Craig, Pegasus, and Shearer were, and that Pegasus continued to proudly tout its association with Shearer on its website well into 2024.  The latter photograph is below:



*From left: Craig, Shearer, another Pegasus/SNCF executive, and Natalie Gartmann*

646.    In about December 2023 or January 2024, in yet another effort to maintain the Tintra charade, Pegasus listed Shearer on Pegasus' website as "Strategic Advisor." Shearer remained so listed until early April 2024.

647.    Included in that listing on Pegasus' website was a glowing description of Shearer's and "Tintra Group['s]" bona fides published by Pegasus.

648.    In that listing, Pegasus described Shearer as "a passionate advocate and enabler of public private partnerships being the only way in which the challenges of climate adaptation can be solved."

649.    A copy of Shearer's biography on Pegasus' website (as preserved by the Internet Archive) is below:



*A screen shot from Pegasus' website, depicting the presentation of Shearer as "Strategic Advisor" and "enabler of public private partnerships" as of about April 4, 2024.*

650.    Until sometime in about May 2024, in yet another effort to continue propping up the Tintra charade, Pegasus continued to maintain on its website the glowing description of Tintra's non-existent business that it first placed there to dupe Plaintiff in early 2023.

651.    In the UK Complaint, Craig and Deborah similarly indicated to the English Court that Tintra—by then, as they well knew, defunct—was a going concern whose "principal business is to provide banking and other financial services with a focus on emerging market economies and cross-border monetary transfers."

652.    Upon information and belief, Defendants continued to maintain their deceptive presentation of Tintra into 2024 because of how tightly linked their participation in the Barbados BGB project had become with "Tintra" and because to admit otherwise publicly would have been tantamount to a public admission of their involvement in a fraud.

653.    Plaintiff commenced legal action against Tintra's directors in the UK on January 25, 2024.

654.    By June 11, 2024, Manager Defendants were acutely aware of and following Plaintiff's UK litigation against Tintra's directors.  Manager Defendants, upon information and belief, were apprised by Tintra's directors of key issues, such as that Tintra's directors had failed to pay their UK counsel.

655.    Upon information and belief, Defendants, together with others, have been actively working to prevent discovery of the full scope of their misconduct and destroy or conceal evidence.

(a)    Upon information and belief, on about April 12, 2024, as Tintra was about to enter formal bankruptcy in the UK and shortly before Craig, Deborah, and CFP VII sued Tintra and Shearer in the UK, Sangay sought to delete his WhatsApp chats with the Tintra employee who was in charge of Tintra's payments of the personal expenses of Sangay's family.

136

(b)     After learning of this impending action on August 28, 2024, upon information and belief, Manager Defendants caused LRB's (i.e., Tintra AI's) public listing on the UK regulator Companies House website to be amended to remove references to CFP Fintech's involvement as a director.

(c)     Tintra's posts published on Tintra's X (formerly Twitter) account over the recent years remained publicly available throughout most of 2024, notwithstanding (and for months after) Tintra's bankruptcy, the filing of the UK Complaint, and the commencement of Plaintiff's litigation against Tintra's directors in the UK.  Yet, in mid-October 2024, just weeks after Plaintiff notified Defendants that it intended to commence litigation, all of the posts published on Tintra's X (formerly Twitter) account after April 21, 2021, were deleted. Upon information and belief, Shearer controls that account.

(d)     Upon information and belief, Shearer and others at Tintra have gone to great lengths to prevent the UK liquidator from obtaining copies of Tintra's emails, and it was only through a statutory process involving Tintra's information technology provider that the liquidator has been able to recover Tintra's email server.

(e)     Plaintiff obtained a winding-up order for Tintra in a hearing held by an English court on June 5, 2024, following a five month period during which Tintra, despite being insolvent, intensively battled Plaintiff in the English courts using attorney Botros (LRB's and Tintra's dual advisor on the purported takeover) to prevent Plaintiff from obtaining that order.  The day before the court hearing of June 5, 2024, once the winding up order became inevitable, Plaintiff's UK counsel were approached by Defendants' UK counsel for the first time.  Upon information and belief, that approach was part of Defendants' desperate attempt to prevent Plaintiff from proceeding with the winding up of Tintra.

(f)     In the course of Pegasus' own repositioning as a purported ESG and climate mitigation investor several years ago, Pegasus' website was scrubbed of references to inconvenient investments inconsistent with its present image, including those in cannabis and fossil fuels.

(g)     In response to the UK Complaint, Shearer filed a Defense containing damning allegations against the Cogut Family, on about July 8, 2024.  Even though approximately nine months have passed since Craig and Deborah filed the UK Complaint, upon information and belief, they have made no further filings in that case.  Upon information and belief, Craig and Deborah are not actively prosecuting that case because doing so is likely to produce further damning allegations against them.

## FIRST CAUSE OF ACTION

**(Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)—Manager Defendants)**

656.    Plaintiff repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

657.    This claim is brought by Plaintiff against each Manager Defendant (within this First Cause of Action and the Second Cause of Action, each a "**RICO Defendant,**" and collectively, "**RICO Defendants**"), pursuant to 18 U.S.C. § 1964(c), for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq*.

658.    Each RICO Defendant is and, at all relevant times, was a "person" under 18 U.S.C. § 1961(3).

659.    Plaintiff is and, at all relevant times, was a "person" under 18 U.S.C. § 1961(3).

660.    Each RICO Defendant violated 18 U.S.C. § 1962(c) and injured the business or property of Plaintiff.

**A.    The RICO Enterprise.**

661.    At all times between about the fall of 2021 and the present time, Tintra was and remains an "enterprise" as defined by 18 U.S.C. § 1961(4) (the "**RICO Enterprise**").

662.    At all relevant times, the RICO Enterprise engaged in activities that affected interstate and foreign commerce.

663.    Each RICO Defendant was "employed by or associated with" the RICO Enterprise, within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), during the period commencing from about the fall of 2021 and ending no earlier than in June 2024 (such period, the "**Relevant Period**").

**B.    RICO Defendants' Conduct or Participation in the Conduct of the RICO Enterprise's Affairs.**

664.    During the Relevant Period, each RICO Defendant conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity.

665.    Each RICO Defendant conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity in order to enrich themselves by securing business opportunities and profits through unlawful or deceptive means, while concealing the wrongdoing from the public, from Plaintiff, and from other victims of RICO Defendants.

666.    RICO Defendants pursued multiple opportunities by conducting the affairs of the RICO Enterprise through a pattern of racketeering activity.

667.    RICO Defendants targeted the Other Victims (particularly focusing on GCF and USAID) and the SPAC.

668.    RICO Defendants targeted valuable business opportunities in the United Kingdom and Rwanda for RICO Defendants.

669.    In pursuing these business opportunities, RICO Defendants committed or caused to be committed, utilizing the RICO Enterprise, and through it, a number of unlawful acts constituting a pattern of racketeering activity.    RICO Defendants committed multiple acts of wire fraud, laundered proceeds of their unlawful activity, used the RICO Enterprise to confer or offer or agree to confer benefits in violation of state bribery law, and committed violations of 18 U.S.C. § 1952 (the "**Travel Act**").

670.    In conducting or participating, directly or indirectly, in the conduct of the RICO Enterprise, RICO Defendants were assisted by others, including Shearer and Neumann

(collectively, "**Other RICO Participants**," and each an "**Other RICO Participant**"). Throughout the Relevant Period, RICO Defendants directed Other RICO Participants to take actions necessary to accomplish RICO Defendants' illicit aims.

671.    Throughout the Relevant Period, RICO Defendants conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise by, among other things:

(a)    Craig, who is Pegasus' controller, founder, chairman and CEO, (1) set the overall strategy of the RICO Enterprise, (2) liaised with key figures of the targets of the RICO Enterprise's activities (e.g., senior officials of at least some of the Other Victims), and (3) tasked the RICO Enterprise's titular leadership, and directly or indirectly tasked non-executive employees of the RICO Enterprise, with specific goals and even specific day-to-day operational tasks.

(b)    David oversaw the implementation of Craig's instructions at the RICO Enterprise.

(c)    Pegasus directed and/or controlled the RICO Enterprise's employees', the RICO Enterprise's, Shearer's and Neumann's tasks, including extensive document preparation and the positioning of the RICO Enterprise publicly and to the Other Victims.

(d)    Each RICO Defendant (1) was extensively involved in the management of the RICO Enterprise, (2) played a key role in the RICO Enterprise and its wrongful conduct, and (3) put the RICO Enterprise and its CEO, board members, and employees to RICO Defendants' use.  The RICO Enterprise's titular leadership deferred to and took direction from RICO Defendants.  The RICO Enterprise's employees were similarly compelled to defer to RICO Defendants' decisions and follow RICO Defendants' instructions.

(e)    RICO Defendants' direction and/or control of the RICO Enterprise extended to decision-making as to whether the RICO Enterprise would enter into the Agreement and then, later, the Settlement Deed and the Amendment Deed with Plaintiff and as to the terms that were included or excluded therefrom.

(f)    RICO Defendants directed and/or controlled Shearer and the RICO Enterprise in their dealings with Plaintiff on multiple occasions, including when Plaintiff sought to exercise and enforce its legal rights following the RICO Enterprise's breaches of the Agreement.

(g)    On those occasions when Shearer and RICO Defendants disagreed as to certain conduct to be undertaken by the RICO Enterprise, RICO Defendants' decisions controlled.

(h)    RICO Defendants treated Shearer as their subordinate and eventually formalized that role by appointing him a "Strategic Advisor" to Pegasus while he nominally remained the RICO Enterprise's CEO.

(i)    RICO Defendants directed and/or controlled others in relation to the RICO Enterprise's Board composition.  Specifically, RICO Defendants set the criteria to fill a director vacancy and directed and/or controlled others to vet a candidate for that position.  Upon information and belief, that criteria required the candidate to follow RICO Defendants' instructions, and RICO Defendants held the authority to approve the candidate for that position.

(j)    Despite its limited financial resources, the RICO Enterprise spent much, if not all, the money it did have at the direction, and for the benefit, of RICO Defendants.

(k)    RICO Defendants set the strategy, parameters, and range in which the titular Board of the RICO Enterprise was authorized to operate (including the numerical parameters of what the Board was allowed to offer in settlement discussions with Plaintiff).

(l)    RICO Defendants instructed, directed, and/or controlled the RICO Enterprise's attorneys, including in those attorneys' negotiations on behalf of the RICO Enterprise.

(m)    In late 2023, RICO Defendants, via the RICO Enterprise's counsel, attempted to negotiate a release for themselves with Plaintiff.

(n)    As managers and operators of the RICO Enterprise, RICO Defendants met with important business and governmental contacts, partners, and potential partners, of the RICO Enterprise, together with Other RICO Participant Shearer.

(o)    In June 2023, Craig, Deborah, and CFP VII placed $1.2 million in the RICO Enterprise's or its UK counsel's bank account.

672.    RICO Defendants exercised their direction and control in multiple other ways, as described throughout the Complaint, including in Section IV of the Complaint.

673.    In conducting or participating, directly or indirectly, in the conduct of the RICO Enterprise's affairs, RICO Defendants (1) communicated with other RICO Defendants, Other RICO Participants, the Other Victims, Plaintiff, and others, from and/or to the United States, (2) conducted meetings with other RICO Defendants, Other RICO Participants, the Other Victims, and others, in the United States, (3) made and/or disseminated, and/or directed and/or caused to be

made and/or disseminated, in or through the United States statements containing fraudulent representations to the public generally and to numerous parties, including Plaintiff and the Other Victims, using interstate and international wires, telephone calls, electronic mails, WhatsApp and text messages, the internet, servers in the United States, and the SWIFT messaging system, and (4) targeted victims who are organized and operate in the United States (including Plaintiff and USAID) or operate in the United States (including GCF, IMF, and IDB). In conducting the RICO Enterprise's illicit activities, RICO Defendants made and/or caused others to make payments to and from the United States.

### C.     Pattern of Racketeering Activity.

674.    During the Relevant Period, each RICO Defendant conducted or participated, directly or indirectly, in the conduct of the RICO Enterprise through a pattern of racketeering activity.

675.    Specifically, each RICO Defendant committed multiple predicate acts of racketeering activity (as more specifically alleged below), including: (1) wire fraud in violation of 18 U.S.C. § 1343, targeting multiple victims (Plaintiff and the Other Victims), (2) money laundering in violation of 18 U.S.C. § 1957, (3) bribery in violation of New York's commercial anti-bribery law (N.Y. Penal Law § 180.03), and (4) traveling or using the facilities of interstate or foreign commerce in violation of the Travel Act.

676.    Those predicate acts were not isolated incidents but instead formed a continuous, related pattern of racketeering activity, involving the same participants furthering multiple, related schemes via the RICO Enterprise, which schemes targeted multiple victims (with a particular focus on targeting the Other Victims, like GCF and USAID), with the same or similar purpose of enriching RICO Defendants by securing business opportunities and profits through unlawful or

deceptive means with the use of the RICO Enterprise while concealing the wrongdoing from their victims, including the public, Plaintiff, and the Other Victims.

*1.    First Set of Predicate Acts: Wire Fraud, in Violation of 18 U.S.C. § 1343.*

677.    To execute their schemes and secure business opportunities for themselves and the RICO Enterprise, each RICO Defendant conducted the affairs of the RICO Enterprise through multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

*a.    A Scheme to Defraud the Other Victims.*

678.    In about late 2021, RICO Defendants devised or intended to devise a scheme to defraud the Other Victims out of the control of, and out of at least $30.5 million in funding for, the Barbados BGB (including to defraud (1) GCF out of $15.5 million in funding for the Barbados BGB and (2) USAID out of $5 million in funding for the roll-out of the Barbados BGB).

679.    RICO Defendants sought to secure management of those funds by fraudulently portraying the RICO Enterprise to the Other Victims as possessing cutting-edge banking technology and the capability to set up the systems for a new bank, including by making and by causing and/or directing the RICO Enterprise and Other RICO Participants to make public statements.  By that portrayal, RICO Defendants sought to deceive the Other Victims about RICO Defendants' wherewithal to establish, manage, and operate the Barbados BGB with the use of the RICO Enterprise.  But as RICO Defendants were aware, no such technology or capability existed. In furtherance of that scheme, RICO Defendants made or caused to be made the materially false and/or misleading representations specified in Sections I.B.4, I.G, I.H, I.L, I.M, I.N, I.O, I.R, I.S, I.U, I.V and I.W above.

680.    By that scheme, RICO Defendants intended to defraud the Other Victims.

681.    In furtherance of that scheme, each RICO Defendant, throughout the Relevant Period, transmitted or caused to be transmitted writings, signs, signals, pictures, or sounds, by

foreign or interstate wires. Those transmissions contained the materially false and/or misleading representations identified as having been made, or caused to be made, by one or more RICO Defendants in Sections I.B.4, I.G, I.H, I.L, I.M, I.N, I.O, I.R, I.S, I.U, I.V and I.W above. RICO Defendants' other transmissions included the following additional writings, signs, signals, pictures, or sounds transmitted by interstate or foreign wires:

(a) Pegasus transmitted, and Craig and David caused to be transmitted, multiple versions of the Preliminary Application to GCF between April 28 and August 10, 2022.

(b) Pegasus transmitted, and Craig and David caused to be transmitted, multiple versions of the Main Application to GCF between February 2 and June 14, 2023.

(c) One or more RICO Defendants communicated with USAID in relation to the Barbados BGB via email and/or otherwise through electronic means at various times prior to and after the award of the USAID funding to RICO Defendant Pegasus.

(d) Upon information and belief, at least between April 2023 and the fall of 2023, RICO Defendants transmitted or caused to be transmitted to one or more of the Other Victims multiple documents, including documents prepared by the RICO Enterprise together with RICO Defendants at various times between April 2023 and the fall of 2023 (including a document entitled "Tintra Approach and Delivery Plan for BGB").

(e) Drafts and/or final versions of at least some of the foregoing documents were also transmitted among RICO Defendants, Shearer, and the RICO Enterprise's employees via email and/or WhatsApp, as those documents were being prepared, at least between April 2023 and about October 2023.

(f) Between sometime in late 2021 or early 2022 and September 2024, RICO Defendants, Garg, Other RICO Participants, the RICO Enterprise's employees, and the RICO Enterprise's counsel transmitted emails, WhatsApp messages, and other wires in furtherance of the scheme. Such wire transmissions included multiple (1) WhatsApp messages between Craig and Shearer, (2) WhatsApp messages between Shearer and Tintra Pegasus Employee, (3) WhatsApp messages sent by David to Neumann and Director #1, and (4) emails sent by Garg and Tintra Pegasus Employee to each other.

682. As described in the following section, "*A Related Scheme to Defraud Plaintiff*," multiple wire transmissions containing false and/or misleading representations were made and/or

caused to be made to Plaintiff by RICO Defendants, the RICO Enterprise, and others, during 2022 and 2023. Those representations were false and/or misleading. Those transmissions were not, however, limited to the objective of defrauding Plaintiff. They were also made in furtherance of the scheme to defraud the Other Victims because defrauding Plaintiff was essential to the continued existence of the RICO Enterprise and to that scheme remaining undiscovered by the Other Victims.

683.    Accordingly, RICO Defendants committed or caused to be committed multiple acts of wire fraud in violation of 18 U.S.C. § 1343.

<i>b.    A Related Scheme to Defraud Plaintiff.</i>

684.    Sometime in late 2022, RICO Defendants, together with the Other RICO Participants, devised or intended to devise a related scheme to defraud Plaintiff. At a point when the RICO Enterprise needed additional funds—lest its financial distress frustrate RICO Defendants' scheme to defraud the Other Victims—RICO Defendants and the Other RICO Participants devised additional schemes, first to defraud Plaintiff out of a $3 million loan for the RICO Enterprise, and then, in early 2023, to defraud Plaintiff out of its Conversion Right and to fraudulently induce Plaintiff to continue forgoing its Conversion Right, to refrain from timely pursuing recovery measures, and to enter into agreements with the RICO Enterprise to forestall Plaintiff from enforcing its rights.

685.    RICO Defendants and the Other RICO Participants sought to secure the $3 million loan by convincing Plaintiff that the RICO Enterprise was a legitimate, cutting-edge, and prospective banking technology company, with AI banking technology. RICO Defendants, in furtherance of that scheme, relied on materially false and/or misleading representations made or caused to be made by them to Plaintiff, as alleged in ¶¶ 759–763 below, which paragraphs are incorporated by reference and alleged in this cause of action.

145

686.    RICO Defendants sought to induce Plaintiff to first give up and then continue forgoing its Conversion Right, and to induce Plaintiff to refrain from timely pursuing recovery measures and enter into a settlement agreement and then an amendment agreement by deceiving Plaintiff into believing that the RICO Enterprise was able to and intended to repay Plaintiff. RICO Defendants, in furtherance of that continued scheme, made or caused to be made further false and/or misleading representations specified in ¶¶ 775 and 787 below, which paragraphs are incorporated by reference and alleged in this cause of action.

687.    By those schemes, RICO Defendants intended to defraud Plaintiff.

688.    In furtherance of their aforementioned schemes to defraud Plaintiff, each RICO Defendant, during the Relevant Period, transmitted or caused to be transmitted writings, signs, signals, pictures, or sounds, by foreign or interstate wires. Those transmissions contained the false and/or misleading representations identified as having been made, or caused to be made, by one or more RICO Defendants in ¶¶ 759–763, 775, and 787 below. They also include the wires described in the above-titled section, "*A Scheme to Defraud the Other Victims*.," because the transmissions identified in that section were also made in furtherance of the schemes to defraud Plaintiff, because establishing the RICO Enterprise as a legitimate, cutting-edge, and prospective AI banking technology company enabled RICO Defendants both to deceive Plaintiff and to continue to deceive and conceal their scheme to defraud from the Other Victims.

