# EXHIBIT A

IN THE HIGH COURT OF JUSTICE                                                Claim No.
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
LONDON CIRCUIT COMMERCIAL COURT (KBD)
BETWEEN

(1) **CRAIG COGUT**
(2) **DEBORAH COGUT**
(3) **COGUT FAMILY PARTNERSHIP VII**
(a general partnership established under the laws of the United States of America )

**Claimants**

-and-

(1) **TINTRA Limited (formerly TINTRA Plc)**
(2) **RICHARD ALEXANDER SHEARER**

**Defendants**

---

**PARTICULARS OF CLAIM**

---

### A.    SUMMARY OF CLAIM

1.  The Claimants (a husband and wife and their family investment vehicle) claim, in contract, for the Defendants' failure to pay all or any of the sums advanced under an agreement entered into between the Claimants and each of the Defendants on or around 23 May 2023 (the '**Loan Agreement**'). On 15 July 2023, the principal sum of US$1,200,000 was due to be repaid, together with interest. In flagrant breach of the Loan Agreement, the Defendants have failed to make any repayment at all, despite repeated demands and numerous promises by the Second Defendant, that payment was forthcoming. Those unpaid sums under the Loan Agreement are due and owing to the Claimants in debt, alternatively, as damages for breach of contract. Alternatively, the First Defendant has been unjustly enriched by virtue of the monies paid into its account, and the Claimants are entitled to the restitution of those sums from the First Defendant.

1

B.     THE PARTIES

2.     The First and Second Claimants are natural persons. They are husband and wife and each act as partners in the Third Claimant.

3.     The Third Claimant, Cogut Family Partnership VII ('**CFP VII**') is a general partnership formed under the laws of the United States of America with its registered address at 750 East Main Street, Suite 600 Stamford, Connecticut 06902, United States of America. CFP VII serves as an investment vehicle for the First and Second Claimants, and their family.

4.     The First Defendant, Tintra Limited ('**Tintra**') is a private limited company incorporated under the laws of England and Wales on 12 June 2002 (under its former name 'Flatsell Limited'). Further:

   (1)   Tintra's registered address is 2nd Floor Berkeley Square House, Berkeley Square, London, United Kingdom, W1J 6BD.

   (2)   Tintra's principal business is to provide banking and other financial services with a focus on emerging market economies and cross-border monetary transfers.

   (3)   Between 11 November 2004 and 19 May 2006, Tintra held the name 'The Weather Lottery Limited'. On 19 May 2006, it was re-registered as a public company (under the name 'The Weather Lottery Plc'). Tintra was thereafter listed on the London Alternative Investment Market ('**AIM**'). Between 11 October 2013 and 18 January 2024, it has variously held the names, 'Boxhill Technologies Plc', 'St James House Plc' and 'Tintra Plc'.

   (4)   On or around 8 January 2024, Tintra's shares were cancelled from trading on AIM. On 18 January 2024, it ceased to be a public company and was re-registered as a private limited company (under its current name).

5.     The Second Defendant ('**Mr. Shearer**') is a natural person understood to be ordinarily resident in the United Kingdom and/or the United Arab Emirates. Mr. Shearer is, and was at all material times, the Chief Executive Officer and a director of Tintra.

C.    **FACTUAL MATRIX RELEVANT TO THE CLAIM**

6.    David Cogut ('**DC**') is the son of the First and Second Claimants and a shareholder in Tintra and was, at all material times, authorised to act on behalf of the Claimants. In or around October 2021, DC was introduced to Mr. Shearer through a mutual business contact, and DC and Mr. Shearer subsequently met for lunch in London. In a telephone call following that meeting, DC and Mr. Shearer discussed the prospect of the Claimants and DC investing in Tintra.

7.    In March 2022, each of the First and Second Claimants, and DC (directly or indirectly) subscribed to shares in Tintra, in which they remain shareholders to date.

