# EXHIBIT H



~~Claim No. LM-2024-000134~~

IN THE HIGH COURT OF JUSTICE                    **Claim No. LM-2024-000134**

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

LONDON CIRCUIT COMMERCIAL COURT ((KBD)

BETWEEN

(1)  CRAIG COGUT

(2)  DEBORAH COGUT

(3)  COGUT FAMILY PARTNERSHIP VII

(a general partnership established under the laws of the

United States of America)

**Claimants**

-and-

(1) TINTRA Limited (formerly Tintra PLC)

(2)  RICHARD ALEXANDER SHEARER

**Defendants**

---

**AMENDED DEFENCE OF SECOND DEFENDANT**

**Pursuant to Practice Direction Part 17**



A. SUMMARY OF DEFENCE

1. The Second Defendant ("the Second Defendant") was at all relevant times Chief Executive Officer ("CEO") of the First Defendant (the "First Defendant" or "Tintra"). The Second Defendant's involvement in and connection with this matter was conducted entirely in the Second Defendant's capacity as CEO of the First Defendant. The Claimants, particularly the First Defendant and his son, David Cogut, became close associates and perhaps friends with the Second Defendant going so far as to travel together to meetings with Government representatives around the world as recently as ~~three~~ four months ago in the Middle East. The Claimants at all times dealt with the First Defendant, with the Second Defendant only acting as a representative of the First Defendant.

    The claim is made out on three grounds:

    a) Debt for sums had ~~been~~and received ~~and~~ which remain due and owing, ~~alternatively~~

    b) Alternatively, damages for breach of contract

    c) Alternatively, unjust enrichment of the First defendant only.

2. The claim made in Paragraphs 1-5 of the particulars makes repeated and unsupported claims that the Defendants` (to include the Second defendant) are liable to the Claimants for the sum advanced to the First Defendant. This is denied. Money was advanced to the First Defendant only.  The $1,200,000 (One Million Two Hundred Thousand US Dollars) was advanced by the Claimants to the First Defendant only and not to or for the benefit of the Second Defendant. No contract existed between the ~~claimant~~Claimants and the Second Defendant giving rise to ~~liability for breach thereof.~~a claim against the second Defendant.

    ii) Regarding the claim for unjust enrichment the Claimant ~~does not claim that the second enjoyed unjust enrichment, and such~~only makes this claim ~~would be unjust in itself, nor in~~

~~any event does~~against the First Defendant ~~make that head of claim against and~~ not the Second Defendant.

~~2.~~    iii) The defence of the Second Defendant is therefore predicated on the clear fact that there is no liability whatsoever under any of the Claimants` three heads of claim.

3.  ~~3.~~ The Second Defendant has no personal liability for this debt, and it is pleaded that nothing in the exhibits indicates that the Second Defendant is liable to ~~the contrary.~~ pay the sum advanced or any part of it to the Claimants. In fact, it ~~can be~~is argued that the exhibits confirm the ~~defence's~~defences position. At no time prior to this claim was there any discussion about a personal guarantee of the loan by the Second Defendant~~, no~~. Nor was any claim ~~was~~ made alleging liability ~~of the Second Defendant~~ for some other reason for repayment and further it is averred that the sole reason for this claim ~~is~~against the Second Defendant was the realisation by the ~~claimants~~Claimants that they would not receive repayment from the First Defendant following its winding ~~up as part of this claim.~~. Further still, no request for payment was made of the Second Defendant at any time until these proceedings were brought against the First Defendant.

4.  ~~—~~The allegation that the Second Defendant is liable for the sums claim is under CPR 16 (2) (a) is denied on the grounds that;

    a)  no evidence is provided to show money was advanced to any party other than the First Defendant.

    b)  no form of security or guarantee was requested of, or provided by, the Second Defendant.

    c)  In his capacity as CEO of First Defendant, Second Defendant was always acting solely on behalf of the First defendant under CPR 16 (2) (b).

    d)  No demand was made at any time by the Claimants, or those acting on their behalf, of the Second Defendant in a personal capacity nor was it suggested prior to the issue of these proceedings that the Claimants consider the Second defendant has any personal liability prior to the issue of these proceedings.

e) As stated later in Paragraph 28 David Cogut on behalf of the Claimant who was involved in these matters, clearly confirms in Exhibit 5 that the money claimed is money "***they lent to Tintra***".

