UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
FINTECH LEADERS FUND, LLC,

              Plaintiff,

       -v-

CRAIG MYLES COGUT, DEBORAH
CHARLOTTE COGUT, DAVID HAROLD
COGUT, and PEGASUS CAPITAL
ADVISORS, LP,

              Defendants.
```

25-cv-2555 (JSR)

OPINION & ORDER

JED S. RAKOFF, U.S.D.J.:

Plaintiff Fintech Leaders Fund, LLC ("Fintech") brings this action against Pegasus Capital Advisors, LP ("Pegasus"), an investment advising firm, two of its principals, Craig Myles Cogut and his son David Harold Cogut (collectively, "the Coguts"), and Craig Cogut's wife, Deborah Charlotte Cogut.[1] Plaintiff alleges that defendants engaged in a wide-ranging scheme whereby they fraudulently held out a U.K. company, Tintra plc ("Tintra"), as an AI-driven banking technology company in order to fraudulently obtain various financial benefits and opportunities. Plaintiff alleges that it was induced by these and other misrepresentations to make a $3 million loan to Tintra, at least $2 million of which was lost.

---

[1] The allegations in the complaint pertaining to Deborah Cogut appear principally to be limited to her joint ownership of certain bank accounts from which funds were paid to plaintiff. See Amended Compl. ¶ 55, 498. Because the Court dismisses the complaint, it need not address whether she is properly named as a defendant.

1

On July 28, 2025, plaintiff filed an amended complaint alleging seventeen causes of action, including two substantive civil RICO claims in violation of 18 U.S.C. § 1962(c), a civil RICO conspiracy in violation of 18 U.S.C. § 1962(d), and numerous state-law claims.

On August 8, 2025, defendants moved to dismiss the amended complaint for failure to state a claim. See ECF No. 51. By bottom-line Order dated September 10, 2025, the Court granted the motion to dismiss. See ECF No. 57. The Court now sets forth the reasons for that dismissal and enters final judgment.

## I.     Background[2]

Plaintiff's action arises from defendants' alleged use of fraud, bribery, and corruption as part of a scheme to secure funds and others financial opportunities at plaintiff's and other victim's expense. See generally Amended Compl., ECF No. 48. Plaintiff alleges that it was a victim of this scheme because, inter alia, it was fraudulently induced by defendants' misrepresentations to make a loan of $3 million dollars to Tintra, the majority of which was never repaid. Id. ¶¶ 980-81.

Plaintiff alleges that defendants, together with Tintra's CEO, Richard Shearer ("Shearer"), conspired to falsely represent Tintra as a banking technology company despite its being, at all relevant times, "an empty shell with no meaningful operations." Id. ¶¶ 7-9, 15, 29-

_____

[2] The Court draws the factual background from the amended complaint, accepting as true all "well-pleaded factual allegations," as it must on a motion to dismiss. Lynch v. City of New York, 952 F.3d 67, 74-75 (2d Cir. 2020).

2

32. These misrepresentations were made as part of a wider-ranging RICO conspiracy that defrauded not only plaintiff, but also a variety of other victims, including the United Nations-affiliated Green Climate Fund ("GCF"), the government of Barbados, the United States Agency for International Development (USAID), the International Monetary Fund, the Rockefeller Foundation, and the Inter-American Development Bank. Id. ¶ 10.

Plaintiff's civil RICO claims, alleged across nearly 300 pages of the amended complaint, largely reduce to a set of interrelated schemes, that, plaintiff alleges, defendants carried out through one or both of two RICO enterprises: (1) the Tintra Enterprise, which consists of Tintra, a legal U.K. entity, and (2) the Cogut-BGB Enterprise, an "association-in-fact" enterprise, made up of the defendants, Tintra, Shearer (Tintra's CEO), and a variety of other individuals and entities affiliated either with Tintra or with defendant Pegasus. Id. ¶ 11. Plaintiff alleges that, between late 2021 and mid-2024, defendants conducted the business of these enterprises through a pattern of racketeering activity in furtherance of the following schemes:

***The Cogut SPAC Fraud.*** In March 2021, Craig Cogut launched a Special Purpose Acquisition Company ("SPAC"), which, as part of its commitment to investors, had 18 months to acquire a company meeting certain requirements; if it failed to do so, it had to return its investors' funds. Id. ¶ 5, 117. According to plaintiff, in order to satisfy this goal, Craig, Shearer (who was a close personal friend of

the Coguts), and several other non-parties, devised a plan "to deceptively reposition Tintra's image . . . as a banking technology company" in order to fraudulently increase its market valuation and to allow it to be acquired by Craig's SPAC. Id. ¶¶ 7, 13. By satisfying the SPAC's commitment to its investors, the Coguts would benefit financially, even if Tintra, in fact, remained worthless. Id. ¶¶ 5, 14.