689.    RICO Defendants sought to continue deceiving Plaintiff so Plaintiff would not—by its efforts—uncover and reveal the true nature of Tintra and thwart their other schemes, including to defraud the Other Victims.

690.    Accordingly, RICO Defendants committed or caused to be committed multiple acts of wire fraud in violation of 18 U.S.C. § 1343.

146

2.    *Second Set of Predicate Acts: Money Laundering in Violation of 18 U.S.C. § 1957.*

691.    During the Relevant Period, each RICO Defendant knowingly engaged or attempted to engage in multiple instances of money laundering.

692.    Wire fraud constitutes "specified unlawful activity" under 18 U.S.C. § 1957.

693.    During the Relevant Period, each RICO Defendant conducted the affairs of the RICO Enterprise through a pattern of knowingly engaging or attempting to engage in millions of dollars' worth of monetary transactions that involved funds obtained through the commission of wire fraud.

a.    *Property Criminally Derived from Plaintiff by Wire Fraud.*

694.    On December 23, 2022, the RICO Enterprise extracted $3 million from Plaintiff, as described in Section II.A above.  Those funds were obtained through the commission of wire fraud, which RICO Defendants knew.

695.    RICO Defendants caused the RICO Enterprise subsequently to engage or attempt to engage in monetary transactions using criminally derived property, including by the RICO Enterprise (1) transferring those funds or causing them to be transferred from the RICO Enterprise's UK counsel's client bank account to a bank account or bank accounts held by the RICO Enterprise and/or one or more of its subsidiaries, (2) making repayments of its overdue debts in about early 2023, (3) paying or committing to pay the costs of the sponsorship of the Animal Ball in the first half of 2023, (4) making payments to Tintra's directors (including Shearer and Neumann) and officers and employees (including Tintra Pegasus Employee) and for other expenses (including the expenses of the RICO Enterprise's efforts in furtherance of the scheme to defraud the Other Victims) in 2023, and (5) making payments of general working capital costs in 2023.

147

*b.    Property Criminally Derived from USAID by Wire Fraud.*

696.    RICO Defendants solicited from USAID, and upon information and belief, in about early 2023, USAID approved a grant of "$5 million to help establish the [Barbados BGB] bank's management and administrative capacity."  Those funds were obtained through the commission of wire fraud, which RICO Defendants knew.

697.    Following receipt of the funds from USAID, RICO Defendants engaged or attempted to engage in monetary transactions with that criminally derived property during 2023, including (1) upon information and belief, paying costs of and/or related to Garg's services and (2) expending at least some of the funds provided by USAID on costs purported to be incurred in connection with Pegasus' impending roll-out of the Barbados BGB.

*c.    Property Criminally Derived from GCF by Wire Fraud.*

698.    GCF approved Pegasus' Preliminary Application and, upon information and belief, in late 2022 or early 2023 sent $612,600 to Pegasus to assist Pegasus with preparing its Main Application.  Those funds were obtained through the commission of wire fraud, which RICO Defendants knew.

699.    Upon information and belief, following receipt of the funds from GCF, RICO Defendants engaged or attempted to engage in monetary transactions using that criminally derived property by expending at least some of those funds on costs of activities purportedly related to Pegasus' Main Application.

*3.    Third Set of Predicate Acts: Bribery in Violation of New York Penal Law Section 180.03.*

700.    During the Relevant Period, each RICO Defendant engaged in multiple acts of commercial bribery in violation of New York Penal Law § 180.03.

701.    During the Relevant Period, RICO Defendants (directly or via entities they controlled) conferred or agreed to confer upon, or offered to, GCF's Executive #1 payments or benefits, which, upon information and belief, were in excess of one thousand dollars.

702.    At all relevant times, GCF's Executive #1 was an employee, officer, agent, and/or fiduciary of GCF.  Upon information and belief, those payments or benefits were conferred, or offered or agreed to be conferred, on GCF's Executive #1 without GCF's consent.

703.    RICO Defendants did so, upon information and belief, to influence the decision-making of GCF's Executive #1 in his conduct with respect to GCF's affairs.  Specifically, RICO Defendants sought to obtain (1) at least tens of millions of dollars and potentially hundreds of millions of dollars in funding for their funds and projects (such as the Barbados BGB) and (2) at least four extensions of the deadlines previously given by GCF to RICO Defendants' funds for securing third party capital.

704.    During GCF's Executive #1's tenure at GCF, GCF committed over $200 million to funds and/or projects managed or sub-managed by RICO Defendants and their entities, including $15.5 million to the Barbados BGB.  GCF also granted four extensions of fundraising deadlines to such funds.  Those funding awards and decisions have caused economic harm to GCF in excess of two hundred fifty dollars.

    *4. Fourth Set of Predicate Acts: Travel Act Violations.*

705.    During the Relevant Period, RICO Defendants committed multiple violations of the Travel Act.

706.    In violation of the Travel Act, RICO Defendants traveled or used the mail or another facility of interstate or foreign commerce intending to distribute the proceeds of that unlawful activity or to otherwise promote, manage, establish, carry on, or facilitate the promotion of, management of, establishment of, or carrying on of, unlawful activity, including (1) violations of

the anti-bribery provisions of Foreign Corrupt Practices Act ("**FCPA**"), *see* 15 U.S.C. § 78dd-2 *et seq.*, (2) violations of the commercial anti-bribery statutes of New York, N.Y. Penal Law § 180.03, and (3) violations of 18 U.S.C. § 1957. RICO Defendants thereafter performed or attempted to perform such distribution, promotion, management, establishment, carrying on, or facilitation, as alleged below.

> ### a.    *Travel or Use of Facilities—FCPA Violations.*

707.    Each RICO Defendant is a "domestic concern" within the meaning of 15 U.S.C. § 78dd-2(h)(1) and a "United States person" within the meaning of 15 U.S.C. § 78dd-2(i)(2).

> ### (i)    *Travel or Use of Facilities—FCPA Violations—GCF's Executive #1.*

708.    GCF's Executive #1 is a foreign official within the meaning of 15 U.S.C. § 78dd-2(h)(2).

709.    During the Relevant Period, and no later than sometime between January 6 and February 4, 2023, RICO Defendants, upon information and belief, (1) offered or promised to appoint GCF's Executive #1 a "Strategic Advisor" or to a similar position or positions at Pegasus, their funds and/or their portfolio companies, (2) offered, paid, or promised to pay GCF's Executive #1 fees, and/or (3) authorized such appointment, offer, promise, or payment.

710.    The title, the appointment(s) and involvement with a private investment business, and the fees or the possibility of receiving the fees, were each of value to GCF's Executive #1.

711.    During the Relevant Period, RICO Defendants corruptly made use of the mails or means of instrumentality of interstate commerce and/or did acts outside the United States, in furtherance of (1) an offer or promise to appoint GCF's Executive #1 a "Strategic Advisor" or to a similar position or positions at Pegasus, their funds, and/or their portfolio companies, (2) an offer,

payment, or promise to pay GCF's Executive #1's fees, and/or (3) an authorization of such appointment, offer, promise, or payment.

712.    RICO Defendants did so to influence GCF's Executive #1's acts and decisions in his official capacity, to induce him to do or omit to do acts in violation of his lawful duty, to secure an improper advantage, or to induce him to use his influence with GCF, the Barbados Government, and/or the Government of Rwanda to affect or influence their respective acts or decisions, in order to assist RICO Defendants in obtaining or retaining business or directing business to RICO Defendants and their affiliated funds and entities, including, as relevant here, business or opportunities involving the RICO Enterprise.

713.    RICO Defendants thus violated 15 U.S.C. § 78dd-2(a)(1) and/or 15 U.S.C. § 78dd-2(i)(1).

714.    RICO Defendants conducted or participated in the conduct of the affairs of the RICO Enterprise through violations of the Travel Act in connection with the aforementioned FCPA violations. Pegasus and Craig traveled or used the mail or the facilities of interstate or foreign commerce intending to distribute the proceeds of the unlawful activity of targeting GCF's Executive #1 in violation of FCPA alleged above, and to promote, manage, establish, carry on, or facilitate the promotion of, management of, establishment of, or carrying on of, the unlawful activity of bribing GCF's Executive #1 in violation of FCPA, including by:

    (a)    Traveling on multiple occasions to meetings and joint appearances with or involving GCF's Executive #1 in various locations in the United States (including in New York) and around the world.

    (b)    Hosting GCF's Executive #1 at events organized by RICO Defendants, including in New York.

    (c)    Pegasus publishing false and/or misleading disclosures on its website as to its arrangement with GCF's Executive #1.

(d)     Promoting the special relationship between GCF's Executive #1 and Pegasus in private investment presentations prepared by Pegasus.

(e)     Corruptly using the wires to offer, or cause others to offer, payments for a purportedly advisory relationship and/or appointments to GCF's Executive #1.

(f)     Distributing the proceeds of GCF's funding, including (1) funding to which GCF committed during GCF's Executive #1's tenure, (2) GCF's funding disbursed during his tenure, and (3) GCF's funding disbursed following the granting of the extensions described above. GCF provided that funding (1) for the Barbados BGB project, (2) to GFCR, (3) to SNCF, (4) to Pegasus' CRAFT Vehicle, and (5) to the CRAFT Fund.

(g)     Upon information and belief, such distributions also included payments made by SNCF, GFCR, and the CRAFT Fund to, for, and/or in reimbursement of, certain expenses and fees of Manager Defendants' affiliates that manage them or act as their general partners.

715.    Thereafter, RICO Defendants did, or attempted to, distribute the proceeds of, and promote, manage, establish, carry on, or facilitate the promotion of, management of, establishment of, or carrying on of, the targeting of GCF's Executive #1 in violation of the FCPA, including by, during the Relevant Period: (1) engaging in the conduct described in the preceding paragraph, (2) authorizing RICO Defendants' funds and/or portfolio companies to offer or promise to appoint GCF's Executive #1 a "Strategic Advisor" or to a similar position or positions at those funds and/or portfolio companies and/or to offer, pay, or promise to pay, GCF's Executive #1 fees, and (3) upon information and belief, funding the payments of such fees and/or providing the funds from which such payments would be made pursuant to arrangements reached, or which may be reached, as described above.

*(ii)     Travel or Use of Facilities—FCPA Violations—the President of Rwanda's Son.*

716.    The President of Rwanda, Paul Kagame, is a foreign official within the meaning of 15 U.S.C. §§ 78dd-2(h)(2). President Paul Kagame controls the Government of Rwanda, having ruled Rwanda since 2000. His control includes that over the RDB, to which he appoints board

152

members and to which he has appointed his older son and Brian's brother Ivan, who is also a foreign official within the meaning of 15 U.S.C. §§ 78dd-2(h)(2).

717.    In about late 2022 and no later than in early 2023, the RICO Enterprise hired Brian for a "no show" job, which he held until at least late 2023.  Brian was paid a salary or received other similar payments by the RICO Enterprise in relation to that job throughout at least most of 2023 and received certain other benefits, including admission to the lavish Animal Ball at the RICO Enterprise's expense.  Upon information and belief, the RICO Enterprise also at its expense assisted Brian with obtaining or maintaining the requisite immigration status in the UK.

718.    The offer of employment to, the promises of payment to, the hiring of, and the payments to or for the benefit of, Brian were of value to each of President Kagame and Ivan.  So was Brian's ability to remain in the UK lawfully.

719.    During the Relevant Period, RICO Defendants and/or Shearer caused, authorized, and/or enabled the RICO Enterprise to (and Shearer and the RICO Enterprise did) make the offer of employment to, promise employment and payment to, employ, make payments to, and/or give things of value to, Brian.   Upon information and belief, during the Relevant Period, RICO Defendants and/or Shearer caused, authorized, and/or enabled the RICO Enterprise to promise Brian, and to seek to obtain for him, a visa to allow him to remain in the UK and to pay the costs related thereto.

720.    During the Relevant Period, RICO Defendants, upon information and belief, corruptly made use of the mails or means of instrumentality of interstate commerce and/or did acts outside the United States in furtherance of offers, payments, gifts, promises to pay, the giving of money and/or things of value, and/or authorizing, directing, and/or enabling some or all of the foregoing.

721.    RICO Defendants and/or Shearer did so to attempt to influence each of President Kagame's and Ivan's acts and decisions in each of their respective official capacities, to induce them to do or omit to do acts in violation of their lawful duties, to secure an improper advantage, or to induce them to use their influence with the Rwandan government or its instrumentality (such as the RDB) to affect or influence their acts or decisions, in order to assist RICO Defendants in obtaining or retaining business or directing business to RICO Defendants, their affiliated entities, and the RICO Enterprise.

722.    RICO Defendants thus violated 15 U.S.C. § 78dd-2(a)(1) and/or 15 U.S.C. § 78dd-2(i)(1).

723.    RICO Defendants conducted or participated in the conduct of the affairs of the RICO Enterprise through violations of the Travel Act in connection with the aforementioned FCPA violations.  RICO Defendants traveled or used the mail or the facilities of interstate or foreign commerce with intent to promote, manage, establish, carry on, or facilitate the promotion of, management of, establishment of, or carrying on of, the violations of the FCPA alleged above, including by:

    (a)    Directly or indirectly making payments by wire to the RICO Enterprise, causing, directing, or enabling it to pay Brian's salary and other costs related to Brian's employment.

    (b)    Craig and David making to the RICO Enterprise, or causing the RICO Enterprise to make, payments from which the costs of the following were met: (1) Shearer's travel to a meeting with the President of Rwanda (at which Brian was present) and (2) upon information and belief, Brian's attendance at the Animal Ball in London, England in June 2023.

    (c)    Craig and David traveling in June 2023 to London, England, for a meeting with Brian and others at Tintra's office, and to attend (and attending) the Animal Ball, which was sponsored by the RICO Enterprise, and upon information and belief, also meeting with Brian on that occasion.

724.     Thereafter, RICO Defendants did, or attempted to, promote, manage, establish, carry on, or facilitate the promotion of, management of, establishment of, or carrying on of, the targeting of the President of Rwanda and Ivan in violation of the FCPA, including by, during the Relevant Period: (1) engaging in the conduct described in the preceding paragraph, (2) authorizing Shearer to engage in his conduct described in the preceding paragraph, (3) causing and/or authorizing the RICO Enterprise to make the offer of employment to, employ, promise payment to, and/or make payments to or for the benefit of, Brian, and (4) organizing an "intimate dinner" in New York on September 20, 2023, to which RICO Defendants invited both Brian's titular employer Shearer and Brian's father and brother's subordinate Akamanzi of RDB.

### (iii)    *Travel or Use of Facilities—FCPA Violations—UK Minister's Son.*

725.     At all relevant times, UK Minister was a foreign official within the meaning of 15 U.S.C. §§ 78dd-2(h)(2).  Upon information and belief, at the relevant times, UK Minister's primary governmental responsibilities included "[c]lean growth" in the UK and the British Government's "Green finance strategy."

726.     In about January 2023, the RICO Enterprise hired UK Minister's Son.  UK Minister's Son was paid a salary or received other similar payments by the RICO Enterprise in relation to that job throughout at least most of 2023 and received certain other benefits at the RICO Enterprise's expense, including admission to the Animal Ball.

727.     The offer of employment to, the promises of payment to, the hiring of, and the payments to or for the benefit of UK Minister's Son were of value to UK Minister.

728.     During the Relevant Period, RICO Defendants and/or Shearer caused, authorized, and/or enabled the RICO Enterprise to (and Shearer and the RICO Enterprise did)  make the offer

of employment to, promise employment and payment to, employ, make payments to, and/or give things of value to UK Minister's Son.

729.    During the Relevant Period, RICO Defendants, upon information and belief, corruptly made use of the mails or means of instrumentality of interstate commerce and/or did acts outside the United States in furtherance of offers, payments, gifts, promises to pay, the giving of money and/or things of value, and/or authorizing, directing, and/or enabling some or all of the foregoing.

730.    RICO Defendants and/or Shearer did so to influence UK Minister's acts and decisions in his official capacity, to induce him to do or omit to do acts in violation of his lawful duty, to secure an improper advantage, or to induce him to use his influence with the British Government or its instrumentality (such as the British Government's Blue Planet Fund) to affect or influence their acts or decisions, in order to assist RICO Defendants in obtaining or retaining business or directing business to RICO Defendants, their affiliated entities, and the RICO Enterprise.

731.    RICO Defendants thus violated 15 U.S.C. § 78dd-2(a)(1) and/or 15 U.S.C. § 78dd-2(i)(1).

732.    RICO Defendants conducted or participated in the conduct of the affairs of the RICO Enterprise through violations of the Travel Act in connection with the aforementioned FCPA violations.  RICO Defendants traveled or used the mail or the facilities of interstate or foreign commerce with intent to promote, manage, establish, carry on, or facilitate the promotion of, management of, establishment of, or carrying on of, the violation of the FCPA alleged above, including by:

(a)      Directly or indirectly making payments by wire to the RICO Enterprise, causing, directing, or enabling it to pay UK Minister's Son's salary and other costs related to UK Minister's Son's employment.

(b)      Craig and David making to the RICO Enterprise, or causing the RICO Enterprise to make, payments from which the costs of UK Minister's Son's attendance at the Animal Ball event in London, England in June 2023 were paid.

(c)      Craig and David traveling in June 2023 to London, England, for a meeting with UK Minister's Son and others at Tintra's office, to attend the Animal Ball, which was sponsored by the RICO Enterprise, and, upon information and belief, also meeting with UK Minister's Son, as well as with UK Minister and UK Minister's wife, at the Animal Ball.

(d)      Organizing, and Craig attending, the World Oceans Day event in London in June 2023.

733.     Thereafter, RICO Defendants did or attempted to promote, manage, establish, carry on, or facilitate the promotion of, management of, establishment of, or carrying on of, the targeting of UK Minister in violation of the FCPA, including by: (1) engaging in the conduct described in the preceding paragraph, (2) authorizing Shearer to engage in his conduct described in the preceding paragraph, and (3) causing and/or authorizing the RICO Enterprise to make the offer of employment to, employ, promise payment to, and/or make payments to or for the benefit of, UK Minister's Son.

> *b.     Travel or Use of Facilities—Money Laundering.*

734.     RICO Defendants conducted or participated in the conduct of the affairs of the RICO Enterprise through violations of the Travel Act by traveling or using the mail or the facilities of interstate or foreign commerce with intent to promote, manage, establish, carry on, or facilitate the promotion of, management of, establishment of, or carrying on of, money laundering in violation of 18 U.S.C. § 1957, alleged above, including as described below.

(a)      At various times in 2023, RICO Defendants used the wires or facilities of interstate or foreign commerce to communicate with the Other RICO Participants or among themselves concerning the use of the funds extracted by wire fraud from Plaintiff, USAID, and GCF.

(b) Upon information and belief, RICO Defendants communicated with Other RICO Participants in relation to the RICO Enterprise's attendance at (and expenditure for) the United States Department of State's "Call to Advance Democracy" event in March 2023, which involved expenditure of funds extracted by wire fraud.

(c) In an effort to conceal their and the RICO Enterprise's money laundering, RICO Defendants communicated with Shearer at various times throughout 2023 and 2024, Craig and David made wire transfers to Plaintiff on April 12, 2023, Craig made a wire transfer to the RICO Enterprise in June 2023, and David arranged for that and other wire transfers during the period between April 2023 and June 2023.