8.    In or around December 2022, Tintra completed a placement to Fintech Leaders Fund LLC ('**FLF**'), a US-based institutional investor, pursuant to a share placement deed (the '**Share Placement Deed**') through which Tintra would raise from FLF, an initial sum of US$3,000,000 with a further option of raising an additional US$2,000,000. On 16 December 2022, the completion was announced on the London Stock Exchange.

9.    In or around April 2023, in a telephone call that took place between Mr. Shearer and DC:

  (1)    Mr. Shearer told DC that:

    (a)    FLF had raised concerns about the recovery of the sums it had invested in Tintra.

    (b)    As a result of FLF's concerns, Tintra needed funds to prove its ability to return FLF's investments; and

    (c)    In or around January 2023, the family office of a Gulf-based investor had invested US$10,000,000 in Tintra, but, because of restrictions placed on the use of these funds, they could not be allocated towards any payments to FLF; (in fact, this was false in that this investment had "*no conditionality*", as subsequently recorded in Tintra's audited annual report for the year 31 January 2023 filed with Companies House on 23 October 2023).

  (2)    Following the above statements, Mr. Shearer then asked DC whether he knew of any sources through which Mr. Shearer could obtain such funds.

3

10. On 5 May 2023, Tintra announced that it had been in discussions with FLF to bring the Share Placement Deed to an end, and that FLF had issued Tintra with two statutory demands for a total amount of £2,936,433.27, inclusive of interest.

11. On or around 23 May 2023, Mr. Shearer spoke with DC via telephone call. In that call:

    (1) Mr. Shearer repeated the difficulties that Tintra was facing at that time.

    (2) Mr. Shearer explained that he had considered approaching "*hedge funds*" for the monies that Tintra needed but then asked DC whether the Claimants would directly advance funds totalling US$2,500,000 instead.

    (3) Mr. Shearer stated that Tintra was in the process of entering into a settlement with FLF for the repayment of the funds provided under the Share Placement Deed.

    (4) Mr. Shearer explained that the sum of US$2,500,000 was needed as some form of security to show to FLF, Tintra's ability to settle in cash, but that that sum would not, in reality, be put towards any payments.

    (5) Mr. Shearer assured DC that the requested sum would be wired directly to Tintra/Mr. Shearer's lawyers, DLA Piper (UK) LLP ('**DLA**'), and held there to the order of the Claimants.

    (6) Mr. Shearer said that, at that time, Tintra was also in the process of finalising a transaction with an Abu-Dhabi based group, the 'Lootah' group, for an investment of approximately US$25,000,000 (the '**Lootah Transaction**'), which was due to close on 15 July 2023 and following which the sum advanced by the Claimants would be returned.

    (7) For those reasons as set out in paragraphs 11(5) through 11(6) above, Mr. Shearer represented that there was "*no risk*" to the Claimants in loaning the funds to Tintra.

12. On or around 25 May 2023, a further conversation took place by telephone between Mr. Shearer and DC. In that call, Mr. Shearer stated that:

4

  (1) Contrary to his previous discussion with DC, he had been informed by DLA that the Claimants could not transfer sums directly to DLA to be held in a client account because the Claimants were not clients of DLA.

  (2) Instead, sums would have to be transferred to Tintra, and those sums would then be transferred to DLA immediately upon receipt by Tintra.

13. In or around May 2023, in advance of entering into the Loan Agreement, the First Claimant spoke with Mr. Robert McKie ('**Mr. McKie**') of DLA in telephone calls on at least two separate occasions. In those calls, Mr. McKie *inter alia* confirmed to the First Claimant that Tintra, his client, needed to borrow funds from the Claimants for the reasons set out above in paragraph 11(4).