For these reasons it is denied that the Second Defendant owes any money in the claim at all, and it is submitted that there is no evidence to the contrary. It is important to remember that at the time of the loan the First Defendant was a public company with a board comprised of eight directors and over 1000 shareholders. As such it would be most unusual for an individual director and minority shareholder to assume any personal liability.

## B. THE PARTIES

~~3.~~5. Second Defendant was appointed CEO of the First Defendant on 2nd July 2021.

~~4.~~ First Defendant was wound up by the High Court on June 5th 2024.

## C. FACTUAL MATRIX

### The relationship between the parties

~~5.~~6. The Second Defendant denies that the description of the relationship between the Parties appearing in Paragraph 6 is true or accurate. The Description of the relationship between the ~~parties~~Parties in this section of the Particulars of Claim greatly underestimates the level of daily correspondence and communication between them.

~~6.~~7. It is admitted that the Claimants became shareholders in March 2022. Between then and March 2024 the parties were in ~~at times~~ almost daily contact and on many occasions multiple times each day. There were numerous telephone conversations~~, occasions where~~ and many Whatsapp messages, numbered in the hundreds in a group chat ~~were dozens of messages per day on several topics~~, and e-mails passing between the parties or particularly two members of the Claimant family specifically the First Claimant and his son David Cogut with Second Defendant and less so but still materially others involved in or with First Defendant. This

correspondence and communication were between Second Defendant as CEO of First Defendant along with other members of the staff of First Defendant and the third-party technical staff ~~building technology.~~ of the First Defendant. Some of this was to assist the Claimants` business not only ~~with the~~ within First Defendant, but in other areas of business conducted by the Claimants to which First Defendant had no beneficial interest.

~~7.~~8. The business relationship was a deep and close one and involved First Defendant assisting the Claimants in other areas of business, this included several 100's of hours of time by various staff of the First Defendant, where it related to a number of other transactions, introductions and going as far as to be in direct communication to assist the business efforts of the Claimants with ~~bodies such as~~ the Green Climate Fund, the ~~United Nations and a number~~Government of ~~state and national~~Barbados, the Maharashtra State Government, various government ~~bodies along with~~ and non-government business development efforts related to capital raising for the Claimants primary business Pegasus Capital ~~Advisors'~~Advisors funds~~.~~. The relationship was layered and very collegial with ~~a large amount of~~ value added by the First Defendant which included works undertaken by the Second ~~Defendant~~Claimant acting as CEO of First Defendant.

~~8.~~9. ~~Maybe most~~Most importantly First Defendant and its associated technical staff were involved in the project known as the "Blue Green Bank" which was intended to use the technological developments in core banking owned and patented by the First Defendant including artificial intelligence to build a platform for use by the Green Climate Fund project in Barbados. The First Defendant also provided free of charge regulatory advice and many valuable regulatory documents were ~~produced also~~ drafted and provided free of charge ~~and provided to that project.~~

.

~~9.~~10.     The Claimants announced publicly that they were investors in the First Defendant, a project to enhance banking facilities to emerging economies using artificial intelligence,

thereby revolutionising the way business is done in those parts of the world.

10.11.     Unsurprisingly in the world of financial technology these developments take considerable investment, and it was on this basis that First Defendant agreed to an investment referred to in paragraph 9Paragraph 9 of the Particulars of Claim ("Particulars") from Fintech Lenders Fund ("FLF")

**The FLF investmentInvestment**

11.12.     The contents of Paragraph 6-8 of the particulars are not disputed. The information referred to was the subject of Regulatory News Service announcements due to the First Defendant being listed on the Alternative Investment Market ("AIM") of the London Stock Exchange at the time. Such information was placed in the public domain under the duty of disclosure required of a company. This investment was not a loan. It was in fact an equity investment into the First Defendant, providing $3.15m15M in the firstFirst instance.

12.13.     There were difficulties from the start with the arrangement with FLF and its parent Bergen Asset Management and after the initial tranche of $3.15million15M was received the parties very quickly entered litigation in April 2023.