Plaintiff alleges that this marketing scheme was fraudulent because "[a]t all relevant times, Tintra had no material underlying business and possessed no substantive technologies or products" and "never had, never developed, nor had the ability to develop, the technology or the products that it promoted in public statements beginning in the fall of 2021." Id. ¶ 119.

Plaintiff's own interaction with the alleged RICO scheme began in late 2022. At that point, Tintra's valuation still was not high enough to be acquired by Craig's SPAC, but Tintra needed financing to continue operations. Id. ¶¶ 21, 405. In October 2022, Shearer, Tintra's CEO, met with plaintiff to discuss plaintiff making a loan to Tintra. Id. ¶ 411. To pitch plaintiff on lending to Tintra, Shearer represented that Tintra was building an AI platform to make banking transactions in developing countries easier. Id. ¶ 412. Shearer also sent a presentation to plaintiff describing Tintra's plans. Id. ¶ 414. Plaintiff alleges that these representations were all false and/or misleading, as were various public announcements put out by Tintra

4

over the same time period, on which plaintiff alleges it reasonably relied. Id. ¶¶ 413-14, 423, 426-30.

By the end of December 2022, not knowing that these representations about Tintra's capabilities were false, plaintiff agreed to loan Tintra $3 million. In return, plaintiff was afforded various rights, including the right to convert any outstanding loan amounts into Tintra shares (the "Conversion Right"). Id. ¶¶ 23, 424, 431. Although the loan was negotiated between plaintiff and Tintra, plaintiff alleges that the Coguts knew of the loan negotiations, that Shearer sought their sign-off on the loan, and that they ultimately approved Tintra's entry into the agreement. Id. ¶¶ 437, 442-44.

Within several weeks, plaintiff sought to exercise its Conversion Right for part of the $3 million loan balance, but Tintra refused to honor that commitment. Id. ¶¶ 25, 453-57. Plaintiff alleges that Tintra did so at the Coguts direction. In plaintiff's telling, the Coguts did not want plaintiff to become a Tintra shareholder and believed that any share issuance would have hindered the acquisition of Tintra by Craig Cogut's SPAC. Id. ¶¶ 457-66.

Following this alleged breach of the loan agreement, plaintiff engaged in settlement negotiations with Tintra throughout the early months of 2023. Plaintiff alleges that, in the course of those negotiations, the Coguts "directed and/or caused" Tintra to make various settlement proposals, and that, at the Coguts' direction, Tintra provided plaintiff with false bank statements to convince plaintiff of its ability to repay the outstanding loan balance. Id.

¶¶ 472, 477, 486-88. Relying on this fraudulent proof of funds, plaintiff waived its Conversion Right. Id. ¶¶ 478, 493.

Then, on April 12, 2023, Tintra sent plaintiff a partial payment from an account associated with the Coguts. Id. ¶ 498. No further payments were made, but on July 4, 2023, after requesting various additional proof of funds, plaintiff agreed to a "Settlement Deed" that extended Tintra's deadline to repay the remainder of the balance. Id. ¶¶ 586-89. Two further extensions were negotiated through an "Extension Agreement" and an "Amendment Deed." Id. ¶¶ 596, 608, 613. Throughout this period, plaintiff alleges that Tintra made various false representations regarding its intent and ability to pay the balance due. See, e.g., id. ¶¶ 595, 599-600, 605.