(d) RICO Defendants traveled to multiple locations globally, including New York, for meetings at which the expenditure of the funds out of which Plaintiff or the Other Victims (in particular, USAID and GCF) had been defrauded was promoted, managed, established, or carried on (or facilitated), including meetings, which involved Shearer, with government officials and the Other Victims at which meetings the RICO Enterprise's role in the Barbados BGB project was discussed, thereby promoting the attendant expenditure of the funds out of which those victims had been defrauded. Such meetings included meetings with the Prime Minister of Barbados on about May 19 and June 20, 2023, a dinner with decision-makers at several Other Victims in New York on September 20, 2023, and meetings which included RICO Defendants, Shearer, and others at Tintra's office in London on June 27, 2023, and in August 2023.

(e) RICO Defendants traveled to the Animal Ball, an event funded in part by the RICO Enterprise—for RICO Defendants' and their family's benefit—with the use of the funds out of which Plaintiff had been defrauded, thus promoting that expenditure.

(f) Craig traveled to Dubai, where, on December 6, 2023, he and Garg presented the Barbados BGB project to a public audience at COP28, the world's most prominent climate conference. Garg specifically promoted the expenditure of GCF's and USAID's funds in that presentation as well as the purported technology for the core digital banking system of the Barbados BGB. That expenditure was then further promoted by Pegasus through publication of a video of that presentation on its website.

735.    Thereafter, RICO Defendants did or attempted to promote, manage, establish, carry on, or facilitate the promotion of, management of, establishment of, or carrying on of, money laundering, including by: (1) engaging in the conduct described in the preceding paragraph, (2) upon information and belief, during 2023, paying costs of and/or related to Garg's services

from the funds obtained from USAID by wire fraud, (3) in 2023, expending funds obtained from GCF by wire fraud on costs of activities purportedly related to Pegasus' Main Application, and (4) in 2023, expending the funds obtained from Plaintiff by wire fraud as described in the above titled section, "*Property Criminally Derived from Plaintiff by Wire Fraud.*"

     *c.*  *Travel or Use of Facilities—Bribery in Violation of New York State Law—GCF's Executive #1.*

736. During the Relevant Period, RICO Defendants conducted or participated in the conduct of the affairs of the RICO Enterprise through violations of the Travel Act by traveling or using the mail or the facilities of interstate or foreign commerce with intent to promote, manage, establish, carry on, or facilitate the promotion of, management of, establishment of, or carrying on of, the unlawful activity of bribery of GCF's Executive #1 in violation of N.Y. Penal Law § 180.03, as described in the above-titled section, "*Third Set of Predicate Acts: Bribery in Violation of New York Penal Law Section 180.03.*"

737. Thereafter, RICO Defendants did, or attempted to, promote, manage, establish, carry on, or facilitate the promotion of, management of, establishment of, or carrying on of, the bribing of GCF's Executive #1, including by, during the Relevant Period: (1) engaging in the conduct described in the above-titled section, "*Third Set of Predicate Acts: Bribery in Violation of New York Penal Law Section 180.03.*," (2) entering into agreements or understandings with GCF's Executive #1, (3) upon information and belief, making such payments, (4) authorizing their funds and/or portfolio companies to offer or promise to appoint GCF's Executive #1 a "Strategic Advisor" or to a similar position or positions at those funds and/or portfolio companies, and/or to offer, pay, or promise to pay GCF's Executive #1 fees, (5) editing and publishing Pegasus' website (A) to add a description of the arrangement with GCF's Executive #1 and/or (B) to provide a false and/or misleading description of the arrangement with GCF's Executive #1 and/or causing the

same, (6) preparing investor presentation materials describing the arrangements with GCF's Executive #1, and/or (7) upon information and belief, funding payments of fees and/or providing the funds from which such payments would be able to be made pursuant to arrangements reached with GCF's Executive #1 or which may be reached as described above.

### D.    Effects of the Racketeering Activities on Interstate or Foreign Commerce

738.    Each RICO Defendant engaged in, and each RICO Defendant's activities affected, interstate or foreign commerce, by, among other things, (1) committing multiple acts of wire fraud, money laundering, bribery, and Travel Act violations involving transactions that crossed state and international lines, (2) causing substantial monetary damage to Plaintiff and the Other Victims, (3) draining the Other Victims of millions of dollars in cash and/or commitments, (4) inserting themselves into multiple funding projects (including, in January 2024, a $1 billion UNDP program, announced from New York), and (5) preying on some of the most vulnerable countries in the world.

### E.    The Pattern of Racketeering Injured Plaintiff in Its Business or Property.

739.    Plaintiff is a "person injured in his or her business or property" by reason of RICO Defendants' pattern of racketeering activity, within the meaning of U.S.C. § 1964(c).

740.    Plaintiff was injured by reason of certain predicate acts.  Specifically, Plaintiff lost its $3 million advanced as the loan to the RICO Enterprise by reason of RICO Defendants' predicate acts of wire fraud.  When, within weeks, Plaintiff's efforts to recover its loan threatened the viability of RICO Defendants' other schemes, their further predicate acts of wire fraud again injured Plaintiff, which deprived it of its Conversion Right and further prevented Plaintiff's recovery of the money it lent the RICO Enterprise.

741.    As a direct and proximate result of the racketeering activities and violations of 18 U.S.C. § 1962(c) by each RICO Defendant, including injury by reason of one or more predicate acts constituting the pattern of racketeering activity, Plaintiff has been injured in its business or

property.  Plaintiff has lost (1) the funds it advanced to the RICO Enterprise, (2) Plaintiff's Conversion Right, (3) the amounts owed to Plaintiff by the RICO Enterprise under the Settlement Deed and the Amendment Deed, (4) interest owed to Plaintiff under the Agreement (unpaid now for nearly two years), the Settlement Deed and the Amendment Deed, and (5) the costs of seeking to enforce Plaintiff's rights, including Plaintiff's costs incurred investigating RICO Defendants' wrongdoing.

## <u>SECOND CAUSE OF ACTION</u>

**(Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d)—Each RICO Defendant)**

742.    Plaintiff repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

743.    This claim is brought by Plaintiff against each RICO Defendant for relief, under 18 U.S.C. § 1964, for violations of 18 U.S.C. §§ 1961, *et seq*.

744.    It is unlawful "for any person to conspire to violate" 18 U.S.C. § 1962(c).  *See* 18 U.S.C. § 1962(d).

745.    Each RICO Defendant intentionally and knowingly agreed, conspired, and joined with the other RICO Defendants and Other RICO Participants to conduct or participate, directly or indirectly, in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity, which pattern of racketeering activity is alleged in the FIRST CAUSE OF ACTION.  In other words, each RICO Defendant agreed to join, and participated, in a conspiracy with the other RICO Defendants and Other RICO Participants to commit acts that, if completed, would violate 18 U.S.C. § 1962(c).

746.    The objective of RICO Defendants and Other RICO Participants' agreement was to enrich RICO Defendants by securing business opportunities and profits through unlawful or

deceptive means while concealing the wrongdoing from the public, from Plaintiff, and from other victims of RICO Defendants.  RICO Defendants and Shearer sought to achieve that objective by conducting the affairs of the RICO Enterprise through the criminal schemes described in the FIRST CAUSE OF ACTION.

747.    Each RICO Defendant knew about and knowingly agreed to facilitate the broad goals of the conspiracy.  Each RICO Defendant stood to benefit greatly—to the tune of at least millions of dollars—from the success of the criminal schemes described in the FIRST CAUSE OF ACTION.  Additionally, (1) RICO Defendants, Shearer, and Neumann maintained close personal and business ties with each other throughout the Relevant Period, (2) RICO Defendants and Neumann continued those ties after the Relevant Period, (3) RICO Defendants and Other RICO Participants engaged in mutually dependent, coordinated efforts to achieve the objectives of the RICO Enterprise (including in their efforts to deprive Plaintiff of money or property), and (4) they sought to conceal the racketeering activity undertaken to enrich RICO Defendants.

748.    Each RICO Defendant knew about and knowingly agreed to participate in the conspiracy from about the time of a meeting between David and Shearer in about the fall of 2021.  Craig funded the RICO Enterprise in or about March 2022, and again and again in 2023, and David funded the RICO Enterprise in April 2023 and caused his family members and/or investment vehicles to fund it in or about March 2022 and June 2023, collectively, to the tune of at least more than $3 million in the aggregate, while RICO Defendants were using the RICO Enterprise as a focal point of their schemes.  David received shares and/or warrants in the RICO Enterprise in or about March 2022.

749.    RICO Defendants committed overt acts in furtherance of the conspiracy, including the predicate acts alleged in the FIRST CAUSE OF ACTION.  In addition, RICO Defendants acted

in furtherance of the conspiracy by their other acts, described throughout this Complaint, which facilitated the commission of the predicate acts.

750.    At least two members of the RICO Defendants' conspiracy knew that at least two predicate acts as alleged in the FIRST CAUSE OF ACTION would be committed to achieve the objectives of the criminal schemes.

751.    Each RICO Defendant agreed to further or committed at least two predicate acts of racketeering in the conduct of the RICO Enterprise's affairs.

752.    As a direct and proximate result of RICO Defendants' conspiracy, in violation of 18 U.S.C. § 1962(d), Plaintiff has been injured in its business or property.  Plaintiff has lost (1) the funds it advanced to the RICO Enterprise, (2) Plaintiff's Conversion Right, (3) the amounts owed to Plaintiff by the RICO Enterprise under the Settlement Deed and the Amendment Deed, (4) interest owed to Plaintiff under the Agreement (unpaid now for nearly two years), the Settlement Deed and the Amendment Deed, and (5) the costs of seeking to enforce Plaintiff's rights, including Plaintiff's having to investigate and uncover RICO Defendants' wrongdoing.

## **THIRD CAUSE OF ACTION**

### **(Fraud—The Agreement and the Funding of the Loan—Manager Defendants)**

753.    Plaintiff repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

754.    Each Manager Defendant, seeking to induce Plaintiff to provide money to Tintra, made, or caused others to make, materially false and/or misleading representations to Plaintiff, knowing that, or recklessly disregarding whether, those representations were false and/or misleading, and intending to induce Plaintiff to rely on them.  By that fraud, Plaintiff was induced to lend Tintra $3 million.

755.    Plaintiff was, at all relevant times, a prospective lender or lender to Tintra.

756.    While Tintra was negotiating the loan with Plaintiff, each Manager Defendant was aware that Tintra was negotiating a funding transaction with a prospective funder of (such as a prospective lender to) Tintra.

757.    While Tintra was negotiating the loan with Plaintiff, each Manager Defendant was aware that Tintra was negotiating the loan with Plaintiff.

758.    After Tintra announced the Agreement and before Plaintiff closed on the loan, each Manager Defendant was aware that Plaintiff had not closed on the loan.

759.    Each Manager Defendant made, or caused Tintra, Shearer, and/or Neumann to make, to Plaintiff the false and/or misleading representations contained in the following public statements directed at, among others, prospective funders to Tintra, intending that the statements containing those representations be communicated to such prospective funders and that such prospective funders rely on those misrepresentations in making financial decisions in relation to Tintra and in evaluating the creditworthiness of Tintra and making decisions with respect to Tintra, including, among others, when making decisions as to whether to agree to provide money to Tintra, to provide money to Tintra, to enter into other agreements with Tintra, and to take other steps concerning their business relationship with Tintra:

(a)    The false and/or misleading representations contained in Tintra's announcements published on March 7 and March 21, 2022, including the representations in those announcements concerning the Cogut Family's investment in Tintra and the terms of that investment;

(b)    The false and/or misleading representations made in Tintra's public announcements, as detailed in Schedule 1, on the dates set forth in Schedule 1; and

(c)    The false and/or misleading representations made in Neumann's statements, as detailed in Schedule 2, on the dates set forth in Schedule 2.

760.    Each Manager Defendant made, or caused Tintra, Shearer, and Neumann to make, to Plaintiff the false and/or misleading representations contained in Tintra's announcement

published on November 8, 2022, and Tintra's Half-Yearly Results published on October 27, 2022.

Those misrepresentations were directed at, among others:

> (a)    Tintra's prospective funders, and each Manager Defendant intended that the statements containing those misrepresentations be communicated to such funders and that such funders rely on those misrepresentations;
>
> (b)    Tintra's prospective funder with whom Manager Defendants knew Tintra and Shearer were negotiating a funding transaction, and each Manager Defendant intended that the statements containing those misrepresentations be communicated to such funder and that the funder rely on those misrepresentations; and/or
>
> (c)    Plaintiff specifically, with whom Manager Defendants knew Tintra and Shearer were negotiating the loan, and each Manager Defendant intended that the statements containing those misrepresentations be communicated to Plaintiff specifically and that Plaintiff rely on those misrepresentations.

761.    Each Manager Defendant made, or caused Tintra, Shearer, and Neumann to make, to Plaintiff the false and/or misleading representations contained in the Presentation (provided to Plaintiff on or about October 4, 2022), as detailed in Schedule 3, with the intent that those misrepresentations be communicated to Plaintiff and that Plaintiff rely on them.

762.    Once Tintra and Plaintiff signed the Agreement, Tintra, Shearer, and Neumann made to Plaintiff the false and/or misleading representations contained in Tintra's announcement published on December 16, 2022, with the intent that they be communicated to Plaintiff and that Plaintiff rely on them, upon information and belief, without objection from Manager Defendants.

763.    By Tintra's Half-Yearly Results published on October 27, 2022, and the Presentation, Manager Defendants adopted and reaffirmed, or caused Tintra, Shearer, and Neumann to adopt and reaffirm, to Plaintiff the misrepresentations described in ¶ 759.

764.    Each Manager Defendant made, or caused others to make, the representations described above knowing that, or recklessly disregarding whether, they were false and/or misleading when made.

765.     Each Manager Defendant intended that Plaintiff rely on the misrepresentations described in (1) ¶¶ 759, 760, and 761 in making its decision whether to enter into the Agreement, and (2) ¶¶ 759, 760, 761, and 762 in making its decision whether to send Tintra $3 million.

766.     The misrepresentations described in ¶¶ 759, 760, 761, and 762 were material.

767.     Plaintiff did not know about the false and/or misleading nature of any of the foregoing misrepresentations at the time Plaintiff relied on them.

768.     Before entering into the Agreement on December 15, 2022, Plaintiff specifically reviewed the statements made to Plaintiff (directly or through public statements), prior to December 15, 2022, as described above.  Plaintiff reasonably relied on the misrepresentations made in those statements in entering into the Agreement.  Plaintiff detrimentally relied on the misrepresentations made in those statements, by entering into the Agreement.

769.     By that fraud, Plaintiff was induced to enter into the Agreement.

770.     Before closing on the loan on December 23, 2022, Plaintiff specifically reviewed the statements made to Plaintiff in Tintra's December 16, 2022 public announcement, as described above.  Plaintiff reasonably relied on the misrepresentations contained in that announcement, as well as the misrepresentations described in ¶¶ 759, 760 and 761 in closing on the loan.  Plaintiff detrimentally relied on those misrepresentations, by lending Tintra $3 million.

771.     By that fraud, Plaintiff was induced to lend Tintra $3 million.

772.     As a direct and proximate result of each Manager Defendant's fraud, Plaintiff was damaged, including by losing the funds it loaned to Tintra.

## FOURTH CAUSE OF ACTION

### (Fraud—The Conversion Right—Manager Defendants)

773.     Plaintiff repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

774.    Each Manager Defendant, seeking to induce Plaintiff to give up its Conversion Right, made, or caused others to make, materially false and/or misleading representations to Plaintiff knowing that, or recklessly disregarding whether, those representations were false and/or misleading, and intending to induce Plaintiff to rely on them.

775.    Each Manager Defendant made, or caused Tintra and Shearer to make, to Plaintiff the false and/or misleading representations contained in the March 31 Cash Repayment Notice (on March 31, 2023) and the April 3 Cash Repayment Notice (on April 3, 2023), with the intent that those misrepresentations be communicated to Plaintiff and that Plaintiff rely on them in deciding whether to agree that Tintra be permitted to repay the loan in cash, to give up Plaintiff's Conversion Right.

776.    Each Manager Defendant made, or caused others to make, the representations described in ¶ 775 knowing that, or recklessly disregarding whether, they were false and/or misleading when made.

777.    Those misrepresentations were material.

778.    Plaintiff reasonably relied on those misrepresentations and the misrepresentations described in the THIRD CAUSE OF ACTION.

779.    Plaintiff detrimentally relied on the misrepresentations described in ¶ 775 and the THIRD CAUSE OF ACTION by forgoing its Conversion Right.

780.    Each Manager Defendant intended that Plaintiff rely on the misrepresentations described in ¶ 775 as well as the misrepresentations described in the THIRD CAUSE OF ACTION in evaluating the creditworthiness of Tintra and making decisions with respect to Tintra (including whether to accept the April 3 Cash Repayment Notice, to give up Plaintiff's Conversion Right).

781.    Before agreeing to waive the condition that an Event of Default had not occurred before Tintra could make a cash repayment (the "**Condition**"), to accept the April 3 Cash Repayment Notice, and to give up the Conversion Right, Plaintiff specifically reviewed the March 31 Cash Repayment Notice and the April 3 Cash Repayment Notice and considered them and the purported bank statements contained therein.  Plaintiff considered those notices in light of the statements that contained the false and/or misleading representations described in the THIRD CAUSE OF ACTION.  In waiving the Condition, accepting the April 3 Cash Repayment Notice, and agreeing to give up its Conversion Right, Plaintiff relied on the misrepresentations described in the THIRD CAUSE OF ACTION and the misrepresentations made by or in the March 31 Cash Repayment Notice and the April 3 Cash Repayment Notice.

782.    Plaintiff did not know about the false and/or misleading nature of any of the foregoing misrepresentations at the time Plaintiff detrimentally and reasonably relied on them.

783.    By that fraud, Plaintiff was induced to waive the Condition, to accept the April 3 Cash Repayment Notice, and to forgo its Conversion Right, on April 5, 2023, and each Manager Defendant deprived Plaintiff of its Conversion Right.

784.    As a direct and proximate result of that fraud by each Manager Defendant, Plaintiff was damaged, including by losing its Conversion Right.

## FIFTH CAUSE OF ACTION

### (Fraud—The Settlement Deed, the Amendment Deed, the Loan, and the Conversion Right—All Defendants)

785.    Plaintiff repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

786.    Each Defendant, seeking to induce Plaintiff (1) to continue forgoing its Conversion Right and (2) to refrain from pursuing measures to recover the loan, made, or caused others to

make, materially false and/or misleading representations to Plaintiff, knowing that, or recklessly disregarding whether, those representations were false and/or misleading, and intending to induce Plaintiff to rely on them.

787.    Defendants made, or caused Tintra, Shearer, Neumann, Cox, Tintra's UK counsel, and/or the other Defendants and their controlled vehicles to make, to Plaintiff the false and/or misleading representations contained in the statements made as and by the persons indicated below, intending that the statements containing those representations be communicated to Plaintiff and that Plaintiff rely on those representations in deciding whether to continue forgoing Plaintiff's Conversion Right, to refrain from pursuing measures to recover the loan, and to enter into agreements with Tintra in addition to the Agreement:

(a)    The false and/or misleading representations made in Cox's email (sent by Tintra and Cox) to Plaintiff on or about April 11, 2023.

(b)    The false and/or misleading representations made by the wire transfers sent by the Cogut Family and their two controlled vehicles to Plaintiff on April 12, 2023, and in the SWIFT messages that accompanied those wire transfers.

(c)    The false and/or misleading representations made in or by the Website Statements, first published by Pegasus and/or Craig and David, upon information and belief, between about February 15 and March 30, 2023, and continuously made thereafter until about May 2024.

(d)    The false and/or misleading representations made in the statements made by Tintra, Shearer, and Neumann, contained in Tintra's May 5, 2023 public announcement.