### D. THE LOAN AGREEMENT

14. On or around 25 May 2023, the parties entered into the Loan Agreement pursuant to which the Claimants would advance a sum of US$2,500,000 to the Defendants (thereafter varied by further oral agreement, to a sum of US$1,200,000 as pleaded in paragraph 16 below). The terms of the Loan Agreement were agreed verbally by DC (acting on behalf of all three Claimants) and Mr. Shearer (acting in his personal capacity and on behalf of Tintra) and evidenced (in part) in written correspondence between the parties (as pleaded below in paragraphs 15 to 17). The terms of the Loan Agreement were as follows:

  (1) The Claimants would advance the sum to the Defendants.

  (2) The sum would be paid into Tintra's bank account and then transferred to a DLA client account, where it would be held to the Claimants' order and would not be released without the express approval of the Claimants.

  (3) The sum, plus interest, would be repaid on the earlier date of (i) 15 July 2023 or (ii) the closing date of the Lootah Transaction (the '**Repayment Date**').

  (4) An interest rate of 12% would accrue over the approximately six-week repayment period, equivalent to a monthly interest rate of 8% (which would continue to accrue to any unpaid sums due after the Repayment Date).

5

    (5)        The Defendants were to be jointly liable for the repayment of the debt, to be repaid in accordance with sub-paragraph (3) above.

15.      On 30 May 2023, DC acting on behalf of the Claimants, Mr. Shearer acting on behalf of the Defendants, and Mr. McKie of DLA exchanged correspondence that recorded and/or reflected, in part, the terms of the Loan Agreement. In particular, the following correspondence was exchanged:

    (1)        At 12:40 pm, Mr. Shearer wrote to Mr. McKie of DLA (with the First Claimant and DC in copy) (**Exhibit-1**), stating that:

> *"I write further to the various communications on the funds getting placed held to order in your client account related to the Bergen/FLF matter. There are more funds coming over from Tintra plc in multiple payments over the next few days.*
>
> *Related to that and for the purposes of clarity could you please confirm;*
>
> 1) *the funds will be held to our order and will not be released without prior approval*
>
> 2) *that funds can be recalled at any time until a settlement agreement is signed - it isn't the intention to do this to be clear but if you can confirm that this is the case.*
>
> 3) *that a payment cannot be released post any settlement until approval is given.*
>
> *The approval in this instance will come from me but only once I have received in writing agreement from David Cogut, as shareholder, to do so – who I have copied here for completeness – and that you will confirm such agreement has been received before taking any instructions."*

    (2)        At 12:42 pm, Mr. McKie responded to Mr Shearer confirming the contents of the above email (**Exhibit-1**).

    (3)        Thereafter, at 1:56 pm, Mr. Shearer wrote to the First Claimant and DC (**Exhibit-1**), stating:

> *"Please see below the confirmation from DLA related to the funds of $2.5m held to your order with me as your proxy.*
>
> *I wanted to write separately with confirmation points on the terms of the agreement between us in both my personal capacity and in my capacity as CEO of Tintra plc*

> 1) I will forward funds received to Tintra plc immediately they are received to DLA's Client Account and confirm the same in writing once they are received.
>
> 2) I will not give any instructions to DLA Piper without your written consent
>
> 3) I will execute on your instructions to me in a timely manner
>
> 4) The funds will be recalled regardless of outcome on July 15th unless we mutually agree to an alternative
>
> 5) During the period the funds are held, if funds come in from other shareholders I will inform you and we will arrange for funds to be partially returned.
>
> 6) The funds will be returned with a coupon of 12% paid after 15th July."

16. On 1 June 2023, at a meeting in person, Mr. Shearer informed DC that he now only required a sum of US$1,200,000 as he had found other sources to raise the balance. Accordingly, on the same day, the parties, by way of further oral agreement, varied the terms of the Loan Agreement such that the Claimants would now advance a sum of US$1,200,000 to the Defendants (the '**Principal Sum**'). The other terms of the Loan Agreement continued to operate and remain effective.