13.14.     It was against this background that First Defendant sought to raise new funds from various sources.

14.15.     The content of Paragraph 9 of the Particulars is misleading.  Throughout this whole period the partiesClaimants and First Defendant, mostly through the Second Defendant but involving other staff members and consultants of First Defendant as well, were in daily contact on. On numerous occasions on athrough telephone and Whatsapp messaging about multiple matters concerning the Claimants business interests outside of Tintra; this is detailed

in Paragraphs 9-14 of this Defence above. This range of ~~progressive~~ subjects appeared to add with value ~~being added it appeared~~ in both directions to each side. The Claimants were in close sometimes daily contact with First Defendant and had access to the RNS system when the company was publicly quoted whereby all material statements ~~effecting~~affecting the business were published for the benefit of all shareholders, including the First Claimant, who owned less than 5% at any time in the First Defendant. The FLF position would be discussed not in one telephone call in April 2023 but in many hundreds of communications throughout 2023 and 2024. As can be seen from Paragraph 10 of the Particulars the FLF matter was thoroughly aired in the public domain.

**Correspondence and Communication ~~paragraphs~~Paragraphs 9-13 Particulars of Claim - A loan agreement for US$2.5 million.**

16  As no loan of US$2.5M was ever made it follows that no terms were ever agreed. It is admitted that throughout April and May 2023 discussions took place regarding a loan between the First Defendant and the Claimants. There was no agreement to pay interest rate of 12% or 8% per month. These claims are denied as false.

17  At Paragraph 15 there is exhibited an email from the Second defendant to DLA requesting confirmation from DLA that if a loan of US$2.5M was forthcoming they were to act in a certain way. In view of the close relationship that had developed Second Defendant then advised the Claimants by the e-mail that is exhibited. He states that these steps would be met, both personally and in his capacity as CEO of First Defendant. Bearing in mind that at the time the company was publicly listed with a board of eight directors and over 1000 shareholders, this language was clearly intended to infer best endeavours on his part as much as was possible to ensure the contents of the email were complied with due to the fact that whilst Second Defendant was CEO First Defendant he was only one director of a number and a minority shareholder. However, this point is moot regardless, as the loan was never forthcoming, and this exchange was not related to the later dealings between the parties.

18   At Paragraph 16 the further proposal for US$1.2M is detailed. The allegation by the Claimant that the same terms existed in relation to this as with the US$2.5M does not automatically follow and as such is denied. The intention was to be a loan to Tintra repayable quickly with a reasonable fee for the facility. In exhibit 5 to the Particulars David Cogut who is confirmed as central to this matter and the relationship between the parties on 1 November 2023 states *"Tintra will be paying back the 1.19mm or so they lent to Tintra".* There is no mention or calculation of interest or a fee indicating that this advance was not made on terms.

~~15.~~19   As can be seen there was frequent correspondence and communication. There are several Statements by the Claimants detailing the content of these communications, in particular telephone conversations. The contents expressed to be accurate are ~~disputed. There~~not accepted because there were many long calls and Whatsapp messages, often several per day on a broad range of topics and it ~~seems~~is impossible to single out, out of context, an accurate account or recollection of specific matters in the way it is presented in the Particulars of Claim. The relationship was not as described. The Particulars indicate there were very few conversations and they were all about funding. This is not correct.

~~16.~~20  ~~Throughout this time the technology team employed by First Defendant on~~There were many topics discussed both about First Defendant and about the business of the Claimants including funding for the Claimants business, technology and regulatory advice for a banking business the Claimants were building along with many other matters related to the Claimants business as well as the Tintra funding. For example, throughout this time the technology team employed by First Defendant were also assisting the Claimants business with their own banking project at no cost to the Claimants or its associated business. At the time of discussions regarding a facility the Claimants were therefore: -

   a)   in multiple daily contact with First Defendant. This contact was with Second Defendant, in capacity as CEO of First Defendant, mainly but other staff of First Defendant also.

   b)   It appears based on these communications that the Claimants had been an enthusiastic investor for over one year at this time.

c) The Claimants were introduced to other opportunities by First Defendant as described above on a no-fee basis as it was assumed that there was a quid pro quo relationship that had developed and was working well.