Those deadlines, too, passed without payment. Id. ¶ 617. Accordingly, in January 2024, plaintiff filed a winding up petition against Tintra in the United Kingdom, seeking to place Tintra in the English version of bankruptcy. Id. ¶ 347. The winding up petition was granted on June 5, 2024. Id. ¶ 351. Plaintiff also filed a lawsuit against Tintra's directors in the U.K. in January 2024. Id. ¶ 872. Plaintiff did not sue any of the defendants here in that action; nor are any of the defendants in that action sued here.[3]

---

[3] In May 2024, the Coguts also filed suit in the U.K. against Tintra and Shearer based on the alleged failure of Tintra to repay a loan that the Coguts had provided to it. Amended Compl. ¶ 852; see also id., Ex. 9 ("U.K. Complaint"). Relying on the complaint in that action, plaintiff alleges that the Coguts extended that loan to Tintra as part of a scheme to deceive plaintiff into believing that Tintra had the funds to repay the Fintech loan. Id. ¶ 520-23, 854.

*The SEC Scheme.* In March 2023, as the relationship between plaintiff and Tintra soured, plaintiff alleges that the Coguts devised a new scheme in response to plaintiff's unwelcome attempts to recover the unpaid loan balance. The plan, proposed by David Cogut, was to "concoct[] false allegations" against plaintiff of improper trading, to file them with the SEC, and to thereby trigger a costly SEC investigation of plaintiff. Id. ¶¶ 27, 543-85. Based in part on a series of WhatsApp messages between David Cogut and Shearer, plaintiff alleges that the Coguts urged Shearer to come up with false allegations, and that the Coguts or their U.S. lawyer "submitted the same or similar false allegations to the SEC." Id. ¶ 543-441, 561.

In June 2023, the SEC commenced an unscheduled examination of plaintiff's manager, which concluded in a no-findings letter, but nonetheless resulted in substantial costs to plaintiff. Id. ¶¶ 28, 583-84. Plaintiff alleges that this scheme, which coincided with its attempts to recover its loan from Tintra, was intended to "deter [it] from pursuing claims against Tintra, force [it] into an unfavorable settlement with Tintra, and put [it] and affiliated entities out of business." Id. ¶ 27.

*The Other Victims Fraud.* Over the same time period as the "Cogut SPAC Fraud," plaintiff alleges that defendants put their fraudulent portrayal of Tintra's capabilities to another use. Specifically, plaintiff alleges that defendants devised a plan for Pegasus, the investment advising firm in which Craig and David Cogut are principals, to become the manager of a proposed public-private ESG-focused bank,

7

the Barbados Blue Green Bank ("Barbados BGB"). The Barbados BGB was to be capitalized in part by USAID and various intergovernmental organizations. Id. ¶ 13.

In order to secure this opportunity with the Barbados BGB, plaintiff alleges that the Coguts promoted their and Pegasus's relationship with Tintra and Tintra's ability to provide AI banking technology for the Barbados BGB (again, despite Tintra having no such capabilities). Id. ¶¶ 8-9; see also id. ¶¶ 156-284) (describing defendants' scheme to obtain control of, and funding for, the Barbados BGB).

On January 18, 2023, Pegasus was awarded a $5 million contract by USAID to establish the technological and operational infrastructure necessary for the Barbados BGB, id. ¶ 19, and on July 13, 2023, Pegasus was approved by the Green Climate Fund as the manager of the Barbados BGB project, id. ¶ 263. The Barbados BGB project continues at present. Id. ¶ 874.

*Miscellaneous Other Schemes.* In addition to the schemes detailed above, plaintiff alleges that defendants engaged in a variety of other schemes, all related to Tintra, which it terms, variously, the Takeover-Going Private Scheme, the GCF Bribery Scheme, and the Corrupt Practices Scheme. These include allegations that defendants, along with Tintra, Shearer, and several other associated parties, (a) devised and promoted a "sham takeover" of Tintra, as well as a "sham tender offer" for Tintra's shares, as part of an attempt to "cover up their wrongdoing and Tintra's true state of affairs," id.

8

¶¶ 318, 336-37; (b) engaged in conduct that amounted to bribery of officials affiliated with the Green Climate Fund, id. ¶ 32; and (c) used Tintra to complete a variety of "improper transactions with third parties," such as by creating sham jobs for the son of the Rwandan president and the stepson of a UK minister, id. ¶¶ 359-97.