(e)    The false and/or misleading representations (that Defendants caused to be made as part of their wire transfer scheme to deceive Plaintiff by wiring $1.2 million to Tintra) made in Tintra and Shearer's email to Plaintiff on or about May 24, 2023, on Tintra and Shearer's call with Plaintiff on May 25, 2023, in Tintra's UK counsel's emails to Plaintiff's UK counsel on May 30 and June 20, 2023, and on the call between Tintra's UK counsel and Plaintiff's UK counsel on June 23, 2023.

(f)    The false and/or misleading representations made in Tintra's 12-Month Unaudited Results to 31 January 2023 published by Tintra and Shearer on July 31, 2023, Tintra's Annual Report for the Year Ended 31 January 2023 published

by Tintra and Shearer on October 2, 2023, and Tintra's Half-Year Report for the period to 31 July 2023 published by Tintra and Shearer on October 31, 2023.

(g)     The false and/or misleading representations made in Tintra's UK counsel's emails to Plaintiff's UK counsel on August 4, August 10, and October 4, 2023.

(h)     The false and/or misleading representations made in Tintra's and Shearer's statements contained in Tintra's August 10, August 31, September 7, and October 5, 2023 public announcements.

(i)     The false and/or misleading representations made by Tintra and Shearer effecting the payments sent by Tintra to Plaintiff on July 6, 2023, and August 21, 2023.

(j)     The false and/or misleading representations made in the statements attributed to Craig in Tintra's public announcement of September 25, 2023.

(k)     The false and/or misleading representations made in Tintra's and Shearer's statements in the rest of the same announcement.

(l)     The false and/or misleading representations made by Tintra's and Shearer's publication of the regulatory "acting in concert" forms filed with the LSE in September 2023 and October 2023 and by the Defendant makers of those forms permitting that publication.

(m)     The false and/or misleading representations made in the November 5, 2023 public announcement by LRB published by Tintra and Shearer.

788.    Each Defendant made, or caused others to make, the representations described in the preceding paragraph knowing that, or recklessly disregarding whether, they were false and/or misleading when made.

789.    Those misrepresentations were material.

790.    Plaintiff reasonably relied on those misrepresentations and the misrepresentations described in the THIRD CAUSE OF ACTION and the FOURTH CAUSE OF ACTION.

791.    Plaintiff detrimentally relied on the misrepresentations described in ¶ 787, the THIRD CAUSE OF ACTION, and the FOURTH CAUSE OF ACTION, as described below.

792.    At each time after April 12, 2023, each Defendant intended that Plaintiff rely on the misrepresentations made, prior to that time, in the statements and by the conduct described in

170

¶ 787, as well as the misrepresentations described in the THIRD CAUSE OF ACTION and the FOURTH CAUSE OF ACTION, in evaluating the creditworthiness of Tintra and making decisions with respect to Tintra (including whether to continue forgoing Plaintiff's Conversion Right and to refrain from pursuing measures to recover the loan and whether to enter into a settlement agreement with Tintra (i.e., the Settlement Deed and the Amendment Deed)).

793.    At various times between April 12, 2023, and December 2023, Plaintiff reviewed or, at times subsequent to the initial review, considered the statements and conduct described in ¶ 787 (made prior to each such time).  Plaintiff considered those in light of the statements that contained the false and/or misleading representations described in the THIRD CAUSE OF ACTION and the FOURTH CAUSE OF ACTION.  At each such time, in continuing to forgo its Conversion Right and refraining from pursuing timely recovery measures during that period, Plaintiff relied on the misrepresentations described in the THIRD CAUSE OF ACTION and the FOURTH CAUSE OF ACTION and the misrepresentations made in or by the statements and conduct described in ¶ 787 (prior to that time).

794.    In entering into the Settlement Deed, Plaintiff relied on the misrepresentations described in the THIRD CAUSE OF ACTION and the FOURTH CAUSE OF ACTION and the misrepresentations made in or by the statements and conduct described in ¶ 787 (prior to July 4, 2023).

795.    In entering into the Amendment Deed, Plaintiff relied on the misrepresentations described in the THIRD CAUSE OF ACTION and the FOURTH CAUSE OF ACTION and the misrepresentations made in or by the statements and conduct described in ¶ 787 (prior to November 10, 2023).

796.    Plaintiff did not know about the false and/or misleading nature of any of the foregoing misrepresentations at the time Plaintiff detrimentally and reasonably relied on them.

797.    By that fraud, Defendants induced Plaintiff (1) to continue forgoing the Conversion Right, (2) to refrain from timely pursuing measures to recover the loan, and (3) to enter into formal agreements to do the same (i.e., the Settlement Deed on July 4, 2023, and the Amendment Deed on November 10, 2023).

798.    As a direct and proximate result of that fraud by each Defendant, Plaintiff was damaged, including by losing its ability to recover the loan and to exercise its Conversion Right.

## SIXTH CAUSE OF ACTION

### (Negligent Misrepresentation—Manager Defendants)

799.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1 through 655 as if fully set forth herein, with the exception of any allegations as to Defendants' knowledge, in particular in ¶¶ 4(c), 20, 28, 193(b), 256, 353, 398, 400, 628–630, 632, 633, 635, 636, 639, and 651.

800.    As to each representation (if any) for which a Manager Defendant is found not liable for fraud under the THIRD CAUSE OF ACTION, the FOURTH CAUSE OF ACTION, and/or the FIFTH CAUSE OF ACTION in the event that it is found that such Manager Defendant did not have the requisite knowledge or recklessness (each, a "**Relevant Representation**" and collectively, the "**Relevant Representations**"), Plaintiff pleads this Sixth Cause of Action in the alternative, against such Manager Defendant.

801.    Each Manager Defendant had a duty to Plaintiff to exercise reasonable care in its representations to Plaintiff, including to impart correct information to Plaintiff, not to impart inaccurate or untruthful information to Plaintiff, and to correct inaccurate or untruthful information.

802.    That duty arose because:

(a)    As controlling persons of Tintra, Manager Defendants assumed a duty to (1) prospective funders generally (including Plaintiff) who—as Manager Defendants knew—might provide money to Tintra, (2) prospective funders (including Plaintiff) from whom Manager Defendants knew money was specifically being sought for Tintra, (3) Plaintiff specifically, first while money was being sought from it, as Manager Defendants knew, and then, because Plaintiff had provided funds to Tintra and had the right to become a shareholder of Tintra through its Conversion Right, as Manager Defendants knew.

(b)    As Shearer's effective superior and, later, formal employer, Pegasus assumed a duty as outlined in paragraph (a) above in relation to statements made by Shearer.

(c)    Manager Defendants assumed a duty to Plaintiff because (at all times after Tintra made its March 7 and March 21, 2022 public announcements) Manager Defendants used the Cogut Family's investment in Tintra and Manager Defendants' purported credibility, or permitted for those to be used, in promoting Tintra and inducing both prospective funders generally (including Plaintiff) and Plaintiff specifically to provide money to Tintra.

(d)    Manager Defendants assumed a duty to Plaintiff by supplying and/or volunteering, unsolicited by Plaintiff, representations to Plaintiff, directly or indirectly, on which they knew Plaintiff would rely and/or while they were aware of the purposes to which those representations would be put.

(e)    Craig and David assumed a duty to Plaintiff because LRB, a bidder they at least co-controlled, was making public representations to Plaintiff and other stakeholders in Tintra, intending Plaintiff and stakeholders to act on those representations.

803.    Manager Defendants made or caused to be made the representations described as having been made by Manager Defendants in the THIRD CAUSE OF ACTION, the FOURTH CAUSE OF ACTION, and the FIFTH CAUSE OF ACTION.

804.    Those representations were false and/or misleading.

805.    Those representations were material.

806.    Each Manager Defendant had a pecuniary interest in Tintra and the transactions described in this Complaint.

807.    As to each Relevant Representation, each Manager Defendant was negligent or should have known that the Relevant Representation was false and/or misleading.

808.    Each Manager Defendant thus did not comply with his or its duty in making or causing to be made each such Relevant Representation.

809.    At each time, each Manager Defendant knew or should have known that each person to whom a duty was owed would look to the Relevant Representations made prior to that time.

810.    As to each Relevant Representation, Plaintiff did not know that the Relevant Representation was false and/or misleading.

811.    Plaintiff reasonably relied on each Relevant Representation.  Plaintiff entered into the Agreement in reliance on each Relevant Representation made prior to December 15, 2022. Plaintiff closed on the loan in reliance on each Relevant Representation made on or prior to December 16, 2022.  Plaintiff gave up its Conversion Right in reliance on each Relevant Representation made on or prior to April 3, 2023.  Plaintiff entered into the Settlement Deed in reliance on each Relevant Representation made prior to July 4, 2023.  Plaintiff entered into the Amendment Deed in reliance on each Relevant Representation made prior to November 10, 2023. At each time between April 12, 2023, and December 2023, Plaintiff continued forgoing the Conversion Right and refraining from timely pursuing recovery measures in reliance on each Relevant Representation made prior to that time.

812.    As a direct and proximate result of Manager Defendants' breaches of their duty to Plaintiff, Plaintiff was injured.  Plaintiff has lost the funds advanced to Tintra as a loan and its Conversion Right.

## SEVENTH CAUSE OF ACTION

**(Aiding and Abetting Fraud—The Agreement and the Funding of the Loan—Manager Defendants)**

813.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1 through 798 as if fully set forth herein.

814.    As to each Manager Defendant, Plaintiff pleads this Seventh Cause of Action in the alternative to the fraud alleged in the THIRD CAUSE OF ACTION to have been perpetrated by that Manager Defendant.

815.    Plaintiff alleges that, if any Manager Defendant is found not liable for the fraud alleged in the THIRD CAUSE OF ACTION (each such Manager Defendant, in this Seventh Cause of Action, an "**Aiding and Abetting Defendant**"), that Manager Defendant aided and abetted the fraud perpetrated by any of Tintra, Shearer, Neumann, and/or other Manager Defendants.

### A.    The Fraud That Each Aiding and Abetting Defendant Aided and Abetted.

816.    Tintra, Shearer, Neumann, and/or other Manager Defendants, seeking to induce Plaintiff first to agree to lend money to Tintra and then to lend money to Tintra, made materially false and/or misleading representations to Plaintiff, knowing that, or recklessly disregarding whether, those representations were false and/or misleading, and intending to induce Plaintiff to rely on them.

817.    By that fraud, Plaintiff was induced to enter into the Agreement and lend Tintra $3 million and lost the entirety of that loan.

818.    Plaintiff was, at all relevant times, a prospective lender or a lender to Tintra.

819.    While Tintra was negotiating the loan with Plaintiff, Tintra, Shearer, Neumann, and/or other Manager Defendants were aware that Tintra was negotiating a funding transaction with a prospective funder of (such as a prospective lender to) Tintra.

820.    While Tintra was negotiating the loan with Plaintiff, Tintra, Shearer, Neumann, and/or other Manager Defendants were aware that Tintra was negotiating the loan with Plaintiff.

821.    After Tintra announced the Agreement and before Plaintiff closed on the loan, Tintra, Shearer, Neumann, and/or other Manager Defendants were aware that Plaintiff had not closed on the loan.

822.    Tintra, Shearer, Neumann, and/or other Manager Defendants made, or caused Tintra, Shearer, and/or Neumann to make, to Plaintiff the false and/or misleading representations contained in the public statements described in ¶ 759, directed at, among others, prospective funders to Tintra, intending that the statements containing those representations be communicated to such prospective funders and that such prospective funders rely on those misrepresentations.

823.    Tintra, Shearer, Neumann, and/or other Manager Defendants made, or caused Tintra, Shearer, and/or Neumann to make, to Plaintiff the false and/or misleading representations contained in Tintra's announcement published on November 8, 2022, and Tintra's Half-Yearly Results published on October 27, 2022.  Those misrepresentations were directed at, among others:

(a)    Tintra's prospective funders; and Tintra, Shearer, Neumann, and/or other Manager Defendants intended that the statements containing those misrepresentations be communicated to such funders and that such funders rely on those misrepresentations;

(b)    Tintra's prospective funder with whom Tintra, Shearer, Neumann, and/or other Manager Defendants knew Tintra and Shearer were negotiating a funding transaction; and Tintra, Shearer, Neumann, and/or other Manager Defendants intended that the statements containing those misrepresentations be communicated to such funder and that the funder rely on those misrepresentations; and

(c)    Plaintiff specifically, with whom Tintra, Shearer, Neumann, and/or other Manager Defendants knew Tintra and Shearer were negotiating the loan; and Tintra, Shearer, Neumann, and/or other Manager Defendants intended that the statements containing those misrepresentations be communicated to Plaintiff specifically and that Plaintiff rely on those misrepresentations.

824.    Tintra, Shearer, Neumann, and/or other Manager Defendants made, or caused Tintra, Shearer, and/or Neumann to make, to Plaintiff the false and/or misleading representations contained in the Presentation (provided to Plaintiff on or about October 4, 2022), as detailed in Schedule 3, with the intent that those misrepresentations be communicated to Plaintiff and that Plaintiff rely on them.

825.    Once Tintra and Plaintiff signed the Agreement, Tintra, Shearer, Neumann, and/or other Manager Defendants made, or caused Tintra, Shearer, and/or Neumann to make, to Plaintiff the false and/or misleading representations contained in Tintra's announcement published on December 16, 2022, with the intent that they be communicated to Plaintiff and that Plaintiff rely on them.

826.    By Tintra's Half-Yearly Results published on October 27, 2022, and the Presentation, Tintra, Shearer, Neumann, and/or other Manager Defendants adopted and reaffirmed, or caused Tintra, Shearer, and/or Neumann to adopt and reaffirm, to Plaintiff the misrepresentations described in ¶ 759.

827.    Tintra, Shearer, Neumann, and/or other Manager Defendants made, or caused others to make, the representations described in this Seventh Cause of Action, knowing that, or recklessly disregarding whether, they were false and/or misleading when made.

828.    Tintra, Shearer, Neumann, and/or other Manager Defendants intended that Plaintiff rely on the misrepresentations described in (1) ¶¶ 822, 823, and 824 in making its decision whether to enter into the Agreement and (2) ¶¶ 822, 823, 824, and 825 in making its decision whether to send Tintra $3 million.

829.    The misrepresentations described in ¶¶ 822, 823, 824, and 825 were material.

830.    Plaintiff did not know about the false and/or misleading nature of any of the foregoing misrepresentations at the time Plaintiff relied on them.

831.    Before entering into the Agreement on December 15, 2022, Plaintiff specifically reviewed the statements made to Plaintiff (directly or through public statements), prior to December 15, 2022, as described above.  Plaintiff reasonably relied on the misrepresentations made in those statements in entering into the Agreement.  Plaintiff detrimentally relied on the misrepresentations made in those statements by entering into the Agreement.

832.    By that fraud, Plaintiff was induced to enter into the Agreement.

833.    Before closing on the loan on December 23, 2022, Plaintiff specifically reviewed the statements made to Plaintiff in Tintra's December 16, 2022 public announcement, as described above.  Plaintiff reasonably relied on the misrepresentations contained in that announcement, as well as the misrepresentations described in ¶¶ 822, 823, 824, and 825 in closing on the loan.  Plaintiff detrimentally relied on those misrepresentations by lending Tintra $3 million.

834.    By that fraud, Plaintiff was induced to lend Tintra $3 million.

835.    As a direct and proximate result of the fraud by Tintra, Shearer, Neumann, and/or other Manager Defendants, Plaintiff was damaged by losing funds it loaned to Tintra.

**B.    Each Aiding and Abetting Defendant Provided Substantial Assistance to Perpetrate the Fraud.**

836.    Each Aiding and Abetting Defendant knew about Tintra's, Shearer's, Neumann's and/or other Manager Defendant's (or Manager Defendants') fraud to induce Plaintiff to enter into the Agreement and lend money to Tintra, and each Aiding and Abetting Defendant substantially assisted Tintra, Shearer, Neumann, and/or those other Manager Defendants to perpetrate that fraud.

837.    Each Aiding and Abetting Defendant knew that Tintra, Shearer, Neumann, and/or those other Manager Defendants sought to fraudulently induce Plaintiff to enter into the Agreement and close on the loan.

838.    Each Aiding and Abetting Defendant knew that Tintra, Shearer, Neumann, and/or those other Manager Defendants sought to induce Plaintiff to enter into the Agreement, by the false and/or misleading representations described in ¶¶ 822, 823, and 824.  Each Aiding and Abetting Defendant knew that those representations were false and/or misleading.

839.    Each Aiding and Abetting Defendant knew that Tintra, Shearer, Neumann and/or those other Manager Defendants sought to induce Plaintiff to close on the loan, by the false and/or misleading representations described in ¶¶ 822, 823, 824, and 825.  Each Aiding and Abetting Defendant knew that those representations were false and/or misleading.

840.    Each Aiding and Abetting Defendant provided substantial assistance to Tintra, Shearer, Neumann, and/or those other Manager Defendants to perpetrate that fraud on Plaintiff.

841.    As a direct and proximate result of the substantial assistance provided by each Aiding and Abetting Defendant, Plaintiff proximately suffered injuries from the fraud effectuated upon it and lost the funds advanced to Tintra as a loan.

## EIGHTH CAUSE OF ACTION

### (Aiding and Abetting Fraud—The Conversion Right—Manager Defendants)

842.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1 through 798 and 813 through 841 as if fully set forth herein.

843.    As to each Manager Defendant, Plaintiff pleads this Eighth Cause of Action in the alternative to the fraud alleged in the FOURTH CAUSE OF ACTION to have been perpetrated by that Manager Defendant.

844.    Plaintiff alleges that, if any Manager Defendant is found not liable for the fraud alleged in the FOURTH CAUSE OF ACTION (each such Manager Defendant, in this Eighth Cause of Action, an "**Aiding and Abetting Defendant**"), that Manager Defendant aided and abetted the fraud perpetrated by any of Tintra, Shearer, Neumann, and/or other Manager Defendants.

### A.    The Fraud That Each Aiding and Abetting Defendant Aided and Abetted.

845.    Tintra, Shearer, and/or other Manager Defendants, seeking to induce Plaintiff to, among other things, forgo its Conversion Right, made materially false and/or misleading representations to Plaintiff, knowing that, or recklessly disregarding whether, those representations were false and/or misleading, and intending to induce Plaintiff to rely on them.

846.    Tintra, Shearer, and/or other Manager Defendants made, or caused Tintra and Shearer to make, to Plaintiff the false and/or misleading representations contained in the March 31 Cash Repayment Notice (on March 31, 2023) and the April 3 Cash Repayment Notice (on April 3, 2023), with the intent that those misrepresentations be communicated to Plaintiff and that Plaintiff rely on them in deciding to agree that Tintra be permitted to repay the loan in cash and to give up Plaintiff's Conversion Right.

847.    Tintra, Shearer, and/or other Manager Defendants made, or caused Tintra and Shearer to make, the false and/or misleading representations described in the preceding paragraph, knowing that, or recklessly disregarding whether, they were false and/or misleading when made, and with the intent that those misrepresentations be communicated to Plaintiff and that Plaintiff rely on them.

848.    Tintra, Shearer, Neumann, and/or other Manager Defendants made, or caused Tintra, Shearer, and/or Neumann to make, the false and/or misleading representations described in the SEVENTH CAUSE OF ACTION, knowing that, or recklessly disregarding whether, they were

false and/or misleading when made, and with the intent that those misrepresentations be communicated to Plaintiff and that Plaintiff rely on them.