17. By email dated 2 June 2023 from Mr. Shearer to DC, Mr. Shearer confirmed *inter alia* that "*the funds will be sent directly to DLA as they hit*"; that the "*[r]eturn of funds is 15th July or as soon as Lootah close. Whichever is the sooner*" and that he would not "*agree to settle without your prior agreement and/or funds being returned*" (**Exhibit-2**).

E.   **THE CLAIMANTS' PERFORMANCE OF THE LOAN AGREEMENT**

18. In June 2023, in performance of the Loan Agreement, the Claimants transferred the Principal Sum of US$1,200,000 to Tintra in the following instalments:

    (1)   On 5 June 2023, the First and Second Claimants transferred a sum of US$600,000 from their jointly held Citibank account to Tintra's Lloyds bank account (**Exhibit-3**).

    (2)   On 9 June 2023, CFP VII transferred the remaining sum of US$600,000 from its Citibank Account to Tintra's Lloyds bank account (**Exhibit-4**).

7

F.   **THE DEFENDANTS' BREACH OF THE LOAN AGREEMENT**

19.   In breach of the terms of the Loan Agreement, Tintra and/or Mr. Shearer failed to pay the Principal Sum, or any sum at all by 15 July 2023.

20.   As at the date of issue of this claim, the Claimants have made repeated requests and/or demands for payment of the sums owing from the Defendants under the Loan Agreement. On each and every occasion, the Defendants have admitted (or alternatively, have not denied) their liability in respect of the sums owed. In particular:

(1)   On 1 November 2023, DC requested that the Claimants' accountants, LH Frishkoff & Company ('**LHF**'), send "*wiring instructions*" to Mr. Shearer for the repayment of the sums lent to the Defendants (**Exhibit-5**). On the same day, LHF sent Mr. Shearer the banking information "*in which the funds should be wired to*" (**Exhibit-5**).

(2)   On 20 November 2023, LHF sought to follow up on the funds and requested an estimated date of transfer (**Exhibit-5**). On 21 November 2023, Mr. Shearer responded to LHF stating that "*you should have had it I'll come back to you during the day*" (**Exhibit-5**).

(3)   On 9 January 2024, LHF once again wrote to Mr. Shearer in respect of the payment, noting that "*[t]he funds are not showing up on our end…*" (**Exhibit-6**). On 12 January 2024, Mr. Shearer responded stating that "*[t]he funds have now been released from our side. I think not a false start this time! We're just waiting on remittance advice to show value date, which will be today or Monday*" (**Exhibit-6**).

(4)   On 15 January 2024 and 29 January 2024, LHF made further requests for payment, noting that the funds had not yet been transferred (**Exhibit-6**). On 30 January 2024, Mr. Shearer responded saying that "*…we are hopeful that we are at the end of the process now and I hope to come back to you on Tuesday or Wednesday.*" (**Exhibit-6**).

(5)   On 12 February 2024, in response to a request by LHF for the SWIFT confirmation in connection to the funds that had allegedly been transferred to the Claimants, Mr. Shearer stated that "*I just chased my colleague for it and will fwd shortly*" (**Exhibit-7**).

(6)   On 2 April 2024, in response to a further request by LHF for the SWIFT confirmation, Mr. Shearer stated that "*[t]o the point at hand payment has been instructed from our

*recently reactivated account…I expect to be reverting soon and indeed for you to be in funds.*" (**Exhibit-8**).

(7) On 5 April 2024, LHF sought another update from Mr. Shearer as to the transfer of the funds, to which Mr. Shearer responded on 8 April 2024 that Tintra had "*engaged a funding partner to provide a bridge to settle this…*" (**Exhibit-8**).