d) The Claimants were working with the First Defendant to develop software for their own banking project.

e) The Claimants confirmed in an announcement that they were investors in, and ~~enthusiastic~~perhaps even excited about, their involvement with the First Defendant. ~~See Exhibit.~~

The specific detailed conversations alleged in Paragraphs 9-17 did not take place in the way described. Many conversations did indeed take place and there would be mention of the FLF matter, Tintra's fund raising and related work between the Parties across several topics. The subject matter involving the need by First Defendant for funds to assist the FLF matter was discussed but claims of an agreed deal on terms which included usurious levels of interest are fanciful. The conversations Second Defendant did have were in his capacity as CEO and this is further confirmed as DLA only act for First Defendant and not Second Defendant; as the Claimant confirms in Paragraph 21 (b) below.

21 a) Unsurprisingly the First Defendant turned to the Claimant~~,~~ as existing major shareholders, as it did with other major shareholders, to assist solve the issues of the aggressive nature of ~~FLFand~~FLF and its parent Bergen Asset Management. The Initial discussions for a $2.~~5million loan~~5M bridge facility to the First Defendant were discontinued without a deal or terms agreed, when other major shareholders agreed to assist. It is admitted that these discussions had taken place initially with a view to the Claimants making a loan to the First defendant of US$2.5M. But it is denied that the Second Defendant was a party to these discussions personally other than as CEO on behalf of the First Defendant. Again, this was a public company and not a closely held private entity. The claim that the First Defendant somehow (and it is not specified how) incurred liability for any advanced funds is denied. There is no evidence produced by the Claimant to show otherwise. There were conversations and communications daily between the

<del>Parties which covered several topics by way of discussion and were of a non contractual nature. It is denied that, as is claimed in Paragraphs 9-13 or thereafter in Paragraphs 14-17 of the Particulars that there was ever any mention of the Second Defendant being in any way personally liable for a repayment. There is no evidence, as is required by CPR 16 (2)(b), that either a final agreement was settled for a loan of this sum and/or that such a loan</del> involved <del>shareholders agreed to assist</del>the Second Defendant.

<del>17.</del>    b) Further in relation to the possible loan of $2.5M it is admitted that, as stated in Paragraph 13, DLA Solicitors spoke with the First Claimant about a loan but as also admitted by the First Claimant *" inter alia confirmed to the First Claimant that Tintra his client, needed to borrow funds……"*.There is no mention of, and it is denied that, any other party involved was involved. Indeed, the First Claimant admits this position in the words quoted above this to be the case at Paragraph 13 of the particulars.

c) It is clearly stated by DLA that they were acting for First Defendant but there is no indication by DLA that terms were agreed involving an interest rate. It is denied that the e-mail entries involving DLA detailed at Paragraphs 14 and 15 are relevant or can be taken to indicate, as the Claimant alleges, that terms were agreed for the larger loan and subsequently transferred on the same terms to the smaller advance of US$1.2M to First Defendant.

d) It is denied that the Second Defendant had any personal involvement in the negotiations surrounding the abortive proposal to advance US$2.5M other than in the capacity of CEO of the First Defendant and the Claimants are put to strict proof of their allegations which they have not yet provided.

<del>18.</del>22 Some weeks later, a new verbal agreement with was entered into between the Claimants and the First Defendant for $1.<del>2million</del>2M advanced by the Claimants in two tranches of $600,000. <del>Under the</del>The terms <del>agreed there was</del>discussed for the original loan were no longer part of this

new loan to ~~be a facility fee of 12% of~~ the ~~total sum but no First defendant, please~~ see Paragraph 21 above. No monthly interest rate was agreed~~.~~ ~~because repayment was expected quickly.~~ However, by way of a charge Tintra discussed a facility fee of 12%. ~~It is~~ denied that this was an interest payment or that a succeeding interest of 8% would become payable on any sum outstanding. At the time of agreement, it was intended that the monies would flow back quickly, so no material communication was entered into on monthly fees as neither the Claimant nor the First Defendant thought it would be necessary. ~~As an observation, and without prejudice to this defence, it~~It is ~~not accepted~~denied that there ~~could be an~~was any agreement for First Defendant to include an interest rate of 8% per month~~, such an amount~~ if time did continue which would in ~~and of~~ itself represent a ~~compounded interest of circa~~fee more than 200% per annum. Such a sum would amount at best to a penalty rate and possibly would have rendered the whole agreement void. We draw your attention to Ahuja Investments Ltd v Victory gaming Ltd &Anor [2021] EWHC 2382 (ch) & Cavendish Square Holding BV v Makdessi [20150UKSC 67 and Parking Eye Ltd v Beavis [2015] UKSC67~~.~~