On March 27, 2025, plaintiff filed an initial complaint against defendants, setting forth most of the factual allegations just described and alleging, inter alia, a civil RICO violation based on predicate acts of wire fraud, money laundering, bribery, and violations of the Travel Act. On July 1, 2025, the Court granted defendants' motion to dismiss for failure to state a claim. The dismissal was without prejudice to plaintiff promptly filing an amended complaint, which plaintiff did on July 28, 2025.

The amended complaint substantially restated the allegations in the initial complaint, added additional factual allegations, a second, association-in-fact RICO enterprise, and, in connection with the so-called "SEC Scheme," an additional RICO predicate in the form of witness tampering.

Defendants promptly renewed their motion to dismiss, arguing that the amended complaint suffers from the same defects as the initial complaint and that it still fails to state a civil RICO claim.

## II. <u>Legal Standard</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S.

662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). In the context of civil RICO claims, allegations of predicate acts of fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). See <u>First Capital Asset Mgmt., Inc. v. Satinwood, Inc.</u>, 385 F.3d 159, 178 (2d Cir. 2004).

## III. <u>Discussion</u>

Defendants argue that the complaint should be dismissed because plaintiff fails to plead a cognizable RICO claim that adequately alleges (i) a RICO injury, (ii) continuity, and (iii) control of the RICO enterprise. Defendants argue that dismissal of plaintiff's RICO claims necessitates dismissal of the complaint as a whole. Because the Court agrees that the amended complaint fails to allege the continuity required to make out a pattern of racketeering activity, the Court need not address the other defects alleged.

### A. <u>Substantive RICO</u>

To state a claim for damages under RICO, a civil plaintiff must allege "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." <u>DeFalco v. Bernas</u>, 244 F.3d 286, 305 (2d Cir. 2001) (quoting <u>Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp.</u>, 101 F.3d 900, 904 (2d Cir.1996)). In this case, plaintiff alleges that defendants violated 18 U.S.C. § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To prove a violation of Section 1962(c), a plaintiff must demonstrate that "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) . . . participate[d] in (6) an 'enterprise' (7) the activities of which affect[ed] interstate or foreign commerce.'" Moss v. Morgan Stanley Inc., 719 F.2d 5, 17 (2d Cir. 1983) (quoting 18 U.S.C. § 1962(a)-(c) (1976)), cert. denied Moss v. Newman, 465 U.S. 1025 (1984).

Plaintiff alleges two substantive racketeering counts, each based on one of two alternative RICO enterprises: (1) the Tintra Enterprise and (2) the association-in-fact Cogut-BGB Enterprise. Amended Compl. ¶ 11. Plaintiff alleges the same predicate acts for both RICO counts, namely: (i) wire fraud in violation of 18 U.S.C. § 1343; (ii) money laundering in violation of 18 U.S.C. § 1343; (iii) commercial bribery in violation of New York Penal Law § 180.03; (iv) violations of the Travel Act, 18 U.S.C. § 1952; and (v) witness tampering in violation of 18 U.S.C. § 1512(b).

Defendants urge the Court to dismiss the RICO counts on several grounds: First, defendants contend, the complaint does not plead an injury to business or property caused by the alleged racketeering activity. Second, the complaint fails to adequately plead a pattern of racketeering activity. And third, the complaint fails to allege

11

that defendants conducted the affairs of the alleged RICO enterprises. The Court need only address the second of these contentions.

To demonstrate a "pattern of racketeering activity," a civil RICO plaintiff must allege at least two qualifying predicate acts that are related and either "amount to or pose a threat of continuing criminal activity." Cofacrèdit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999) (emphasis omitted) (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989)); see also 18 U.S.C. § 1961(1) (listing predicate acts). "[I]solated acts of racketeering activity" do not constitute a pattern." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n.14 (1985).

The latter of these requirements -- the so-called "'continuity' requirement" -- is a "temporal concept" and concerns whether the alleged racketeering activity has, or threatens to, persist over time. H.J. Inc., 492 U.S. at 241. It can be met by proof of either "close-ended" or "open-ended" continuity. Spool v. World Child Intern. Adoption Agency, 520 F.3d 178, 183 (2d Cir. 2008). The amended complaint fails to demonstrate either form.