849.    The misrepresentations described in the three preceding paragraphs were material.

850.    Plaintiff reasonably relied on those misrepresentations.

851.    Plaintiff detrimentally relied on those misrepresentations by forgoing its Conversion Right.

852.    Before agreeing to waive the Condition, accept the April 3 Cash Repayment Notice, and give up the Conversion Right, Plaintiff specifically reviewed the March 31 Cash Repayment Notice and the April 3 Cash Repayment Notice and considered them and the purported bank statements contained therein.    Plaintiff considered those notices in light of the statements that contained the false and/or misleading representations described in the SEVENTH CAUSE OF ACTION.    In waiving the Condition, accepting the April 3 Cash Repayment Notice, and agreeing to give up its Conversion Right, Plaintiff relied on the misrepresentations made by or in the March 31 Cash Repayment Notice and the April 3 Cash Repayment Notice and the misrepresentations described in the SEVENTH CAUSE OF ACTION.

853.    Plaintiff did not know about the false and/or misleading nature of any of the foregoing misrepresentations at the time Plaintiff detrimentally and reasonably relied on them.

854.    By that fraud, Plaintiff was induced to waive the Condition, to accept the April 3 Cash Repayment Notice, and to give up its Conversion Right, on April 5, 2023, and Tintra, Shearer, Neumann, and/or other Manager Defendants deprived Plaintiff of its valuable Conversion Right.

855.    As a direct and proximate result of that fraud by Tintra, Shearer, Neumann, and/or other Manager Defendants Plaintiff was damaged by losing the Conversion Right.

**B.    Each Aiding and Abetting Defendant Provided Substantial Assistance to Perpetrate the Fraud.**

856.    Each Aiding and Abetting Defendant knew about Tintra's, Shearer's, Neumann's and/or other Manager Defendant's (or Manager Defendants') fraud to induce Plaintiff to give up its Conversion Right, and each Aiding and Abetting Defendant substantially assisted Tintra, Shearer, Neumann, and/or those other Manager Defendants to perpetrate that fraud on Plaintiff.

857.    Each Aiding and Abetting Defendant knew that Tintra, Shearer, Neumann, and/or those other Manager Defendants sought to fraudulently induce Plaintiff to waive the Condition, to accept the April 3 Cash Repayment Notice, and to give up its Conversion Right.

858.    Each Aiding and Abetting Defendant knew that Tintra, Shearer, Neumann, and/or those other Manager Defendants sought to induce Plaintiff as described in ¶ 846 by the false and/or misleading representations described in this Eighth Cause of Action.  Each Aiding and Abetting Defendant knew that those representations were false and/or misleading.

859.    Each Aiding and Abetting Defendant provided substantial assistance to Tintra, Shearer, Neumann and/or those other Manager Defendants in perpetrating that fraud on Plaintiff.

860.    As a direct and proximate result of the substantial assistance provided by each Aiding and Abetting Defendant, Plaintiff proximately suffered injuries from the fraud effectuated upon it, and lost the funds advanced to Tintra as a loan and its Conversion Right.

### NINTH CAUSE OF ACTION

**(Aiding and Abetting Fraud—The Settlement Deed, the Amendment Deed, the Loan, and the Conversion Right—All Defendants)**

861.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1 through 798 and 813 through 860 as if fully set forth herein.

862. As to each Defendant, Plaintiff pleads this Ninth Cause of Action in the alternative to the fraud alleged in the FIFTH CAUSE OF ACTION to have been perpetrated by that Defendant.

863. Specifically, Plaintiff alleges that, if any Defendant is found not liable for the fraud alleged in the FIFTH CAUSE OF ACTION (in this Ninth Cause of Action, an "**Aiding and Abetting Defendant**"), that Aiding and Abetting Defendant nevertheless aided and abetted the fraud perpetrated by any of Tintra, Shearer, Neumann, Cox, LRB, CFP Fintech, Al-Abdulla, and/or other Defendants.

**A.     The Fraud That Each Aiding and Abetting Defendant Aided and Abetted.**

864. Tintra, Shearer, Neumann, Cox, LRB, CFP Fintech, Al-Abdulla, and/or other Defendants, seeking to induce Plaintiff (1) to continue forgoing its Conversion Right and (2) to refrain from pursuing measures to recover the loan, made or caused others to make materially false and/or misleading representations to Plaintiff, knowing that, or recklessly disregarding whether, those representations were false and/or misleading and intending to induce Plaintiff to rely on them.

865. Tintra, Shearer, Neumann, Cox, Tintra's UK counsel, LRB, CFP Fintech, Al-Abdulla, and/or other Defendants made or caused to be made to Plaintiff the false and/or misleading representations, as identified in ¶ 787, knowing that, or recklessly disregarding whether, they were false and/or misleading when made.

866. Tintra, Shearer, Neumann, Cox, LRB, CFP Fintech, Al-Abdulla, and/or other Defendants made or caused to be made to Plaintiff the misrepresentations identified in ¶ 787, intending that the statements containing those representations be communicated to Plaintiff and that Plaintiff rely on those representations in deciding to continue forgoing Plaintiff's Conversion

Right, to refrain from pursuing measures to recover the loan, and to enter into a settlement agreement or settlement agreements with Tintra.

867.    Tintra, Shearer, Neumann, and/or other Manager Defendants made, or caused Tintra, Shearer, and/or Neumann to make, the false and/or misleading representations described in the SEVENTH CAUSE OF ACTION, knowing that, or recklessly disregarding whether, they were false and/or misleading when made and intending that those misrepresentations be communicated to Plaintiff and that Plaintiff rely on them.

868.    Tintra, Shearer, and/or other Manager Defendants made, or caused Tintra and Shearer to make, the false and/or misleading representations described in the EIGHTH CAUSE OF ACTION, knowing that, or recklessly disregarding whether, they were false and/or misleading when made, and intending that those misrepresentations be communicated to Plaintiff and that Plaintiff rely on them.

869.    The misrepresentations described in ¶¶ 866, 867, and 868 were material.

870.    Plaintiff reasonably relied on those misrepresentations.

871.    At various times between April 12, 2023, and December 2023, Plaintiff reviewed or at times subsequent to the initial review, considered, the statements and conduct described in ¶ 866 (made prior to each such time).  Plaintiff considered those in light of the statements that contained the false and/or misleading representations described in the SEVENTH CAUSE OF ACTION and the EIGHTH CAUSE OF ACTION.  At each such time, in continuing to forgo its Conversion Right and refraining from pursuing timely recovery measures during that period, Plaintiff relied on the misrepresentations described in the SEVENTH CAUSE OF ACTION and the EIGHTH CAUSE OF ACTION and the misrepresentations made in or by the statements and conduct described in ¶ 866 (prior to that time).

872.    In entering into the Settlement Deed, Plaintiff relied on the misrepresentations described in the SEVENTH CAUSE OF ACTION and the EIGHTH CAUSE OF ACTION and the misrepresentations made in or by the statements and conduct described in ¶ 866 (prior to July 4, 2023).

873.    In entering into the Amendment Deed, Plaintiff relied on the misrepresentations described in the SEVENTH CAUSE OF ACTION and the EIGHTH CAUSE OF ACTION and the misrepresentations made in or by the statements and conduct described in ¶ 866 (prior to November 10, 2023).

874.    Plaintiff did not know about the false and/or misleading nature of any of the foregoing misrepresentations at the time Plaintiff detrimentally and reasonably relied on them.

875.    By that fraud (other than the fraud executed with the use of LRB's statements and conduct, as described in ¶ 866), Tintra, Shearer, Neumann, Cox, and/or other Defendants induced Plaintiff (1) to continue forgoing its Conversion Right (as to each of the foregoing persons, with effect from after the first statement made by that person as described above and until December 2023), (2) to refrain from timely pursuing measures to recover money owed under the loan (as to each of the foregoing persons, with effect from after the first statement made by that person as described above and until December 2023), and (3) to enter into formal agreements to do the same (i.e., the Settlement Deed and the Amendment Deed).

876.    By the fraud executed with the use of LRB's, CFP Fintech's, and/or Al-Abdulla's statements and conduct, as described in ¶ 866, Tintra, Shearer, Neumann, Cox, LRB, CFP Fintech, Al-Abdulla, and/or other Defendants induced Plaintiff (1) to continue forgoing its Conversion Right (with effect from after September 7, 2023, until December 2023), (2) to refrain from timely pursuing measures to recover money owed under the loan (with effect from after the same date

and until December 2023), and (3) to enter into a formal agreement to do the same (i.e., the Amendment Deed).

877.    As a direct and proximate result of the fraud alleged in this Ninth Cause of Action, Plaintiff was damaged, including by losing its ability to recover the loan and to exercise its Conversion Right.

**B.    Each Aiding and Abetting Defendant Provided Substantial Assistance to Perpetrate the Fraud.**

878.    Each Aiding and Abetting Defendant knew about Tintra's, Shearer's, Neumann's, Cox's, LRB's, CFP Fintech's, Al-Abdulla's, and/or other Defendant's (or Defendants') fraud to induce Plaintiff to continue forgoing its Conversion Right, to refrain from pursuing recovery measures, and to enter into settlement agreements), and each Aiding and Abetting Defendant substantially assisted Tintra, Shearer, Neumann, Cox, LRB, CFP Fintech, Al-Abdulla, and/or those other Defendants to perpetrate that fraud on Plaintiff.

879.    Each Aiding and Abetting Defendant knew that Tintra, Shearer, Neumann, Cox, LRB, CFP Fintech, Al-Abdulla, and/or those other Defendants sought to fraudulently induce Plaintiff to continue to forgo its Conversion Right and pursue other recovery measures, and to enter into settlement agreements with Tintra.

880.    At each time, each Aiding and Abetting Defendant knew that Tintra, Shearer, Neumann, Cox, and/or those other Defendants, by the false and/or misleading representations described above in this Ninth Cause of Action as having been made in the statements made or published, or by the conduct engaged in, before that time (including such false and/or misleading representations described in the SEVENTH CAUSE OF ACTION and the EIGHTH CAUSE OF ACTION), sought to induce Plaintiff to continue forgoing its Conversion Right, to refrain from timely pursuing measures to recover money owed under the loan, and to enter into formal

agreements to do the same (i.e., the Settlement Deed and the Amendment Deed). Each Aiding and Abetting Defendant knew that those representations were false and/or misleading.

881.    At each time on or after September 7, 2023, each Aiding and Abetting Defendant knew that Tintra, Shearer, Neumann, Cox, LRB, CFP Fintech, Al-Abdulla, and/or those other Defendants by the false and/or misleading representations made in LRB's and CFP Fintech's statement(s) and/or by LRB's, CFP Fintech's, and/or Al-Abdulla's conduct, as described in ¶ 866, sought to induce Plaintiff to continue forgoing its Conversion Right, to refrain from timely pursuing measures to recover the money owed under loan, and to enter into a formal agreement to do the same (i.e., the Amendment Deed).

882.    Each Aiding and Abetting Defendant provided substantial assistance (as described throughout this Complaint) to Tintra, Shearer, Neumann, Cox, LRB, CFP Fintech, Al-Abdulla, and/or those other Defendants in perpetrating on Plaintiff the fraud described above.

883.    As a direct and proximate result of the substantial assistance provided by each Aiding and Abetting Defendant, Plaintiff proximately suffered injuries from the fraud effectuated upon it, and lost the funds advanced to Tintra as a loan and its Conversion Right.

## TENTH CAUSE OF ACTION

**(Tortious Interference with Contract—Payment of Tintra's Debts to Third Parties in Violation of the Agreement—Manager Defendants)**

884.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1 through 798 as if fully set forth herein.

885.    There was a valid contract between Plaintiff and Tintra—the Agreement—in which Plaintiff agreed to lend Tintra $3 million by way of a convertible loan, and Tintra agreed, under Section 4.1 of the Agreement, to issue shares of its stock to Plaintiff, by way of conversion(s) of the loan, at the request of Plaintiff, on dates determined by Plaintiff, each, in the number

determined in accordance with a formula set forth in Sections 1.1 and 4.1 of the Agreement. Tintra could, however, elect to pay Plaintiff in cash if Tintra properly exercised its right of cash repayment in accordance with Section 4.2 of the Agreement. The Agreement provided that, to exercise its right of cash repayment, Tintra was required to provide "proof of [Tintra] holding . . . cleared funds in the amount equal to the [cash repayment amount]" (Section 4.2(A)). The Agreement also provided that Tintra could not use the proceeds received from Plaintiff to pay down debts to third parties (Section 8.4(A)).

886.    Tintra breached the Agreement by using the proceeds of Plaintiff's loan to pay down third party debts in breach of Section 8.4(A) of the Agreement.

887.    Manager Defendants were aware of the Agreement and its terms.

888.    Manager Defendants were aware of and knew about the permitted uses of the proceeds of Plaintiff's loan under the Agreement and that such uses did not include repayment of debts.

889.    In support of their wrongful purposes discussed herein and without proper justification, Manager Defendants intentionally procured Tintra's breach of the Agreement.

890.    But for Manager Defendants inducing or causing Tintra to breach the Agreement, Tintra would not have breached the Agreement.

891.    As a direct and proximate result of Tintra's breach of the Agreement, Plaintiff was injured. Plaintiff has lost the principal amount of the debt owed to it by Tintra under the Agreement.

## ELEVENTH CAUSE OF ACTION

**(Tortious Interference with Contract—Failure to Issue Tintra's Stock to Plaintiff in Violation of the Agreement—Manager Defendants)**

892.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1 through 798 and 884 to 891 as if fully set forth herein.

893.    Tintra breached the Agreement by refusing to honor Plaintiff's exercises of the Conversion Right to convert its loan into stock on two occasions: on January 23 and another time on March 15, 2023, in breach of Section 4.1 of the Agreement.

894.    Manager Defendants were aware and knew that Tintra was required under the Agreement to issue the shares to Plaintiff.

895.    In support of their wrongful purposes discussed herein and without proper justification, Manager Defendants intentionally procured Tintra's breaches of the Agreement.

896.    But for Manager Defendants inducing or causing to Tintra to breach the Agreement, Tintra would not have breached the Agreement.

897.    As a direct and proximate result of Tintra's breaches of the Agreement, Plaintiff was injured.  Plaintiff has lost the as-exercised value of the part of the loan that Plaintiff was prevented, in breach of the Agreement, from converting.

## TWELFTH CAUSE OF ACTION

**(Tortious Interference with Contract—Delisting and Reregistration as Private Company—Manager Defendants)**

898.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1 through 798 and 884 to 897 as if fully set forth herein.

899.    By delisting from the AIM Market of the LSE on January 8, 2024, Tintra violated Sections 12.1(G), 8.1, 8.3(D), 10.1, and 10.3(A) of the Agreement.

900.    By its failure to reobtain its listed status at all times thereafter, Tintra violated Section 5.5 of the Agreement.

901.    By its failure to make regulatory filings relating to the admission to trading of the Shares on AIM at all times following the delisting, Tintra violated Section 10.11(J) of the Agreement.

902.    By its reregistration as a private company on January 18, 2024, Tintra violated Sections 8.1, 8.3(D) and 10.1 of the Agreement.

903.    Manager Defendants were aware of and knew about the foregoing obligations under the Agreement.

904.    In support of their wrongful purposes discussed herein and without proper justification, Manager Defendants intentionally procured Tintra's breaches of the Agreement.

905.    But for Manager Defendants inducing or causing Tintra's breaches of the Agreement, Tintra would not have breached the Agreement.

906.    As a direct and proximate result of Tintra's breaches of the Agreement, Plaintiff was injured. Plaintiff has lost the principal amount of the debt owed to it by Tintra under the Agreement and its valuable Conversion Right.

### THIRTEENTH CAUSE OF ACTION

**(Civil Conspiracy—The Agreement and the Funding of the Loan, and the Conversion Right—Manager Defendants)**

907.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1 through 798 and 813 through 906 as if fully set forth herein.

908.    As alleged in the THIRD CAUSE OF ACTION and/or the SEVENTH CAUSE OF ACTION, Tintra, Shearer, Neumann and/or Manager Defendants, committed fraud by making or

causing others to make the false and/or misleading representations described in those Causes of Action, with the intent that others, including Plaintiff, rely on those representations.

909.    That fraud inured to the benefit of Manager Defendants.

910.    Each Manager Defendant (and through Craig, the Sponsor and the SPAC), Tintra, Shearer, and Neumann agreed and conspired with each other for the unlawful objective of defrauding the Other Victims and prospective funders, including Plaintiff.

911.    In or about the fall of 2021, Manager Defendants (and through Craig, the Sponsor and the SPAC), Tintra and Shearer reached an agreement to participate in a common scheme to fraudulently reposition Tintra as a rapidly developing, innovative, cutting-edge, and prospective AI banking technology company focusing on ESG, in order to defraud the Other Victims and prospective funders, including Plaintiff, of Tintra.  Neumann then joined that scheme no later than in February 2022.

912.    Thereafter, in or about October 2022, Manager Defendants (and through Craig, the Sponsor and the SPAC), Tintra, and Shearer reached an agreement to participate in a common scheme to fraudulently induce Plaintiff to enter into the Agreement and to provide a $3 million loan to Tintra.

913.    In furtherance of their scheme, Manager Defendants, Tintra, Shearer, and Neumann intentionally committed overt acts as alleged throughout this Complaint (including in the FIRST CAUSE OF ACTION and SECOND CAUSE OF ACTION).

914.    As a direct and proximate cause of the abovementioned conspiracy, the overt acts committed in furtherance thereof, and the underlying fraud committed against Plaintiff, Plaintiff has been damaged, including by losing the $3 million advanced to Tintra and the value of the Conversion Right.

## FOURTEENTH CAUSE OF ACTION

### (Civil Conspiracy—The Conversion Right—Manager Defendants)

915.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1 through 798 and 813 through 914 as if fully set forth herein.

916.    As alleged in the FOURTH CAUSE OF ACTION and/or the EIGHTH CAUSE OF ACTION, Tintra, Shearer, and/or Manager Defendants committed fraud by making or causing others to make the false and/or misleading representations described in those Causes of Action, with the intent to induce Plaintiff to forgo its Conversion Right.

917.    That fraud inured to the benefit of Manager Defendants.

918.    Each Manager Defendant (and through Craig, the Sponsor and the SPAC), Tintra and Shearer conspired and agreed with each other for the unlawful objective of defrauding Plaintiff.

919.    Upon information and belief, no later than in early 2023 (and prior to March 31, 2023), Manager Defendants (and through Craig, the Sponsor and the SPAC), Tintra and Shearer reached an agreement to participate in a common scheme to defraud Plaintiff out of its Conversion Right as described above.

920.    In furtherance of their scheme, Manager Defendants, Tintra, and Shearer intentionally committed overt acts, as described throughout this Complaint (including preparing and providing to Plaintiff the March 31 Cash Repayment Notice and the April 3 Cash Repayment Notice).

921.    As a direct and proximate cause of the above-mentioned conspiracy, the overt acts committed in furtherance thereof, and the underlying fraud committed against Plaintiff, Plaintiff has been damaged, including by losing the $3 million advanced to Tintra and the value of the Conversion Right.

## FIFTEENTH CAUSE OF ACTION

**(Civil Conspiracy—The Settlement Deed, the Amendment Deed, the Loan, and the Conversion Right—All Defendants)**

922.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1 through 798 and 813 through 921 as if fully set forth herein.

923.    As alleged in the FIFTH CAUSE OF ACTION and/or the NINTH CAUSE OF ACTION, Tintra, Shearer, LRB, CFP Fintech, Al-Abdulla, Defendants, and others committed fraud by making or causing others to make the false and/or misleading representations described in those Causes of Action, with the intent to induce Plaintiff to continue forgoing its Conversion Right, to refrain from timely pursuing measures to recover the loan, and to enter into agreements with Tintra in addition to the Agreement.

924.    That fraud inured to the benefit of Defendants.

925.    Each Defendant, Tintra, Shearer, LRB, CFP Fintech and Al-Abdulla conspired and agreed with each other for the unlawful objective of defrauding Plaintiff.