(8) On 17 April 2024, in compliance with obligations under the Practice Direction - Pre-Action Conduct and Protocols, Claimants' solicitors wrote to Mr. Shearer and Tintra by letter seeking *inter alia* repayment of the sums owed (**Exhibit-9**). On 19 April 2024, in response by email, Mr. Shearer confirmed *inter alia* that "*it is absolutely the intention to repay the principal and all the agreed amounts to your Client. There have indeed been a number of missed deadlines in this matter, however these have been missed through a lack of ability rather than lack of desire to*" and "*the issue is fully acknowledged. It is expected, indeed will, be resolved as soon as the bridge loan is drawn and in full way before the second payment date you.*" (**Exhibit-10**).

21. Despite repeated demands by the Claimants and notwithstanding that the Defendants have admitted their liability, in breach of the terms of the Loan Agreement, the Defendants have failed to pay all or any part of the Principal Sum owed to the Claimants.

22. As at the date of this claim, the Claimants are entitled to, and claim the Principal Sum of US$1,200,000 plus contractual interest (at a rate of 12% in respect of the repayment period and thereafter, at a monthly rate of 8%) in debt, alternatively as damages for breach of contract.

G. **INTEREST**

23. Pursuant to the terms of the Loan Agreement, the Claimants claim contractual interest on the Principal Sum outstanding at a rate of 12% up to and including the Repayment Date, and at a monthly rate of 8% from 16 July 2023 until judgment; alternatively, the Claimants are entitled to and claim interest pursuant to section 35A of the Senior Courts Act 1981 at such a rate and for such a period as the Court thinks fit.

H. **UNJUST ENRICHMENT**

24. In the alternative and without prejudice to the claim in debt and/or for breach of contract set out above and without prejudice to the Claimants' position that the Loan Agreement is a valid

9

and enforceable agreement, insofar as the Defendants allege that the Loan Agreement is unenforceable and/or invalid, Tintra has been unjustly enriched at the expense of the Claimants and the Claimants are entitled to an order for restitution.

25. Pursuant to the terms of the Loan Agreement, and as set out at paragraph 18 above, the Claimants paid and Tintra received the following sums:

    (1) Tintra received from the First and Second Claimants, the sum of US$600,000 on or around 5 June 2023.

    (2) Tintra received from the Third Claimant, the sum of US$600,000 on or around 9 June 2023.

26. By reason of the Defendants' non-payment of the sums due under the Loan Agreement, the consideration for the Principal Sum paid by the Claimants to the Defendants has wholly failed.

27. In the circumstances, Tintra is liable to repay the entirety of the Principal Sum advanced under the Loan Agreement.

**AND THE CLAIMANTS CLAIM:**

(1) The sum of US$1,200,000 in debt or alternatively, as damages for breach of contract against the Claimants;

(2) Alternatively, restitution in the sum of US$1,200,000.

(3) Interest in respect of the Loan Agreement as follows:

    (a) In the sum of US$144,000 from 9 June 2023 up to and including 15 July 2023; and

    (b) In the sum of US$985,249 from 16 July 2023 up to and including 23 May 2024 and continuing to accrue at a daily rate of approximately 0.27% until judgment.

    (c) Alternatively interest at such a rate and for such period as the Court thinks fit pursuant to section 35A of the Senior Courts Act 1981.

(4)  Interest on the sum of restitution of US$1,200,000 under section 35A of the Senior Courts Act 1981, at such rate and for such period as the court thinks fit;

(5)  Further or other relief; and

(6)  Costs

**CHARLOTTE EBORALL**
**CHINMAYI SHARMA**

**23 May 2024**

11

**STATEMENT OF TRUTH**

The First Claimant believes that the facts stated in this Particulars of Claim are true. The First Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Full name......CRAIG COGUT...............   Position or office held......INDIVIDUAL......

Signed..................................

The Second Claimant believes that the facts stated in this Particulars of Claim are true. The Second Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Full name......DEBORAH COGUT...............   Position or office held......INDIVIDUAL......

Signed..................................

The Third Claimant believes that the facts stated in this Particulars of Claim are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Full name......CRAIG COGUT...............   Position or office held......PARTNER......

Signed..................................