~~19.~~23  The Second Defendant did not make any representations at any time before during or after the loan was made that ~~the Second Defendant had given a~~he would have any personal ~~guarantee~~responsibility in this matter. Although discussions would absolutely have taken place informally about the range of ongoing possible ~~remedies/~~investments/loans/advances/equity ~~placements~~raising that may be ~~become~~ available~~.~~ in the future. The loan was verbally agreed ~~and~~, unsecured and made to the First Defendant alone and it is clear there was no third-party involvement in respect of personal guarantees and no evidence to support this.

~~16~~24   It is admitted that $1.~~2million~~2M was transferred to the First Defendant or its Solicitor as described in ~~Section E~~ Paragraph 18 and again this confirms the position that this is a matter between the Claimant and the First Defendant.

**Breach of contract**

~~20.~~25 It is admitted that the First Defendant did not repay the loan. It is denied that the Second Defendant has any liability to the Claimant as a guarantor ~~whether that be formally or informally~~, this is simply not borne out by the facts or the exhibits. It is denied that any parties other than the Claimant and the First Defendant entered into ~~any contract~~an agreement for this funding.

**Correspondence and Exhibits**

~~21.~~26 Paragraph 20 refers to the series of 8 e-mails provided as exhibits to the claim.

~~22.~~27 It is denied that these show that any liability falls on the Second Defendant. In the subject matter and content of these e-mails there is no mention ~~or~~of any suggestion that the Second Defendant holds any liability personally in respect of repayment of the loan. ~~In fact there~~There is no correspondence at all; as might be expected if there was any merit in the claim; against the Second Defendant~~, r~~ that due to default by First Defendant, asking the Second Defendant ~~must now perform.~~ to pay. Indeed, it is argued that the exhibits prove conclusively that the liability for repayment rests with the First Defendant alone. In the entirety of the pleadings and attached exhibits there is no indication that the Second Defendant is acting in any capacity other than as CEO of the First Defendant and there is no evidence to support the contention that the corporate veil has been pierced.

Where a subject matter is mentioned in the exhibits the only subject matter is stated to be "Tintra". The First Defendant is the only legal entity to which the Claimants have looked for repayment before this claim and there is no evidence they are entitled by law to look elsewhere for payment.

~~23.~~28 In ~~of~~ Paragraph 20 (7) ~~and~~& (8) the Second Defendant confirmed that "it is …. the intention to repay~~……~~…your client" by reference to a "bridge loan" thus confirming the First Defendant

was ~~in the process of attempting to secure funds from third parties~~seeking to meet its ~~obligations~~liability there is no mention of the Second Defendant.

~~24.~~29 At Paragraph 21 of the Particulars, ~~the Claimant states~~it is averred that "notwithstanding the Defendants have admitted their liability". There has been no admission ~~of liability~~whatsoever by the Second Defendant of liability, on the contrary, the evidence it is submitted ~~points~~goes to exactly the opposite conclusion that the Second Defendant has no liability.

~~25.~~30 There is no demand for payment made to the Second Defendant in any of the exhibits. In fact, the exhibits state ~~that~~ the loan was to the First ~~Defendant only and that repayment was to be made by the First Defendant.~~defendant. I refer to e-mail from David Cogut of November 1 2023 at Exhibit 5 stating *"Enareta Can you please send wiring instructions ~~……….~~…Richard`s company Tintra will be paying back 1.19m or so **they ~~(the Claimant)~~ lent to Tintra".* ~~This clearly confirms the First Defendant~~Confirming Tintra as ~~the~~ payee and Tintra and that ~~the Claimant~~they looked to ~~First Defendant~~Tintra for repayment.