*Close-Ended Continuity.* "To satisfy close-ended continuity, [a] plaintiff must prove 'a series of related predicates extending over a substantial period of time.'" Cofacrèdit, 187 F.3d at 242 (quoting H.J. Inc., 492 U.S. at 242). Although neither the Second Circuit nor the Supreme Court has set a "bright-line requirement" for the length of time over which the predicate acts must extend, the Second Circuit has emphasized that "it will be rare" that a period of less than two

12

years will demonstrate close-ended continuity. Spool, 520 F.3d at 184; see also Satinwood, Inc., 385 F.3d at 181 (2d Cir. 2004) ("[T]his Court has never found a closed-ended pattern where the predicate acts spanned fewer than two years."); Cofacrèdit, 187 F.3d at 242 (same); GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 468 (2d Cir. 1995) (although "somewhat mechanistic," requiring a two-year duration "effectuate[s] Congress's intent to target 'long-term criminal conduct'"). Additionally, the relevant time period for assessing continuity is "the time during which the RICO predicate activity occurred, not the time during which the underlying scheme operated." Spool, 520 F.3d at 184.

Plaintiff does not plead a series of related predicate acts extending for a period of longer than two years and therefore has not demonstrated close-ended continuity. Although the complaint, at times, describes the "relevant period" as extending from "about the fall of 2021 . . . [to] no earlier than June 2024," it does not adequately allege predicate acts that span this period. See Amended Compl. ¶ 882; see also id. ¶ 895 (alleging that "each RICO Defendant conducted or participated . . . in the conduct of the RICO Enterprise through a pattern of racketeering activity" "[d]uring the Relevant Period").

Defendants argue that the earliest predicate act alleged in the complaint -- an allegation of wire fraud -- is alleged to have taken place no earlier than March 17, 2022.[4] See id. ¶ 904 ("By March 17,

---

[4] Under the heightened pleading standard applicable to allegations of fraud under Rule 9(b), a complaint must state "the contents of the

2022, each RICO Defendant caused the transmission of at least one wire in furtherance of the [alleged fraudulent schemes].”). In response, plaintiff argues that the complaint “identifies many instances of wires used, from October 2021, in furtherance of the scheme.” Pl.’s Mem. of Law in Opp. to Defs.’ MTD the Corrected Amended Compl. at 26, ECF No. 54 (“Pl.’s Mem.”). However, the portions of the complaint that plaintiff points to in support of this contention do not allege wire fraud. Rather, the statements identified -- all public announcements concerning Tintra published by the Tintra Board of Directors -- were alleged to have been published “to online publications via the [London Stock Exchange].” Amended Compl. ¶¶ 179 n.10, 182. The complaint does not allege transmission over a United States wire, as is necessary to state a claim for wire fraud. See Bascuñán v. Elsaca, 927 F.3d 108, 122 (2d Cir. 2019).

Additionally, plaintiff does not allege that any of the allegedly false statements that it identifies as having been made prior to March 2022 were made or transmitted by the defendants. See Satinwood, 385 F.3d at 180 (“In analyzing the issue of continuity . . . we evaluate the RICO allegations with respect to each defendant individually.”). And, in light of the complaint’s other allegations,

---

[allegedly fraudulent] communications, who was involved, . . . where and when they took place, and . . . why they were fraudulent.” Sullivan v. UBS AG, 149 F.4th 206, 221 (2d Cir. 2025) (quoting Spool, 520 F.3d at 185). Many of the allegations in the amended complaint arguably lack the specificity necessary to meet this standard. However, the Court need not parse plaintiff’s individual allegations, as, taken together, they still do not demonstrate continuity.

the conclusory assertion that "unless otherwise stated," all of Tintra's announcements "were caused to be made by [the defendants]," is not plausible for the period prior to March 2022. Amended Compl. ¶ 180.

Indeed, none of the evidence that plaintiff points to as detailing defendants' "extensive conduct and direction of the affairs of Tintra" pertains to 2021. See Pl.'s Mem. at 26. Plaintiff's allegations regarding defendants' control over Tintra rest largely on a document filed by Shearer in a separate proceeding brought by the Coguts against him and against Tintra in U.K. court. See Amended Defence of Second Defendant, Ex. 14, ECF No. 48 ("Shearer Defense"). But the factual allegations contained in that document are relevant only to the period after March 2022 when the Coguts became shareholders in Tintra. See id. ¶ 7. Accordingly, the complaint contains no factual allegations to support the contention that defendants "caused to be made" any allegedly false statements in the period before March 2022.