926.    Upon information and belief, no later than in April 2023, Defendants, Tintra and Shearer reached an agreement to participate in a common scheme to defraud Plaintiff out of its Conversion Right as described above.

927.    LRB, CFP Fintech, and Al-Abdulla joined that scheme no later than between September 1 and September 7, 2023.

928.    In furtherance of their scheme, Defendants, Tintra, Shearer, LRB, CFP Fintech, and Al-Abdulla intentionally committed overt acts, as described throughout this Complaint (including the Cogut Family making wire transfers to Plaintiff on April 12, 2023, Defendants wiring or causing other Defendants and their controlled vehicles to wire $1.2 million to Tintra and providing or causing other Defendants to provide written instructions as to how to deceive Plaintiff to Tintra

and Shearer, and Tintra, Shearer, LRB, CFP Fintech, and Al-Abdulla purporting to conduct a fake takeover and a fake tender offer).

929.    Defendants intentionally took their overt acts described throughout this Complaint to assist Tintra and Shearer to carry out the aforementioned common plan to defraud Plaintiff.

930.    As a direct and proximate cause of the above-mentioned conspiracy, the overt acts committed in furtherance of that conspiracy, and the underlying torts committed against Plaintiff, Plaintiff has been damaged, including by losing the $3 million advanced to Tintra and the value of the Conversion Right.

## SIXTEENTH CAUSE OF ACTION

### (Unjust Enrichment—All Defendants)

931.    Plaintiff repeats and realleges the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

932.    Each Defendant has been enriched at Plaintiff's expense.

933.    Plaintiff loaned Tintra $3 million and possessed the Conversion Right.

934.    Each Manager Defendant knew, no later than on December 16, 2022, that Plaintiff had agreed to loan Tintra money and contracted for the Conversion Right.

935.    Each Manager Defendant knew, no later than on December 23, 2022, that Plaintiff had lent Tintra money and held the Conversion Right.

936.    Deborah knew, no later than on April 12, 2023, when she wired funds to Plaintiff directly, that Plaintiff had agreed to, and did, loan Tintra money and held the Conversion Right.

937.    By each Manager Defendant's actions, Plaintiff was induced to lend Tintra $3 million on December 23, 2022.

938.    By each Manager Defendant's actions, Plaintiff was induced to forgo its Conversion Right on April 5, 2023.

939.    By each Defendant's actions, Plaintiff was induced to continue forgoing its Conversion Right and to refrain from expeditiously pursuing recovery measures.

940.    Each Defendant was unjustly enriched at Plaintiff's expense, including the $3 million advanced by Plaintiff and the value of the Conversion Right.

941.    Manager Defendants caused Tintra to pay prior creditors and Tintra's other expenses using the funds provided by Plaintiff, enriching the Cogut Family by at least $3 million, because Tintra's making those payments allowed Tintra to continue as a purported going concern for Defendants' benefit and to do so without having to contribute the equivalent amount in cash using the Cogut Family's funds.

942.    Manager Defendants caused Tintra to use Plaintiff's funds and to deprive Plaintiff of its Conversion Right, among other things, (1) to extend Tintra's operating life and (2) to prevent discovery of the Scheme for Defendants' benefit.  That enabled Manager Defendants to present Tintra as their purported partner to the Other Victims and execute the Scheme for Pegasus to secure $30.5 million in funding from the Other Victims for the Barbados BGB and to secure control of the Barbados BGB.  Pegasus substantially benefited therefrom as, upon information and belief, Manager Defendants were successful in securing the $30.5 million in funding for, and the control of, the Barbados BGB.  Each of Craig and David benefited from the same through his respective direct or indirect ownership or beneficial ownership of Pegasus.

943.    Manager Defendants caused Tintra to pay (1) the costs of Manager Defendants, the Cogut Family, and their affiliates and (2) for employees, officers, board members, and agents (including Shearer, Neumann, Tintra Pegasus Employee, Johnson, and others) from Plaintiff's funds or funds that Tintra retained as a result of its having misused Plaintiff's funds and while using Tintra's resources funded with Plaintiff's funds.  Tintra and its employees, officers, board

members, and agents, at Plaintiff's expense, assisted Manager Defendants with securing, or in

advancing, multiple lucrative business opportunities.

944.    Such costs, work and business opportunities included, among other things:

(a)    The work of Tintra, Shearer, Neumann, Tintra Pegasus Employee, and other Tintra employees, directors, and agents for Manager Defendants with respect to Pegasus' efforts to obtain the control of, and the funding for, the Barbados BGB project from the Other Victims, from which Pegasus benefited because those efforts were ultimately successful. Each of Craig and David benefited from the same through his direct or indirect ownership or beneficial ownership of Pegasus.

(b)    Shearer's work assisting Manager Defendants and SNCF, GFCR, the CRAFT Fund, and Pegasus' CRAFT Vehicle. Such assistance by Shearer included securing or attempting to secure funding for SNCF and GFCR, including getting £24 million (approximately US$29.5 million) from the British Government for GFCR's grant arm and $5 million from the Minderoo Foundation by GFCR. Each of Craig and David benefited from the same through his direct or indirect ownership or beneficial ownership of Pegasus, and each Defendant benefited from the same through his, her, or its economic interest in those funds (through management and general partner companies controlled and/or directly or indirectly owned or beneficially owned by those Defendants).

(c)    Upon information and belief, Shearer's assistance to Pegasus with obtaining approvals (including governmental approvals) for multiple, large projects, including those with the Indian state of Maharashtra and the United Arab Emirates' Ministry of Climate Change and Environment. Each of Craig and David benefited from the same through his direct or indirect ownership or beneficial ownership of Pegasus.

(d)    Johnson's work assisting Manager Defendants with advancing their Galapagos hotel development, which proceeded with the use of that assistance. Each of Craig and David benefited from the same through his direct or indirect ownership or beneficial ownership of Pegasus, and each Defendant benefited from the same through his, her, or its direct or indirect economic interest in that development.

(e)    Tintra's resources expended for the benefit of Sangay (Manager Defendants' business partner in their Bhutanese hotel venture) and his family. Manager Defendants benefited from the same through their direct or indirect interests in that venture.

(f)    Tintra's resources expended on Manager Defendants' pursuit of business opportunities in Rwanda (including for SNCF and the CRAFT Fund). Each of

Craig and David benefited from the same through his direct or indirect ownership or beneficial ownership of Pegasus, and each Defendant benefited from the same through his, her, or its economic interest in those funds (through management and general partner companies controlled and/or directly or indirectly owned or beneficially owned by those Defendants).

(g)    Other business opportunities secured or advanced with the use of Tintra's resources.

945.    Upon information and belief, having secured the control of the Barbados BGB with the misuse of Plaintiff's funds, Craig and Pegasus have been able to hold the Barbados BGB out as a model and to hold themselves out as specialist fund managers with relevant expertise to secure for themselves the $1 billion UNDP partnership and to advance other valuable BGB projects outside of Barbados and other business opportunities.

946.    Each of Craig and David benefited from the same through his or her direct or indirect ownership or beneficial ownership of Pegasus.

947.    Misusing Plaintiff's funds, Tintra put on at least one lavish event—the Animal Ball—substantially benefiting Craig, David, Deborah and Pegasus.

948.    Once Tintra had been looted and was of no further use to Defendants, Manager Defendants took its only remaining asset (the name it had deceitfully made for itself as a purported banking technology company), by taking for themselves that name (by rebranding LRB as "Tintra AI") so that Defendants could continue to benefit from Tintra's name without paying Tintra or its creditors (including Plaintiff). The continued use of Tintra's name enabled Manager Defendants to enrich themselves, or put themselves in a position to enrich themselves, through (1) continuing their Scheme, (2) ultimately obtaining control of the funding for the Barbados BGB, and (3) pursuing other BGB and investment management opportunities—those to control potentially hundreds of millions, and even billions, of dollars.

949.    Manager Defendants' conduct involved extensive tortious conduct towards Plaintiff. Defendants achieved multiple business objectives, including securing tens of millions of dollars in funding, advancing multi-hundred-million-dollar projects, and depriving through fraud—of which Manager Defendants were masterminds and Deborah an active participant—Plaintiff of its funds and the Conversion Right to which Plaintiff was entitled. For the foregoing reasons, it would be unjust and against equity and good conscience to allow any of Defendants to keep the ill-gotten gains they derived at Plaintiff's expense.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff, awarding it:

(i)    On the First Cause of Action, against each RICO Defendant:

- o Damages in an amount to be proved at trial, including but not limited to the value of the loan and the value of the Conversion Right;

- o Treble damages for Defendants' violations of RICO, pursuant to 18 U.S.C. § 1964(c);

- o Attorneys' fees, pursuant to 18 U.S.C. § 1964(c);

- o Costs of suit, pursuant to 18 U.S.C. § 1964(c);

- o Prejudgment and post judgment interest;

(ii)    On the Second Cause of Action, against each RICO Defendant:

- o Damages in an amount to be proved at trial, including but not limited to the value of the loan and the value of the Conversion Right;

- o Treble damages for Defendants' violations of RICO pursuant to 18 U.S.C. § 1964(c);

- o Attorneys' fees, pursuant to 18 U.S.C. § 1964(c);

- o Costs of suit, pursuant to 18 U.S.C. § 1964(c);

- o Prejudgment and post judgment interest;

(iii)    On the Third Cause of Action, against each Manager Defendant:

    o Damages in an amount to be proved at trial, including but not limited to the value of the loan;

    o Attorneys' fees;

    o Costs of suit;

    o Prejudgment and post judgment interest;

    o Punitive damages in an amount to be determined at trial;

(iv)    On the Fourth Cause of Action, against each Manager Defendant:

    o Damages in an amount to be proved at trial, including but not limited to the value of the loan and the value of the Conversion Right;

    o Attorneys' fees;

    o Costs of suit;

    o Prejudgment and post judgment interest;

(v)    On the Fifth Cause of Action, against each Defendant:

    o Damages in an amount to be proved at trial, including but not limited to the value of the loan and the value of the Conversion Right;

    o Attorneys' fees;

    o Costs of suit;

    o Prejudgment and post judgment interest;

    o Punitive damages in an amount to be determined at trial;

(vi)    On the Sixth Cause of Action, against each Manager Defendant:

    o Damages in an amount to be proved at trial, including but not limited to the value of the loan and the value of the Conversion Right;

    o Attorneys' fees;

    o Costs of suit;

    o Prejudgment and post judgment interest;

    o Punitive damages in an amount to be determined at trial;

(vii)    On the Seventh Cause of Action, against each Manager Defendant:

       o   Damages in an amount to be proved at trial, including but not limited to the value of the loan;

       o   Attorneys' fees;

       o   Costs of suit;

       o   Prejudgment and post judgment interest;

       o   Punitive damages in an amount to be determined at trial;

(viii)    On the Eighth Cause of Action, against each Manager Defendant:

       o   Damages in an amount to be proved at trial, including but not limited to the value of the loan and the value of the Conversion Right;

       o   Attorneys' fees;

       o   Costs of suit;

       o   Prejudgment and post judgment interest;

       o   Punitive damages in an amount to be determined at trial;

(ix)    On the Ninth Cause of Action, against each Defendant:

       o   Damages in an amount to be proved at trial, including but not limited to the value of the loan and the value of the Conversion Right;

       o   Attorneys' fees;

       o   Costs of suit;

       o   Prejudgment and post judgment interest;

       o   Punitive damages in an amount to be determined at trial;

(x)    On the Tenth Cause of Action, against each Manager Defendant:

       o   Damages in an amount to be proved at trial, including but not limited to the loss of the loan;

       o   Attorneys' fees;

       o   Costs of suit;

       o   Prejudgment and post judgment interest;

        o   Punitive damages in an amount to be determined at trial;

(xi)     On the Eleventh Cause of Action, against each Manager Defendant:

        o   Damages in an amount to be proved at trial, including but not limited to the as-exercised value of the part of the loan that Plaintiff was prevented from converting in breach of the Agreement;

        o   Attorneys' fees;

        o   Costs of suit;

        o   Prejudgment and post judgment interest;

        o   Punitive damages in an amount to be determined at trial;

(xii)    On the Twelfth Cause of Action, against each Manager Defendant:

        o   Damages in an amount to be proved at trial, including but not limited to the value of the loan and the value of the Conversion Right;

        o   Attorneys' fees;

        o   Costs of suit;

        o   Prejudgment and post judgment interest;

        o   Punitive damages in an amount to be determined at trial;

(xiii)   On the Thirteenth Cause of Action, against each Manager Defendant:

        o   Damages in an amount to be proved at trial, including but not limited to the value of the loan;

        o   Attorneys' fees;

        o   Costs of suit;

        o   Prejudgment and post judgment interest;

        o   Punitive damages in an amount to be determined at trial;

(xiv)   On the Fourteenth Cause of Action, against each Manager Defendant:

        o   Damages in an amount to be proved at trial, including but not limited to the value of the loan and the value of the Conversion Right;

        o   Attorneys' fees;

      o   Costs of suit;

      o   Prejudgment and post judgment interest;

      o   Punitive damages in an amount to be determined at trial;

(xv)    On the Fifteenth Cause of Action, against each Defendant:

      o   Damages in an amount to be proved at trial, including but not limited to the value of the loan and the value of the Conversion Right;

      o   Attorneys' fees;

      o   Costs of suit;

      o   Prejudgment and post judgment interest;

      o   Punitive damages in an amount to be determined at trial;

(xvi)   On the Sixteenth Cause of Action, against each Defendant:

      o   Damages in an amount to be proved at trial and disgorgement of all amounts wrongfully or inequitably obtained by that Defendant;

      o   Attorneys' fees;

      o   Costs of suit;

      o   Prejudgment and post judgment interest; and

(xvii)  For all causes of action, such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all triable issues raised in this Complaint.

Dated: March 27, 2025
    New York, New York

Respectfully submitted,

**GREENSPOON MARDER LLP**

By: */s/ Philippe Zimmerman*
Philippe Zimmerman
1345 Avenue of the Americas, Suite 2200
New York, New York 10105
Tel.:    212 524 5000
Email: Philippe.Zimmerman@gmlaw.com

**Schedule 1**

**Materially False and/or Misleading Representations Made in Statements Published by
Tintra Between March 7 and November 8, 2022**

1.       Between March 7 and November 8, 2022, Tintra, Shearer, and Neumann made statements containing materially false and/or misleading representations, as described in this Complaint above.   During that period, Tintra, Shearer, and Neumann made multiple other statements containing materially false and/or misleading representations, as described below.

2.       Tintra, Shearer, and Neumann made multiple statements containing materially false and/or misleading representations regarding Tintra's purported business, technologies and products, and related matters.

3.       On March 17, 2022, Tintra published an announcement which included the following statements:

> The board of directors (the "Board") of fast-growth RegTech business, Tintra PLC announces the next stage of its strategy, previously set out in the announcement of 4 November 2021 (the "Announcement") - the development of what the Board believes to be the world's first built for purpose Web 3.0 banking platform (the "Platform"), to expand its already-extensive technological capabilities, through to the launch of [sic] of an equally innovative fully functional metaverse bank.
>
> . . .
>
> Tintra's revolutionary "borderless" approach will introduce a financial and regulatory infrastructure built solidly upon Web 3.0 technologies and concepts, including metaverse and blockchain interoperability, transparency by utilising dataless cryptographic mechanisms, and blockchain-based verification.  While the Platform will develop over time, along with these Web 3.0 technologies and concepts, it is being built on a "clean-sheet" basis rather than bolting such elements on to legacy platforms.  Tintra's infrastructure will be fully compliant with current regulation, apply artificial intelligence to enhance the KYC/AML framework but include in built latency elements that the Board believes will give the business a competitive edge as the world moves into a Web 3.0 environment.
>
> . . .
>
> This latest proposed expansion of Tintra's technological capabilities complement its existing investments in artificial intelligence ("AI") and machine learning.

1

Building on its partnership with TMC2, Tintra is continuing to develop end-to-end AI-driven technologies, designed to allow emerging market financial institutions to access global banking systems.

The advanced technology the Group is developing is set, in the Board's view, to revolutionise the regulatory environment and make access to the global marketplace as seamless in Africa, Latin America or Asia tomorrow as it is in Europe or the United States today.

Discussing the vision for Tintra to become the World's first truly Web 3.0 enabled bank, Group CEO, Richard Shearer, said: ". . . As I've discussed elsewhere we are building banking infrastructure that will allow us to open borders and business sectors across Asia, Africa and Latin America. Our unique thinking on this is that the methodology to achieve this is by building tomorrow's bank and then reverse engineering it back to fit today's regulatory and fiscal landscape - as opposed to others who, in our view, are taking a more bottom up approach.

We are already pushing this process of solving the AML/KYC challenges faced by emerging market individuals and businesses along rapidly with a number of in-house PhD level brains rethinking what's possible. Today's announcement is a natural next step along that same path and I look forward to sharing a lot more in the coming months on how we are opening up modern physical borders and at the same time contemplating a banking future beyond borders and perhaps even into the metaverse."

4.     The foregoing representations were false and/or misleading because Tintra was a struggling company with no product, technology, or substantive business, and Tintra (1) was not developing "the world's first built for purpose Web 3.0 banking platform," (2) had no "already-extensive technological capabilities," (3) was not working on a "launch of [sic] of an equally innovative fully functional metaverse bank," (4) had no "revolutionary" approach, business or technology, (5) had nothing that was "built solidly upon Web 3.0 technologies and concepts, including metaverse and blockchain interoperability, transparency by utilising dataless cryptographic mechanisms, and blockchain-based verification," (6) was not developing "infrastructure . . . apply[ing] artificial intelligence to enhance the KYC/AML framework," (7) could not be undertaking an "expansion of Tintra's technological capabilities complement[ing] its existing investments in artificial intelligence ('AI') and machine learning" (since it had no such

capabilities that could be expanded, and no such investments), and (8) was not "developing" "[t]he advanced technology" referenced.

5.    At page 16 of its 2022 Annual Report published on August 1, 2022 (i.e., shortly before Pegasus made its final submission of the Preliminary Application to GCF), Tintra, Shearer, and Neumann stated:

> So, what are we doing and why are we doing it?
>
> We are building banking infrastructure technology systems that are focused on frontier and emerging markets, which it believes are underserved by today's environment.  By creating an open, integrated banking capability, Tintra will offer software as a service ("SaaS") to its clients but uniquely sitting on its own global banking platform, using scalable infrastructure and application programming interface ("API") innovation.
>
> As a Bank, Tintra will become the banking interface between African and Gulf states, Latin and Central America, and South-East Asia - enabling businesses and family offices in those jurisdictions to bank outside of their own territory and to be able to make payments globally, to standards in terms of service, KYC/AML recognition and cost-efficiencies that align with those of developed markets.
>
> Tintra is dedicated to delivering best in class technology and services to ensure that the ability to access banking and make payments matches the demand for frictionless trade, particularly in emerging and frontier markets.  Tintra intends to continue to build its financial services technology suite at pace, to be able to provide a full suite of banking infrastructure services within its target markets.

6.    The foregoing representations were false and/or misleading because Tintra: (1) was not developing products, technology, "banking infrastructure" or "best in class technology," (2) did not have "its own global banking platform," and (3) was not engaging in any such "building" process.  They were false and/or misleading because the 2022 Annual Report failed to disclose that no substantive work was being undertaken on any of the projects described in that statement.  They were false and/or misleading because Tintra could not have "continue[d]" to build purported products because it had not started doing so (and in any event it did not have a "financial services technology suite" which it could "continue to build" to begin with).