On April 8th ~~2024 First Defendant~~8 RS stated *"so to that end we have engaged a funding partner to provide a bridge to settle this."* Again, there is no mention of liability ~~or guarantee~~ of ~~Second Defendant~~RS personally only a need for ~~First Defendant~~Tintra to secure third party funds to settle.

~~17~~31 No claim for repayment whatsoever was made of the Second Defendant, nor liability alleged against the Second Defendant before this claim. It would seem unusual, at best, for a filed claim to be the first time a debtor hears about its ~~liability. The Second Defendant has not been asked to repay the loan at any time prior to this filing. One reasonable inference which may be drawn from this failure to make a simple demand for repayment prior to litigation is that the Claimants themselves doubted the validity of; and evidential support for; their claim against the Second Defendant~~alleged liability. It is clear that this decision to assert the claim against the Second Defendant was taken only when faced with the insolvency and/or liquidation of the actual

debtor, ~~being~~ the First Defendant. However, no evidence is produced or pleaded which shows that any liability attaches to the Second Defendant to repay this loan on behalf of the First Defendant

**The Claimants claim**

32  Accordingly for all the reasons above the Second defendant denies liability as follows: -

**Paragraph 1 of the Particulars**: It is denied that the Second Defendant entered into a loan agreement with the claimant or is otherwise liable under an agreement between the Claimant and the First Defendant.

**Paragraph 6-8 of the Particulars** are admitted.

**Paragraph 9-13** It is admitted that conversations took place involving the Second Defendant in capacity as CEO of the First Defendant and DLA Solicitors as Solicitor of the First Defendant regarding the need for the First Defendant to secure funds.

**Paragraph 13-16** It is admitted that discussions took place regarding an advance by the Second Defendant of US$ 2.5M. It is denied that this agreement was ever completed as these funds were not advanced. It is agreed that a fee would be paid if the loan of US$ 2.5M was made amounting to 12%. No interest was negotiated additionally. The agreement was not completed.

**Paragraph 18** is admitted. A total of US$1.2M was advanced to Tintra.

**Paragraph 19** asserts that neither First Defendant nor Second Defendant paid the principal sum. However, there was no obligation upon Second Defendant to do so as there was no liability in this matter falling to Second Defendant.

**Paragraph 20** contains requests made of the First Defendant but no mention of any claim against or liability of the Second Defendant. As stated above in Paragraph 20 (3) Exhibit 5 shows the Claimants stating clearly "the money they lent to Tintra" with no other comment.

**The Claimants Claim**

26.33  The Claimant makes its claim under three alternative heads, those being one of simple debt, damages for breach of contract and unjust enrichment.

27.34  The Second Defendantdefendant has no liability for payment of any sum of principal or interest to the Claimants regardless of the fact that the claim for excessive interest rate of 12% and then 8% per month would arguably rendersrender the agreement void. in any event.

28.35  Damages for breach of contract: The Second Defendant was never a party to any agreement or contract and cannot therefore be liable for damages.

29.36  Unjust enrichment: The Claimants do not make out a claim under this headinghead against the Second Defendant which in any event is denied and there is no suggestion the Second Defendant received any enrichment from these funds whatsoeveras without any evidential support.

**AND THE SECOND DEFENDANT DENIES LIABILITY FOR:- : -**

1) Repayment of the sum claimed of US$-1,200,000 as a debt or any part thereof

2) alternatively Alternatively, damages for breach of contract

3) Any involvement in, orAlternatively, liability for, the claim for unjust enrichment

4) Any interest

And the Second Defendant claims:

5) Further, or other relief, as the Court determines

6) Costs

                                                                                    J M Botros

                                                                                    20 June 2024

**STATEMENT OF TRUTH**

**I understand that proceedings for contempt of court may be brought against a person who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth**

**The Second Defendant** believes that the facts stated in this amended Defence and the statement of truth on the Part 7 Defence Pack and any sheets attached thereto are true.

**I am authorised** by the Second defendant to sign this statement of Truth.

Signed                                                                                  Dated  8th July 2024

*J M Botros*

J M Botros

Direct Access Counsel Authorised to conduct Litigation