Similarly, the complaint does not allege any predicate acts that occurred in 2024. Although it canvasses various conduct and communications allegedly undertaken by the defendants in the early months of 2024, nowhere does it plead conduct constituting a RICO predicate. For example, plaintiff points in its opposition to various factual allegations that it contends demonstrate that the Coguts "deceitfully continued to hold Tintra out as a bona fide technology business well into 2024." Pl.'s Mem. at 27. The portions of the complaint that plaintiff identifies, however, contain unremarkable and

15

unelaborated allegations about Shearer and Craig Cogut's business dealings with various entities, such as the United Nations Development Programme (UNDP) and the World Bank, none of which on their face constitute wire fraud or any other predicate act. See, e.g., Amended Compl. ¶ 830 ("On January 24, 2024, Craig met with Shearer in Dubai and prepared together for a meeting with a sovereign fund for the following day."); id. ¶ 833 ("On January 24, 2024, the Coguts and Shearer posed for photographs in formal attire together.").

Accordingly, given that the relevant time period for measuring continuity is the time during which the predicate acts occurred rather than "the time during which the underlying scheme operated," Spool, 520 F.3d at 184, plaintiff's failure to adequately plead predicate acts that occurred, at the very least, earlier than March 2022 or later than fall 2023, defeats its claim of close-ended continuity, see id. at 185 (concluding that "a period of no more than sixteen months" is "insufficient . . . to demonstrate close-ended continuity under this Court's precedents" (quoting DeFalco v. Bernas, 244 F.3d 286, 322 (2d Cir. 2001))). This is particularly so where, as here, the alleged scheme centers on a relatively straightforward investor fraud, involves only a few individual actors, and identifies only one victim who has come forward. See id. at 184 (noting that a finding of close-ended continuity based on a less than two-year period would be especially inappropriate where the activity only involved a "handful of participants" and did not involve a "complex, multi-faceted conspiracy").

16

*Open-Ended Continuity.* The amended complaint also does not demonstrate open-ended continuity. A plaintiff can demonstrate open-ended continuity even if the predicate acts alleged do not extend over a substantial period of time, as long as the plaintiff can "show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." Cofacrèdit, 187 F.3d at 243. Open-ended continuity is "generally presumed when the enterprise's business is primarily or inherently unlawful." Spool, 520 F.3d at 185. However, no such presumption applies when the enterprise "primarily conducts a legitimate business." Id. (quoting Cofacrèdit, 187 F.3d at 243). In the latter case, open-ended continuity must be shown by evidence that "the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." Cofacrèdit, 187 F.3d at 243.

Plaintiff does not appear to contend that the facts alleged in the complaint demonstrate open-ended continuity with respect to the Tintra Enterprise, nor could it, as Tintra was placed into liquidation by a U.K. court in June 2024 and, accordingly, ceased to exist. See Amended Compl. ¶ 351; see also id. ¶ 880 (alleging that Tintra was a RICO enterprise "[a]t all times between about the fall of 2021 and at least June 2024").

As to the association-in-fact Cogut-BGB Enterprise, which involves identical allegations and parties as the Tintra Enterprise, see id. ¶ 983, the complaint also does not demonstrate open-ended

17

continuity. Unlike crimes such as murder, drug trafficking, or similarly "inherently unlawful" acts, Grace Int'l Assembly of God v. Festa, 797 F. App'x 603, 606 (2d Cir. 2019), allegations of fraud do not by their nature "impl[y] a threat of continued criminal activity," Cofacrèdit, 187 F.3d at 243; see also, e.g., Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp., 667 F. Supp. 3d 83, 136 (S.D.N.Y. 2023) ("[F]raud does not fall within the 'inherently unlawful' category of predicate acts so as to imply a threat of continued criminal activity.").