7. At page 15 of the 2022 Annual Report, Tintra, Shearer, and Neumann stated:

Our AI-first banking infrastructure is designed to not just to [sic] meet, but exceed, current global AML and KYC protocols, greatly reducing the risk of illicit financial flows (IFFs) through those Hubs and beyond.

8. That representation was false and/or misleading because Tintra had no "banking infrastructure" (and no banking infrastructure "designed to . . . exceed" "global AML and KYC protocols"), and no banking infrastructure that utilized "AI."

9. At page 3 of the 2022 Annual Report, Tintra, Shearer, and Neumann stated:

Tintra is Deep Technology & Banking Infrastructure utilising artificial intelligence to address the challenges of moving money between developed and emerging markets. Our patent-pending technology is the leading dependable banking infrastructure, enabling people to send money directly and compliantly without human inaccuracies or subjective bias. [footnotes omitted].

We are developing a Global Banking Infrastructure . . .

Tintra's focus is therefore on building a deeply innovative, highly regulated financial services business, using our own patented technology, global banking licences and a very strong ESG framework.

10. Those representations were false and/or misleading because Tintra had no (and was not building any) (1) substantive technology, (2) substantive proprietary "own . . . technology" or "our . . . technology," (3) deep technology, (4) banking infrastructure, (5) technology or banking infrastructure that utilized artificial intelligence, (6) technology that was "leading" and "dependable" or represented "banking infrastructure" or "[b]anking [i]nfrastructure utilising artificial intelligence" or "banking infrastructure" that removed human error or "subjective bias," or (7) "global banking licences." Additionally, that statement was false and/or misleading because Tintra was not involved in any activities that could be described as "ESG" (and in fact was not involved in any substantive business activities other than the furtherance of the fraudulent Scheme, the main reason for which Tintra continued to exist).

4

11.     Tintra, Shearer, and Neumann made multiple statements containing materially false and/or misleading representations regarding the way in which Tintra was governed, who made decisions at Tintra, how those decisions were made, and Tintra's compliance and internal controls.

12.     At page 36 of the 2022 Annual Report, Tintra, Shearer, and Neumann stated:

GOVERNANCE

Corporate Governance Statement

The Group is committed to deployment of a good level of corporate governance. As Chairman, my responsibilities include leading the Board in an effective manner, overseeing the Group's corporate governance model, and ensuring that adequate and accurate information flows freely between senior management executives and Non-Executive Directors in a timely manner.

. . .

The Board of Directors

The Board is responsible for the overall management of the Group, including the formulation and approval of the Group's business plan, medium-long term objectives and strategy, the approval of budgets, oversight of key changes and risks arising in the Group's operations, the sound management of risks in the Group and implementation of mitigants and controls, which shall include Group strategy, policies and plans. While the Board may delegate certain responsibilities, it reserves decision by the Board on specific matters including, but not limited to, significant capital expenditures, budget setting, business plan signoff, material business contracts and corporate transactions such as mergers, acquisitions and investment.

13.     The foregoing representations were false and/or misleading because (1) Tintra was not "committed to deployment of a good level of corporate governance" and (2) it was Manager Defendants rather than the "Board" who were "responsible for the overall management of" Tintra.

14.     They were false and/or misleading because Tintra did not have "good level of corporate governance," "sound management of risks," or bona fide internal "controls" or "mitigants" and because that information was omitted from the disclosure.

15.     At page 37 of the 2022 Annual Report Tintra, Shearer, and Neumann stated:

The Board convenes a minimum of eleven times a year, approximately monthly, and more frequently where business needs require.

16.    That representation was false and/or misleading because Tintra held very few board meetings.

17.    At page 32 of the 2022 Annual Report, Tintra, Shearer, and Neumann stated:

The Group's financial risk management strategy is based on sound economic objectives and corporate practices.  The Board and senior executives review the cash and liquidity position at every Board meeting, to manage our short and medium-term viability.

18.    That representation was false and/or misleading because Tintra's "cash and liquidity" position was not reviewed at every board meeting.

19.    At page 36 of the 2022 Annual Report, Tintra, Shearer, and Neumann stated, "The Board meets formally on a regular basis to review performance."

20.    That representation was false and/or misleading because Tintra's Board did not meet regularly to review performance or otherwise.

21.    Tintra, Shearer, and Neumann made multiple statements containing materially false and/or misleading representations regarding Tintra's licenses.

22.    At page 107 of the 2022 Annual Report, in the Notes to its Consolidated Financial Statements (Note 30), Tintra, Shearer, and Neumann stated:

In March 2022, the group updated its intended strategy to now apply in the UK for a Small Bank Licence with the PRA [Prudential Regulation Authority] directly, as well as EMI authorisation from the FCA [Financial Conduct Authority], integrating Tintra's UK regulatory position into line with its Full Bank Licence Applications in Qatar and Puerto Rico that are already underway.

23.    Upon information and belief, that representation was false and/or misleading because Tintra had not applied for a license in Puerto Rico.

24.    On September 15, 2022, Tintra published the following announcement.

Granting of Middle East Licence

The board of directors (the "Board") of Tintra, the rapidly innovating Deep Tech & Banking business, is delighted to announce that it has gained the first of a number of required approvals in Qatar as it tracks toward its banking licence.

The Company was today awarded a Fintech Services Licence (the "Licence") to operate in the Qatar Financial Centre ("QFC").  The QFC is an onshore business and financial centre that allows companies to operate in Qatar and the wider Middle East region within a legal and tax environment aligned to international standards.

The Licence, awarded to Tintra Middle East LLC, a wholly owned subsidiary of the Company, allows the Company to immediately commence the mobilization of an office in Doha and the hiring process of an initial 12-15 regulated and unregulated positions as the Company builds out a full team in the territory.

The Licence is a foundational hub element of the "hub and spoke" strategy outlined in the Company's recently published Annual Report ( https://tintra.com/investor-relations/annual-accounts/), in which the Company is to establish regulated banking operations in key regions from which to build the World's first emerging market focused clearing bank built upon Web3 principles.

This licence allows the Company to put in place the right team, made up of both local and international staff, and at the same time commence the regionally specific movement of Intellectual Property and technology.  Once this is completed to the regulators satisfaction upgrades to the Licence will be made towards the full banking operation.

It is anticipated that the first of these amendments will be issued in around 6 months once this initial mobilization has been completed, in line with the Regulated Business Plan, that has been submitted.

25.    The "licence" (1) permitted its holder to engage only in what was effectively programming and coding services and similar services, (2) did not permit its holder to engage in any banking or financial transaction activities, (3) specifically prohibited its holder from engaging in banking and financial services transactions, and (4) had an expiry date of January 31, 2023, i.e., only four months after its grant date of September 14, 2022.  Upon information and belief, the Qatar "licence" was the equivalent of a certificate of registration and was not a financial services let alone banking license of any kind.

26.    The announcement thus contained representations that were false and/or misleading because (1) those substantial limitations were omitted from the disclosure and (2) it created the

false impression that Tintra had been granted a hard-to-obtain specialist financial services or banking-type license, while omitting to disclose the fact that the "licence" was extremely narrow and amounted to no more than an equivalent of a certificate of registration.

**Schedule 2**

**Materially False and/or Misleading Representations Made in Statements Published by Neumann on Social Media Platforms and in the Press Between February 3 and November 18, 2022**

1.    Throughout 2022, using social media platforms and the press, Neumann repeatedly made statements containing false and/or misleading representations regarding Tintra's business and technology (in addition to such statements described in the Complaint above).  Neumann's promotion of Tintra and its non-existent business, technologies, and products was specifically prevalent at key junctures of Defendants' involvement in the Scheme and milestones in their application process with GCF.

2.    In a LinkedIn post published by Neumann on February 3, 2022, Neumann stated the following:

> I'm happy to share that I'm starting a new position as Non Executive Board Member at Tintra [ ]!  It's an honor and a pleasure to join such a dynamic team to revolutionize banking technology and bring it to my beloved Latin America.  Thank you, Richard Shearer, for the trust you have placed in me.  Let's do this! hashtag#latinamerica  hashtag#technology  hashtag#banking  hashtag#fintech hashtag#regtech

3.    In a Twitter post published by Neumann on February 3, 2022, Neumann stated the following:

> I am delighted to announce that I have joined the Board of Directors of @tintraplc, where I will be focused on bringing Latin America into cutting-edge banking technology that bridges markets.  Here is the official announcement to the @LSEplc #Banking #LatinAmerica

4.    The representations that Tintra had "cutting-edge banking technology" and would or could "revolutionize banking technology" were false and/or misleading, because Tintra did not have such technology and would not and could not do so.

1

5.      On March 10, 2022, Neumann published a Twitter post, which linked to (and which included the headline of) an article by the press outlet Finextra titled "Tintra secures additional investment under $10 million funding round."  In turn, the Finextra article included the following statements:

> Tintra PLC has secured a subscription for an additional $250,000 investment under its current $10 million funding round, to help drive its next stage of strategic growth and advance its RegTech business unit.
>
> . . .
>
> A fast-growing Regulatory Technology company committed to revolutionising the global marketplace, Tintra is building emerging market focused banking infrastructure driven by patentable artificial intelligence that will enable institutions, EMI's, multi-nationals, Governments and large corporates in the emerging world gain level playing field access to global banking systems in a way that understands their geographic need.
>
> Tintra is utilising a number of Artificial Intelligence and Machine Learning internal and external experts in its development of advanced, end-to-end AI tech [some already patented] that will revolutionise how compliance between developed and emerging market economies works.
>
> Richard Shearer, CEO of Tintra PLC, confirmed: "I am extremely pleased to have on board this new partner and investor.  One that shares our artificial intelligence driven vision of revolutionising how emerging markets directly benefit from financial inclusion."

6.      Neumann's post constituted an endorsement and a republication of the Finextra article and that statement.

7.      The representations made in the Finextra article were false and/or misleading because Tintra had no substantive business and therefore (1) was not "building emerging market focused banking infrastructure" (let alone one that was "driven by patentable artificial intelligence"), (2) would not (and had no reasonable prospect to) "enable institutions, EMI's, multi-nationals, Governments and large corporates in the emerging world gain level playing field access to global banking systems in a way that understands their geographic need," and (3) was

2

not "utilising a number of Artificial Intelligence and Machine Learning internal and external experts in its development of advanced, end-to-end AI tech [some already patented]."

8.    In a LinkedIn post published by Neumann on March 9, 2022, which linked to (and included the headline of) an article at Fintech Financial News, Neumann stated, "Well done, Richard Shearer, Phil Derbyshire, and Stephany-Winnie Malcolm. Tintra [ ] keeps growing apace. Let's change the world of finance!    hashtag#regtech hashtag#fintech hashtag#banking hashtag#bankinginnovation."

9.    The Fintech Financial News article contained the same false and/or misleading representations as the Finextra article.

10.    That post constituted an endorsement and a republication of the Fintech Financial News article and those false and/or misleading representations.

11.    In a LinkedIn post published by Neumann on March 10, 2022, Neumann stated the following:

> Thank you, Finance Monthly for featuring me discussing how Tintra['s] . . . AI-first technology will make it the first global bank custom-built for Web 3.0 and level the playing field for entrepreneurs (particularly women) in emerging markets and maximize development, while reducing the risk of illicit financial flows. Richard Shearer Andrew Bowen Phil Derbyshire hashtag#artificialintelligence hashtag#integrity hashtag#bankinginnovation hashtag#development hashtag#emergingmarkets Asymmetrica

12.    That LinkedIn post was referencing a LinkedIn post by Tintra, which in turn included a hyperlink to (and republished) a Finance Monthly article published on March 10, 2022. The article contained an interview with Neumann, in which Neumann was reported to have made the following statements:

> You were recently appointed to the board of Tintra PLC. Why did you decide to join the company and how do you see your role developing?
>
> I decided to join the Tintra Board because I'm excited about its mission. I think it applies innovative technologies that remove bias, improve economic inclusion and

3

economic development which are all values that I have clearly stated and fought for during my career.  This is a bank that is building its systems from the ground up, rather than trying to impose new technology on a legacy system, with which there is friction.  Tintra's approach is completely innovative.  Its frictionless technology will increase the opportunity for entrepreneurs and economic development: both are things I care about.

How do I see my role developing? Hopefully, my credentials in financial integrity and my relationships with multinational organisations like the OECD, FATF, OAS, UNODC will be helpful to bring forth a productive dialogue between Tintra and those organisations.  I hope also to bridge nuanced and effective relationships between Tintra and the Western Hemisphere, particularly Latin America.

. . .

Do you believe that advanced technology and Is AI the key to overcoming compliance red tape?

Yes, I think so.  I think it will be fantastic.

. . .

AI properly built and applied is key to that.  I think that Tintra's approach is good because they are starting with that, rather than trying to backwards induce an AI system on an older legacy system.  This is something I think most banks are finding very challenging.  The way Tintra is building its framework ensures that its systems will not only be more efficient now but continue to innovate well into the future. Tintra will be the world's first bank purpose-built for Web 3.0.

13.    Those representations were false and/or misleading because Tintra (1) had no substantive technology (let alone AI technology), (2) was not building a bank (let alone "the first global bank custom-built for Web 3.0"), (3) did not "appl[y] innovative technologies that remove bias, improve economic inclusion and economic development," (4) was not "a bank that is building its systems from the ground up, rather than trying to impose new technology on a legacy system, with which there is friction," (5) was not "completely innovative," and (6) did not have "frictionless technology."

14.    In a Twitter post published by Neumann on March 10, 2022, Neumann reaffirmed the false and/or misleading representations made in the Finance Monthly interview, stating:

Thank you, @Finance_Monthly for featuring me discussing what it means to me to be NED of @tintraplc, as a woman in fintech and banking, and #TNT's AI-first approach will democratize finance in emerging markets.

15.    Because Tintra had no substantive business and thus no "AI-first approach" or an approach that would "democratize finance in emerging markets," that statement contained representations that were false and/or misleading.

16.    On March 10 and March 11, 2022, Neumann yet again reaffirmed the false and/or misleading representations from the Finance Monthly interview by (1) republishing a Twitter post by Tintra containing (along with an image of Neumann, smiling, with Tintra's logo prominently displayed) the following statement:

> @vanessaneumann, Independent NED of Tintra PLC, recently spoke to @Finance_Monthly about the challenge of bias & prejudice within the Western Financial System and why she thinks advanced #technology and #AI is key to overcoming red tape.  https://finance-monthly.com/2022/03/connecting-emerging-markets-former-venezuelan-ambassador-on-the-need-for-frictionless-financial-bridging-of-business/

and (2) publishing an Instagram post containing the following statement:

> It's a joy to join @dickie.shearer's @tintraplc team as an independent NED (non-executive director) and work at the forefront of banking technology that will open up so many opportunities for entrepreneurs in emerging markets while greatly reducing the risk of IFFs (illicit financial flows).  More prosperity for the brave and the good, with less risk and therefore lower costs.  We're building a socially and fiscally inclusive banking platform that exists in a space outside of geography, politics, and culture.  How could I not be super excited about this?
>
> . . .
>
> Read my interview in @financemonthly here:  . . . https://www.finance-monthly.com/2022/03/connecting-emerging-markets-former-venezuelan-ambassador-on-the-need-for-frictionless-financial-bridging-of-business/

17.    Those representations were false and/or misleading because Tintra was not "at the forefront of banking technology," as it had none, and was not "building a socially and fiscally

inclusive banking platform," as it was not building a banking platform or any substantive product or technology.

18.    On March 17, 2022, Neumann republished a Twitter post by Tintra containing (along with an image with the word "METAVERSE") the following statement:

> Tintra is on route to building the world's first built for purpose #Web3 #banking platform - expanding our already-extensive technological capabilities through the launch of the world's first #metaverse bank.

> For full details, see @LSEplc https://www.londonstockexchange.com/news-article/TNT/world-s-first-web-3-0-bank-to-power-metaverse/15371699

19.    That post included a link to Tintra's March 17, 2022 announcement which included the misrepresentations described in ¶¶ 3 and 4 of Schedule 1 above and republished and adopted those misrepresentations.

20.    The representations made in the March 17, 2022 post were false and/or misleading because Tintra, a company with no substantive business, was not "on route to building the world's first built for purpose #Web3 #banking platform."

21.    In a LinkedIn post published by Neumann on March 20, 2022, Neumann stated the following:

> Great to see more coverage of our plans to make Tintra PLC (where I'm board member and senior advisor) the first bank purpose built for hashtag#Web3 and the hashtag#metaverse.   CEO Richard Shearer dreams big and delivers. hashtag#bankingandfinance hashtag#bankinginnovation

22.    The post included a link to an article in "Finance Derivative" titled "RegTech firm, Tintra PLC, announces world's first Web 3.0 bank to power metaverse," which contained the following statements:

> Fast-growth RegTech business, Tintra PLC, has today provided further information on its route to building the world's first built for purpose Web 3.0 banking platform – expanding its already-extensive technological capabilities through the launch of the world's first metaverse bank.

6

Though many incumbent and legacy banks are currently opening lounges and branches in the metaverse via platforms like Decentraland, Tintra intends to create the first bank capable of functioning operationally within the digital realm of the metaverse.

Tintra's revolutionary "borderless" approach will introduce a financial and regulatory infrastructure built solidly upon Web 3.0 technologies and concepts, including metaverse and blockchain interoperability, transparency by utilising dataless cryptographic mechanisms, and blockchain-based verification.

While the Platform will develop over time, along with these Web 3.0 technologies and concepts, it is being built on a "clean-sheet" basis rather than bolting such elements on to legacy platforms. Tintra's infrastructure will be fully compliant with current regulation, apply artificial intelligence to enhance the KYC/AML framework but include in built latency parts that the Board believes will give the business a competitive edge as the world moves into a Web 3.0 environment.

. . .

This latest proposed expansion of Tintra's technological capabilities complement its existing investments in artificial intelligence ("AI") and machine learning. Building on its partnership with TMC2, Tintra is continuing to develop end-to-end AI-driven technologies, designed to allow emerging market financial institutions to access global banking systems.

The advanced technology the Group is developing, is set to revolutionise the regulatory environment and make access to the global marketplace as seamless in Africa, Latin America or Asia tomorrow as it is in Europe or the United States today.

Discussing the vision for Tintra to become the World's first metaverse enabled bank, Group CEO, Richard Shearer, said: ". . . Our approach will lay the path for new and inclusive ways for challenger banks to operate which can't necessarily be replicated by incumbent banks that remain dependent on legacy infrastructure.

We are building tomorrow's bank and then reverse engineering it back to fit today's regulatory and fiscal landscape as opposed to others who, in our view, are taking a more bottom-up approach. We are already pushing this process along rapidly and with a number of PhD level brains working on the problems in-house. I look forward to sharing a lot more in the coming months.

23.     The representations made in the March 20, 2022 LinkedIn post and the foregoing article to the effect that Tintra was a bank and intended to build the technology described in the article were false and/or misleading as Tintra was not a bank and had no intention of building the technology described therein. The representation in the LinkedIn post that Shearer was

"deliver[ing]" was false and/or misleading because Tintra was not engaging in any substantive business that could deliver substantive products or technologies.

24.    The representations in the LinkedIn post and the article were false and/or misleading because Tintra was a struggling company, with no product, technology, substantive business, or capability, was not conducting the business that the article described it to be, and was not undertaking the activities the article described it as undertaking.

25.    In a Twitter post published by Neumann on August 9, 2022, the day before Tintra submitted the final version of the Preliminary Application to GCF, Neumann stated the following:

> Interesting article by @tintraplc CEO Richard Shearer, who knows Asia well. Cross-border transactions that are faster & cheaper (with proper AML/KYC) are a development priority for @WhiteHouse @IMFNews @WorldBank @the_IDB, and of course, LatAm, too. #TNT

26.    Those representations were false and/or misleading because they implied that Tintra was supported by the White House and that Tintra had a bona fide association with the priorities of the U.S. Government and IMF, neither of which was true.