Nor does the complaint adequately allege that the predicate racketeering acts were the "regular way" by which defendants conducted their business. Cofacrèdit, 187 F.3d at 243; see also World Westling Ent., Inc. v. Jakks Pacific, Inc., 530 F. Supp. 3d 486, 515-16 (S.D.N.Y. 2007) ("Where the collective business and other entities that comprise [an association-in-fact] enterprise 'primarily conduct [] a legitimate business,' there has to be some allegation that the predicate acts reflected 'the regular way of operating that business.'" (quoting Cofacrèdit, 187 F.3d at 243)). Although the complaint asserts that the purpose of the Cogut-BGB Enterprise was to carry out certain fraudulent schemes, it does not allege that the entities and individuals that made up that enterprise regularly conduct their business via racketeering. Indeed, to the contrary, the complaint identifies the members of the Cogut-BGB Enterprise as individuals and entities engaged in otherwise legitimate business. See Amended Compl. ¶¶ 41-55; see also World Wrestling Ent., 530 F. Supp. 3d at 516

18

(explaining that an allegation that "the principal goal of [the association-in-fact] was to procure [certain benefits] through fraud and corruption . . . is not the same as saying that [the defendants] and the other components of the alleged enterprise normally did business via racketeering"). Accordingly, the mere fact that defendants continue to transact business does not suffice to establish an ongoing threat of criminal activity.[5]

Because the failure to demonstrate continuity is fatal to plaintiff's substantive civil RICO claim, the Court need not address the remaining grounds defendants press for dismissal. It may be that plaintiff has a claim for garden-variety fraud, but, plaintiff has not shown, notwithstanding its 300-paged complaint, that the conduct it complains of amounts to the sort of pervasive unlawful conduct to which the civil RICO statute is directed.

---

[5] To the extent that the amended complaint treats the Cogut-BGB Enterprise as essentially interchangeable with the Tintra Enterprise, Amended Compl. ¶ 11 n.1, it also is not clear that it makes sense to treat the Cogut-BGB Enterprise as outlasting Tintra, given the centrality of Tintra to the fraudulent scheme for which the Cogut-BGB Enterprise was allegedly formed. Although the amended complaint alleges that, in January 2024, an entity named LRB renamed itself "Tintra AI" so that defendants could "continue their Scheme," id. ¶ 18, 45, the amended complaint does not allege that this entity has any relation to Tintra or that it was involved in any acts of racketeering activity. Thus, given that Tintra was in liquidation by June 2024 and that the Coguts were by that time suing Shearer and Tintra in U.K. court, see id., Ex. 9, it is doubtful that the Cogut-BGB Enterprise, as pleaded, operated after June 2024 as "a continuing unit . . . with a common purpose." Boyle v. United States, 556 U.S. 938, 948 (2009).

19

## B. RICO Conspiracy

Plaintiff's failure to state a claim for a substantive RICO violation "is fatal to [its] RICO conspiracy claim under § 1962(d)." D. Penguin Bros. v. City Nat. Bank, 587 F. App'x 663, 669 (2d Cir. 2014). Plaintiff relies on the same pattern of racketeering activity to underlie its conspiracy claim as it does to support its substantive RICO claim. See Amended Compl. ¶ 1014 (alleging that the pattern of racketeering activity underlying the conspiracy "is alleged in the [substantive RICO claim]"). And a RICO conspiracy claim must fail if the substantive claims themselves are deficient. See Black Radio Network, Inc. v. NYNEX Corp., 44 F. Supp. 2d 565, 581 (S.D.N.Y. 1999).

## C. State-Law Claims

Plaintiff's only remaining claims are state-law causes of action. See Amended Compl. ¶¶ 1022-1220. Because plaintiff asserts only federal question jurisdiction, in the absence of any remaining federal-law claims, the state-law claims are best left to a state court to decide. See Royal Canin U. S. A., Inc. v. Wullschleger, 604 U.S. 22, 31-32 (2025) (explaining that a district court "may (and indeed, ordinarily should) kick the case to state court" where the district court "has dismissed all claims over which it has original jurisdiction" (quoting 28 U.S.C. § 1367(c))); Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine -- judicial economy, convenience, fairness, and comity -- will

20

point toward declining to exercise jurisdiction over the remaining state-law claims.").

## IV.    Conclusion

For the foregoing reasons, the Court granted defendants' motion to dismiss the amended complaint.

The Clerk of Court is respectfully directed to enter final judgment in favor of defendants.

SO ORDERED.

New York, NY
December 29, 2025

JED S. RAKOFF, U.S.D.J.

21