**Schedule 3**

**Materially False and/or Misleading Representations Made in the Presentation**

1.      The Presentation contained numerous materially false and/or misleading representations regarding Tintra and its business and products.  Those misrepresentations were made in the Presentation to falsely present Tintra as a credible business with real, substantive technology and a viable product.

2.      Beginning at page 5 of the Presentation, Tintra, Shearer, and Neumann stated the following:

> Operating as a fast-growth regulatory and financial Deep Tech company, we are building a clearing bank designed solely for emerging markets clients, the first we know to exist, with regulation at the forefront.
>
> We are applying for regulatory licenses to operate from the UK, Qatar, Puerto Rico, Singapore, Mauritius and other markets to form the platforms of Tintra's "Hubs" along with a number of other subsidiary licences.

3.      Those representations were false and/or misleading because Tintra was not growing, had no product, and had no discernable business, let alone a complex business that could be described as "Deep Tech."

4.      The representation that Tintra was "building a clearing bank designed solely for emerging markets clients" was false and/or misleading because at no time was Tintra authorized to conduct banking activities, nor would it have been authorized to conduct banking activities even if it had successfully carried out its business plan (which it did not because it had no discernible product or technology).

5.      At page 12 of the Presentation, Tintra, Shearer, and Neumann stated the following:

UNIQUE IN TECHNOLOGY

CORE BANKING

We take a view of total agnosticism in all aspects of our business. We do not want to innovate when someone else is doing a great job nor do we want to stick with what is known where we think innovation is necessary.

With this in mind our tech stack takes aspects of the old and layers it with our (very) new. Our core banking platform is provided by the world leading Temenos. They provide banking core to a vast array of big name financial institutions and after a year of exploration we decided that what they do is done better than we, or perhaps anyone can do. It is upon this highly regarded and over almost a year we have developed a strategy that will enable us to develop our revolutionary KYC/AML and Web 3.0 technologies to sit on top of it.

In adopting this established and effective infrastructure, we at Tintra are focusing our resources on the innovation that is needed within AML/KYC, resting assured that our core banking services are built for today and the future.

AI FOR KYC/AML

The driving point of differentiation in the tech stack is how it pertains to achieving our goal of always-on KYC. We do this by harnessing the power of Artificial Intelligence for which we have already filed 4 patents in the UK & the US. Protecting the way our payment processes work and how they are due diligenced gives us a material edge. This, as well as offering end-to-end AI technology that mitigates human intervention in KYC and AML to a large degree.

Harnessing machine learning (ML), the data obtained from our core banking services and global research programmes will inform ML algorithms. Through this, we are implementing an approach to money laundering that is preventative, where automated risk assessment processes at a KYC level reduce the need for manual intervention at a later stage. Our stated goal is that "Tintra's compliance goal is to establish financial innocence before the event rather than prosecute financial guilt after it'

This AI-first banking infrastructure is designed not just to meet but exceed current global anti-money laundering (AML) and know your customer (KYC) protocols, greatly reducing the risk of illicit financial flows (IFFs) through our own banking hubs and beyond.

6.    The representations that Tintra was "UNIQUE IN TECHNOLOGY" and had "CORE BANKING" were false and/or misleading because Tintra had no technology, let alone unique technology, and was not involved in banking (and had no banking technology) and thus could not have had anything reasonably described as "core" banking.

7.     The representation that Tintra's "core banking platform is provided by the world leading Temenos" was false and/or misleading because at that time Tintra did not have a core banking platform or any other product and was not operating or developing one using Temenos or any other back-end software developer.  Tintra and its directors were using references to Temenos to falsely bolster Tintra's credibility by associating it with a leading software provider.

8.     The representations that Tintra had "our tech stack" and possessed "differentiation in the tech stack" ("tech stack" being normally understood to be a combination of programming languages, frameworks, libraries, tools, and technologies that are used to develop and deploy a software application or system), and the description of the purported "tech stack," were false and/or misleading because Tintra had no substantive technology and thus could not have had a "tech stack."

9.     The representation that for "over almost a year we have developed a strategy that will enable us to develop our revolutionary KYC/AML and Web 3.0 technologies to sit on top of it" was false and/or misleading as Tintra was not developing such "revolutionary . . . technologies," nor did it have a strategy that would "enable [Tintra] to develop" such "revolutionary . . . technologies."  That representation was also false and/or misleading because Tintra did not have (1) any "revolutionary" technologies that it could develop further or (2) a "tech stack" "on top of" which any such technologies could "sit."

10.     The representation that Tintra's "tech stack" had a "driving point of differentiation" was false and/or misleading for the reasons described above.

11.     The representation "We do this by harnessing the power of Artificial Intelligence for which we have already filed 4 patents in the UK & the US.  Protecting the way our payment processes work and how they are due diligenced gives us a material edge.  This, as well as offering

3

end-to-end AI technology that mitigates human intervention in KYC and AML to a large degree" was false and/or misleading because Tintra was not "harnessing the power of artificial intelligence," had no "payment processes," had no "material edge" as it had no substantive business, was not "offering" any product to customers (as it had no substantive technology or product) (and was not "offering end-to-end AI technology"), and had no technology that "mitigate[d] human intervention in KYC and AML to a large degree" (as it had no substantive technology or product).

12.     The representation "Harnessing machine learning (ML), the data obtained from our core banking services and global research programmes will inform ML algorithms" was false and/or misleading as Tintra did not engage in machine learning, had no "data" to "inform" machine learning algorithms, and was not engaged in banking service and thus could not have "obtained" "data" as represented.

13.     The representation "we are implementing an approach to money laundering that is preventative, where automated risk assessment processes at a KYC level reduce the need for manual intervention at a later stage" was false and/or misleading because Tintra was not "implementing" any substantive technology let alone "automated risk assessment processes."

14.     The representation "This AI-first banking infrastructure is designed not just to meet but exceed current global anti-money laundering (AML) and know your customer (KYC) protocols, greatly reducing the risk of illicit financial flows (IFFs) through our own banking hubs and beyond" was false and/or misleading because Tintra had no banking infrastructure.

15.     On page 65 of the Presentation, Tintra, Shearer and Neumann stated the following:

DEFINING THE SOLUTION

Seizing this opportunity, we are building a banking infrastructure that acts as an interface between emerging markets and Europe and the United States, using patented KYC/AML technology to recognise the compliance risk in a distinctive

4

way.  The key is the development of cultural API with full licences, where we control the entire stack, from tech through to custody and even clearing.

16.    Those representations were false and/or misleading because Tintra had no substantive banking infrastructure, was not developing any banking infrastructure, and had no tech "stack."

17.    On page 67 of the Presentation, Tintra, Shearer and Neumann provided further specificity in making their false and/or misleading portrayal of Tinta, stating:

HOW TINTRA WILL BE PRESENT IN EACH HUB

We are building a core banking operations hub in each of Qatar, Puerto Rico, Singapore, and the UK, fully serviced by key compliance, operations, finance, customer management, HR, and IT roles that you would expect in such a hub.  We will operate in these by taking Deposits in the same way a Traditional Bank would, with the integral deployment of high end, smart technology as a 'tech stack.' From those Hubs, we will provide the clearing bank interfaces and full service of money transfer capabilities for businesses in those jurisdictions to be able to bank safely, efficiently, fairly, and securely.

18.    The representation that "[w]e are building a core banking operations hub in each of Qatar, Puerto Rico, Singapore, and the UK, fully serviced by key compliance, operations, finance, customer management, HR, and IT roles that you would expect in such a hub" was false and/or misleading because Tintra was not building, never built, and had no intention or ability to ever build core banking operations in any such jurisdiction, nor did its employee roster ever include any employees located in the far-flung global outposts it purported to operate.

19.    The representation that Tintra "will operate in these [markets] by taking Deposits in the same way a Traditional Bank would, with the integral deployment of high end, smart technology as a 'tech stack'" was false and/or misleading because Tintra never had the capability to take deposits or otherwise operate as a bank (and did not have a "tech stack"), and because it did not disclose that Tintra had no realistic prospect of ever operating as a bank.

20.     On page 69 of the Presentation, an excerpt of which is below, Tintra, Shearer, and Neumann went even further, referring to "Tintra Bank" (a phrase they used in combination with Manager Defendants), as having "[o]pen [b]anking [i]nfrastructure to provide a global platform unlocking emerging market value."   Those characterizations were false and/or misleading representations because Tintra never was, nor could it ever become, a bank, and Tintra did not have an open banking infrastructure (because it had no substantive technology, product, or even business).



21.     On page 70 of the Presentation, Tintra, Shearer, and Neumann expounded further on the lie that Tintra was to be a bank by including the following diagram:



22.     The heading "CORE BANKING" in the diagram was false and/or misleading as described above.

23.     The representation that Tintra was "implementing a state-of-the-art, industry leading core bank system platform" was false and/or misleading because Tintra had no core bank system platform and was not developing any such platform.

24.     The representation that Tintra provided or would provide banking services to "our global network" was false and/or misleading as Tintra had no "global network" of any relevant kind.

25.     On page 77 of the Presentation, Tintra, Shearer, and Neumann portrayed Tintra as providing "BANKING AS A SERVICE" with the capability to provide "full clearing bank open services to our customers and partners."  An extract of page 77 of the Presentation is below:



26.    The representations that Tintra "provides full clearing bank open services to our customers and partners" and that "[w]e drive 4 main services for enterprise clients" immediately above columns titled "CROSS BORDER REMITTANCE," "MERCHANT ACQUIRING & ISSUING," "MULTI CURRENCY BANK ACCOUNTS," and "TREASURY MANAGEMENT," were false and/or misleading because Tintra never had a product or service to offer to customers, never had any bona fide customers, and was not developing any such product or service. Further, the representations describing Tintra's revenue, income, and profitability flows and sources derived from "customers and partners" and "full clearing bank open services" were false and/or misleading for the same reasons.

8

27.    On page 84 of the Presentation, Tintra, Shearer, and Neumann portrayed:



# NEXT STEPS

*With the past 12 months acting as an indicator for Tintra, our journey is just beginning, and we expect the next 12 months to bring even greater success. The below summarises that which we have already achieved, and what our next steps entail.*

| Banking Application | Regulatory Body | Status |
| --- | --- | --- |
| UK Small Bank Licence | Prudential Regulatory Authority | Applied |
| UK EMI Authorisation | UK Financial Conduct Authority | Applied |
| Qatar Full Bank Licence | Qatar Financial Centre Regulatory Authority | Awarded |
| Puerto Rico Full Bank Licence | Office of the Commissioner of Financial Institutions | Applied |
| Singapore – licence type tbc | Monetary of Singapore | |
| Mauritius Digital Licence | Financial Services Commission | Awarded |
| Rwanda Bank Licence | Kigali International Finance Centre | In discussion |

| Opening of Offices | Status |
| --- | --- |
| London | Opened |
| Qatar | October 2022 |
| Puerto Rico | February 2023 |
| Singapore | November 2022 |

| Patents | Status |
| --- | --- |
| 1-4 | Applied and Pending |
| 5-10 | Anticipated Q4 2022 |
| 11+ | During 2023 |

28.    Upon information and belief, the representation that Tintra had "Applied" for a "Puerto Rico Full Bank Licence" was false and/or misleading, because Tintra had not applied for such a license in Puerto Rico.

29.    Upon information and belief, the representation that Tintra was involved in seven "Banking Application[s]" in six jurisdictions was false and/or misleading because, as described elsewhere, (1) Tintra had made only one banking license application (in the UK, which application had no reasonable prospect of success) and (2) Tintra never applied for any other banking licenses.

30.    The representation that Tintra was "[o]pening" three additional offices was false and/or misleading.  Tintra was based in London, and its London office was and would be the only office it ever had.  Tintra had no financial resources to open multiple offices and never had any offices other than its London office.

31.    On page 117 of the Presentation, Tintra, Shearer, and Neumann portrayed Tintra's status as a bank, as follows:





# REGULATORY & ONGOING CAPITAL ADEQUACY

Tintra Plc follows the UK Prudential Regulatory Authority's ('PRA') principles on Capital Requirements, including Tier 1 and Tier 2 capital, which has been considered. As we have stated elsewhere we are passionate about building a regulation-first business so our capital adequacy benchmarks are as important to us as our more vocally stated philosophy on KYC/AML.

As a firm that is publicly listed on sections of both the London and New Stock Exchanges, we have inherent diversity of funding and capital, allowing us to raise money both privately and publicly. We maintain a prudent funding profile with sufficient access to an appropriate diversity of funding sources which are highly likely to continue to be sufficient and available at a reasonable cost in a variety of normal and stressed market conditions.

An Internal Liquidity Adequacy Assessment Process (ILAAP), on an individual and consolidated basis with the appropriate supervisory measures, is in place to identify, measure, manage and monitor liquidity and funding risks across different time horizons and stress scenarios, consistent with the risk appetite established by Tintra's management and Board.

In addition, the segregation of client money from Tintra's own balance funds is an important safeguard for the protection of our customers, and our balance sheet liquidity management. Upon receiving client money, it is deposited in a client bank account, which meets the definitions required by the PRA, and is promptly paid out of that account (save for minimum sums required to open the account or to keep it open).

Foreign exchange risk strategies are in place to reduce or prevent losses from unexpected events within the FX market, deploying short-term and forward hedging strategies that are commonplace in established businesses exposed to currency risk.

**117** / REGULATORY STRATEGY

32.    The representation that "Tintra Plc follows the UK Prudential Regulatory Authority's ('PRA') principles on Capital Requirements, including Tier 1 and Tier 2 capital" was false and/or misleading because, upon information and belief, at no time did Tintra make any

attempt to follow such a regulatory requirement, and at no time did Tintra have capital sufficient to meet that requirement.

33.    Pages 28 to 42 of the Presentation include a section authored by Neumann, titled "Our Philosophy."

34.    That section was included in the presentation to build the purported reputation and legitimacy of Tintra.  Neumann's section of the Presentation included the following statements:

OUR PHILOSOPHY (p. 28)

. . .

Authored by Tintra Board Member

Dr Vanessa Neumann PhD (p. 28)

. . .

*Tintra will enable fully borderless financial inclusivity, measured through behaviour, rather than by background, race, religion, or passport.  This will be achieved through a global in-house banking infrastructure that enables seamless geographical financial transactions.  Regulated by patented, predictive, always-on, verifiably above-regulation, KYC/AML platform.  We are building what is set to be the world's first truly Web 3.0 bank.  We Are Tintra.  (p. 29)*

. . .

Ultimately, our approach to the application of artificial intelligence (AI) to compliance is to dehumanize KYC/AML.  In short, we are using our background as a cultural API, putting regulation on top of it, and then putting revolutionary tech on top of that.  In this way, we control not just the tech stack, but the whole commercial stack, as well.  We will solve the problem inherent in a neo-colonial approach.  (p. 32)

. . .

Tintra's aim is to revolutionise banking by creating AI-led infrastructure that bridges all borders, without prejudice.  We are building the world's first bank custom-built for Web 3.0 and the Metaverse.  (p. 36)

. . .

Tintra will be the world's first financial institution that combines both a global network of banking licences with an artificial intelligence system that is specifically

engineered to radically improve both compliance accuracy and economic inclusion and development. These are the twin goals of every single international organization: the United Nations, International Monetary Fund, the World Bank, the Organization for Economic Cooperation and Development (OECD), and the Financial Action Task Force (FATF). (p. 36)

. . .

Furthermore, our technology is custom-built not only to continually input regulatory changes, but also changes in customer behaviours that virtually eliminate customer compliance risk. Tintra's approach of building an AI-driven compliance system from the ground up also obviates the problems of biased AI datasets, which fail to catch illicit financial flows, while producing a 90 per cent rate of false positives. (p. 39)

. . .

To increase accuracy in preventing illicit financial flows (IFFs), while facilitating licit and desirable financial flows transparently and smoothly, the financial sector needs better regulatory technology, an information technology that enhances regulatory and compliance processes. We are doing this by building a better regulatory technology (RegTech) framework from the ground up, with cutting-edge and patentable artificial intelligence (AI) that is custom built to improve frictionless compliance today, while also remaining at the forefront of evolving financial technology well into the future, including for Web 3.0. (p. 39)

. . .

Our AI system is designed to start with the underserved emerging markets, basing its datasets on the actual people it seeks to serve. According to Feenberg's Critical Theory of Technology, this should greatly increase AML and KYC accuracy, thereby radically mitigating risk over current protocols. By identifying people more correctly, it will mitigate both the risk of onboarding a 'bad' person and the risk of having a 'good' person go 'off radar' to more opaque financial mechanisms. Our proprietary technology will also increase social and economic inclusion, and prosperity, in line with the objectives set out by the G20, UN SDGs, and the FSB. (p. 39)

35.    Those statements contained the following representations that were false and/or

misleading (because Tintra had no substantive technology (and no proprietary or AI technology),

was not developing such technology, had no product, and had no discernable business):

(a)    "Tintra will enable fully borderless financial inclusivity . . . achieved through a global in-house banking infrastructure . . . [r]egulated by patented, predictive,

always-on, verifiably above-regulation, KYC/AML platform.  We are building what is set to be the world's first truly Web 3.0 bank," (p. 29)

(b)    "[O]ur approach to the application of artificial intelligence (AI) to compliance is to dehumanize KYC/AML," (p. 32)

(c)    "[W]e control not just the tech stack, but the whole commercial stack," (p. 32)

(d)    "Tintra's aim is to revolutionise banking by creating AI-led infrastructure," (p. 36)

(e)    "Tintra will be the world's first financial institution that combines both a global network of banking licences with an artificial intelligence system that is specifically engineered to radically improve both compliance accuracy and economic inclusion and development," (p. 36)

(f)    "[O]ur technology is custom-built," (p. 39)

(g)    "Tintra's approach of building an AI-driven compliance system from the ground up also obviates the problems of biased AI datasets," (p. 39)

(h)    "We are doing this by building a better regulatory technology (RegTech) framework from the ground up, with cutting-edge and patentable artificial intelligence (AI) that is custom built to improve frictionless compliance today," (p. 39)

(i)    "Our AI system is designed to start with the underserved emerging markets, basing its datasets on the actual people it seeks to serve," (p. 39) and

(j)    "Our proprietary technology will also increase social and economic inclusion." (p. 39)

36.    Pages 228 to 232 of the Presentation included a section authored by Tintra's director Lyske, titled "Patent Strategy."

37.    That section was included in the Presentation to bolster the intellectual property positioning of Tintra.  That section of the Presentation included the following statements:

PATENT STRATEGY

Evident throughout the previous sections, at its core, Tintra is a tech company, innovating through bleeding edge techniques in artificial intelligence, utilising Web 3.0 sociological standards to drive home a new proposition for its customers.  This tech heavy focus leads directly to the question of intellectual property and protection, both from an active and defensive viewpoint.  Here we outline our calculated patent strategy, which is being executed with both speed and precision.

13

Authored by Joe Lyske, PhD (p. 228)

. . .

SUMMARY

As we have detailed throughout this book, our vision is clear and our work is unrivalled.  The patent strategy outlined here cements this, and our position as a market leader in the Financial and Regulatory Tech sphere.  With our commercial viability strong, our innovative inventions are stronger and we have a precise plan to protect this.  (p. 232)

38.     The representations that "Tintra [was] a tech company, innovating through bleeding edge techniques in artificial intelligence, utilising Web 3.0 sociological standards to drive home a new proposition for its customers" and "[Tintra's] commercial viability [was] strong" were false and/or misleading because Tintra had no substantive technology (and no proprietary or AI technology), was not developing such technology, had no product, and had no discernable business.